## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| NICK PEARSON, FRANCISCO PADILLA, CECILIA LINARES, AUGUSTINA BLANCO, ABEL GONZALEZ, and RICHARD JENNINGS, On Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> NBTY, INC., a Delaware corporation; and REXALL SUNDOWN, INC., a Florida corporation; and TARGET CORPORATION, a Minnesota Corporation, <br><br> Defendants. | Case No.:    11 CV 07972 <br><br> <u>CLASS ACTION</u> <br><br> **Judge James B. Zagel** |

### SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Nick Pearson, Francisco Padilla, Cecilia Linares, Augustina Blanco, Abel Gonzalez and Richard Jennings ("Plaintiffs"), by and through their attorneys, bring this action on behalf of themselves and all others similarly situated against Defendants NBTY, Inc. ("NBTY"); Rexall Sundown, Inc. ("Rexall"); and Target Corporation ("Target") (collectively, "Defendants"), and allege as follows:

### NATURE OF ACTION

1.     Defendants NBTY, Rexall, or their affiliates (collectively "Rexall") manufacture, distribute, market, and sell joint health dietary supplements containing glucosamine under the following brands: Osteo Bi-Flex, Flex-a-min, American Health, Good N Natural, Knox, MET-Rx, Nature's Bounty, Natural Wealth, Physiologics, Rexall, Sundown, Sundown Naturals, Solgar, and Vitamin World (collectively, "Rexall Products"). In addition,

Rexall manufactures joint health dietary supplements containing glucosamine sold under brand names of companies not affiliated with Rexall, including but not limited to Target Corporation's Up & Up Triple Strength Glucosamine Chondroitin plus MSM and certain of Costco's Kirkland Glucosamine products (collectively, "Private Label Products"). (The Rexall Products and the Private Label Products are collectively referred to herein as the "Covered Products." The Covered Products are identified by name, date, and location of sale in Exhibit A hereto.)

2.      Each of the Covered Products bear the ingredient name glucosamine in bold, large letters, prominently on the front of each label. The primary purported active ingredient in each of the Covered Products is glucosamine. The front of the packages/labels for the Covered Products makes joint health representations – including, generally, that the Covered Products help rebuild cartilage or support renewal of cartilage,[1] help maintain the structural integrity of joints,[2] maintain healthy connective tissue,[3] lubricate joints and maintain joint comfort,[4] or support mobility and flexibility[5] (collectively referred to as the "joint health benefit representations.) Some of the Covered Product labels also claim to provide improvements in joint comfort within seven days.[6] Defendants prominently displayed these joint health benefit representations on the front of each of the Covered Product packages/labels, where consumers cannot miss the representations.

3.      Defendants primarily market these Covered Products to, and they are purchased primarily by, persons suffering from osteoarthritis. Persons who experience joint ailments and persons who seek to prevent joint ailments also purchase these Covered Products.

4.      However, limitations accompany these taglines such that the take-away is that

---

[1] *See, e.g.,* Up & Up Triple Strength Glucosamine Chondroitin with MSM, certain Osteo Bi-Flex labels.
[2] *See, e.g.,* Up & Up Triple Strength Glucosamine Chondroitin with MSM.
[3] *See, e.g.,* certain Osteo Bi-Flex labels, Kirkland Glucosamine Chondroitin.
[4] *See, e.g.,* certain Osteo Bi-Flex and certain Flex-a-min labels.
[5] *See, e.g.,* certain Osteo Bi-Flex labels, Up & Up Triple Strength Glucosamine Chondroitin with MSM.
[6] *See, e.g.,* certain Osteo Bi-Flex and certain Flex-a-min labels.

the Covered Products will provide these specific joint related benefits for all joints in the human body, for adults of all ages and for all manner and stages of joint related ailments.

