# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NICK PEARSON, FRANCISCO PADILLA,
CECILIA LINARES, AUGUSTINA BLANCO,
ABEL GONZALEZ, and RICHARD JENNINGS,
On Behalf of Themselves and All Others
Similarly Situated,

        Plaintiffs,

    vs.

NBTY, INC., a Delaware corporation; and
REXALL SUNDOWN, INC., a Florida
corporation; and TARGET CORPORATION, a
Minnesota Corporation,

        Defendants.

Case No.: 11 CV 07972

**Judge James B. Zagel**

## DEFENDANTS NBTY, INC.'S AND REXALL SUNDOWN, INC.'S ANSWER AND SEPARATE OR AFFIRMATIVE DEFENSES TO <u>PLAINTIFFS' SECOND AMENDED COMPLAINT</u>

Defendants NBTY, Inc. and Rexall Sundown, Inc. (collectively, "Defendants"), for their

Answer and Separate or Affirmative Defenses to Plaintiffs' Second Amended Complaint

("Complaint"), state as follows:

## NATURE OF ACTION

1.      Defendants NBTY, Rexall, or their affiliates (collectively "Rexall") manufacture, distribute, market, and sell joint health dietary supplements containing glucosamine under the following brands: Osteo Bi-Flex, Flex-a-min, American Health, Good N Natural, Knox, MET-Rx, Nature's Bounty, Natural Wealth, Physiologics, Rexall, Sundown, Sundown Naturals, Solgar, and Vitamin World (collectively, "Rexall Products").  In addition, Rexall manufactures joint health dietary supplements containing glucosamine sold under brand names of companies not affiliated with Rexall, including but not limited to Target Corporation's Up & Up Triple Strength Glucosamine Chondroitin plus MSM and certain of Costco's Kirkland Glucosamine products (collectively, "Private Label Products").  (The Rexall Products and the Private Label Products are collectively referred to herein as the "Covered Products." The Covered Products are identified by name, date, and location of sale in Exhibit A hereto.)

**ANSWER**:  Defendants admit that NBTY, Inc., Rexall Sundown, Inc., or their affiliates ("Rexall") manufacture, distribute, market, and sell the joint health dietary supplements referred to in Paragraph 1 as the "Rexall Products."  Defendants also admit that Rexall manufactures the joint health dietary supplements referred to in Paragraph 1 as the "Private Label Products." Defendants admit that the Complaint collectively refers to the "Rexall Products" and "Private Label Products" as the "Covered Products," and admit that they manufactured or sold the Covered Products during certain time periods and in certain geographic locations.  Defendants lack knowledge or information sufficient to form a belief as to whether the Covered Products are "identified by name, date, and location of sale in Exhibit A hereto" because no such exhibit was filed with the Complaint, and therefore deny the same.

2.      Each of the Covered Products bear the ingredient name glucosamine in bold, large letters, prominently on the front of each label. The primary purported active ingredient in each of the Covered Products is glucosamine. The front of the packages/labels for the Covered Products makes joint health representations – including, generally, that the Covered Products help rebuild cartilage or support renewal of cartilage, help maintain the structural integrity of joints, maintain healthy connective tissue, lubricate joints and maintain joint comfort, or support mobility and flexibility (collectively referred to as the "joint health benefit representations.) Some of the Covered Product labels also claim to provide improvements in joint comfort within seven days. Defendants prominently displayed these joint health benefit representations on the front of each of the Covered Product packages/labels, where consumers cannot miss the representations.

**ANSWER**:  Defendants admit that the Covered Products contain, among other

ingredients, glucosamine, and that the packages for the Covered Products typically identify the

ingredient "Glucosamine" on the front label.  Defendants also admit that some of the packages

for the Covered Products have, at certain times, contained the statements "helps rebuild

cartilage," "supports renewal of cartilage," "helps maintain the structural integrity of joints,"

"helps maintain healthy connective tissue," "helps lubricate joints and maintain joint comfort,"

and "supports mobility and flexibility," but Defendants otherwise deny Plaintiffs'

characterization of such statements.  Defendants deny any and all remaining allegations

contained in Paragraph 2 of the Complaint.

3.      Defendants primarily market these Covered Products to, and they are purchased primarily by, persons suffering from osteoarthritis. Persons who experience joint ailments and persons who seek to prevent joint ailments also purchase these Covered Products.

**ANSWER**:  Upon information and belief, Defendants are without knowledge as to why

consumers purchase the Covered Products, and Defendants deny that they market the Covered

Products to "persons suffering from osteoarthritis."  Defendants further state that the packages

and labels for the Covered Products state that the product is "not intended to diagnose, treat,

cure or prevent any disease."  Defendants deny any remaining allegations contained in

Paragraph 3 of the Complaint.

4.      However, limitations accompany these taglines such that the take-away is that the Covered Products will provide these specific joint related benefits for all joints in the human body, for adults of all ages and for all manner and stages of joint related ailments.

**ANSWER**:  The allegations of Paragraph 4 are vague and ambiguous and cannot be

answered as phrased.  Defendants, therefore, lack knowledge or information sufficient to form a

belief as to the truth of the allegations in this Paragraph and, therefore, deny the same.

5.      In truth, the Covered Products do not rebuild, renew, or maintain cartilage, lubricate joints or improve joint mobility or flexibility, and they do not provide joint comfort in as little as 7 days. Clinical cause and effect studies have found that the primary active ingredient in the Covered Products, glucosamine, is ineffective, taken alone or in combination with the second primary active ingredient in the Covered Products – chondroitin - or any of the other ingredients in the Covered Products, with regard to the purported joint health benefits represented on the Covered Products' packaging and labeling. As a study sponsored by the National Institute of Health ("NIH") concluded: "The analysis of the primary outcome measure did not show that either [glucosamine or chondroitin], alone or in combination, was efficacious. . . ." Clegg, D., et al., Glucosamine, Chondroitin Sulfate, and the Two in Combination for Painful Knee Osteoarthritis, 354 New England J. of Med. 795, 806 (2006) ("2006 GAIT Study"). As a result, in addition to affirmatively misrepresenting the joint health benefits of their Covered Products, the failure of Defendants to disclose the facts regarding these studies also constitutes deception by omission or concealment. Thus, Defendants' joint health benefit representations and omissions are false, misleading and reasonably likely to deceive the public.

**ANSWER**:  Defendants admit that Clegg, *et al.*, *Glucosamine, Chondroitin Sulfate, and*

*the Two in Combination for Painful Knee Osteoarthritis*, was published in NEW ENGLAND

JOURNAL OF MEDICINE in 2006.  Defendants deny that Plaintiffs' characterization of this study is

complete or accurate.  Defendants deny any and all remaining allegations contained in

Paragraph 5 of the Complaint.

6.      Despite the deceptive nature of Defendants' representations, Defendants conveyed and continue to convey their uniform joint health benefit representations at the point of purchase on the front of their Products' packages and labeling.  The only reason that any consumer would purchase the Covered Products is to obtain joint health benefits, which the Covered Products do not provide.

**ANSWER**:  Defendants deny the allegations contained in Paragraph 6 of the Complaint.

7.     As a result of Defendants' deceptive representations, consumers - including Plaintiffs and other members of the proposed Class - have purchased a Covered Product that does not have the benefits advertised.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to

Plaintiffs' alleged purchases or uses of the Covered Products, and therefore deny the same.