5.    In truth, the Covered Products do not rebuild, renew, or maintain cartilage, lubricate joints or improve joint mobility or flexibility, and they do not provide joint comfort in as little as 7 days.   Clinical cause and effect studies have found that the primary active ingredient in the Covered Products, glucosamine, is ineffective, taken alone or in combination with the second primary active ingredient in the Covered Products – chondroitin - or any of the other ingredients in the Covered Products, with regard to the purported joint health benefits represented on the Covered Products' packaging and labeling.   As a study sponsored by the National Institute of Health ("NIH") concluded:   "The analysis of the primary outcome measure did not show that either [glucosamine or chondroitin], alone or in combination, was efficacious. . . ."   Clegg, D., et al., Glucosamine, Chondroitin Sulfate, and the Two in Combination for Painful Knee Osteoarthritis, 354 New England J. of Med. 795, 806 (2006) ("2006 GAIT Study").   As a result, in addition to affirmatively misrepresenting the joint health benefits of their Covered Products, the failure of Defendants to disclose the facts regarding these studies also constitutes deception by omission or concealment.   Thus, Defendants' joint health benefit representations and omissions are false, misleading and reasonably likely to deceive the public.

6.    Despite the deceptive nature of Defendants' representations, Defendants conveyed and continue to convey their uniform joint health benefit representations at the point of purchase on the front of their Covered Products' packages and labeling. The only reason that any consumer would purchase the Covered Products is to obtain joint health benefits, which the Covered Products do not provide.

7.    As a result of Defendants' deceptive representations, consumers - including Plaintiffs and other members of the proposed Class - have purchased a Covered Product that does not have the benefits advertised.

8.    Plaintiffs bring this action on behalf of themselves and all other similarly situated

consumers in the United States, who purchased a Covered Product, to (1) halt the dissemination of these false and misleading representations, (2) correct the false and misleading perception it has created in the minds of consumers, and (3) obtain redress for those who have purchased the Covered Products. Plaintiffs allege violations of the Illinois Consumer Fraud Act, 815 Ill. Comp. Stat. 502/1, *et seq.*, California's Business and Professions Code § 17200 *et. seq.* and Civil Code § 1750 *et. seq.*, Massachusetts General Laws ch. 93A, *et. seq.*, and similar laws of the other Class States.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members and many members of the Class are citizens of a state different from Defendants.

10.     This Court has personal jurisdiction over Defendants because Defendants are authorized to do and do conduct business in Illinois. Defendants have marketed, promoted, distributed, and/or sold the Covered Products in Illinois, and Defendants have sufficient minimum contacts with this State and/or sufficiently avail themselves of the markets in this State through their promotion, sales, and/or marketing within this State to render the exercise of jurisdiction by this Court permissible.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiffs Nick Pearson, and Francisco Padilla's claims occurred while they resided in this judicial district. Venue is also proper under 18 U.S.C. § 1965(a) because Defendants transact substantial business in this District.

## PARTIES

12.     Plaintiff Nick Pearson resides in Cook County, Illinois. In or around June 2011, Plaintiff Pearson was exposed to and saw Defendant Target's joint health benefit representations by reading the package/label of Target's Up & Up Triple Strength Glucosamine Chondroitin plus MSM product at a Target store in Chicago, Illinois. After reading the label,

Plaintiff Pearson purchased the Up & Up Triple Strength Glucosamine Chondroitin plus MSM product to relieve his joint pain and in so doing relied on every single one of the product's joint health benefit representations. The Up & Up Triple Strength Glucosamine Chondroitin plus MSM product that Plaintiff purchased and took as directed did not have the joint health benefits as represented. As a result, Plaintiff Pearson suffered injury in fact and lost money.

13. Plaintiff Cecilia Linares resides in Imperial, California. Towards the end of 2010, Plaintiff Linares was exposed to and saw Costco's representations by reading the package/label of Costco's Kirkland Glucosamine Chondroitin product at a Costco store in El Centro, California. After reading the label, Plaintiff Linares purchased the Kirkland Glucosamine Chondroitin product to relieve her joint pain and in so doing relied on every single one of the product's joint health benefit representations. The Kirkland Glucosamine Chondroitin product that Plaintiff Linares purchased and took as directed did not have the joint health benefits as represented. As a result, Plaintiff Linares suffered injury in fact and lost money.

14. Plaintiff Abel Gonzalez resides in Canyon Lake, California. On or around January 2012, Plaintiff Gonzalez was exposed to and saw Costco's representations by reading the package/label of Costco's Kirkland Glucosamine with MSM label at a Costco store in Lake Elsinore, California. After reading the label, Plaintiff Gonzalez purchased the Kirkland Glucosamine with MSM product to improve the joint function and reduce the joint pain in his shoulders and in so doing relied on every single one of the product's joint health benefit representations. The Kirkland Glucosamine with MSM product that Plaintiff Gonzalez purchased and took as directed did not have the joint health benefits as represented. As a result, Plaintiff Gonzalez suffered injury in fact and lost money.