Defendants deny any and all remaining allegations contained in Paragraph 7 of the Complaint.

8.     Plaintiffs bring this action on behalf of themselves and all other similarly situated consumers in the United States, who purchased a Covered Product, to (1) halt the dissemination of these false and misleading representations, (2) correct the false and misleading perception it has created in the minds of consumers, and (3) obtain redress for those who have purchased the Covered Products. Plaintiffs allege violations of the Illinois Consumer Fraud Act, 815 Ill. Comp. Stat. 502/1, *et seq.*, California's Business and Professions Code § 17200 *et. seq.* and Civil Code § 1750 *et. seq.*, Massachusetts General Laws ch. 93A, *et. seq.*, and similar laws of the other Class States.

**ANSWER**:  Defendants admit that Plaintiffs purport to bring this action on behalf of

themselves and other similarly situated "consumers in the United States" for alleged violations

of the Illinois Consumer Fraud and Deceptive Business Practices Act, the California Business

and Professionals Code, § 17200, California Civil Code § 1750, and chapter 93A of

Massachusetts General Laws, but deny that Plaintiffs are entitled to any relief, deny that

certification of a class for purposes of a trial would be appropriate, and deny that the proposed

class definition is appropriate for purposes of a trial.  Defendants deny any and all remaining

allegations contained in Paragraph 8 of the Complaint.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members and the members of the Class are citizens of a state different from Defendants.

**ANSWER**:  Defendants admit that, based on the allegations contained in the Complaint,

this Court has jurisdiction over this action because the amount-in-controversy, as alleged in the

complaint, exceeds $5,000,000 and there are more than 100 putative class members. Defendants

deny any and all remaining allegations contained in Paragraph 9 of the Complaint.

10.     This Court has personal jurisdiction over Defendants because Defendants are authorized to do and do conduct business in Illinois. Defendants have marketed, promoted, distributed, and/or sold the Covered Products in Illinois, and Defendants have sufficient minimum contacts with this State and/or sufficiently avail themselves of the markets in this State through their promotion, sales, and/or marketing within this State to render the exercise of jurisdiction by this Court permissible.

**ANSWER**: Defendants admit that they are authorized to conduct business in this district

and that they have marketed, promoted, advertised, and sold products in this district.

Defendants further admit that, based on the allegations in the Complaint, this Court has personal

jurisdiction over Defendants. Defendants deny any and all remaining allegations contained in

Paragraph 10 of the Complaint.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiffs Nick Pearson, and Francisco Padilla's claims occurred while they resided in this judicial district. Venue is also proper under 18 U.S.C. § 1965(a) because Defendants transact substantial business in this District.

**ANSWER**: Defendants admit that, based on the allegations contained in the Complaint,

venue in this judicial district appears to be proper. Defendants deny any and all remaining

allegations contained in Paragraph 11 of the Complaint.

## PARTIES

12.     Plaintiff Nick Pearson resides in Cook County, Illinois. In or around June 2011, Plaintiff Pearson was exposed to and saw Defendant Target's joint health benefit representations by reading the package/label of Target's Up & Up Triple Strength Glucosamine Chondroitin plus MSM product at a Target store in Chicago, Illinois. After reading the label, Plaintiff Pearson purchased the Up & Up Triple Strength Glucosamine Chondroitin plus MSM product to relieve his joint pain and in so doing relied on every single one of the product's joint health benefit representations. The Up & Up Triple Strength Glucosamine Chondroitin plus MSM product that Plaintiff purchased and took as directed did not have the joint health benefits as represented. As a result, Plaintiff Pearson suffered injury in fact and lost money.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to

Plaintiff Pearson's alleged purchase or use of the Target Triple Strength Product, and therefore

deny the same. Defendants also deny that the Target Triple Strength Product "did not have the joint health benefits as represented" and that Plaintiff Pearson "suffered injury in fact and lost money." Defendants further deny any remaining allegations contained in Paragraph 12 of the Complaint.

13.     Plaintiff Cecilia Linares resides in Imperial, California. Towards the end of 2010, Plaintiff Linares was exposed to and saw Costco's representations by reading the package/label of Costco's Kirkland Glucosamine Chondroitin product at a Costco store in El Centro, California. After reading the label, Plaintiff Linares purchased the Kirkland Glucosamine Chondroitin product to relieve her joint pain and in so doing relied on every single one of the product's joint health benefit representations. The Kirkland Glucosamine Chondroitin product that Plaintiff Linares purchased and took as directed did not have the joint health benefits as represented. As a result, Plaintiff Linares suffered injury in fact and lost money.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to

Plaintiff Linares's alleged purchase or use of the "Kirkland Glucosamine Chondroitin product"

("Kirkland Product"), and therefore deny the same. Defendants deny that the Kirkland Product

"did not have the joint health benefits as represented" and that Plaintiff Linares "suffered injury

in fact and lost money." Defendants deny any remaining allegations contained in Paragraph 13

of the Complaint.

14.     Plaintiff Abel Gonzalez resides in Canyon Lake, California. On or around January 2012, Plaintiff Gonzalez was exposed to and saw Costco's representations by reading the package/label of Costco's Kirkland Glucosamine with MSM label at a Costco store in Lake Elsinore, California. After reading the label, Plaintiff Gonzalez purchased the Kirkland Glucosamine with MSM product to improve the joint function and reduce the joint pain in his shoulders and in so doing relied on every single one of the product's joint health benefit representations. The Kirkland Glucosamine with MSM product that Plaintiff Gonzalez purchased and took as directed did not have the joint health benefits as represented. As a result, Plaintiff Gonzalez suffered injury in fact and lost money.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to

Plaintiff Gonzalez's alleged purchase or use of the "Kirkland Glucosamine with MSM product"

("Kirkland MSM Product"), and therefore deny the same. Defendants deny that the Kirkland

MSM Product "did not have the joint health benefits as represented" and that Plaintiff Gonzalez

"suffered injury in fact and lost money." Defendants deny any remaining allegations contained in Paragraph 14 of the Complaint.

15.     Plaintiff Francisco Padilla resides in Cook County, Illinois. In late 2010, Plaintiff Padilla was exposed to and saw Defendant Rexall's representations by reading the package/label of the Osteo Bi-Flex Triple Strength product at a Walgreens store in Chicago, Illinois. After reading the label, Plaintiff Padilla purchased the Osteo Bi-Flex Triple Strength product and relied on every single one of Defendant Rexall's joint health benefit representations. The Osteo Bi-Flex Triple Strength product Plaintiff Padilla purchased and took as directed did not have the joint health benefits as represented. As a result, Plaintiff Padilla suffered injury in fact and lost money.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to Plaintiff Padilla's alleged purchase or use of the "Osteo Bi-Flex Triple Strength product" ("OBF Triple Strength Product"), and therefore deny the same. Defendants deny that the OBF Triple Strength Product "did not have the joint health benefits as represented" and that Plaintiff Padilla "suffered injury in fact and lost money." Defendants deny any remaining allegations contained in Paragraph 15 of the Complaint.