15. Plaintiff Francisco Padilla resides in Cook County, Illinois. In late 2010, Plaintiff Padilla was exposed to and saw Defendant Rexall's representations by reading the package/label of the Osteo Bi-Flex Triple Strength product at a Walgreens store in Chicago, Illinois. After reading the label, Plaintiff Padilla purchased the Osteo Bi-Flex Triple Strength product and relied on every single one of Defendant Rexall's joint health benefit

representations.  The Osteo Bi-Flex Triple Strength product Plaintiff Padilla purchased and took as directed did not have the joint health benefits as represented.  As a result, Plaintiff Padilla suffered injury in fact and lost money.

16.     In or around March 2011, Plaintiff Francisco Padilla was exposed to and saw Defendant Rexall's representations by reading the package/label of the Flex-a-min Triple Strength with Hyaluronic Acid product at a Costco store in Chicago, Illinois.  After reading the label, Plaintiff Padilla purchased the Flex-a-min Triple Strength with Hyaluronic Acid product and relied on every single one of the product's joint health benefit representations. The Flex-a-min Triple Strength with Hyaluronic Acid product Plaintiff Padilla purchased and took as directed did not have the joint health benefits as represented.  As a result, Plaintiff Padilla suffered injury in fact and lost money.

17.     Plaintiff Augustina Blanco resides in Moreno Valley, California.  In or around February 2012, Plaintiff Blanco was exposed to and saw CVS Pharmacy's representations by reading the label of the CVS Triple Strength Glucosamine Chondroitin with MSM product at a CVS store in Moreno Valley, California. In reliance on the joint health benefit representations on the front of the label, Plaintiff purchased the CVS Triple Strength Glucosamine Chondroitin with MSM product.  The CVS Triple Strength Glucosamine Chondroitin with MSM product Plaintiff Blanco purchased and took as directed did not have the joint health benefits as represented.  As a result, Plaintiff Blanco suffered injury in fact and lost money.

18.     Plaintiff Richard Jennings resides in Oak Bluffs, Massachusetts.  Beginning in approximately 1997, and continuing throughout the Class Period, Plaintiff Jennings was exposed to and saw Defendant Rexall's representations by reading the label of the Osteo Bi-Flex products he purchased.  He purchased Osteo Bi-Flex on a monthly basis, and consumed it on a daily basis.  Most of the Osteo Bi-Flex he purchased was Osteo Bi-Flex Triple Strength. He purchased most of the Osteo Bi-Flex products from Wal-Mart or BJ's Wholesale Club.  In reliance on the joint health benefit representations on the packaging and marketing materials,

Plaintiff Jennings purchased the Osteo Bi-Flex products. The Osteo Bi-Flex products Plaintiff Jennings purchased and took as directed did not have the joint health benefits as represented. As a result, Plaintiff Jennings suffered injury in fact and lost money.

19.     Defendant NBTY, Inc. ("NBTY") is a corporation organized and existing under the laws of the state of Delaware. NBTY's headquarters is at 2100 Smithtown Ave., Ronkonkoma, New York 11779.

20.     Defendant Rexall Sundown, Inc. ("Rexall") is a corporation organized and existing under the laws of the state of Florida. Defendant Rexall's headquarters is at 2100 Smithtown Ave., Ronkonkoma, New York 11779.

21.     Defendants NBTY and Rexall have manufactured, advertised, marketed, distributed, or sold the Covered Products to tens of thousands of consumers nationwide, including in Illinois.

22.     Defendant Target Corporation is incorporated under the laws of the state of Minnesota. Defendant's corporate headquarters is located at 1000 Nicollet Mall, Minneapolis, Minnesota 55403. Defendant Target markets and sells the Up & Up Glucosamine Product distributed by Defendants NBTY and Rexall to tens of thousands of consumers nationwide, including in Illinois.