16.     In or around March 2011, Plaintiff Francisco Padilla was exposed to and saw Defendant Rexall's representations by reading the package/label of the Flex-a-min Triple Strength with Hyaluronic Acid product at a Costco store in Chicago, Illinois. After reading the label, Plaintiff Padilla purchased the Flex-a-min Triple Strength with Hyaluronic Acid product and relied on every single one of the product's joint health benefit representations. The Flex-a-min Triple Strength with Hyaluronic Acid product Plaintiff Padilla purchased and took as directed did not have the joint health benefits as represented. As a result, Plaintiff Padilla suffered injury in fact and lost money.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to Plaintiff Padilla's alleged purchase or use of the "Flex-a-min Triple Strength with Hyaluronic Acid product" ("Flex-a-min Product"), and therefore deny the same. Defendants deny that the Flex-a-min Product "did not have the joint health benefits as represented" and that Plaintiff Padilla "suffered injury in fact and lost money." Defendants deny any remaining allegations contained in Paragraph 16 of the Complaint.

17.     Plaintiff Augustina Blanco resides in Moreno Valley, California. In or around February 2012, Plaintiff Blanco was exposed to and saw CVS Pharmacy's representations by

reading the label of the CVS Triple Strength Glucosamine Chondroitin with MSM product at a CVS store in Moreno Valley, California. In reliance on the joint health benefit representations on the front of the label, Plaintiff purchased the CVS Triple Strength Glucosamine Chondroitin with MSM product. The CVS Triple Strength Glucosamine Chondroitin with MSM product Plaintiff Blanco purchased and took as directed did not have the joint health benefits as represented. As a result, Plaintiff Blanco suffered injury in fact and lost money.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to

Plaintiff Blanco's alleged purchase or use of the "CVS Triple Strength Glucosamine

Chondroitin with MSM product" ("CVS Triple Strength Product"), and therefore deny the same.

Defendants deny that the CVS Triple Strength Product "did not have the joint health benefits as

represented" and that Plaintiff Blanco "suffered injury in fact and lost money." Defendants

deny any remaining allegations contained in Paragraph 17 of the Complaint.

18.     Plaintiff Richard Jennings resides in Oak Bluffs, Massachusetts. Beginning in approximately 1997, and continuing throughout the Class Period, Plaintiff Jennings was exposed to and saw Defendant Rexall's representations by reading the label of the Osteo Bi-Flex products he purchased. He purchased Osteo Bi-Flex on a monthly basis, and consumed it on a daily basis. Most of the Osteo Bi-Flex he purchased was Osteo Bi-Flex Triple Strength. He purchased most of the Osteo Bi-Flex products from Wal-Mart or BJ's Wholesale Club. In reliance on the joint health benefit representations on the packaging and marketing materials, Plaintiff Jennings purchased the Osteo Bi-Flex products. The Osteo Bi-Flex products Plaintiff Jennings purchased and took as directed did not have the joint health benefits as represented. As a result, Plaintiff Jennings suffered injury in fact and lost money.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to

Plaintiff Jennings's alleged purchase or use of certain Osteo Bi-Flex products, and therefore

deny the same. Defendants deny that the Osteo Bi-Flex products purchased by Plaintiff

Jennings "did not have the joint health benefits as represented" and that Plaintiff Jennings

"suffered injury in fact and lost money." Defendants deny any remaining allegations contained

in Paragraph 18 of the Complaint.

19.     Defendant NBTY, Inc. ("NBTY") is a corporation organized and existing under the laws of the state of Delaware. NBTY's headquarters is at 2100 Smithtown Ave., Ronkonkoma, New York 11779.

**ANSWER**: Defendants admit the allegations contained in Paragraph 19 of the

Complaint.

20.     Defendant Rexall Sundown, Inc. ("Rexall") is a corporation organized and existing under the laws of the state of Florida. Defendant Rexall's headquarters is at 2100 Smithtown Ave., Ronkonkoma, New York 11779.

**ANSWER**: Defendants admit the allegations contained in Paragraph 20 of the

Complaint.

21.     Defendants NBTY and Rexall have manufactured, advertised, marketed, distributed, or sold the Covered Products to tens of thousands of consumers nationwide, including in Illinois.

**ANSWER**: Defendants admit that Rexall manufactures and distributes the Covered

Products.  Defendants admit that Rexall advertised, marketed, and sold some (but not all) of the

Covered Products and that some (but not all) of the Covered Products are available nationwide,

including in Illinois.  Defendants deny any and all remaining allegations contained in Paragraph

21 of the Complaint.

22.     Defendant Target Corporation is incorporated under the laws of the state of Minnesota.  Defendant's corporate headquarters is located at 1000 Nicollet Mall, Minneapolis, Minnesota 55403.  Defendant Target markets and sells the Up & Up Glucosamine Product distributed by Defendants NBTY and Rexall to tens of thousands of consumers nationwide, including in Illinois.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 22 of the Complaint, and therefore denies the same.

## FACTUAL ALLEGATIONS

23.     Throughout the Class Period, Defendants have manufactured, distributed, marketed, or sold the Covered Products.

**ANSWER**:  Defendants admit that Rexall has manufactured and distributed the Covered

Products during certain time periods and in certain geographic locations.  Defendants also admit

that Rexall marketed and sold some (but not all) of the Covered Products. Defendants deny any

and all remaining allegations contained in Paragraph 23 of the Complaint.

24.    The Covered Products are sold online and in virtually every major food, drug, and mass retail outlet store in Illinois and throughout the United States, including, but not limited to: Wal-Mart, Costco Wholesale, Sam's Club, Rite-Aid, Target, and Walgreens. The Covered Products are available in a variety of tablet count bottles (e.g., 30, 75, 80, 90, 120, 150, 200), retailing for approximately $5-50 (depending upon tablet count). The following are exemplar screen shots of some of the Covered Products:

   

**ANSWER**: Defendants admit that certain (but not all) of the Covered Products are sold

online and nationwide at various stores, including stores such as Wal-Mart, Costco Wholesale,

Sam's Club, Rite-Aid, Target, and Walgreens. Defendants further admit that the Covered

Products come in different count bottles, with various retail prices, depending on product, size,

store, and promotion, and are sold at various retailers. Defendants deny any remaining

allegations contained in Paragraph 24 of the Complaint.

25.     Since each of the Products' launches, Defendants have consistently conveyed the message to consumers throughout Illinois and the United States that the Products help to rebuild, renew or maintain cartilage, and improve joint mobility and flexibility, lubricate joints and maintain joint comfort simply by taking the recommended number of tablets each day. Some of the Products also claim to provide improvement in joint comfort within 7 days. They do not. Defendants' joint health benefit representations and omissions are false, misleading and deceptive.

**ANSWER**:  Defendants admit that the packages for some of the Covered Products have, at certain times, contained the statements "helps rebuild cartilage," "helps renew cartilage," "helps maintain cartilage," "helps improve joint mobility," "helps lubricate joints," "helps maintain joint comfort," and "shows improvement in joint comfort within 7 days," but otherwise deny Plaintiffs' characterization of such statements.  Defendants deny any and all remaining allegations contained in Paragraph 25 of the Complaint, including that Defendants made any false, misleading, or deceptive representations.

26.     The primary active ingredient in all of the Covered Products is glucosamine.  The scientific evidence is that glucosamine, taken alone or in combination with chondroitin sulfate, does not provide the joint health benefits represented by Defendants.

**ANSWER**:  Defendants admit that all of the Covered Products contain, among other ingredients, glucosamine.  Defendants deny any and all remaining allegations contained in Paragraph 26 of the Complaint.