## FACTUAL ALLEGATIONS

### The Covered Products

23.     Throughout the Class Period, Defendants have manufactured, distributed, marketed, or sold the Covered Products.

24.     The Covered Products are sold online and in virtually every major food, drug, and mass retail outlet store in Illinois and throughout the United States, including, but not limited to: Wal-Mart, Costco Wholesale, Sam's Club, Rite-Aid, Target, and Walgreens. The Covered Products are available in a variety of tablet count bottles (*e.g.*, 30, 75, 80, 90, 120, 150,

200), retailing for approximately $5-50 (depending upon tablet count). The following are exemplar screen shots of some of the Covered Products:



25.     Since each of the Products' launches, Defendants have consistently conveyed the message to consumers throughout Illinois and the United States that the Products help to rebuild, renew or maintain cartilage, and improve joint mobility and flexibility, lubricate joints and maintain joint comfort simply by taking the recommended number of tablets each day. Some of the Products also claim to provide improvement in joint comfort within 7 days. They do not. Defendants' joint health benefit representations and omissions are false, misleading and deceptive.

26.     The primary active ingredient in all of the Covered Products is glucosamine. The scientific evidence is that glucosamine, taken alone or in combination with chondroitin sulfate, does not provide the joint health benefits represented by Defendants.

27.     The second primary active ingredient in some of Defendants' Products is chondroitin sulfate (*e.g.*, Up & Up Triple Strength Glucosamine Chondroitin plus MSM, Osteo Bi-Flex Regular Strength, Kirkland Glucosamine Chondroitin). The scientific evidence is that

chondroitin sulfate, alone or in combination with glucosamine, does not provide the joint health benefits represented by Defendants.

28.     In addition to these two primary active ingredients that Defendants prominently promote as being the primary active ingredients that provide the purported joint health benefits, some of the Covered Products also contain methylsulfonylmethane ("MSM") (*e.g.*, Up & Up Triple Strength Glucosamine Chondroitin plus MSM, Kirkland Glucosamine with MSM, Osteo Bi-Flex Triple Strength).  MSM is also not effective in providing the joint health benefits represented by Defendants, but in any event the focus of this action is on the uniform false and deceptive representations and omissions that Defendants make about glucosamine and chondroitin on the package labeling of each of their Glucosamine Products.

29.     Some of the Covered Products also contain other ingredients such as Hyaluronic Acid (*e.g.*, Up & Up Triple Strength Glucosamine Chondroitin plus MSM), and *Boswellia Serrata* ("AKBA" or "Aflapin") (*e.g.*, Up & Up Triple Strength Glucosamine Chondroitin plus MSM, Osteo Bi-Flex One Per Day, certain Flex-a-min products).  These minor ingredients are also not effective in providing the joint health benefits represented by Defendants, but in any event the focus of this action is on the uniform false and deceptive representations and omissions that Defendants make about glucosamine on the package labeling of each of the Covered Products.

30.     Even though numerous clinical studies have found that the two primary ingredients in the Covered Products, glucosamine and chondroitin, alone or in combination, are ineffective, Defendants continue to represent on the Covered Products' packaging and labeling that they provide the joint health benefits for adults of all ages, without any limitation on which joints or what joint related ailments the Covered Products provide these joint health benefits. For example, exemplar front and side panels of the Osteo Bi-Flex Regular Strength and the Up & Up  Glucosamine Chondroitin plus MSM product labels appear or have appeared in the past as follows:






*Scientific Studies Confirm That The Covered Products Are Not Effective.*

31.     Independent studies published at least as early as 2004, have found that glucosamine and chondroitin, alone or in combination, are not effective in providing the represented joint health benefits.[7]

32.     For example, a 2004 study by McAlindon et al., entitled Effectiveness of Glucosamine For Symptoms of Knee Osteoarthritis: Results From an Internet-Based Randomized Double-Blind Controlled Trial, 117(9) Am. J. Med. 649-9 (Nov. 2004), concluded that glucosamine was no more effective than placebo in treating the symptoms of knee osteoarthritis – in short, it was ineffective.