27.     The second primary active ingredient in some of Defendants' Products is chondroitin sulfate (*e.g.*, Up & Up Triple Strength Glucosamine Chondroitin plus MSM, Osteo Bi-Flex Regular Strength, Kirkland Glucosamine Chondroitin).  The scientific evidence is that chondroitin sulfate, alone or in combination with glucosamine, does not provide the joint health benefits represented by Defendants.

**ANSWER**:  Defendants admit that some of the Covered Products, including those identified in Paragraph 27, contain, among other ingredients, chondroitin sulfate.  Defendants deny any and all remaining allegations contained in Paragraph 27 of the Complaint.

28.     In addition to these two primary active ingredients that Defendants prominently promote as being the primary active ingredients that provide the purported joint health benefits, some of the Covered Products also contain methylsulfonylmethane ("MSM") (e.g., Up & Up Triple Strength Glucosamine Chondroitin plus MSM, Kirkland Glucosamine with MSM, Osteo

Bi-Flex Triple Strength). MSM is also not effective in providing the joint health benefits represented by Defendants, but in any event the focus of this action is on the uniform false and deceptive representations and omissions that Defendants make about glucosamine and chondroitin on the package labeling of each of their Glucosamine Products.

**ANSWER**:  Defendants admit that some of the Covered Products, including those

identified in Paragraph 28, contain methylsulfonylmethane ("MSM"), among other ingredients.

Defendants deny any and all remaining allegations contained in Paragraph 28 of the Complaint.

29.     Some of the Covered Products also contain other ingredients such as Hyaluronic Acid (*e.g.*, Up & Up Triple Strength Glucosamine Chondroitin plus MSM), and Boswellia Serrata ("AKBA" or "Aflapin") (*e.g*., Up & Up Triple Strength Glucosamine Chondroitin plus MSM, Osteo Bi-Flex One Per Day, certain Flex-a-min products). These minor ingredients are also not effective in providing the joint health benefits represented by Defendants, but in any event the focus of this action is on the uniform false and deceptive representations and omissions that Defendants make about glucosamine on the package labeling of each of the Covered Products.

**ANSWER**:  Defendants admit that some of the Covered Products, including those

identified in Paragraph 29, contain hyaluronic acid and an extract of Boswellia Serrata, among

other ingredients.  Defendants deny any and all remaining allegations contained in Paragraph 29

of the Complaint.

30.    Even though numerous clinical studies have found that the two primary ingredients in the Covered Products, glucosamine and chondroitin, alone or in combination, are ineffective, Defendants continue to represent on the Covered Products' packaging and labeling that they provide the joint health benefits for adults of all ages, without any limitation on which joints or what joint related ailments the Covered Products provide these joint health benefits. For example, exemplar front and side panels of the Osteo Bi-Flex Regular Strength and the Up & Up Glucosamine Chondroitin plus MSM product labels appear or have appeared in the past as follows:

 



**ANSWER**:  Defendants admit that Plaintiffs have accurately reproduced a portion of a package for Osteo Bi-Flex Regular Strength and the Up & Up Glucosamine Chondroitin plus MSM.  Defendants lack knowledge or information sufficient to form a belief as to Plaintiffs' allegation concerning unidentified "numerous clinical studies," and therefore deny the same. Defendants deny any remaining allegations contained in Paragraph 30 of the Complaint.

31.    Independent studies published at least as early as 2004, have found that glucosamine and chondroitin, alone or in combination, are not effective in providing the represented joint health benefits.

**ANSWER**:  Defendants deny the allegations contained in Paragraph 31 of the Complaint, including the allegations contained in footnote 7 of the Complaint.

32.     For example, a 2004 study by McAlindon et al., entitled Effectiveness of Glucosamine For Symptoms of Knee Osteoarthritis: Results From and Internet-Based Randomized Double-Blind Controlled Trial, 117(9) Am. J. Med. 649-9 (Nov. 2004), concluded that glucosamine was no more effective than placebo in treating the symptoms of knee osteoarthritis – in short, it was ineffective.

**ANSWER**:  Defendants admit that McAlindon, *et al.*, *Effectiveness of Glucosamine for Symptoms of Knee Osteoarthritis: Results from an Internet-Based Randomized Double-Blind Controlled Trial*, was published in THE AMERICAN JOURNAL OF MEDICINE in 2004.  Defendants deny that Plaintiffs' characterization of this study is complete or accurate.  Defendants deny any and all remaining allegations contained in Paragraph 32 of the Complaint.

33.     Also as early as 2004, studies confirmed there is a significant "placebo" effect with respect to glucosamine consumption.  A 2004 study by Cibere et al, entitled Randomized, Double-Blind, Placebo-Controlled Glucosamine Discontinuation Trial In Knee Osteoarthritis, 51(5) Arthritis Care & Research 738-45 (Oct. 15, 2004), studied users of glucosamine who claimed to have experienced at least moderate improvement after starting glucosamine.  These patients were divided into two groups – one that continued using glucosamine and one that was given a placebo.  For six months, the primary outcome observed was the proportion of disease flares in the glucosamine and placebo groups.  A secondary outcome was the time to disease flare.  The study results reflected that there were no differences in either the primary or secondary outcomes for glucosamine and placebo.  The authors concluded that the study provided no evidence of symptomatic benefit from continued use of glucosamine – in other words, any prior perceived benefits were due to the placebo effect and not glucosamine.

**ANSWER**:  Defendants admit that Cibere, *et al.*, *Randomized, Double-Blind, Placebo-Controlled Glucosamine Discontinuation Trial in Knee Osteoarthritis*, was published in ARTHRITIS & RHEUMATISM in 2004.  Defendants deny that Plaintiffs' characterization of this study is complete or accurate.  Defendants deny any and all remaining allegations contained in Paragraph 33 of the Complaint.

34.     In the 2006 Glucosamine Arthritis Intervention Trial ("GAIT") Study, the study authors rigorously evaluated the effectiveness of glucosamine hydrochloride and chondroitin, alone and in combination, on osteoarthritis for six months.  According to the study's authors, "The analysis of the primary outcome measure did not show that either supplement, alone or in combination, was efficacious. . ." 2006 GAIT Study at 806.  Subsequent GAIT studies in 2008 and 2010 reported that glucosamine and chondroitin did not rebuild cartilage and were otherwise ineffective – even in patients with moderate to severe knee pain for which the 2006 reported results were inconclusive.  *See* Sawitzke, A.D., et al., The Effect of Glucosamine and/or Chondroitin Sulfate on the Progression of Knee Osteoarthritis: A GAIT Report, 58(10) J.

Arthritis Rheum. 3183–91 (Oct. 2008); Sawitzke, A.D., *Clinical Efficacy And Safety Of Glucosamine, Chondroitin Sulphate, Their Combination, Celecoxib Or Placebo Taken To Treat Osteoarthritis Of The Knee: 2-Year Results From GAIT*, 69(8) Ann Rhem. Dis. 1459-64 (Aug. 2010).