33.     Also as early as 2004, studies confirmed there is a significant "placebo" effect with respect to glucosamine consumption.  A 2004 study by Cibere et al, entitled Randomized, Double-Blind, Placebo-Controlled Glucosamine Discontinuation Trial In Knee Osteoarthritis, 51(5) Arthritis Care & Research 738-45 (Oct. 15, 2004), studied users of glucosamine who claimed to have experienced at least moderate improvement after starting glucosamine.  These patients were divided into two groups – one that continued using glucosamine and one that was given a placebo.  For six months, the primary outcome observed was the proportion of disease flares in the glucosamine and placebo groups.  A secondary outcome was the time to disease flare.  The study results reflected that there were no differences in either the primary or secondary outcomes for glucosamine and placebo.  The authors concluded that the study provided no evidence of symptomatic benefit from continued use of glucosamine – in other words, any prior perceived benefits were due to the placebo effect and not glucosamine.

34.     In the 2006 Glucosamine Arthritis Intervention Trial ("GAIT") Study, the study authors rigorously evaluated the effectiveness of glucosamine hydrochloride and chondroitin,

---

[7] Many of these studies focus on patients with osteoarthritis and osteoarthritis of the knee, because the vast majority of purchasers of the Covered Products buy these products for relief of the symptoms of osteoarthritis and osteoarthritis of the knee, the most common arthritic conditions.  Moreover, studies involving patients with osteoarthritis and patients with osteoarthritis of the knee are deemed, by experts in the field, to be a proxy for whether these products provide any of the represented joint health benefits, regardless of whether or not a consumer may have osteoarthritis.

alone and in combination, on osteoarthritis for six months. According to the study's authors, "The analysis of the primary outcome measure did not show that either supplement, alone or in combination, was efficacious. . ." 2006 GAIT Study at 806.[8] Subsequent GAIT studies in 2008 and 2010 reported that glucosamine and chondroitin did not rebuild cartilage[9] and were otherwise ineffective – even in patients with moderate to severe knee pain for which the 2006 reported results were inconclusive. *See* Sawitzke, A.D., et al., The Effect of Glucosamine and/or Chondroitin Sulfate on the Progression of Knee Osteoarthritis: A GAIT Report, 58(10) J. Arthritis Rheum. 3183–91 (Oct. 2008); Sawitzke, A.D., Clinical Efficacy And Safety Of Glucosamine, Chondroitin Sulphate, Their Combination, Celecoxib Or Placebo Taken To Treat Osteoarthritis Of The Knee: 2-Year Results From GAIT, 69(8) Ann Rhem. Dis. 1459-64 (Aug. 2010).

35. The GAIT studies are consistent with the reported results of prior and subsequent studies. For example, the National Collaborating Centre for Chronic Conditions ("NCCCC") reported "the evidence to support the efficacy of glucosamine hydrochloride as a symptom modifier is poor" and the "evidence for efficacy of chondroitin was less convincing." NCCCC, Osteoarthritis National Clinical Guideline for Care and Management of Adults, Royal College of Physicians, London 2008. Consistent with its lack of efficacy findings, the NCCCC Guideline does not recommend the use of glucosamine or chondroitin for treating osteoarthritis. *Id.* at 33.

36. A study by Rozendaal et al., entitled Effect of Glucosamine Sulfate on Hip Osteoarthritis, 148 Ann. of Intern. Med. 268-77 (2008), assessing the effectiveness of glucosamine on the symptoms and structural progression of hip osteoarthritis during 2 years of

---

[8] The 2006 Gait Study was funded by the National Center for Complementary & Alternative Medicine and the National Institute of Arthritis and Musculoskeletal and Skin Diseases, two components of NIH.
[9] To a similar effect a study by Kwok, et al., entitled The Joints On Glucosamine (JOG) Study: A Randomized, Double-Blind, Placebo-Controlled Trial To Assess The Structural Benefit Of Glucosamine In Knee Osteoarthritis Based On 3T MRI, 60 Arthritis Rheum 725 (2009) concluded that glucosamine was not effective in preventing the worsening of cartilage damage.

treatment, concluded that glucosamine was no better than placebo in reducing symptoms and progression of hip osteoarthritis.

37.     In March 2009, Harvard Medical School published a study conclusively proving that the ingestion of glucosamine could not affect the growth of cartilage. The study took note of prior studies, which "cast considerable doubt" upon the value of glucosamine. The authors went on to conduct an independent study of subjects ingesting 1500 mg of glucosamine, and proved that only trace amounts of glucosamine entered the human serum, far below any amount that could possibly affect cartilage. Moreover, even those trace amounts were present only for a few hours after ingestion. The authors noted that a 1986 study had found no glucosamine in human plasma after ingestion of four times the usual 1500 mg of glucosamine chloride or sulphate. Silbert, Dietary Glucosamine Under Question, Glycobiology 19(6):564-567 (2009).