**ANSWER**: Defendants admit that Clegg, *et al.*, *Glucosamine, Chondroitin Sulfate, and the Two in Combination for Painful Knee Osteoarthritis*, was published in NEW ENGLAND JOURNAL OF MEDICINE in 2006. Defendants deny that Plaintiffs' characterization of this study is complete or accurate. Upon information and belief, Defendants admit that the referenced 2006 study was funded by the National Center for Complementary & Alternative Medicine and the National Institute of Arthritis and Musculoskeletal and Skin Diseases. Defendants further admit that Sawitzke, *et al.*, *The Effect of Glucosamine and/or Chondroitin Sulfate on the Progression of Knee Osteoarthritis*, was published in ARTHRITIS & RHEUMATISM in 2008, and that Sawitzke, *et al.*, *Clinical Efficacy and Safety of Glucosamine, Chondroitin Sulphate, Their Combination, Celecoxib or Placebo Taken to Treat Osteoarthritis of the Knee: 2-Year Results from GAIT*, was published in ANNALS OF THE RHEUMATIC DISEASES in 2010. However, Defendants deny that Plaintiffs' characterization of these studies is complete or accurate. Defendants also admit that Kwoh, *et al.*, *The Joints on Glucosamine (JOG) Study: A Randomized, Double-Blind, Placebo-Controlled Trial to Assess the Structural Benefit of Glucosamine in Knee Osteoarthritis Based on 3T MRI*, referenced in footnote 9 of the Complaint, was published in ARTHRITIS & RHEUMATISM in 2009. Defendants deny that Plaintiffs' characterization of this study is complete or accurate. Defendants deny any and all remaining allegations contained in Paragraph 34 of the Complaint.

35.     The GAIT studies are consistent with the reported results of prior and subsequent studies. For example, the National Collaborating Centre for Chronic Conditions ("NCCCC") reported "the evidence to support the efficacy of glucosamine hydrochloride as a symptom modifier is poor" and the "evidence for efficacy of chondroitin was less convincing." NCCCC, Osteoarthritis National Clinical Guideline for Care and Management of Adults, Royal College of Physicians, London 2008. Consistent with its lack of efficacy findings, the NCCCC

Guideline did not recommend the use of glucosamine or chondroitin for treating osteoarthritis. *Id.* at 33.

**ANSWER**: Defendants admit that OSTEOARTHRITIS: NATIONAL CLINICAL GUIDELINE

FOR CARE AND MANAGEMENT OF ADULTS, by the National Collaborating Centre for Chronic

Conditions, was published by the Royal College of Physicians in 2008. Defendants deny that

Plaintiffs' characterization of this publication is complete or accurate. Defendants deny any and

all remaining allegations contained in Paragraph 35 of the Complaint.

36.    A study by Rozendaal et al., entitled Effect of Glucosamine Sulfate on Hip Osteoarthritis, 148 Ann. of Intern. Med. 268-77 (2008) assessing the effectiveness of glucosamine on the symptoms and structural progression of hip osteoarthritis during 2 years of treatment, concluded that glucosamine was no better than placebo in reducing symptoms and progression of hip osteoarthritis.

**ANSWER**:  Defendants admit that Rozendaal, *et al*., *Effect of Glucosamine Sulfate on*

*Hip Osteoarthritis*, was published in ANNALS OF INTERNAL MEDICINE in 2008.  Defendants deny

that Plaintiffs' characterization of this study is complete or accurate.  Defendants deny any and

all remaining allegations contained in Paragraph 36 of the Complaint.

37.    In March 2009, Harvard Medical School published a study conclusively proving that the ingestion of glucosamine could not affect the growth of cartilage. The study took note of prior studies, which "cast considerable doubt" upon the value of glucosamine. The authors went on to conduct an independent study of subjects ingesting 1500 mg of glucosamine, and proved that only trace amounts of glucosamine entered the human serum, far below any amount that could possibly affect cartilage. Moreover, even those trace amounts were present only for a few hours after ingestion. The authors noted that a 1986 study had found no glucosamine in human plasma after ingestion of four times the usual 1500 mg of glucosamine chloride or sulphate. Silbert, Dietary Glucosamine Under Question, Glycobiology 19(6):564-567 (2009).

**ANSWER**:  Defendants admit that Silbert, *Dietary Glucosamine Under Question*, was

published in GLYCOBIOLOGY in 2009.  Defendants deny that Plaintiffs' characterization of this

study is complete or accurate.  Defendants deny any and all remaining allegations contained in

Paragraph 37 of the Complaint.

38.    In April 2009, the Journal of Orthopaedic Surgery published an article entitled, "Review Article: Glucosamine." The article's authors concluded that, based on their literature review, there was "little or no evidence" to suggest that glucosamine was superior to a placebo

even in slowing down cartilage deterioration, much less rebuilding it. Kirkham, et al., Review Article: Glucosamine, Journal of Orthopaedic Surgery, 17(1): 72-6 (2009).

**ANSWER**: Defendants admit that Kirkham, *et al*., *Review Article: Glucosamine*, was published in the JOURNAL OF ORTHOPAEDIC SURGERY in 2008. Defendants deny that Plaintiffs' characterization of this review article is complete or accurate. Defendants deny any and all remaining allegations contained in Paragraph 38 of the Complaint.

39. A 2010 meta-analysis by Wandel et al. entitled Effects of Glucosamine, Chondroitin, Or Placebo In Patients With Osteoarthritis Of Hip Or Knee: Network Meta-Analysis, BMJ 341:c4675 (2010), examined prior studies involving glucosamine and chondroitin, alone or in combination, and whether they relieved the symptoms or progression of arthritis of the knee or hip. The study authors reported that glucosamine and chondroitin, alone or in combination, did not reduce joint pain or have an impact on the narrowing of joint space: "Our findings indicate that glucosamine, chondroitin, and their combination do not result in a relevant reduction of joint pain nor affect joint space narrowing compared with placebo." *Id.* at 8. The authors went as far to say, "We believe it unlikely that future trials will show a clinically relevant benefit of any of the evaluated preparations." *Id.*

**ANSWER**: Defendants admit that Wandel, et al., *Effects of Glucosamine, Chondroitin, or Placebo in Patients With Osteoarthritis of Hip or Knee: Network Meta-Analysis*, was published in BMJ in 2010. Defendants deny that Plaintiffs' characterization of this study is complete or accurate. Defendants deny any and all remaining allegations contained in Paragraph 39 of the Complaint.

40. In July 7, 2010, Wilkens et al., reported that there was no difference between placebo and glucosamine for the treatment of low back pain and lumbar osteoarthritis and that neither glucosamine nor placebo were effective in reducing pain related disability. The researchers also stated that, "Based on our results, it seems unwise to recommend glucosamine to all patients" with low back pain and lumbar osteoarthritis. Wilkens et al., Effect of Glucosamine on Pain-Related Disability in Patients With Chronic Low Back Pain and Degenerative Lumbar Osteoarthritis, 304(1) JAMA 45-52 (July 7, 2010).

**ANSWER**: Defendants admit that Wilkens, *et al*., *Effect of Glucosamine on Pain-Related Disability in Patients With Chronic Low Back Pain and Degenerative Lumbar Osteoarthritis*, was published in the JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION in

2010.  Defendants deny that Plaintiffs' characterization of this study is complete or accurate.

Defendants deny any and all remaining allegations contained in Paragraph 40 of the Complaint.