38.     In April 2009, the Journal of Orthopaedic Surgery published an article entitled, "Review Article: Glucosamine." The article's authors concluded that, based on their literature review, there was "little or no evidence" to suggest that glucosamine was superior to a placebo even in slowing down cartilage deterioration, much less rebuilding it. Kirkham, et al., Review Article: Glucosamine, Journal of Orthopaedic Surgery, 17(1): 72-6 (2009).

39.     A 2010 meta-analysis by Wandel et al. entitled Effects of Glucosamine, Chondroitin, Or Placebo In Patients With Osteoarthritis Of Hip Or Knee: Network Meta-Analysis, BMJ 341:c4675 (2010), examined prior studies involving glucosamine and chondroitin, alone or in combination, and whether they relieved the symptoms or progression of arthritis of the knee or hip. The study authors reported that glucosamine and chondroitin, alone or in combination, did not reduce joint pain or have an impact on the narrowing of joint space: "Our findings indicate that glucosamine, chondroitin, and their combination do not result in a relevant reduction of joint pain nor affect joint space narrowing compared with placebo." *Id.* at 8. The authors went as far to say, "We believe it unlikely that future trials will show a clinically relevant benefit of any of the evaluated preparations." *Id.*

40.     In July 7, 2010, Wilkens *et al.*, reported that there was no difference between

- 13 -

placebo and glucosamine for the treatment of low back pain and lumbar osteoarthritis and that neither glucosamine nor placebo were effective in reducing pain related disability. The researchers also stated that, "Based on our results, it seems unwise to recommend glucosamine to all patients" with low back pain and lumbar osteoarthritis. Wilkens *et al.*, Effect of Glucosamine on Pain-Related Disability in Patients With Chronic Low Back Pain and Degenerative Lumbar Osteoarthritis, 304(1) JAMA 45-52 (July 7, 2010).

41. In 2011, Miller and Clegg, after surveying the clinical study history of glucosamine and chondroitin reported that, "The cost-effectiveness of these dietary supplements alone or in combination in the treatment of OA has not been demonstrated in North America." Miller, K. and Clegg, D., Glucosamine and Chondroitin Sulfate, Rheum. Dis. Clin. N. Am. 37 103-118 (2011).

42. Scientific studies also confirm that the other ingredients in the Covered Products are ineffective. For example, some of the Covered Products also contain methylsulfonylmethane ("MSM"), an organic sulfur compound found in fruits, corn, tomatoes, tea, coffee, and milk. Clinical cause and effect studies have found no causative link between MSM supplementation and joint renewal, rejuvenation, or joint comfort. *See, e.g.*, S. Brien, *et. al.*, Systematic Review of the Nutritional Supplements (DMSO) and methylsulfonylmethane (MSM) in the treatment of osteoarthritis (Apr. 17, 2008) (concluding that there is no "definitive evidence that MSM is superior to placebo in the treatment of mild to moderate OA of the knee").

43. Some of the Covered Products also contain hyaluronic acid, a component of synovial fluid found in the fluids of the eyes and joints. Clinical cause and effect studies have found that there is no causative link between hyaluronic acid supplementation, and joint renewal or rejuvenation, or joint comfort.

44. Some of the Covered Products also contain an extract of *Boswellia Serrata* the Defendants claim leads to improvement in joint comfort within 7 days. *Boswellia Serrata* supplementation does not provide joint renewal or rejuvenation and clinical evidence has shown that Boswellia Serrata in the amounts contained in the Covered Products cannot provide joint

comfort.

45.     Some of the Covered Products also contain other ingredients such as vitamin D, vitamin C, manganese, boron and collagen.  Clinical cause and effect studies have found that no causative link between these ingredients and joint renewal or rejuvenation or joint comfort.