41.     In 2011, Miller and Clegg, after surveying the clinical study history of glucosamine and chondroitin reported that, "The cost-effectiveness of these dietary supplements alone or in combination in the treatment of OA has not been demonstrated in North America." Miller, K. and Clegg, D., Glucosamine and Chondroitin Sulfate, Rheum. Dis. Clin. N. Am. 37 103-118 (2011)

**ANSWER**:  Defendants admit that Miller, K. and Clegg, D., *Glucosamine and Chondroitin Sulfate*, was published in RHEUMATIC DISEASE CLINICS OF NORTH AMERICA.

Defendants deny that Plaintiffs' characterization of this study is complete or accurate.

Defendants deny any and all remaining allegations contained in Paragraph 41 of the Complaint.

42.     Scientific studies also confirm that the other ingredients in the Covered Products are ineffective. For example, some of the Covered Products also contain methylsulfonylmethane ("MSM"), an organic sulfur compound found in fruits, corn, tomatoes, tea, coffee, and milk. Clinical cause and effect studies have found no causative link between MSM supplementation and joint renewal, rejuvenation, or joint comfort. *See, e.g.*, S. Brien, et. al., Systematic Review of the Nutritional Supplements (DMSO) and methylsulfonylmethane (MSM) in the treatment of osteoarthritis (Apr. 17, 2008) (concluding that there is no "definitive evidence that MSM is superior to placebo in the treatment of mild to moderate OA of the knee").

**ANSWER**:  Defendants admit that some of the Covered Products contain MSM.

Defendants further admit that Brien, *et al.*, *Systematic Review of the Nutritional Supplements Dimethyl Sulfoxide (DMSO) and Methylsulfonylmethane (MSM) in the Treatment of Osteoarthritis*, was published in OSTEOARTHRITIS & CARTILAGE in 2008.  Defendants deny that Plaintiffs' characterization of this study is complete or accurate.  Defendants deny any and all remaining allegations contained in Paragraph 42 of the Complaint.

43.     Some of the Covered Products also contain hyaluronic acid, a component of synovial fluid found in the fluids of the eyes and joints. Clinical cause and effect studies have found that there is no causative link between hyaluronic acid supplementation, and joint renewal or rejuvenation, or joint comfort.

**ANSWER**: Defendants admit that some of the Covered Products contain hyaluronic acid.  Defendants lack knowledge or information sufficient to form a belief as to Plaintiffs'

allegation concerning unidentified "[c]linical cause and effect studies" and therefore deny the

same. Defendants deny any and all remaining allegations contained in Paragraph 43 of the

Complaint.

44.     Some of the Covered Products also contain an extract of Boswellia Serrata the
Defendants claim leads to improvement in joint comfort within 7 days. Boswellia Serrata
supplementation does not provide joint renewal or rejuvenation and clinical evidence has shown
that Boswellia Serrata in the amounts contained in the Covered Products cannot provide joint
comfort.

**ANSWER**: Defendants admit that some of the Covered Products contain an extract of

Boswellia Serrata and that the packaging for some of the Covered Products states that the

product "shows improvement in joint comfort within 7 days." Defendants lack knowledge or

information sufficient to form a belief as to Plaintiffs' allegation concerning unidentified

"clinical evidence" and therefore deny the same. Defendants deny any and all remaining

allegations contained in Paragraph 44 of the Complaint.

45.     Some of the Covered Products also contain other ingredients such as vitamin D,
vitamin C, manganese, boron and collagen. Clinical cause and effect studies have found that no
causative link between these ingredients and joint renewal or rejuvenation or joint comfort.

**ANSWER**: Defendants admit that some of the Covered Products contain other

ingredients, including vitamin D, vitamin C, manganese, boron, and collagen. Defendants lack

knowledge or information sufficient to form a belief as to Plaintiffs' allegation concerning

unidentified "[c]linical cause and effect studies" and therefore deny the same. Defendants deny

any and all remaining allegations contained in Paragraph 45 of the Complaint.

46.     Despite the existence of numerous clinical studies that found the ingredients in the Covered Products to be ineffective for the joint health benefits that they represent on the Covered Products' package/labels, Defendants continue to unequivocally claim that their Covered Products are effective and provide these joint health benefits without limitation and thus for adults of all ages and for all manner and stages of joint related ailments.  As the distributor of the Covered Products, Defendants possess specialized knowledge regarding the content and effects of the ingredients contained in the Covered Products and are in a superior position to learn of the effects—and has learned of the effects, or lack thereof— the Covered Products have on consumers.

**ANSWER**:  Defendants deny the allegations contained in Paragraph 46 of the

Complaint.

47.     Specifically, from at least 1997, Defendants knew, but failed to disclose, that the Covered Products do not provide the joint health benefits represented and that well-conducted, clinical studies have found the ingredients in the Covered Products to be ineffective in providing the represented joint health benefits. Plaintiffs and Class members have been and will continue to be deceived or misled by Defendants' deceptive joint health benefit representations. Plaintiffs purchased and consumed at least one of the Covered Products during the Class period and in doing so, read and considered the Covered Product's label and marketing materials and based their decision to purchase the Covered Product on the joint health benefit representations on the Covered Product packaging and marketing materials. Defendants' joint health benefit representations and omissions were a material factor in influencing Plaintiffs' decision to purchase and consume the Covered Products.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to

Plaintiffs' alleged purchases and uses of the Covered Products, and therefore deny the same.

Defendants deny any and all remaining allegations contained in Paragraph 47 of the Complaint.

48.     The only purpose behind purchasing one of the Covered Products is to obtain some or all of the represented joint health benefits.  There is no other reason for Plaintiffs and the Class to have purchased the Covered Products and Plaintiffs and the Class would not have purchased the Covered Products had they known Defendants' joint health benefit statements were false and misleading and that clinical cause and effect studies have found the ingredients to be ineffective for the represented joint health benefits.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to

the purchase decisions made by Plaintiffs and the proposed Class members, and therefore deny

the same.  Defendants deny any and all remaining allegations contained in Paragraph 48 of the

Complaint.

49.     Plaintiffs and the Class members have been injured in fact in their purchases of these Covered Products in that they were deceived into purchasing Covered Products that do not perform for the only reason that they would have purchased these Covered Products – joint health benefits.  As a result, Plaintiffs and the Class members have suffered economic damage in their purchases of these Covered Products.

**ANSWER**:  Defendants deny the allegations contained in Paragraph 49 of the

Complaint.

50.     Defendants, by contrast, reaped profits from their false marketing and sale of these Covered Products.

**ANSWER**:  Defendants deny the allegations contained in Paragraph 50 of the

Complaint.

## CLASS ALLEGATIONS

51.     Plaintiffs bring this action on behalf of themselves and all other similarly situated Class members pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following Class:

**Nationwide Class Action**

All persons in the United States who, since January 1, 2005, purchased one or more of the Covered Products.

Excluded from the Class are (i) Defendants; (ii) retailers of the Covered Products; (iii) the parents, subsidiaries, affiliates, officers, and directors of (i) and (ii); and, (iv) those who purchased the Covered Products for the purpose of resale.

**ANSWER**:  Defendants admit that Plaintiffs seek to be appointed as class

representatives and purport to define the proposed class in Paragraph 51 of the Complaint.

Defendants deny that certification of the putative class for anything other than settlement

purposes is appropriate.

52.     Members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable.  Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains many tens of thousands of members.  The precise number of Class members is unknown to Plaintiffs.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 52 of the Complaint, and therefore deny the same.