**The impact of Defendants' wrongful conduct**

46.     Despite the existence of numerous clinical studies that found the ingredients in the Covered Products to be ineffective for the joint health benefits that they represent on the Covered Products' package/labels, Defendants continue to unequivocally claim that their Covered Products are effective and provide these joint health benefits without limitation and thus for adults of all ages and for all manner and stages of joint related ailments.  As the manufacturer and/or distributor of the Covered Products, Defendants possess specialized knowledge regarding the content and effects of the ingredients contained in the Covered Products and are in a superior position to learn of the effects—and have learned of the effects, or lack thereof— the Covered Products have on consumers.

47.     Specifically, from at least 1997, Defendants knew, but failed to disclose, that the Covered Products do not provide the joint health benefits represented and that well-conducted, clinical studies have found the ingredients in the Covered Products to be ineffective in providing the represented joint health benefits.  Plaintiffs and Class members have been and will continue to be deceived or misled by Defendants' deceptive joint health benefit representations.  Plaintiffs purchased and consumed at least one of the Covered Products during the Class period and in doing so, read and considered the Covered Product's label and marketing materials and based their decision to purchase the Covered Product on the joint health benefit representations on the Covered Product packaging and marketing materials.  Defendants' joint health benefit representations and omissions were a material factor in influencing Plaintiffs' decision to purchase and consume the Covered Products.

48.     The only purpose behind purchasing one of the Covered Products is to obtain some or all of the represented joint health benefits.  There is no other reason for Plaintiffs and

the Class to have purchased the Covered Products and Plaintiffs and the Class would not have purchased the Covered Products had they known Defendants' joint health benefit statements were false and misleading and that clinical cause and effect studies have found the ingredients to be ineffective for the represented joint health benefits.

49.    Plaintiffs and the Class members have been injured in fact in their purchases of these Covered Products in that they were deceived into purchasing Covered Products that do not perform for the only reason that they would have purchased these Covered Products – joint health benefits.  As a result, Plaintiffs and the Class members have suffered economic damage in their purchases of these Covered Products.

50.    Defendants, by contrast, reaped profits from their false marketing and sale of these Covered Products.

## CLASS ALLEGATIONS

51.    Plaintiffs bring this action on behalf of themselves and all other similarly situated Class members pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following Class:

### Nationwide Class Action

> All persons in the United States who, since January 1, 2005, purchased one or more of the Covered Products.

> Excluded from the Class are (i) Defendants; (ii) retailers of the Covered Products; (iii) the parents, subsidiaries, affiliates, officers, and directors of (i) and (ii); and, (iv) those who purchased the Covered Products for the purpose of resale.

52.    Members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable.  Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains many tens of thousands of members.  The precise number of Class members is unknown to Plaintiffs.

53.    Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members.  The common legal and

factual questions include, but are not limited to, the following:

- Whether the representations or omissions discussed herein that Defendants made about the Covered Products were or are misleading, or likely to deceive;

- Whether Plaintiffs and the Class members were deceived in some manner by Defendants' representations;

- Whether Defendants falsely represented that the Covered Products have benefits which they do not in fact have;

- Whether the alleged conduct constitutes violations of the laws asserted herein;

- Whether Plaintiffs and Class members have been injured and the proper measure of their losses as a result of those injuries;

- Whether Plaintiffs and Class members are entitled to an award of compensatory/actual damages; and

- Whether Plaintiffs and the Class are entitled to injunctive, declaratory or other equitable relief.

54.     Plaintiffs' claims are typical of the claims of the members of the Class because, *inter alia*, all Class members were injured through the uniform misconduct described above, including being subject to Defendants' deceptive joint health benefit representations, which accompanied the label or packaging of the Covered Products.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the Class.

55.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained counsel competent and experienced in both consumer protection and class litigation.

56.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The expense and burden of individual litigation would make it impracticable or impossible for proposed Class members to prosecute their claims individually. It would thus be virtually impossible for the members of the Class, on an individual basis, to

obtain effective redress for the wrongs done to them. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

57.     In the alternative, the Class also may be certified because Defendants have acted or refused to act on grounds generally applicable to the Class thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

58.     Plaintiffs seek preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent Defendants from engaging in the acts described, and requiring Defendants to provide full restitution to Plaintiffs and Class members. Unless a Class is certified, Defendants will retain monies received as a result of their conduct that were taken from Plaintiffs and Class members. Unless a Class-wide injunction is issued, Defendants will continue to commit the violations alleged, and the members of the Class and the general public will continue to be misled.