53.     Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members.  The common legal and factual questions include, but are not limited to, the following:

- Whether the representations or omissions discussed herein that Defendants made about the Covered Products were or are misleading, or likely to deceive;

- Whether Plaintiffs and the Class members were deceived in some manner by Defendants' representations;

- Whether Defendants falsely represented that the Covered Products have benefits which they do not in fact have;

- Whether the alleged conduct constitutes violations of the laws asserted herein;

- Whether Plaintiffs and Class members have been injured and the proper measure of their losses as a result of those injuries;

- Whether Plaintiffs and Class members are entitled to an award of compensatory/actual damages; and

- Whether Plaintiffs and the Class are entitled to injunctive, declaratory or other equitable relief.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 53 of the Complaint, and therefore deny the same.

54.     Plaintiffs' claims are typical of the claims of the members of the Class because, *inter alia*, all Class members were injured through the uniform misconduct described above, including being subject to Defendants' deceptive joint health benefit representations, which accompanied the label or packaging of the Covered Products.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the Class.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 54 of the Complaint, and therefore deny the same..

55.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained counsel competent and experienced in both consumer protection and class litigation.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 55 of the Complaint, and therefore deny the same.

56.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The expense and burden of individual litigation would make it

impracticable or impossible for proposed Class members to prosecute their claims individually. It would thus be virtually impossible for the members of the Class, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 56 of the Complaint, and therefore deny the same.

57.     In the alternative, the Class also may be certified because Defendants have acted or refused to act on grounds generally applicable to the Class thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

**ANSWER**: Defendants deny the allegations contained in Paragraph 57 of the complaint,

including all subparts, and further deny that class certification under Rule 23(b)(2) is

appropriate.

58.     Plaintiffs seeks preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent Defendants from engaging in the acts described, and requiring Defendants to provide full restitution to Plaintiffs and Class members. Unless a Class is certified, Defendants will retain monies received as a result of their conduct that were taken from Plaintiffs and Class members. Unless a Class-wide injunction is issued, Defendants will continue to commit the violations alleged, and the members of the Class and the general public will continue to be misled.

**ANSWER**: Defendants deny any liability for any injury alleged in the Complaint,

further deny that class certification is appropriate for any purpose other than settlement and deny

that Plaintiffs are entitled to the relief or judgment sought in Paragraph 58 of the Complaint.

## COUNT I

## Violation of the Illinois Consumer Fraud Act, the California Business and Professions Code and California Civil Code, the Massachusetts Unfair Trade Practices Act And The Consumer Protection Laws of The 47 Other Class States And The District Of Columbia

59.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

**ANSWER**:  Defendants fully incorporate by reference herein its responses to Paragraphs

1 through 58 of the Complaint.

60.     Plaintiffs bring this claim individually and on behalf of the Class.

**ANSWER**:  Defendants admit that Plaintiffs purport to bring this action on behalf of

themselves and the proposed Class.

61.     In Illinois, the "Consumer Fraud and Deceptive Business Practices Act" 815 Ill. Comp. Stat. 502/1, *et seq.* ("the Act"), like California's Business and Professions Code §17200 *et. seq.*, California's Civil Code § 1750 *et. seq.*, the Massachusetts Unfair Trade Practices Act, Mass. Gen. Laws. ch. 93A, *et seq.*, and the consumer fraud acts/protection laws of the 47 other states and the District of Columbia, prohibits deceptive acts and practices in the sale of such products as the Covered Products.

**ANSWER**:  Paragraph 61 states legal conclusions to which no response is required.  To

the extent a response is required, Defendants deny the allegations contained in Paragraph 61 to

the extent they allege that Defendants engaged in deceptive acts and practices in the sale of the

Covered Products or that they violated any of the statutes identified in Paragraph 61 of the

Complaint.

62.     Plaintiffs    and    the    Class    were    injured    by    Defendants'    deceptive misrepresentations, concealments and omissions and these misrepresentations, concealments and omissions were material and deceived Plaintiffs and the Class.

**ANSWER**:  Defendants deny the allegations contained in Paragraph 62 of the

Complaint.

63.    Defendants do business in Illinois, California and Massachusetts, sell and distribute their Covered Products in Illinois, California and Massachusetts, and engaged in deceptive acts and practices in connection with the sale of their Covered Products in Illinois, California and Massachusetts, and elsewhere in the United States.

**ANSWER**:  Defendants admit that they do business in Illinois, California, and

Massachusetts, but deny that they engaged in deceptive acts and practices in the sale of the

Covered Products.  Defendants deny any and all remaining allegations contained in Paragraph

63 of the Complaint.

64.    The Covered Products purchased by Plaintiffs and the Class were "consumer items" as that term is defined under the Act.

**ANSWER**:  Paragraph 64 states legal conclusions to which no response is required.  To

the extent a response is required, Defendants lack knowledge or information sufficient to form a

belief as to whether Plaintiffs or the Class purchased any Covered Products, and therefore deny

the same.  Defendants also deny that the phrase "consumer items" is defined in the Act.

Defendants deny any and all remaining allegations contained in Paragraph 64 of the Complaint.

65.    Defendants misrepresented and deceptively concealed, suppressed and/or omitted the material information known to Defendants as set forth above concerning Their Covered Products which has caused damage and injury to Plaintiffs and the Class.

**ANSWER**:  Defendants deny the allegations contained in Paragraph 65 of the

Complaint.

66.    Defendants' deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

**ANSWER**:  Defendants deny the allegations contained in Paragraph 66 of the

Complaint.

67.    Defendants' deceptive acts proximately caused actual injury and damage to Plaintiffs and the Class.

**ANSWER**:  Defendants deny the allegations contained in Paragraph 67 of the

Complaint.

68.     Defendants intended Plaintiffs and all Class members to rely on their representations regarding the joint health benefits of their Covered Products.

**ANSWER**:  Defendants deny the allegations contained in Paragraph 68 of the

Complaint.

69.     The conduct of the Defendants constituted a consumer fraud under the Illinois Consumer Fraud Act, the California Business and Professions Code, and the Massachusetts Unfair Trade Practices Act, and the consumer fraud acts/protection laws of the other 47 states and the District of Columbia.

**ANSWER**:  Defendants deny the allegations contained in Paragraph 69 of the

Complaint.

WHEREFORE, Plaintiffs and the Class pray as follows:

a.     That the Court enter an order certifying this action as a nationwide class action;

b.     That the Court enter an Order against Defendants awarding to Plaintiffs and the Class compensatory/actual damages;

c.     That the Court enter an order granting declaratory and injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein;

d.     Attorneys' fees, expert fees and costs; and

e.     Such other and further relief as the Court deems just and proper.

**ANSWER**:  Defendants deny any liability for any injury alleged in the Complaint and

deny that Plaintiffs are entitled to the relief requested in the "Wherefore" clause following

Paragraph 69 of the Complaint, including all subparts thereof.

## SEPARATE OR ADDITIONAL DEFENSES

1.     Defendants specifically reserve all separate or affirmative defenses that they

may have against each putative class member.  It is not necessary at this time for Defendants to

delineate such defenses against the putative class members because no class has been certified

and the putative class members are not parties to the litigation.

2.     Plaintiffs' Complaint, in whole or part, fails to state a claim upon which relief

can be granted.