## COUNT I
### Violation of the Illinois Consumer Fraud Act, the California Business and Professions Code and California Civil Code, the Massachusetts Unfair Trade Practices Act And The Consumer Protection Laws of The 47 Other Class States And The District Of Columbia

59.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

60.     Plaintiffs bring this claim individually and on behalf of the Class.

61.     In Illinois, the "Consumer Fraud and Deceptive Business Practices Act" 815 Ill. Comp. Stat. 502/1, *et seq.* ("the Act"), like California's Business and Professions Code §17200

*et. seq.*, California's Civil Code § 1750 *et. seq.*, the Massachusetts Unfair Trade Practices Act, Mass. Gen. Laws. ch. 93A, *et seq.*, and the consumer fraud acts/protection laws of the 47 other states and the District of Columbia, prohibits deceptive acts and practices in the sale of such products as the Covered Products.

62.     Plaintiffs and the Class were injured by Defendants' deceptive misrepresentations, concealments and omissions and these misrepresentations, concealments and omissions were material and deceived Plaintiffs and the Class.

63.     Defendants do business in Illinois, California and Massachusetts, sell and distribute their Covered Products in Illinois, California and Massachusetts, and engaged in deceptive acts and practices in connection with the sale of their Covered Products in Illinois, California and Massachusetts, and elsewhere in the United States.

64.     The Covered Products purchased by Plaintiffs and the Class were "consumer items" as that term is defined under the Act.

65.     Defendants misrepresented and deceptively concealed, suppressed and/or omitted the material information known to Defendants as set forth above concerning their Covered Products which has caused damage and injury to Plaintiffs and the Class.

66.     Defendants' deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

67.     Defendants' deceptive acts proximately caused actual injury and damage to Plaintiffs and the Class.

68.     Defendants intended Plaintiffs and all Class members to rely on their representations regarding the joint health benefits of their Covered Products.

69.     The conduct of the Defendants constituted a consumer fraud under the Illinois Consumer Fraud Act, the California Business and Professions Code, and the Massachusetts Unfair Trade Practices Act, and the consumer fraud acts/protection laws of the other 47 states and the District of Columbia.

**WHEREFORE**, Plaintiffs and the Class pray as follows:

a.   That the Court enter an order certifying this action as a nationwide class action;

b.   That the Court enter an Order against Defendants awarding to Plaintiffs and the Class compensatory/actual damages;

c.   That the Court enter an order granting declaratory and injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein;

d.   Attorneys' fees, expert fees and costs; and

e.   Such other and further relief as the Court deems just and proper.


DATED: April 22, 2013

By:   /s/Stewart M. Weltman
STEWART M. WELTMAN, LLC
53 W. Jackson, Suite 364
Chicago, Illinois 60604
Telephone:  312-588-5033
(Of Counsel: Levin Fishbein Sedran & Berman)

Of Counsel:
Elaine A. Ryan
Patricia N. Syverson
Lindsey M. Gomez-Gray
BONNETT, FAIRBOURN, FRIEDMAN &
BALINT, P.C.
2325 E. Camelback Rd., Suite 300
Phoenix, Arizona 85016
Telephone: 602-274-1100

Attorneys for Plaintiffs Nick Pearson, Francisco
Padilla, Cecilia Linares, Augustina Blanco, and
Abel Gonzalez


Peter N. Freiberg (pro hac vice pending)
Jeffrey I. Carton  (pro hac vice pending)
James R. Denlea  (pro hac vice pending)
DENLEA & CARTON LLP
One North Broadway, Suite 509
White Plains, New York 10601

Telephone:    (914) 920-7400

Attorneys for Plaintiff Richard Jennings

<u>CERTIFICATE OF SERVICE</u>

      The undersigned hereby certifies that on this 22nd day of April, 2013, a copy of the foregoing Second Amended Class Action Complaint was filed with the Clerk of Court using the CMM/ECF system which will send notification of such filing to the following:

          Kara L. McCall
          Shelby K. Feuerbach
          **SIDLEY AUSTIN LLP**
          One South Dearborn Street
          Chicago, IL 60603
          Tel: (312) 853-7000
          Fax: (312) 853-7036

          *Counsel for Defendant Target Corporation*

          <u>s/Stewart M. Weltman</u>