3.      Defendants deny that Plaintiffs, any member of the purported class, and/or any member of the general public, have suffered any injury or damage whatsoever, and further deny that Defendants are liable to any such persons for any injury or damage claimed or for any injury or damage whatsoever.

4.      Plaintiffs' claims, and those of the purported class, are barred, in whole or in part, because Defendants' conduct is protected commercial speech and/or to the extent that the relief sought would violate the First Amendment's protection thereof.

5.      Defendants' business practices are not "unlawful" within the meaning of California Business & Professions Code § 17200.

6.      Defendants' business practices are not "unfair" within the meaning of California Business & Professions Code § 17200, and the utility of such business practices outweighs any potential harm.

7.      Defendants' advertising is not unfair, deceptive, untrue or misleading within the meaning of California Business & Professions Code §§ 17200 and Civil Code 1750.  Any statements made by Defendants were truthful and accurate and were not fraudulent or likely to mislead or deceive Plaintiffs or the purported class, or members of the general public.

8.      The conduct alleged by Plaintiffs and the members of the purported class was not, and is not, in violation of the Consumer Legal Remedies Act, and therefore did not, and does not, violate California Business & Professions Code § 17200, *et seq*.

9.      Defendants' business practices are not "unfair" or "deceptive" within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. 505/1, *et seq*.

10.      Defendants' advertising is not unfair, deceptive, untrue or misleading within the meaning of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. 505/1, *et seq*.  Any statements made by Defendants were truthful and accurate and were not fraudulent or likely to mislead or deceive Plaintiffs or the purported class, or members of the general public.

11.     The conduct alleged by Plaintiffs and the members of the purported class was not, and is not, in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. 505/1, *et seq.*

12.     The matters challenged by the Complaint were neither known to Defendants to be, nor in the exercise of reasonable care should have been known to Defendants to be, untrue or misleading.

13.     Defendants allege on information and belief that Plaintiffs and the members of the purported class have not sustained the required injury in fact and/or lost the requisite money or property necessary to confer standing pursuant to California Business and Professions Code § 17200, *et seq.*

14.     Defendants allege on information and belief that Plaintiffs and the members of the purported class have not sustained the required injury in fact and/or lost the requisite money or property necessary to confer standing pursuant to 815 ILL. COMP. STAT. 505/10a.

15.     Plaintiffs' claims, and those of the purported class, are barred, in whole or in part, because the state law safe harbors in California shield Defendants from liability for undertaking actions specifically authorized by federal or state regulatory bodies.

16.     Plaintiffs' claims, and those of the purported class, are barred, in whole or in part, because the state law safe harbors in Illinois shield Defendants from liability for undertaking actions specifically authorized by federal or state regulatory bodies.

17.     Plaintiff's claims are barred, in whole or in part, based on Mass. Gen. Law Chapter 93A, § 3, for "Exempted Transactions."

18.     Plaintiffs and some or all putative class members do not have standing to bring the claims asserted in the Complaint.

19.     Some putative class members do not have standing and their claims are therefore barred, to the extent they are asserting claims based upon alleged misrepresentations to third persons, including others who purchased Defendants' products, or retailers or distributors.

20.     Plaintiffs' causes of action are barred, in whole or in part, because the representations complained of, if any such representations were made, were not material and did not induce Plaintiffs to enter into the transaction.

21.     Plaintiffs' claims, and those of the purported class, are barred, in whole or in part, because Plaintiffs and/or the members of the purported class did not rely or reasonably rely on the alleged statements or conduct of Defendants.

22.     Plaintiffs' claims, and those of the purported class, are barred, in whole or in part, by the voluntary payment doctrine because Plaintiffs and putative class members voluntarily paid for Defendants' products about which they now complain with full knowledge of the facts and circumstances pursuant to which such amounts were paid.

23.     Plaintiffs' claims, and those of the purported class, are barred, in whole or in part, by the doctrine of accord and satisfaction to the extent that they sought and received a refund of their purchase price.

24.     Plaintiffs' claims, and those of the purported class, are barred, in whole or in part, by their failure to mitigate their damages.

25.     Any liability found on the part of Defendants, and any damages awarded in favor of Plaintiffs and putative class members, are subject to the common law comparative fault rules of California, Illinois, Massachusetts and any other applicable state law, and Defendants cannot be liable for more than its proportionate share of any damages awarded. Further, pursuant to any applicable state law, any damages awarded to Plaintiffs and putative class members are subject to apportionment by the jury of the total fault of all participants in the incidents, including Plaintiffs and non-parties.

26.     Defendants are entitled to any set-offs or reductions in liability from collateral sources available to Plaintiffs and putative class members, the value of refunds already provided, or a credit for previous payments.

27.     Plaintiffs are not entitled to equitable relief because there is an adequate remedy at law.

28.     Plaintiffs are not entitled to recovery because their damages, if any, are too speculative.

29.     Plaintiffs' claims, and those of the purported class, are barred, in whole or in part, by the applicable statutes of limitations or the doctrine of laches.

30.     Defendants deny that plaintiffs could satisfy the requirements of Rule 23 if this case were not settled.

31.     Defendants expressly reserve the right to amend this answer.  In doing so, Defendants specifically reserve its Federal Rule of Civil Procedure 12(b) defenses.

32.     By asserting these defenses, Defendants do not allege or admit that they have the burden of proof and/or the burden of persuasion with respect to any of these matters. Defendants specifically reserve all separate or additional defenses that they may have against the named Plaintiffs or putative class members.  It is not necessary at this time for Defendants to delineate such defenses against the putative class members because no class has been certified and the putative class members are not parties to the litigation.

## JURY DEMAND

Defendants demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Defendants pray for judgment as follows:

1.     This case no longer continue as a purported class action;

2.     That Plaintiffs take nothing by way of the Complaint;

3.     That Judgment be entered in favor of Defendants and against Plaintiffs and that the Complaint be dismissed with prejudice;

4.     That Defendants be awarded their costs of suit incurred in the defense of this action;

5.     That Defendants be awarded, as allowed by law, their attorneys' fees incurred in the defense of this action;

6.      For a jury trial on all issues so triable; and

7.      For such other relief as this Court deems proper.


Dated: May 20, 2013                Respectfully submitted,

                                      /s/Kara L. McCall

                                      Kara L. McCall (ARDC No. 6272681)
kmccall@sidley.com
Michael W. Davis (ARDC No. 0591319)
mdavis@sidley.com
T. Robert Scarborough (ARDC No. 6217158)
tscarborough@sidley.com
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, IL 60603
Tel:    (312) 853-7000
Fax:   (312) 853-7036

*Attorneys for Defendants NBTY, Inc. and
Rexall Sundown, Inc.*

33

## <u>CERTIFICATE OF SERVICE</u>

I, Kara L. McCall, one of the attorneys for Defendants, certify that on the 20th of May, 2013, I caused a copy of the foregoing **DEFENDANTS NBTY, INC.'S AND REXALL SUNDOWN, INC.'S ANSWER AND SEPARATE OR AFFIRMATIVE DEFENSES TO PLAINTIFFS' SECOND AMENDED COMPLAINT** to be filed electronically with the Clerk of Court, to be served by operation of the Court's electronic filing system to all counsel of record.

/s/Kara L. McCall_____
Kara L. McCall