# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| NICK PEARSON, FRANCISCO PADILLA, CECILIA LINARES, AUGUSTINA BLANCO, ABEL GONZALEZ, and RICHARD JENNINGS, on Behalf of Themselves and All Others Similarly Situated, | Case No.:    11 CV 07972 |
| Plaintiffs, | CLASS ACTION |
| v. | **Judge James B. Zagel** |
| NBTY, INC., a Delaware corporation; and REXALL SUNDOWN, INC., a Florida corporation; TARGET CORPORATION, a Minnesota Corporation, | |
| Defendants. | |

## PARTIES' JOINT RESPONSE TO OBJECTIONS

Stewart M. Weltman
STEWART M. WELTMAN, LLC
53 W. Jackson, Suite 364
Chicago, Illinois 60604
Telephone: (312) 588-5033
(Of Counsel: Levin Fishbein Sedran & Berman)

Elaine A. Ryan
Patricia N. Syverson
BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.
2325 E. Camelback Rd., Suite 300
Phoenix, Arizona 85016
Telephone: (602) 274-1100

*Attorneys for Plaintiffs Nick Pearson, Francisco Padilla, Cecilia Linares, Augustina Blanco, and Abel Gonzalez*

Peter N. Freiberg
Jeffrey I. Carton
DENLEA & CARTON LLP
One North Broadway, Suite 509
White Plains, New York 10601
Telephone:  (914) 920-7400

*Attorneys for Plaintiff Richard Jennings*

Kara L. McCall
Michael W. Davis
Theodore R. Scarborough, Jr.
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000

*Counsel for Defendants NBTY, Inc.; Rexall Sundown, Inc.; and Target Corp.*

## <u>TABLE OF CONTENTS</u>

**Page**

I.   THE OBJECTORS HAVE MISCHARACTERIZED THE STANDARD FOR THIS COURT'S REVIEW OF THE SETTLEMENT AGREEMENT...............................3

II.  THE OBJECTORS HAVE GROSSLY UNDERVALUED THE COMPONENTS OF THE SETTLEMENT....................................................................................4

  A.   Available Compensation to the Class Is Worth Between $14.2 Million and $27.3 Million ......................................................................................6

  B.   Notice and Administrative Costs Are a Part of the Value of the Settlement.............8

  C.   When Compared to All Components of the Settlement, the Attorneys' Fees Are Reasonable ........................................................................9

  D.   The So-Called "Clear Sailing" Provision and Reverter of Fees Are Proper............10

III. THE OBJECTION AND CLAIMS PROCESSES MEET THE RULE 23 REQUIREMENTS AND DO NOT IMPOSE UNDUE BURDENS ON CLASS MEMBERS OR OBJECTORS.......................................................................11

  A.   The Notice of Attorneys' Fees Request Met the Rule 23(h) Requirements ............11

    1.   Notice of Class Counsel's Fee Request Was Published to the Class............12

    2.   *Mercury Interactive* Has No Precedential Value Here .................................13

    3.   The Adjourned Final Approval Hearing Moots the Objection. .....................14

  B.   The Objection Process Is Typical and Presents No Undue Burden to Class Members. ....................................................................................14

    1.   Requiring Objectors and Opt-Outs To Mail Their Submissions Is Reasonable and Accepted in this Circuit ......................................................15

    2.   Requiring Objectors To Appear at the Fairness Hearing or Request To Be Excused from Appearing Is Not Burdensome ...................................17

    3.   The Law Allows the Parties to Depose Objectors .........................................18

  C.   The Claims Process, Including Two Tiers of Recovery, Is Appropriately Tailored to the Facts and Law Applicable to this Case ...........................................20

    1.   A Claims-Made Process Is Typical, Appropriate, and Necessary in a Consumer Fraud Case Like this One ............................................................20

i

       2.     The Two-Tier Recovery Process Is Appropriate ...........................................21

IV.    THE INCENTIVE AWARDS ARE REASONABLE.......................................................23

V.     THE CY PRES COMPONENT OF THE SETTLEMENT IS MEANINGFUL
COMPENSATION PROVIDING A BENEFIT TO THE CLASS ...................................24

     A.     The Use of *Cy Pres* Relief for Unclaimed Settlement Funds Has Been
Accepted and Widely Used in the Seventh Circuit...................................................24

     B.     OREF Is a Proper *Cy Pres* Recipient........................................................27

     C.     The *Cy Pres* Amount Is of Value to the Class ........................................................29

VI.    MANY OF THE OBJECTORS ARE SERIAL OBJECTORS WITH A HISTORY
OF INTERFERENCE WITH CLASS ACTION SETTLEMENTS FOR
PERSONAL GAIN ................................................................................................30

     A.     McNeal's and Paul's Counsel – Attorney Palmer – Is a Professional
Objector, Whom Previous Courts Have Recognized as Interested Only In
Financial Gain ................................................................................................32

     B.     Easton's Counsel Are Professional Objectors Whom Courts Have Found To
Be Not Motivated by a Concern for the Welfare of the Settlement Class...............34

     C.     Theodore Frank and the Center for Class Action Fairness Are Serial
Objectors Who Repeatedly Seek Thousands of Dollars in Attorneys' Fees
for Filing Objections ................................................................................................36

VII.   THE REMAINING "OBJECTIONS" HAVE BEEN ADDRESSED OR ARE
NOT PROPERLY CONSIDERED OBJECTIONS .........................................................37

     A.     Ms. Radlinski's Objection Has Been Fully Addressed By The Parties...................37

     B.     Ms. Paulson's Objection Should Be Overruled ........................................................38

     C.     The Remaining "Objections" Are Actually Claim Submissions .............................38

CONCLUSION...................................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Barnes v. Fleetboston Fin. Corp.*, No. 01-10395, 2006 WL 6916834
(D. Mass. Aug. 22, 2006) ..............................................................................................31

*Boeing Co. v. Van Gemert,* 444 U.S. 472 (1980) .............................................................6, 7, 8, 10

*Bower v. MetLife, Inc.*, No. 1:09-cv-351, 2012 U.S. Dist. LEXIS 149117
(S.D. Ohio Oct. 17, 2012) ...................................................................................12, 13, 14

*Cassese v. Williams*, 503 F. App'x 55 (2d Cir. 2012) ....................................................................12

*City of Greenville v. Syngenta Crop Prot., Inc.*, 904 F. Supp. 2d 902 (S.D. Ill. 2012) .................17

*Crawford v. Equifax Payment Servs.*, 201 F.3d 877 (7th Cir. 2000) ...........................................23

*Dewey v. Volkswagen of Am.*, 909 F. Supp. 2d 373 (D.N.J. 2012) ..........................................36, 37

*Embry v. ACER Am. Corp.*, No. C09-01808, 2012 WL 3777163
(N.D. Cal. Aug. 29, 2012) ..............................................................................................33

*Fraser v. Asus Computer Int'l*, No. C 12-00652, 2013 WL 3595940
(N.D. Cal. July 12, 2013) ................................................................................................23

*Galloway v. Kansas City Landsmen, LLC*, No. 4:11-1020, 2012 WL 4862833
(W.D. Mo. Oct. 12, 2012) ...............................................................................................15

*Hale v. Wal-Mart Stores, Inc.*, Nos. 01-CV218710 & 01-CV227774, 2009 WL 2206961
(Mo. Cir. Ct. June 17, 2009) ..........................................................................................34

*Hall v. AT & T Mobility LLC*, No. 07-5325, 2010 WL 4053547 (D.N.J. Oct. 13, 2010) ..............26

*Hartless v. Clorox Co.*, 273 F.R.D. 630 (S.D. Cal. 2011) ...............................................................9

*Herfert v. Crayola, LLC*, No. 2:11-cv-01301, slip op. [D.E. 74]
(W.D. Wash. Aug. 17, 2012) ...........................................................................................32

*In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775, 2009 WL 3077396
(E.D.N.Y. Sept. 25, 2009) ...............................................................................................12

*In re Apple Inc. Sec. Litig.*, No. 5:06-CV-05208, 2011 WL 1877988
(N.D. Cal. May 17, 2011) ...........................................................................................36, 37

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935
(N.D. Ill. 2011) ............................................................................................................13, 18

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531 (N.D. Cal. 2012)......................19

*In re Cellphone Fee Termination Cases*, 186 Cal. App. 4th 1380, 113 Cal. Rptr. 3d 510
(2010)............................................................................................................................34

*In re Cendant Corp. Litig.,* 264 F.3d 201 (3d Cir. 2001)............................................................22

*In re Checking Acct. Overdraft Litig.,* 830 F. Supp. 2d 1330 (S.D. Fla. 2011) ................18, 31, 34

*In re Continental Ill. Secs. Litig.*, 962 F.2d 566 (7th Cir. 1992)...................................................23

*In re Hydroxycut Mktg. & Sales Pracs. Litig.*, No. 3:09-cv-01088 slip op. [D.E. 215]
(S.D. Cal. Apr. 29, 2013) ..............................................................................................19

*In re IPO Secs. Litig.*, 728 F. Supp. 2d 289 (S.D.N.Y. 2010) ................................................35, 36

*In re Kentucky Grilled Chicken Coupon Mktg. & Sales Pracs. Litig.*, 280 F.R.D. 364
(N.D. Ill. 2001).......................................................................................................... *passim*

*In re Law Office of Jonathan E. Fortman, LLC*, No. 4:13MC00042, 2013 WL 414476
(E.D. Mo. Feb. 1, 2013) ................................................................................................20

*In re Lawnmower Engine Horsepower Mktg. & Sales Pracs. Litig.*, 733 F. Supp. 2d 997
(E.D. Wis. 2010) ............................................................................................................27

*In re Lawnmower Engine Horsepower Mktg. & Sales Pracs. Litig.*, MDL No. 08-1999,
2010 WL 4386552 (E.D. Wis. Oct. 28, 2010) ..............................................................14

*In re Lifelock, Inc. Mktg. & Sales Prac. Liltig.*, No. 08-1977, 2010 WL 3715138
(D. Ariz. Aug. 25, 2010) ...............................................................................................13

*In re LivingSocial Mktg. & Sales Prac. Litig.*, No. 11-CV-0745, 2013 WL 1181489
(D.D.C. Mar. 22, 2013) ..................................................................................................28

*In re Lucent Techs., Inc., Sec. Litig.*, 307 F. Supp. 2d 633 (D.N.J. 2004) .....................................22

*In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010) .............................13, 14

*In re Mexico Money Transfer Litig.,* 164 F. Supp. 2d 1002 (N.D. Ill. 2000) ...................25, 27, 29

*In re Motor Fuel Temp. Sales Pracs. Litig.*, No. 07-md-01840, slip op. [D.E. 3019]
(D. Kan. Nov. 10, 2011) ................................................................................................15

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 842 F. Supp. 2d 346
(D. Me. 2012).................................................................................................................37

*In re Oil Spill by Oil Rig Deepwater Horizon*, No. MDL 2179, 2013 WL 144042
(E.D. La. Jan. 11, 2013) .................................................................................................33

*In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104 (S.D.N.Y. 1997)....................................22

*In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001) ........................................................23

*In re TD Ameritrade Acct. Holder Litig.*, Nos. C 07–2852 & C 09-4903,
   2011 WL 4079226 (N.D. Cal. Sept. 13, 2011) ......................................................................38

*In re UnitedHealth Grp. Inc. PSLRA Litig.*, 643 F. Supp. 2d 1107 (D. Minn. 2009)...................31

*In re Uponor, Inc.*, *F1807 Plumbing Fittings Prods. Liab. Litig.*, No. 11-MD-2247,
   2012 WL 3984542 (D. Minn. Sept. 11, 2012) .......................................................................33

*Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468 (5th Cir. 2011)...........................................29, 30

*Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766 (N.D. Ohio 2010) .................................37

*Mace v. Van Ru Credit Corp.*, 109 F.3d 338 (7th Cir. 1997) ................................................25, 26

*Mangone v. First USA Bank*, 206 F.R.D. 222 (S.D. Ill. 2001) ............................................. *passim*

*Mars Steel Corp. v. Continental Nat'l Bank & Trust Co.*, 834 F.2d 677 (7th Cir. 1987)...............6

*McKinnie v. JP Morgan Chase Bank, NA*, 678 F. Supp. 2d 806 (E.D. Wis. 2009).....11, 20, 25, 26

*Meyenburg v. Exxon Mobile Corp.,* No. 3:05-cv-15, 2006 WL 2191422
   (S.D. Ill. July 31, 2006)....................................................................................................23, 24

*Milliron v. T–Mobile USA, Inc.,* No. 08-4149, 2009 WL 3345762 (D.N.J. Sept. 10, 2009).........21

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004) ..............................................29, 30

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006)....................................................23

*Radcliffe v. Experian Info. Solutions Inc.*, 715 F.3d 1157 (9th Cir. 2013) ..................................23

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011)....................................... *passim*

*Silverman v. Motorola Solutions, Inc.*, Nos. 12-2339 & 12-2354, 2013 WL 4082893
   (7th Cir. Aug. 14, 2013)..........................................................................................................5

*Simer v. Rios*, 661 F.2d 655 (7th Cir. 1981) .......................................................................25, 26

*Six (6) Mexican Workers v. Ariz. Citrus Growers,* 904 F.2d 1301 (9th Cir. 1990) .....................26

*Smith v. Levine Leichtman Capital Partners, Inc.*, No. C 10-00010, 2012 U.S. Dist.
   LEXIS 163672 (N.D. Cal. Nov. 15, 2012) ........................................................................15, 16

*Smith v. Qwest Communications Co.*, No. C11-02599, 2013 WL 3200592
   (N.D. Cal. June 24, 2013) ....................................................................................................8, 9

v

*State v. Levi Strauss & Co.*, 41 Cal. 3d 460 (1986) ....................................................................27

*Stern v. AT&T Mobility Inc.*, No. 2:05-cv-08842, slip op. [D.E. 394]
    (C.D. Cal. Nov. 22, 2010) .......................................................................................................7

*Stern v. Gambello*, 480 F. App'x 867 (9th Cir. 2012) ............................................................7, 8

*Stern v. Cingular Wireless Corp.*, No. 2:05-cv-08842, slip op. [D.E. 344]
    (C.D. Cal. Oct. 15, 2010) .....................................................................................................19

*Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179 (D.D.C. 2011)..........................................37

*Uhl v. Thoroughbred Tech. & Telecommc'ns, Inc.*, 309 F.3d 978 (7th Cir. 2002) ........................4

*Wear v. Sprint Commc'ns Co.*, No. 2:11-cv-809, 2013 WL 3108312
    (D. Nev. June 18, 2013) ..........................................................................................................8

*Weeks v. Kellogg Co.*, No CV 09-08102, 2011 U.S. Dist. LEXIS 155472
    (C.D. Cal. Nov. 23, 2011) .....................................................................................................14

*Williams v. MGM-Pathe Communications Co.*, 129 F.3d 1026 (9th Cir. 1997) ........................7, 8

## STATUTES AND RULES

Fed. R. App. P. 7.................................................................................................................31, 32

Fed. R. Civ. P. 5(b)(2)(C)........................................................................................................15

Fed. R. Civ. P. 23(e)(5)............................................................................................................30

Fed. R. Civ. P. 23(h)....................................................................................................11, 12, 13

Fed. R. Civ. P. 30(a)(1)............................................................................................................18

## OTHER AUTHORITIES

ALBA CONTE & HERBERT B. NEWBERG, 3 NEWBERG ON CLASS ACTIONS
    § 8:45 (4th ed. 2002).............................................................................................................20

ALBA CONTE & HERBERT B. NEWBERG, 5 NEWBERG ON CLASS ACTIONS
    § 15:37 (4th ed. 2002)...........................................................................................................31

BARBARA J. ROTHSTEIN & THOMAS E. WILLGING, MANAGING CLASS ACTION
    LITIGATION: A POCKET GUIDE FOR JUDGES 15 (Fed. Judicial Ctr., 2d ed. 2009)....................31

Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009)...............31

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.643 (2004)....................................................30

Newberg on Class Actions § 10.15 (3d ed. 1992) ..................................................................25

OREF, About OREF, http://www.oref.org/site/PageServer?pagename= oref_about (last visited Aug. 27, 2013) ..........................................................................................................27

Theodore H. Frank, Resident Fellow, American Enterprise Institute and Director, AEI Legal Center for the Public Interest, *Protecting Main Street from Lawsuit Abuse: Statement Presented to the Senate Republican Conference* (March 16, 2009) at 1, *available at* http://www.aei.org/files/2009/03/16/Frank%20 testimony.pdf ..........................36

Plaintiffs Nick Pearson, Francisco Padilla, Cecilia Linares, Augustina Blanco, Abel Gonzalez, and Richard Jennings ("Plaintiffs"), through their counsel; and Defendants NBTY, Inc.; Rexall Sundown, Inc. ("Rexall"); and Target Corporation ("Settling Defendants"), through their counsel, request that the Court overrule the objections of Theodore H. Frank [D.E. 95] ("Frank Obj."), Pamela Easton [D.E. 98] ("Easton Obj."), Peggy Thomas [D.E. 99] ("P. Thomas Obj."), Simone Thomas [D.E. 100] ("S. Thomas Obj."), Kathleen McNeal and Alison Paul [D.E. 104] ("McNeal/Paul Obj."), John Buckley [D.E. 93] ("Buckley Obj."), and C. Jane Radlinski [D.E. 90] ("Radlinski Obj.").[1] To be sure, the objectors have generally ignored – or have no objection to – the primary features of the Settlement:

First, none of the objectors have any real objection to the amount of compensation to which claimants are entitled. While some of the objectors have half-heartedly objected to the two-tier payment structure, those objections are not based on case law in the Seventh Circuit, which allows for different levels of recovery based on different levels of proof. Thus, there can be no question that the **amount** of compensation available to claimants, and the **process** for seeking compensation, is reasonable and fair.

Second, the Settlement has no cap on the consideration to be made to Class Members. This means not only that **all** consumers who make valid claims will receive the full amounts that

---

[1] Each of the arguments made below are made on behalf of all Parties. Plaintiffs also are submitting herewith their own separate response to the objections, addressing the value of the injunctive relief to the Class. The Settling Defendants agree that the injunctive relief has value to the Class, but take no position on the value of such relief or how it should be calculated. Similarly, to the extent the Plaintiffs' separate response relies on the alleged falsity or deceptiveness of the Settling Defendants' labeling and advertising and/or the alleged lack of efficacy of the products, the Settling Defendants disagree with such assertions.

they are due under the Agreement, but also that there is no limited "fund" from which attorneys'
fees will be taken.  Thus, the award of attorneys' fees has no impact on Class recovery.[2]

     <u>Third</u>, none of the objectors take any issue with the strength of the Notice Program – nor
could they, considering its breadth and scope.  While the Objectors may predict a low claims
rate, they cannot and do not argue that the claims rate was a result of any deficiency in the Notice
Program, which reached an estimated 76 percent of the Class, and which the Court already
approved (Preliminary Approval Order [D.E. 89] ¶ 6).  Indeed, unlike most consumer class
action settlements, which typically involve only publication notice, this settlement provided
direct, individual notice to more than 4.7 million class members, or almost 40 percent of the
estimated class.

     <u>Fourth</u>, the monetary value of this Settlement alone is substantial.  As more fully
discussed below (*see infra* § II.A–C), the minimum total benefit to the Class of the monetary
relief (direct compensation available to class members, notice and administration costs, and
attorneys' fees) is either $33.3 million or $20.2 million.  Either way it is valued, this Settlement
offers significant monetary value to the Class, and the attorneys' fees and expenses requested by
Class Counsel are proportional to that value.

---

[2] Because this is not a "settlement fund" case where all costs (including attorneys' fees and
notice and administration costs) come out of the same fund, many of the background
suppositions on which Objector Frank relies simply are not applicable.  *See, e.g.*, Frank Obj. at
13 ("Every dollar the settlement administrator receives is a dollar that is not available to the class
in settlement."); *id.* at 16 ("In a typical common fund settlement, the district court may, at its
discretion, reduce the fees requested by plaintiffs' counsel – when it does so, the class will
benefit from the surplus.").  These statements, which appear to come from a brief in some other
case, are simply not true:  Because payment to claimants is uncapped, the amount of money
spent on administration or attorneys' fees has no effect on payments to the class.

In the end, although the Objectors – particularly Mr. Frank – refer to "self-dealing" and the "unfairness" of the settlement, they provide no evidence for such baseless claims. Indeed, almost all of their arguments relate to attorneys' fees. But in making such arguments, they ignore or undervalue important components of the settlement. The settlement provides for a claims-made procedure, **with no ceiling**, such that the monetary compensation made available to the Class is conservatively valued alone at approximately $27.3 million or approximately $14.2 million. *See infra* § II.A–C; Plaintiffs' Memorandum of Law in Support of Motion for Final Approval ("Final Approval Br."), being filed herewith, §§ III.C.1.a, V.B.1. Attorneys' fees of $4.5 million would constitute no more than 24 percent of the minimum value of the monetary compensation alone. The percentage is even lower once the value of the injunctive relief and the notice and administration costs are included. *See generally* Plaintiffs' Response to Objections. Accordingly, the attorneys' fees to which the Settling Defendants have agreed are within an acceptable percentage of the overall value to the Class. The remaining objections – related to the claim and objection processes, the incentive awards to the named plaintiffs, and the *cy pres* component – are not supported by fact or the law in this Circuit and should also be overruled.[3]

I.  **THE OBJECTORS HAVE MISCHARACTERIZED THE STANDARD FOR THIS COURT'S REVIEW OF THE SETTLEMENT AGREEMENT.**

This Court is required to carefully review the settlement. *See, e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 578 (N.D. Ill. 2011). However, this Court's duty is not to determine whether the settlement "has achieved perfection," *Mangone v. First USA Bank*, 206 F.R.D. 222,

---

[3] The only Objector who has stated an intent to appear at the Final Approval Hearing is Mr. Frank, through his counsel (Frank Obj. at 3-4).

3

227 (S.D. Ill. 2001), to try to make it "better," *Schulte*, 850 F. Supp. 2d at 591, or to otherwise interfere with a fair and reasonable compromise reached by the Parties.

As the Seventh Circuit has noted, a district court should grant approval if "the proposed settlement is lawful, fair, reasonable and adequate." *In re Kentucky Grilled Chicken Coupon Mktg. & Sales Pracs. Litig.*, 280 F.R.D. 364, 375 (N.D. Ill. 2001) ("*In re KFC*") (quoting *Uhl v. Thoroughbred Tech. & Telecommc'ns, Inc.*, 309 F.3d 978, 986 (7th Cir. 2002)); *see also* Final Approval Br., §§ III.A (discussing public policy strongly favoring class action settlements), III.B. (discussing procedural fairness of the settlement), III.C (discussing substantive fairness of the settlement).

The Court views the facts in the light most favorable to the settlement and "must not substitute its own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." *In re KFC*, 280 F.R.D. at 375. Moreover, the Court is required to reject objectors' arguments that are "tantamount to complaining that the settlement should be 'better,' which is not a valid objection." *Schulte*, 805 F. Supp. 2d at 591–92 (internal quotation marks and citations omitted) (stating further that the Court's belief "that one or a few terms could have been improved . . . is an insufficient grounds for rejection").

## II.  THE OBJECTORS HAVE GROSSLY UNDERVALUED THE COMPONENTS OF THE SETTLEMENT.

None of the Objectors truly contend that the monetary benefits available to Class members are deficient. The available benefits range from at least $3 to as much as $50 for each class member. Importantly, this is an ***uncapped*** settlement allowing compensation for ***all*** class members and ***all*** valid claims. Thus, Objectors have not and cannot contend that the amount available to the class members is anything other than fair and reasonable. *See* Final Approval Br. § II.A.1 (discussing total potential benefit to class members provided by the settlement).

4

Instead, it appears that the focus of the Objectors' arguments is that the amount of the attorneys' fees and expenses ("fees") to which the Settling Defendants have agreed not to object – fees that do not reduce the recovery of any class member – is disproportionate in their view to the value of the Settlement.[4]  Objectors contend that, at most, the Settlement is worth $8 million (the sum of the $2 million claim payment floor, the minimum $1.5 million in notice and administration costs, and the $4.5 million in fees) (Frank Obj. at 15; Easton Obj. at 3; P. Thomas Obj. at 2; S. Thomas Obj. at 2), or as little as $6.5 million if one ignores the notice and administrative costs (Frank Obj. at 12–15; Easton Obj. at 3).  The Objectors then contend that the ratio of fees to the amount recovered is disproportionate, supporting the baseless inference that the Settlement is the by-product of collusion or self-dealing (Frank Obj. at 9–12; Easton Obj. at 3–4; P. Thomas Obj. at 2–3; S. Thomas Obj. at 2; McNeal/Paul Obj. at 6–7).

The Objectors, however, ignore well-settled law governing how courts are to value the monetary component of a claims-made settlement such as this one.  They also contend that the injunctive relief is of no value when, in fact, the injunctive relief provides consumer protection and has a monetary value.  *See generally* Plaintiffs' Response to Objections.  Finally, under Seventh Circuit law, the notice and administration costs are also of value to the Class.

---

[4] Because the amount available for payment of claims is uncapped, the Objectors do not contend that the claims amounts provided in the Settlement are insufficient or should be increased as a result of any decrease in fees.  Accordingly, they would not benefit from any reduction in fees.  Under recent Seventh Circuit precedent, therefore, it would appear that Objectors lack standing or any legally cognizable interest in objecting to the fee amounts.  In *Silverman v. Motorola Solutions, Inc.*, Nos. 12-2339 & 12-2354, 2013 WL 4082893 (7th Cir. Aug. 14, 2013), the Seventh Circuit dismissed the appeal of an objector who was objecting to the fee award, but who had not filed a claim himself.  The Court found that the objector "lacks any interest in the amount of fees, since he would not receive a penny from the fund even if counsel's take should be reduced to zero."  *Id*. at *1.  This same logic applies here.

### A.    Available Compensation to the Class Is Worth Between $14.2 Million and $27.3 Million.

The minimum total potential compensatory benefit available to the class is between $14.2 million and $27.3 million, based upon the valuation methodology dictated by the U.S. Supreme Court's seminal decision in *Boeing Co. v. Van Gemert,* 444 U.S. 472 (1980), and its progeny. *Boeing* reaffirmed the principle "that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from *the fund as a whole*." *Id.* at 478 (emphasis added).  Although *Boeing* involved a judgment, the valuation principle enunciated there applies to the valuation of settlements and the awards of fees therein.  *See* Final Approval Br. § V.B (discussing *Boeing* and its application by the Seventh Circuit in *Mars Steel Corp. v. Continental Nat'l Bank & Trust Co.*, 834 F.2d 677, 679 (7th Cir. 1987), and elsewhere); *see also In re KFC*, 280 F.R.D. at 380 n.9 (citing *Boeing* to support the principle that "[a]bsent extenuating circumstances, *fees are based on the benefit made available to the class, as opposed to the amounts actually claimed*") (emphasis added).

In this case, the settlement allows claims to be made on undocumented purchases, which is an extremely beneficial aspect of this Settlement.  Typically, when a case proceeds to judgment following a trial, class members are required to prove the fact of their purchases through valid documentation; not so in this Settlement.  Further, the Settlement Administrator estimates that there are more than 12 million class members (Notice Plan, attached as Ex. C to the Settlement Agreement), and that the notice program reached over 76 percent of the class (Affidavit of Mark D. Schey ("Schey Aff.") (Ex. A) ¶ 10), such that approximately 9.1 million class members would have received notice of the settlement.  Moreover, approximately 4.7 million class members received direct, individual notice via email or postcard (Affidavit of Michael E. Hamer ("Hamer Aff.") (Ex. B) ¶¶ 10–13; Declaration of Dan Ross ("Ross Decl.")

(Ex. C) ¶¶ 5, 6), which is rare in consumer class actions (Schey Aff. (Ex. A) ¶ 10). Applying the *Boeing* methodology yields a minimum total potential compensatory benefit of $27.3 million (12 million class members x 76 percent reach x $3.00 minimum claim) or, focusing only on class members who received direct notice, $14.2 million (4,718,651 million direct notice recipients x $3.00). Moreover, these amounts are conservative because class members are entitled to make multiple claims – up to $12 each for undocumented purchases and up to $50 for documented purchases. *See also* Final Approval Br. §§ III.C.1.a, V.B.1.

While Objector Frank relies heavily on Ninth Circuit law in support of his collusion arguments, he ignores that even the Ninth Circuit has consistently followed the *Boeing* approach in valuing settlements. For example, in *Williams v. MGM-Pathe Communications Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997), the Ninth Circuit reversed a holding that had restricted a fee award to a percentage of the actual $10,000 claims made instead of the $4.5 million made available. Citing *Boeing*, the Ninth Circuit reversed and remanded, "conclud[ing] that the district court abused its discretion by basing the fee on the class members' claims against the fund rather than on a percentage of the entire fund or on the lodestar." *Id.*

The Ninth Circuit recently reaffirmed this approach over the objection of Mr. Palmer's client[5] and others in *Stern v. Gambello*, 480 F. App'x 867 (9th Cir. 2012). In *Stern*, approximately $36 million was available to pay claims. Objectors asserted that the fee award should be based upon the actual claims made and not the funds made available. The district court overruled these objections and evaluated the fee award based on the funds made available. *Stern v. AT&T Mobility Inc.*, No. 2:05-cv-08842 (C.D. Cal. Nov. 22, 2010) [D.E. 394] (Ex. D).

---

[5] Mr. Palmer is one of the attorneys representing Objectors McNeal and Paul.

Affirming the district court's order, the Ninth Circuit held, "nor was it error to consider, in cross-checking the fees against the recovery, *the potential recovery* rather than the claims actually made." 480 F. App'x at 870 (citing *Williams*, 129 F.3d. at 1027) (emphasis added).[6]

To the extent that the Objectors focus on the floor, the actual claims made, or anything other than the funds that Settling Defendants have made available to class members, their focus is misplaced.

### B.    Notice and Administrative Costs Are a Part of the Value of the Settlement.

Objector Frank also contends that notice and administrative costs should not be included in determining the value of the Settlement (Frank Obj. at 12–15). In rejecting this identical contention, the court in *In re KFC* stated, "[t]he Objection improperly deducts the cost of notice from the Settlement fund created in order to suggest that the requested fee represents a higher percentage of the common fund (Obj. at 7.) Deduction of notice costs from the fund is improper,

---

[6] Two more examples illustrate this point. In *Wear v. Sprint Commc'ns Co.*, No. 2:11-cv-809, 2013 WL 3108312 (D. Nev. June 18, 2013), the court approved a claims-made settlement that appeared to be uncapped, and the defendant's payment of fees would not "'reduce the benefits available for the Class.'" The court noted that "it is appropriate to base the percentage on the gross cash benefits available for class members to claim, plus the additional benefits conferred on the class by the Settling Defendants' separate payment of attorneys' fees and expenses, and the expenses of administration." *Id.* at *1–2 (citing *Boeing*). The court concluded that the agreed-to fee and expense award, as 28.4 percent of the "value of the fund as whole," was within the reasonable range allowed in the Ninth Circuit. *Id.* at *3.

In *Smith v. Qwest Communications Co.*, No. C11-02599, 2013 WL 3200592 (N.D. Cal. June 24, 2013), the district court approved a claims-made settlement similar to the *Wear* settlement and the Settlement here. Following *Boeing*, the court concluded that the approximate $4,273,000 of "cash benefits available for class members *to claim*" plus the "estimated administrative costs of $2,942,000," to be borne by the Settling Defendants plus the "agreed-to attorneys' fees and expenses of $2,901,000," also to be paid separately by the Settling Defendants, in the total amount of "approximately $10,116.000" was the appropriate monetary value of the settlement. *Id.* at *2 (emphasis added). The court also concluded that "[t]he $2,901,000 fee-and-expense award therefore represents 28.68 percent of the fund as a whole" which is "within the range of reasonable percentage-fee awards in this Circuit." *Id.* at *2–3.

however, as the cost of notice and claims administration are properly considered part of the fund, as are attorney fees." *In re KFC*, 280 F.R.D. at 386 (citing *Schulte*, 805 F. Supp. 2d 560); *see also Smith*, 2013 WL 3200592, at \*2; *Hartless v. Clorox Co.*, 273 F.R.D. 630, 645 (S.D. Cal. 2011). These courts reason that if a judgment were obtained on behalf of the class, the class would be required to pay the notice and administrative costs; accordingly, it is a clear benefit to the class that the Settling Defendants are instead paying these costs in connection with the settlement. *Mangone*, 206 F.R.D. at 228 (finding the "biggest monetary benefit" to the class to be the defendant's agreement to bear the costs of Notice "which is an expense that would ordinarily be borne by class action plaintiffs").

Nonetheless, even if the $1.5 million for notice and administrative costs are excluded, the Settlement still has a minimum total potential compensatory benefit that ranges from $31.8 million ($27.3 million (compensation available to 76 percent of class that received publication notice) plus $4.5 million fees) to $18.7 million ($14.2 million (compensation available to direct notice recipients) plus $4.5 million fees) with fee percentage – at the most – at 24 percent.

### C. When Compared to All Components of the Settlement, the Attorneys' Fees Are Reasonable.

There can be no question that all components of the settlement should be considered when evaluating the fairness of the settlement and the reasonableness of the attorneys' fees to be awarded. *See supra* § II.A–B; Final Approval Br. §§ III.C.1.a, V.B.1; *see also Schulte*, 805 F. Supp. 2d at 599 ("Where a settlement includes substantial affirmative relief, such relief must be considered in evaluating the overall benefit to the class."). Thus, the Objectors' arguments about collusion, as based on disproportionality, are baseless: The minimum value of this Settlement – focusing on monetary relief only – is either: (1) $33.3 Million ($27.3 million (compensation available to the 76 percent of class that received publication notice) plus $1.5 million notice and

administrative costs plus $4.5 million in fees); or (2) $20.2 million ($14.2 million (compensation available to direct notice recipients) plus $1.5 million in notice and administrative costs plus $4.5 million in fees and expenses).  Using the *Boeing* valuation criteria, the percentage of attorneys' fees agreed to be paid versus the minimum amount of funds made available by the Settling Defendants (including notice and administration costs), is no more than 22 percent.[7]  This percentage, based on the value of the monetary relief alone, are well under the 25 percent norm that the Objectors contend exists in the Seventh Circuit (Frank Obj. at 9; *see also* Easton Obj. at 2 (appropriate percentage would be 20 to 30 percent)).[8]

Likewise, because the value of the Settlement is based upon the funds made available, and not the amount of claims ultimately made, there is no need to delay the fees and expenses award until the claims period ends in December, as some Objectors contend (*see* Frank Obj. at 17–19; Easton Obj. at 4; McNeal/Paul Obj. at 8).

### D.      The So-Called "Clear Sailing" Provision and Reverter of Fees Are Proper.

Frank also objects to Defendants' agreement not to object to a fee award above $4.5 million as a collusive "clear sailing" agreement (Frank Obj. at 15–16).  As a threshold matter, because the Settlement provides monetary amounts to which Objectors have no complaint, as well as substantial and valuable injunctive relief, Objectors' hollow contentions of a "sell-out" are rebutted by the Settlement Agreement itself.

Further, a clear-sailing provision is a necessary component of any settlement where the fee amount is negotiated after the parties have agreed to the benefits to the class.  Otherwise, an

---

[7] Percentage derived by dividing $4.5 million by $20.2 million.

[8] *See, e.g., In re KFC,* 280 F.R.D. at 380-81 (thorough discussion of case law in Seventh Circuit holding that 30 percent and above are appropriate percentages of fees).

agreement to pay fees separate from the funds made available to the class could never be

reached. Moreover, separate negotiation is a preferred practice because it ensures that class

counsel obtain the best possible deal for the settlement class, as the quality of benefits provided

by the Settlement will then serve as the basis for the subsequent fee negotiations and award.

There is nothing *per se* objectionable about a clear sailing provision or a reverter of unawarded

fees to the defendants. *See McKinnie v. JP Morgan Chase Bank, NA*, 678 F. Supp. 2d 806, 812

(E.D. Wis. 2009) ("[T]he reversion of unclaimed funds to the defendant is not objectionable

when class members receive full recovery for their damages and the parties agree to the

reversion. . . . [A] defendant in a class action settlement has no obligation to oppose the fee

petition submitted by class counsel. Thus, the fact that the proposed settlement includes these

terms does not render it inherently unfair or unreasonable.") (citation omitted); *Mangone*, 206

F.R.D. at 230 ("Courts have broad discretion in distributing unclaimed class action funds, and

where the parties agree on the distribution of unclaimed class funds, the court should defer to

that method of distribution.").

Finally, since there is no cap on claims, the reversion of any fees not awarded to class

counsel does not signal collusion. Put another way, nothing related to the fee award will affect

in any way the amount of monies that any class member will receive.

## III. THE OBJECTION AND CLAIMS PROCESSES MEET THE RULE 23 REQUIREMENTS AND DO NOT IMPOSE UNDUE BURDENS ON CLASS MEMBERS OR OBJECTORS.

### A. The Notice of Attorneys' Fees Request Met the Rule 23(h) Requirements.

Objectors Frank, McNeal, and Paul each offer the hyper-technical and procedural

objection that the Settlement's motion schedule violates Fed. R. Civ. P. 23(h) because Class

Members' objections were required to be filed two weeks before the deadline for Class

Counsel's submission in support of their fee award. Because the Objectors' contention

(i) ignores the fact that notice to the Class clearly and conspicuously disclosed to Class Members that Class Counsel would seek an aggregate fee award up to $4.5 million; (ii) relies upon a Ninth Circuit case that has found little traction in any other court; and (iii) has been mooted by the adjournment of the final approval hearing, such an objection should be turned aside.

       1.     <u>Notice of Class Counsel's Fee Request Was Published to the Class.</u>

Objectors concede that the Settlement Agreement forged between the parties contemplates a fee application being made up to an aggregate amount of $4.5 million. This aspect of the parties' negotiated resolution is clearly and conspicuously disclosed in the Settlement Agreement itself, and memorialized in both the full class notice and on the settlement website. Fed. R. Civ. P. 23(h) provides that "[n]otice [of a claim for an award of attorneys' fees] must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner." Contrary to the Objectors' suggestion, Rule 23(h) does not prescribe any schedule or defined procedure concerning the timing of Class Counsel's fee petition vis-à-vis the deadline for objections. Rather, the statute requires only that **notice** of Class Counsel's claim for fees be "directed to class members in a reasonable manner." *See*, *e.g*., *Bower v. MetLife, Inc.*, No. 1:09-cv-351, 2012 U.S. Dist. LEXIS 149117, at *14 (S.D. Ohio Oct. 17, 2012) ("*Rule 23(h)* gives the Court the discretion to determine the timing of fee petitions, . . . and . . . does not by its plain language require that the fee petition be submitted at any specific time.") (citations omitted); *In re Air Cargo Shipping Servs. Antitrust Litig*., No. 06-MD-1775, 2009 WL 3077396, at *14 n.15 (E.D.N.Y. Sept. 25, 2009) (rejecting objection based on notice's failure to inform when the fee application would be filed, because the maximum amount of the fees that would be requested by counsel was the subject of direct and publication notice, and posted on the settlement website); *Cassese v. Williams*, 503 F. App'x 55, 57–58 (2d Cir. 2012) (notice to the class satisfied due process where it disclosed the amount that would be requested in attorneys'

fees). Thus, publication of notice to the Class, including the amount of Class Counsel's anticipated fee application, is sufficient to satisfy Rule 23(h). *See In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 972–73 (N.D. Ill. 2011) ("[T]he fact that the class notice enabled Class Members to learn [the maximum amount Class Counsel would seek] constituted adequate notice. . . . The Class Notice was sufficient with respect to the costs and expenses that Counsel would likely seek.").

### 2. *Mercury Interactive* Has No Precedential Value Here.

Objector Frank's argument relies heavily on *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010) (Frank Obj. at 5–6). In *Mercury*, the Ninth Circuit held that Rule 23(h) requires that class members be allowed the opportunity to object to Class Counsel's fee motion itself, not merely to the notice that such a motion would be filed. *Id.* at 993–94. *Mercury,* however, is not binding upon this Court, and "it appears that no court outside the Ninth Circuit has ever followed its conclusion that *Rule 23(h)* requires a fee petition to be filed before the objection deadline." *Bower,* 2012 U.S. Dist. LEXIS 149117, at *15–16. As the court noted in *Bower*, Rule 23(h) "does not by its plain language require that the fee petition be submitted at any specific time." *Id.* at *14.

Moreover, the holding in *Mercury* is inapposite because **the proposed fee award in this case does not impact the monetary compensation to the Class or the injunctive relief**. *See, e.g.*, *In re Lifelock, Inc. Mktg. & Sales Prac. Litig*, No. 08-1977, 2010 WL 3715138, at *9 (D. Ariz. Aug. 25, 2010) (holding that *Mercury* did not impact a pending motion for attorneys' fees because the proposed fee award had no effect on the scope of the injunctive and monetary benefits afforded to the class, and stating that "there [was] no 'adversarial' relationship at the fee setting stage requiring the Court to assume the 'role of fiduciary for the class plaintiffs' because the fee award is not coming from a common fund and will not affect class members' rights.")

(quoting *Mercury*, 618 F.3d at 994). Thus, the holding in *Mercury* provides no basis to upset the Parties' settlement and this objection should be overruled.

### 3. The Adjourned Final Approval Hearing Moots the Objection.

The adjournment of the Fairness Hearing from September 4, 2013 to October 4, 2013 moots this procedural objection. Class Counsel is contemporaneously filing their fee petition and supporting documentation on September 4, 2013, alongside their response to the Objections. With the Fairness Hearing now scheduled for October 4, 2013, the Objectors will have a full month in which to review Class Counsel's fee petitions. *See*, *e.g*., *Weeks v. Kellogg Co*., No CV 09-08102, 2011 U.S. Dist. LEXIS 155472, at *80–81 (C.D. Cal. Nov. 23, 2011) (a week's time for objectors to review the fee application was ample time). Thus, the adjournment of the Fairness Hearing nullifies this procedural objection.[9]

### B. The Objection Process Is Typical and Presents No Undue Burden to Class Members.

Three Objectors claim that the objection and opt-out process approved by this Court was "onerous" and therefore improper in various respects (Frank Obj. at 20–23; Easton Obj. at 9–10; McNeal/Paul Obj. at 5–6). As explained below, none of these objections provides any basis for rejecting the Settlement.

---

[9] Moreover, even if *Mercury* were binding upon this Court (which it is not) any alleged error committed by filing the fee petition after the objection deadline would be harmless. *See*, *e.g., Bower*, 2012 U.S. Dist. LEXIS 149117, at *16 (where the Objectors still had over three weeks between the filing of the fee petition and the final fairness hearing, any earlier error in the timing of filing the fee petition would have been harmless); *In re Lawnmower Engine Horsepower Mktg. & Sales Pracs. Litig*., MDL No. 08-1999, 2010 WL 4386552, at *2 (E.D. Wis. Oct. 28, 2010) (same).

      1.     <u>Requiring Objectors and Opt-Outs To Mail Their Submissions Is</u>
                        <u>Reasonable and Accepted in this Circuit.</u>

Objector Frank asserts that the process for objecting was "'unnecessarily onerous'" because objectors and opt-outs could not submit their papers electronically (Frank Obj. at 21). As an initial matter, service by mail is, of course, a time-honored and accepted practice. *See* Fed. R. Civ. P. 5(b)(2)(C) (permitting service by "mailing [the paper] to the person's last known address—in which event service is complete upon mailing").

Moreover, Frank's argument relies on just three out-of-circuit decisions (Frank Obj. at 21 (citing opinions from California, Kansas, and Missouri)), none of which denied approval of a class action settlement on Frank's theory that Rule 23 requires the parties to permit electronic submissions. In *Galloway v. Kansas City Landsmen, LLC*, No. 4:11-1020, 2012 WL 4862833 (W.D. Mo. Oct. 12, 2012) (Frank Obj. at 21), the notice required exclusion forms to be "both emailed *and* either mailed first-class or hand-delivered," which prompted the court to state that this obviously redundant procedure "seems unnecessarily onerous." *Id*. at *6. *Galloway* therefore does not mandate the far-reaching relief Frank seeks in his objection.

Objector Frank's reliance on the unpublished order from *In re Motor Fuel Temp. Sales Pracs. Litig.*, No. 07-md-01840 (D. Kan. Nov. 10, 2011) [D.E. 3019] (Ex. E) (Frank Obj. at 21), is likewise misplaced. That order conditioned approval of the parties' proposed notice plan on their allowing class members who received notice via email to object and-opt out electronically as well. That was simply a decision made by the Court in that particular case, without any holding or finding that it was required by law. Here, requiring a second notice advertising the availability of electronic submission would be unnecessary and wasteful.

Finally, Frank's reliance on *Smith v. Levine Leichtman Capital Partners, Inc*., No. C 10-00010, 2012 U.S. Dist. LEXIS 163672, at *8–9 (N.D. Cal. Nov. 15, 2012) (Frank Obj. at 21), is

15

also unconvincing. *Smith* was a civil RICO case (not a consumer fraud case like this one), brought to recover damages that consumers suffered as the result of a debt-collection scheme in which the defendants represented themselves as being an "official 'district attorney bad check restitution program'" when in fact they had been hired by retail merchants. *See Smith,* 2d Am. Compl. ¶¶ 1–2 [D.E. 98 at 2] (Ex. F). The primary problem with the proposed settlement in *Smith* was the plaintiffs' attempt to drastically enlarge the class definition when they sought preliminary approval. *Smith*, 2012 U.S. Dist. LEXIS 163672, at *5. This "alteration in the class definition significantly increases the number of parties from whom Defendants would receive releases if class members do not opt out of the class. Moreover, due to the increase in class size, the potential monetary recovery for individual class members is significantly diminished." *Id*. Further, the *Smith* court took issue with the proposed settlement's failure to include any injunctive relief, allowing the defendants to continue their unlawful conduct. *Id*. at *6.[10] Only after discussing these blatant inadequacies did the court state, in two sentences, that the parties had made the procedures for filing objections "unduly burdensome" by requiring the submission of a telephone number, proof of class membership, and mailing of objections. *Id*. at *8–9. *Smith* is distinguishable in numerous respects and therefore provides no authority for voiding the Settlement Agreement here.

Whatever the merits of electronic submission, counsel for the Parties is aware of no decision in this Circuit rejecting a class action settlement on the ground that objectors and opt-outs were required to expend the minimal effort necessary to print and mail copies of their

---

[10] *Smith*'s criticism of this facet of the proposed settlement refutes Frank's contention that "prospective injunctive relief" can never offer any value to class members (Frank Obj. at 10–11 n.6). *See generally* Plaintiffs' Response to Objections.

pleadings. Further, a recent case in this Circuit approved a settlement in which *pro se* objectors were required to mail or e-file their objection with the court and send a hard copy to class counsel and defense counsel (similar to the objection process here). *See City of Greenville v. Syngenta Crop Prot., Inc.*, No. 3:10-cv-00188 (S.D. Ill. May 24, 2012) [D.E. 294-1 at Page ID #10429] (Ex. G); *see also City of Greenville v. Syngenta Crop Prot., Inc.*, 904 F. Supp. 2d 902, 903 (S.D. Ill. 2012) (granting final approval of the settlement). At any rate, Frank's argument is factually baseless given that only 1,620 opt outs and eight objections were submitted. Hamer Aff. (Ex. B) ¶ 16; *see also id.* ¶ 19 (explaining that the objection process used in this settlement is standard). Because hundreds of class members did not find the submission process "onerous," this objection should be denied.

### 2. Requiring Objectors To Appear at the Fairness Hearing or Request To Be Excused from Appearing Is Not Burdensome.

The three objectors represented by counsel take issue with the Notice's statement that, to preserve their right to appeal, objectors must appear at the Fairness Hearing in person or through counsel ***unless the Court excuses such appearance*** (Frank Obj. at 20–23; Easton Obj. at 9–10; McNeal/Paul Obj. at 5–6; *see also* Preliminary Approval Order [D.E. 89] ¶ 9(c); Notice [D.E. 73-1] at 6–7. The ability to request exclusion renders the objectors' argument meritless: Both the Preliminary Approval order and the Notice explains that objectors may "ask the Court in your objection to excuse such appearance prior to the Fairness Hearing." *Id.* at 7; Preliminary Approval Order [D.E. 89] ¶ 9(c). Indeed, Objector Easton asked to be excused from appearing at the Fairness Hearing (Easton Obj. at 1, 10). The other two represented objectors did not even make the request, indicating their ability to appear without undue burden.

Further, this argument is unfounded because no objector has presented any evidence that the Notice deterred a single person from objecting. Indeed, the available evidence demonstrates

that this requirement did not dissuade anyone, as four objectors – each of whom is *not* represented by counsel – asked the Court to consider their objections even though they indicated they would not attend the Fairness Hearing (P. Thomas Obj. at 2; S. Thomas Obj. at 1; Buckley Obj.; Radlinski Obj. at 2).  *See also, e.g., AT&T Mobility,* 789 F. Supp. 2d at 970 (rejecting similar objection alleging deterrent effect because "the objectors have not presented any evidence that this notice deterred anyone from objecting, including themselves").  This indisputable fact refutes these serial objectors' overwrought accusations that the Notice "consign[ed] objectors [and] opt-outs to second class status" (Frank Obj. at 22); "can only be interpreted as an attempt to quash all objectors" (McNeal/Paul Obj. at 5); and "violat[ed] the due process rights of class members" (Easton Obj. at 9).[11]

### 3.    The Law Allows the Parties to Depose Objectors.

Objectors Frank and Easton also claim that the Preliminary Approval Order's provision requiring objectors to make themselves available for deposition (Preliminary Approval Order ¶ 9(d)) is "untoward" (Frank Obj. at 22), and "disturbing" (Easton Obj. at 9–10).  This objection has been roundly rejected by courts in this District because it is well-established that the parties to a class action settlement can seek discovery from objectors, including by probing the merits of an objector's claims at deposition.  *See, e.g.*, *AT&T Mobility,* 789 F. Supp. 2d at 970 (noting that, under Fed. R. Civ. P. 30(a)(1), "'[a] party may, by oral questions, depose any person'";

---

[11] In decrying this aspect of the settlement, these serial objectors surely "protest too much."  The obvious and legitimate reason for requiring objectors to appear at the fairness hearing is to allow the parties and the Court to assess the merits of, and the motivations for, objections that may have been "brought by professional objectors and others whose sole purpose is to obtain a fee by objecting to whatever aspects of the Settlement they can latch onto."  *In re Checking Acct. Overdraft Litig.,* 830 F. Supp. 2d 1330, 1361 n.30 (S.D. Fla. 2011) (discussing the problem of "objector blackmail").

concluding that class notice appropriately stated that objectors may be subject to depositions because "[a]pprising objectors of their legal rights and obligations is entirely proper, even if such notification has a marginal deterrent effect"; and finding that "the objectors have not presented any evidence that this notice deterred anyone from objecting, including themselves"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012) (granting motion to compel discovery from objector because the plaintiffs' "requests for documents focus solely on the objector's standing, the bases for his current objections, his role in objecting to this and other class settlements, and his relationships with the counsel that are believed to be behind the scenes manipulating him").

McNeal and Paul's counsel Darrell Palmer knows this objection lacks merit, as another district court recently ordered two objectors represented by Palmer to appear at an evidentiary hearing so class counsel in that litigation could ask them questions pertinent to (i) standing, (ii) objections they had made in other cases within the past five years and rulings on those objections, and (iii) any monetary compensation they received in connection with those objections. *In re Hydroxycut Mktg. & Sales Pracs. Litig.*, No. 3:09-cv-01088, Order Granting in Part and Denying in Part Motion to Quash Deposition Subpoena (S.D. Cal. Apr. 29, 2013) [D.E. 215] (Ex. H); *see also Stern v. Cingular Wireless Corp.*, No. 2:05-cv-08842, Civil Minutes – General at 1 (C.D. Cal. Oct. 15, 2010) [D.E. 344 at 1] (Ex. I) (likewise ordering objectors represented by Palmer to be deposed on "the objectors' standing, factual allegations supporting objections, and whether objections in other class action cases have been made by the objectors").

A federal court has rejected a similar objection from Objector Easton's counsel Jonathan Fortman. After Fortman filed an objection in another class action earlier this year, the district court denied Fortman's motion to quash a subpoena instructing the custodian of records for his

office to attend a deposition and to produce documents. *See In re Law Office of Jonathan E. Fortman, LLC*, No. 4:13MC00042, 2013 WL 414476, at *1-2 (E.D. Mo. Feb. 1, 2013). Because depositions are a proper means of examining "the merits of [an] objection to [a] class action settlement," *id.* at *2, Easton's and Frank's objection to this Court's Preliminary Approval Order should be denied.

### C.  The Claims Process, Including Two Tiers of Recovery, Is Appropriately Tailored to the Facts and Law Applicable to this Case.

Objectors Frank, McNeal, and Paul appear to challenge the claims-made nature of the settlement (Frank Obj. at 10 n.4; McNeal/Paul Obj. at 4–5). Objectors McNeal, Paul, Buckley, Peggy Thomas, and Simone Thomas appear to challenge the use of two tiers of recovery (McNeal/Paul Obj. at 3–4; Buckley Obj.; P. Thomas Obj. at 3; S. Thomas Obj. at 2–3). Nonetheless, the claims process employed is typical of consumer fraud cases, and appropriate in light of the facts and law applicable to this case.

### 1.  A Claims-Made Process Is Typical, Appropriate, and Necessary in a Consumer Fraud Case Like this One.

In a footnote only, Frank appears to take issue (albeit half-heartedly) with the requirement that Claimants submit a claim form, rather than Rexall providing direct payment to all known class members (Frank Obj. at 10 n.4). This argument falls short for two reasons: First, settlements using a proof of claim requirement are "commonly employed" in consumer fraud cases. ALBA CONTE & HERBERT B. NEWBERG, 3 NEWBERG ON CLASS ACTIONS § 8:45 (4th ed. 2002); *see also, e.g.*, *Schulte*, 805 F. Supp. 2d at 593–94 ("there is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment"); *McKinnie*, 678 F. Supp. 2d at 814 (rejecting objection that requiring claimants to "attest that they withdrew cash from a Chase ATM using a non-Chase card 'under penalty of perjury' made the process too onerous and deterred potential class members from filing claims" because "requiring claimants

to verify on the claim forms that they meet class requirements" was not improper); *Milliron v. T–Mobile USA, Inc.,* No. 08-4149, 2009 WL 3345762, at *6 (D.N.J. Sept. 10, 2009) (finding "it perfectly appropriate to require Class members to submit certain information proving that they are entitled to collect the relief awarded in this case"), *aff'd*, 423 F. App'x 131 (3d Cir. 2011). Requiring claimants to present proof of purchase is warranted because it reflects each plaintiff's burden to establish liability and damages. *See Mangone*, 206 F.R.D. at 234–35 (rejecting objectors' argument that bank should bear the burden of establishing which class members were entitled to relief because "[c]lass action status does not alter th[e] basic principle" that "plaintiffs in civil actions bear the burden of proving their damages").

Second, although Rexall could identify certain class members, Rexall does not have complete purchase information for these class members and does not know, for instance, how many purchases each class member has made, what covered products they purchased, how many covered products they purchased, or when those purchases were made. *See, e.g.*, *id.* at 234 (rejecting objection to claims-based character of settlement because it "wrongly assumes that [the defendant bank] keeps records in the ordinary course of its business that would permit" the defendant to ascertain amount of damages to be awarded to each class member). Therefore, even if direct payment without a claim requirement were feasible, Rexall would not know the amount of money to which each class member would be entitled under the Settlement Agreement. The use of a claims process ensures that each claimant has an opportunity to declare and seek recovery for all covered purchases.

2.    The Two-Tier Recovery Process Is Appropriate.

McNeal and Paul raise additional frivolous objections to the claim process (McNeal/Paul Obj. at 3–4). McNeal and Paul initially claim that "the bifurcated award level is ethereal at best" because the cost of mailing used bottles to the settlement administrator "would outweigh the

additional $2 per bottle one is entitled to by submitting." *Id.* This argument is meritless because Claimants do not have to send a "used bottle," but rather can upload proof of purchase on the settlement website at no cost,[12] or can submit copies of the proof of purchase when they submit their claims – requiring no extra postage.

McNeal and Paul then claim that "the distinction between those who save drug store receipts and those who do not is unfair and must be rejected." *Id.* at 4. Objectors Buckley, P. Thomas, and S. Thomas similarly assert that providing more recovery to those with proof of purchase is somehow unfair (Buckley Obj.; P. Thomas Obj. at 3; S. Thomas Obj. at 2–3). But it is well-settled that stronger claims deserve more favorable treatment. *See Schulte*, 805 F. Supp. 2d at 589 ("[W]hen real and cognizable differences exist between the likelihood of ultimate success for different plaintiffs, it is appropriate to weigh distribution of the settlement in favor of plaintiffs whose claims comprise the set that was more likely to succeed.") (internal quotation marks and citations omitted); *id.* at 589–90 ("This allocation method ensures that the benefits of the settlement are made available to all Class Members, while protecting the interests of Class Members with the strongest claims . . . . The way in which the settlement allocates benefits is fair because it recognizes these important differences among Class Members.");[13] *see also In re KFC,* 280 F.R.D. at 373, 387 (giving final approval to class action settlement with three tiers of recovery depending on proof of purchase and noting, in granting final approval, that "all

---

[12] *See* Glucosamine Settlement, Submit Claim, http://www.glucosaminesettlement.com/claim.

[13] *Accord In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997) (collecting cases in which "merit-based weighting has been approved . . . where substantially different or additional claims have been asserted by certain class members and not others"); *In re Lucent Techs., Inc., Sec. Litig.*, 307 F. Supp. 2d 633, 649 (D.N.J. 2004) ("Courts have routinely approved plans of allocation that provide different payments to class members.") (citing *In re Cendant Corp. Litig.,* 264 F.3d 201, 248–49 (3d Cir. 2001)).

Settlement Class members are entitled to make a claim on the Available Amount, whether they retained [proof of] their membership in the class or not").

## IV.    THE INCENTIVE AWARDS ARE REASONABLE.

Relying on *Pampers* and cases cited by the *Pampers* court in which the relief did not benefit class members or was insignificant,[14] Objector Frank argues that the requested incentive awards for the named Plaintiffs ($5,000 each) are "excessive," as to "cast doubt" on whether Rule 23(a)(4)'s adequacy requirements have been met (Frank Obj. at 19).  Objector Frank ignores that Plaintiffs have made at least $14.2 to $27.3 million in direct compensation available to class members and negotiated for injunctive relief that provides significant consumer protection and monetary value (*see supra* § II.A–C).

Further, "[t]his circuit has indicated that incentive fees are designed to encourage individuals to become named plaintiffs."  *Meyenburg v. Exxon Mobile Corp.,* No. 3:05-cv-15, 2006 WL 2191422, at *2 (S.D. Ill. July 31, 2006) (citing *In re Continental Ill. Secs. Litig.*, 962 F.2d 566 (7th Cir. 1992)); *see also In re KFC,* 280 F.R.D. at 382 (same) (citing *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722–23 (7th Cir. 2001)).  In *Meyenberg*, the court found a $3,000

---

[14] Objector Frank cites to *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 951–52 (7th Cir. 2006) (noting that class members may only receive $1 – which was less than 1 percent of the statutory *minimum* available; unlike here where *even without proof of purchase*, class members can receive a refund of approximately 10-15 percent of the purchase price paid); *Crawford v. Equifax Payment Servs.*, 201 F.3d 877, 882 (7th Cir. 2000) (*no* monetary relief for class); *Radcliffe v. Experian Info. Solutions Inc.*, 715 F.3d 1157, 1164–65 (9th Cir. 2013) (involving a settlement agreement that "explicitly conditions the incentive awards on the class representatives' support of the settlement" resulting in class representatives having "very different interests than the rest of the class" and having financial motivations that may have surpassed their motivations to ensuring a fair and reasonable settlement for the class); *Fraser v. Asus Computer Int'l*, No. C 12-00652, 2013 WL 3595940, at *3 (N.D. Cal. July 12, 2013) (adjustment to incentive award was made based on "review of the declarations of named plaintiff and the cooperating class members").

incentive fee to be appropriate because plaintiff "took the inconvenience and risk of pursuing litigation with only the possibility of monetary gain that at best would be modest. Granting an incentive fee to him will serve the added purpose of encouraging other individuals to pursue similar litigation in the future." 2006 WL 2191422, at *2. The same is true as to each of the Plaintiffs in this action. Thus, the requested incentive awards are appropriate. *See* Final Approval Br. § V.E (collecting cases approving comparable incentive awards).

## V. THE CY PRES COMPONENT OF THE SETTLEMENT IS MEANINGFUL COMPENSATION PROVIDING A BENEFIT TO THE CLASS.

No portion of the $2,000,000 floor not claimed by class members will revert back to the Settling Defendants. Rather, under the settlement's *cy pres* clause, any monies under the $2,000,000 floor not claimed by class members (after the appropriate tripling (documented purchases) and doubling (undocumented purchases) of payments to class members) will be donated to the Orthopedic Research and Education Foundation ("OREF"). Objector Easton takes issue with the use of the *cy pres* to distribute unclaimed funds and the choice of the *cy pres* recipient (Easton Obj. at 5–8). Objector Frank does not find fault with the choice of *cy pres* recipient or the use of *cy pres* as a method of disseminating any residual funds, but argues in a footnote that, in determining the value of the settlement, "[a] dollar to the *cy pres* is not worth a dollar to the class." Frank Obj. at 12 n.9.[15] As explained below, these objections are meritless.

### A. The Use of *Cy Pres* Relief for Unclaimed Settlement Funds Has Been Accepted and Widely Used in the Seventh Circuit.

Easton's contention that the Seventh Circuit has rejected *cy pres* relief in cases like this one (Easton Obj. at 5–8) is unfounded. Courts in this Circuit routinely uphold *cy pres* provisions

---

[15] Objectors McNeal and Paul expressly "do not find any fault with" the *cy pres* provision (McNeal/Paul Obj. at 5).

in class action settlements similar to the instant one.  *See, e.g., In re KFC*, 280 F.R.D. at 387

("Courts of the Seventh Circuit have routinely approved the use of *cy pres* distributions in class

action settlements, particularly when locating and ascertaining the status of all individual class

members is prohibitively difficult or expensive.") (internal quotations and citations omitted); *In*

*re Mexico Money Transfer Litig.,* 164 F. Supp. 2d 1002, 1031 (N.D. Ill. 2000) ("The Seventh

Circuit and other courts have recognized that *cy pres* contributions are proper and often are part

of class action settlements.  . . . Particularly in cases like this, where it may well be difficult to

locate class members or to ascertain their status, a *cy pres* distribution is useful."); *McKinnie*,

678 F. Supp. 2d at 813 (stating that "[t]he use of a cy pres contribution is proper and acceptable

in class action settlements" and granting final approval of settlement that contained a reverter

clause and a clear sailing provision); *Mangone*, 206 F.R.D. at 230 ("Courts have broad discretion

in distributing unclaimed class action funds, and where the parties agree on the distribution of

unclaimed class funds, the court should defer to that method of distribution.") (citing NEWBERG

ON CLASS ACTIONS § 10.15 (3d ed. 1992)).[16]

Easton relies solely on two cases that are inapposite due to their patently different

procedural postures (Easton Obj. at 5–8 (repeatedly citing *Mace v. Van Ru Credit Corp*., 109

F.3d 338 (7th Cir. 1997), and *Simer v. Rios*, 661 F.2d 655 (7th Cir. 1981))).  Neither *Mace* nor

---

[16] As Objector Easton notes in her brief, the Parties were able to identify in the settlement agreement which products should be covered, but because the covered products are sold through retailers over-the-counter, Rexall cannot identify all purchasers of the covered products.  And while the Parties were able to identify *some* class members to receive direct notice (primarily members of the Osteo Bi-Flex loyalty club and Costco purchasers of the Kirkland products), Rexall does not have complete information regarding the types of products they purchased, how many they purchased, or when they made their purchases.  Moreover, although the Settlement Administrator was able to create a notice program to reach the class, the Parties are still without information regarding actual purchaser identification for the unknown class members.

*Simer* addressed the propriety of including a *cy pres* provision in a class action settlement to dispose of residual funds. Instead, in each case – neither of which involved a class action settlement – the Seventh Circuit rejected the putative class representative's attempt to use the *cy pres* doctrine as a ground for authorizing class certification in ongoing litigation. *See Mace*, 109 F.3d at 345 (rejecting argument that "the availability of cy pres recovery [offered] an alternative ground for class certification"); *Simer*, 661 F.2d at 675–76 (upholding denial of class certification in part because using a "fluid recovery" to allocate damages to the putative class "would be to ignore the requirements of Rule 23"). Thus, contrary to Easton's contention, neither *Mace* nor *Simer* foreclose the option of using a *cy pres* method of recovery in this type of class action settlement.[17]

Moreover, the *cy pres* provision promotes the parties' legitimate interest in fashioning a claims process that provides benefit to the class but is not susceptible to fraudulent claims. Increasing the payment amount for documented and undocumented claims any further is problematic because it will increase the likelihood that fraudulent claims are submitted. Hamer Aff. (Ex. B) ¶ 18 (providing more than $24 to a consumer for undocumented purchases creates significant risk of fraudulent claims); *see, e.g.*, *Hall v. AT & T Mobility LLC*, No. 07-5325, 2010 WL 4053547, at *11 (D.N.J. Oct. 13, 2010) (rejecting objection asking court to distribute residual funds to class members on *pro rata* basis in part because "the potential for fraudulent claims" presented a "significant" and "well-founded" risk); *McKinnie*, 678 F. Supp. 2d at 813

---

[17] Easton's reliance on *Six (6) Mexican Workers v. Ariz. Citrus Growers,* 904 F.2d 1301 (9th Cir. 1990), is also unhelpful. There, the Court disapproved a *cy pres* order granted as part of a judgment – not a negotiated settlement – to an entity without a substantial track record, without a sufficiently defined purpose, without an established distribution procedure, and without a "reasonable certainty that any member will be benefited." *Id.* at 1307–09.

("distributing any unclaimed amounts to claimants on a pro rata basis will result in an unwarranted windfall for those claimants); *State v. Levi Strauss & Co.*, 41 Cal. 3d 460, 476 (1986) (rejecting objection arguing that *cy pres* distribution should instead be allocated to claimants because providing additional money to claimants – whether legitimate or fraudulent – would constitute a "windfall"); *In re Lawnmower Engine Horsepower Mktg. & Sales Pracs. Litig.*, 733 F. Supp. 2d 997, 1010 (E.D. Wis. 2010) (approving parties' attempt to prevent payment of fraudulent claims).

### B.     OREF Is a Proper *Cy Pres* Recipient.

Secondly, Easton argues that OREF is not a suitable *cy pres* recipient because its mission "is not specific in its application or benefit for the class members in this case" (Easton Obj. at 6). In short, Easton complains that the relationship between the alleged injury suffered by the class members is "too remote" from OREF's charitable purpose. *Id*. Easton's argument fails because OREF's mission plainly aligns with the interests of the class: OREF is a 501(c)(3) organization that leaders of the three major professional organizations in the orthopedic community established "as a means of supporting research and education toward building the scientific base of clinical practice." OREF, About OREF, http://www.oref.org/site/PageServer?pagename= oref_about (last visited Aug. 27, 2013). Having raised nearly $ 95 million since its founding in 1955, OREF has a strong track record of fulfilling its charitable purpose. *Id*.

Here, there is a sufficient nexus between OREF's mission and the interests of the class. Contrary to Easton's suggestion, the law does not require a perfect connection between the class members' interests and OREF's mission. *See, e.g.*, *In re Mexico Money*, 164 F. Supp. 2d at 1031 (an organization devoted to "funding charitable and public interest projects that serve the Mexican and Mexican-American communities in the United States" was an appropriate *cy pres* recipient in case alleging that defendant money transfer services failed to disclose their exchange

rate mark-up to consumers); *In re KFC*, 280 F.R.D. at 387 (stating that an objection to a consumer fraud settlement "improperly and incorrectly ascribe[d] a 'self-serving' motivation for the *cy pres* by counsel and the Defendants" where the *cy pres* recipients were "the nation's leading domestic hunger-relief charity" and local bar foundations that provide assistance to indigent litigants); *In re LivingSocial Mktg. & Sales Prac. Litig.*, No. 11-CV-0745, 2013 WL 1181489, at *11 (D.D.C. Mar. 22, 2013) ("[I]t is appropriate for the residual funds to go to two non-profit organizations that are dedicated to the public interest, particularly where the alternatives would be to return the funds to defendant, thereby reducing the deterrent effect of the suit, or to escheat to the state."). But here, the connection between the mission of OREF and the class members is almost perfect: Plaintiffs allege that all class members took the glucosamine dietary supplements at issue to improve their joint health in some manner. All of the label claims at issue relate to joint health. Because OREF's mission is to support orthopedic research and education, which would include joint health research and education, it is an apt *cy pres* recipient.

Moreover, contrary to Objector Easton's unfounded implications, there is no current – and no previous – relationship between OREF and Rexall. *See* Declaration of Michael Collins (Ex. J). Rexall has not contributed to OREF in the past, OREF has never provided any monetary or other support to Rexall, and Rexall and OREF have no "professional ties." *Id.* ¶¶ 3–5. As in *In re KFC,* Easton's insinuation that there is something "particularly chilling" in the decision to designate OREF as the *cy pres* recipient (Easton Obj. at 8), "could [not] be further from the truth." 280 F.R.D. at 387.

In conclusion, Easton's objections provide no reason to rewrite the settlement's *cy pres* clause. While she has asked the Court to deny *cy pres* relief "and order that such funds be distributed to the class members who file claims" (Easton Obj. at 8), all valid claims – with no

cap – are already being paid and possibly will be doubled and tripled before being paid. *See Mexico Money*, 164 F. Supp. 2d at 1032 ("Given the size of the class, distribution of the total *cy pres* distribution to individuals would not significantly enhance the value of the settlement for any class member, and could have substantially increased administrative expenses.").

### C.     The *Cy Pres* Amount Is of Value to the Class.

Objector Frank takes no issue with the use of *cy pres* or the chosen *cy pres* recipient, but contends in a footnote that the value of any *cy pres* distribution should be reduced because "[a] dollar to the *cy pres* is not worth a dollar to the class" (Frank Obj. at 12 n.9). However, the cases on which Frank relies to disparage *cy pres* distributions are distinguishable. For instance, Frank quotes Judge Posner's statement in *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004), that "[t]here is no indirect benefit to the class from the defendant's giving the money to someone else" (Frank. Obj. at 12 n.9). Frank neglects to mention that what drew Judge Posner's criticism in *Mirfasihi* was the fact that the designated *cy pres* recipient was not a charity, but rather a subclass of the putative class. *See Mirfasihi*, 356 F.3d at 784. In other words, the rest of the class was not benefitting in any way from the payment of money to certain other class members. It was this highly unusual feature of the *Mirfasihi* settlement – which is not present here – that prompted Judge Posner's rebuke.

Objector Frank's reliance on *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468 (5th Cir. 2011) (Frank Obj. at 12 n.9), is also misplaced. In *Klier*, the district court was faced with distributing approximately $830,000 that went unused during the administration of a medical monitoring program created for the benefit of a subclass of plaintiffs who were not required to establish physical injury (the "monitoring subclass"). *See id*. at 472. The settlement separately awarded compensation to a subclass of plaintiffs who were able to demonstrate physical injury (the "demonstrated injury" subclass). *Id*. When it was no longer "feasible and equitable" for the

district court to distribute funds to the monitoring subclass, *id*. at 477, it ordered the unused

funds disbursed to three charities proposed by the defendants and one selected by the court, *id*. at

471. After a member of the demonstrated injury subclass appealed, the Fifth Circuit reversed,

ruling that the "district court abused its discretion by ordering a *cy pres* distribution" and

instructing it to reallocate the unused funds to the demonstrated injury subclass. *Id*. at 480. *Klier*

is thus factually distinguishable because it was both feasible and equitable to reallocate the funds

earmarked for medical monitoring to the readily identifiable subclass of plaintiffs who had

already demonstrated injury. Like *Mirfasihi*, *Klier* provides no basis for denigrating the *cy pres*

relief afforded by the Settlement Agreement. Pursuant to the Settlement Agreement, all claims

will be paid – and possibly doubled (for undocumented purchases) or tripled (for documented

purchases) – before any money is paid to the *cy pres* recipient. As discussed above, money paid

to OREF is of real benefit to the class and should be valued as such.

## VI. MANY OF THE OBJECTORS ARE SERIAL OBJECTORS WITH A HISTORY OF INTERFERENCE WITH CLASS ACTION SETTLEMENTS FOR PERSONAL GAIN.

Absent class members have a right to object. Fed. R. Civ. P. 23(e)(5). *Bona fide*

objectors play a valuable role in ensuring that fair and adequate settlements are approved, and

bringing to the parties' and the court's attention any previously unseen flaws in the settlement.

*See generally* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.643 (2004).

Nonetheless, the right to object is susceptible to abuse. For some time now, there has

been a cottage industry of professional objectors who seek to hold up class action settlements for

their own financial gain. In so doing, they impose an unnecessary tax on the system, prevent

parties to litigation from resolving their claims reasonably and in good faith, and hinder the fair

and efficient administration of justice. *See, e.g., id*. ("Some objections . . . are made for improper

purposes, and benefit only the objectors and their attorneys (*e.g*., by seeking additional

30

compensation to withdraw even ill-founded objections). An objection, even of little merit, can be costly and significantly delay implementation of a class settlement."); ALBA CONTE & HERBERT B. NEWBERG, 5 NEWBERG ON CLASS ACTIONS § 15:37 (4th ed. 2002) ("meritless objections tend to delay providing benefits to bona fide and deserving class members"); BARBARA J. ROTHSTEIN & THOMAS E. WILLGING, MANAGING CLASS ACTION LITIGATION: A POCKET GUIDE FOR JUDGES 15 (Fed. Judicial Ctr., 2d ed. 2009) (advising courts to "watch out . . . for canned objections from professional objectors who seek out class actions to extract a fee by lodging generic, unhelpful protests").[18]

For years, courts and commentators have condemned what they term "objector blackmail," a tactic by which purported class members "file wholly frivolous objections and appeals for no other reason than to induce these side payments from class counsel." Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 VAND. L. REV. 1623, 1624 (2009); *see also, e.g.*, *In re Checking Acct. Overdraft,* 830 F. Supp. 2d at 1361 n.30 (discussing the problem of objector blackmail). Most of the objections filed in this case were filed by professional objectors or, at the very least, objectors with an agenda other than protection of the class members, and, therefore, raise these same concerns.[19]

---

[18] *See also, e.g.*, *Barnes v. Fleetboston Fin. Corp.*, No. 01-10395, 2006 WL 6916834, at *1 (D. Mass. Aug. 22, 2006) ("[P]rofessional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors. Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose benefit the appeal is purportedly raised, gains nothing."); *In re UnitedHealth Grp. Inc. PSLRA Litig.*, 643 F. Supp. 2d 1107, 1108–09 (D. Minn. 2009) (comparing professional objectors to "remoras" (a species of parasitic suckerfish) and stating that their goal was "to hijack as many dollars for themselves as they can wrest from a negotiated settlement").

[19] One method to curb objector blackmail is to require objectors to post bonds under Federal Rule of Appellate Procedure 7 before taking an appeal. *See, e.g.*, *Barnes*, 2006 WL 6916834, at

## A.    McNeal's and Paul's Counsel – Attorney Palmer – Is a Professional Objector, Whom Previous Courts Have Recognized as Interested Only In Financial Gain.

Objectors McNeal and Paul are represented by Joseph Darrell Palmer (McNeal/Paul Obj. at 9). A PACER search quickly shows that Mr. Palmer is one of the most active professional objectors currently in operation. *See* Exhibit X hereto (collecting 24 federal case objections involving Mr. Palmer since 2007).[20] For example, in a span of just three days last October, Mr. Palmer filed nearly verbatim objections in two cases attacking (as he does here) the terms of the *cy pres* designation and the fees requested by class counsel.[21] Numerous examples of cases in which Mr. Palmer has filed objections and subsequently dismissed, abandoned, or withdrawn the objections or appeals without attaining any settlement changes or additional benefits for the class are collected in Exhibit X.[22]

---

*1-3. If the Court overrules the objections and the objectors appeal, the Parties may move to require the objectors to post a bond under Rule 7.

[20] It appears Palmer is also a frequent objector in California state court. *See In re TFT-LCD (Flat Panel) Antitrust Litig*., No. 3:07-md-01827, Indirect-Purchaser Plaintiffs' and Settling States' Joint Response to Objections to Combined Class, *Parens Patriae*, and Government Entity Settlements with AUO, LG Display, and Toshiba Defendants App. A [D.E. 7162 at 28–37] (N.D. Cal. Nov. 15, 2012) (collecting 18 California class actions in which Palmer has filed an objection since 2006).

[21] *Compare In re TFT-LCD (Flat Panel) Antitrust Litig*., No. 3:07-MD-1827, Objections of Leveta Chesser and Johnny Kessel [D.E. 6991] (N.D. Cal. Oct. 15, 2012) (Ex. K), *with Ruwe v. Cellco P'ship*, No. 07-cv-03679, Objections of James J. Poindexter, Cery Perle, and Jeffrey Palmer [D.E. 128] (N.D. Cal. Oct. 13, 2012) (Ex. L).

[22] At least two courts have denied or revoked Palmer's *pro hac vice* status due to unethical conduct. *See Herfert v. Crayola, LLC*, No. 2:11-cv-01301, Order [D.E. 74] (W.D. Wash. Aug. 17, 2012) (denying *pro hac vice* application because Palmer "falsely declared under penalty of perjury that he had not been disbarred or formally censured by a court of record or by a state bar association" when in fact he had been "temporarily suspended from the Colorado Bar Association, the State Bar of Arizona, and the State Bar of California as a result of a Colorado felony conviction") (Ex. M); *Arthur v. Sallie Mae, Inc.*, No. 10-cv-00198, 9/14/2012 Motion Hearing Tr. at 9–10 [D.E. 268] (W.D. Wash. Sept. 21, 2012) (stating that Palmer's failure to

As would be expected, such frivolous filings have caused some courts to treat Mr. Palmer harshly. *See*, *e.g.*, *In re Oil Spill by Oil Rig Deepwater Horizon*, No. MDL 2179, 2013 WL 144042, at *48 n.40 (E.D. La. Jan. 11, 2013) (noting that "Mr. Palmer has been deemed a 'serial objector' by several courts" and citing a transcript in which "Mr. Palmer admit[ed] . . . he had been found to have engaged in 'bad faith and vexatious conduct'"); *In re Uponor, Inc.*, F1807 *Plumbing Fittings Prods. Liab. Litig.*, No. 11-MD-2247, 2012 WL 3984542, at *3 (D. Minn. Sept. 11, 2012) (finding that "the Palmer Objectors have evidenced bad faith and vexatious conduct" and noting "the Palmer Objectors appear to be represented by an attorney who has not entered an appearance in this case and who is believed to be a serial objector to other class-action settlements"); *Embry v. ACER Am. Corp.*, No. C09-01808, 2012 WL 3777163, at *2 (N.D. Cal. Aug. 29, 2012) (holding objector represented by Palmer in contempt and striking his objection for failure to comply with two court orders requiring him to post an appellate bond or dismiss his appeal).[23]

---

timely amend his *pro hac vice* application did "not demonstrate candor with the court or that he took seriously the fact that he made a false statement under oath" and stating that Palmer "has apparently submitted false pro hac vice applications in at least three other cases") (Ex. N).

[23] Palmer's bad faith is also evident in his attempt to adopt wholesale "all other objections filed by other class members in this case" (McNeal/Paul Obj. at 8), even, apparently, those that contradict his own.  For instance, Objectors Easton and Frank challenge the *cy pres* provision (Easton Obj. at 5–8; Frank Obj. at 12 n.9), but Palmer's clients "do not find any fault with" it (McNeal/Paul Obj. at 5).  Blindly incorporating others objections is part of Palmer's *modus operandi*.  *See Saltzman v. Pella Corp.*, No. 1:06-cv-04481, Objections of Dave Thomas [D.E. 323 at PageID # 5525] at 10 (N.D. Ill. Jan. 29, 2013) (objection filed by Palmer that "adopts and joins all other well pled, bona fide objections filed by other class members in this case, and incorporates them by reference as if he appeared in full herein") (Ex. O).

33

**B.**   **Easton's Counsel Are Professional Objectors Whom Courts Have Found To Be Not Motivated by a Concern for the Welfare of the Settlement Class.**

Objector Easton is represented by a cohort of professional objectors who routinely challenge class action settlements by filing canned, unhelpful objections. Steve A. Miller is a prolific objector who often works with two of Ms. Easton's other attorneys, Jonathan Fortman and John C. Kress. The Parties were able to uncover 18 recent cases in which these three lawyers appeared, either individually or jointly, on behalf of a class action objector. *See* Exhibit Y. Although Miller, Fortman, and Kress are apparently not as notorious as Palmer, they too have drawn criticism from various courts. *See, e.g.*, *In re Checking Acct. Overdraft*, 830 F. Supp. 2d at 1361 n.30 (discussing objections, including one filed by Fortman and Kress: "[M]ost if not all of the Objections are motivated by things other than a concern for the welfare of the Settlement Class. Instead, they have been brought by professional objectors and others whose sole purpose is to obtain a fee by objecting to whatever aspects of the Settlement they can latch onto."); *Hale v. Wal-Mart Stores, Inc.*, Nos. 01-CV218710 & 01-CV227774, 2009 WL 2206961 (Mo. Cir. Ct. June 17, 2009) (sanctioning Kress and his co-counsel $11,319.70 for advising their objector clients not to attend depositions). In addition, on at least one occasion, Miller has filed an objection that "simply join[ed] in and adopt[ed another objector's] brief, without any reference to any portion of the record or citation of authority." *See In re Cellphone Fee Termination Cases*, 186 Cal. App. 4th 1380, 1388 n.15, 113 Cal. Rptr. 3d 510, 516 n.15 (2010). Such tactics expose Miller's true objective – to ransack class action settlements for his own personal benefit.

The record of Easton's fourth attorney, Maureen Connors, is harder to trace, perhaps because she appears new to the sport of class action objecting. Nonetheless, in May of this year, Connors joined Miller, Fortman, and Kress on an objection filed in *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 8:10-ml-02151 [D.E.

34

3632] (C.D. Cal. May 13, 2013) (Ex. P).  True to form, the *Toyota* objection lodges many of the same boilerplate objections that Objector Easton asserts here.  *Compare id*. at 11 (claiming that the *cy pres* recipient is "too remote"), *id*. at 23 (asking the court to "assess the value of the [injunctive relief] at zero dollars"), *and id*. at 31–33 (attacking a "clear sailing" provision), *with* Easton Obj. at 6 (claiming that the *cy pres* recipient is "too remote"), *id*. at 4 (arguing that "this Court should not give [the injunctive relief] any monetary value"), *and id*. at 2–3 (attacking a "clear sailing" provision).  Although it is unclear why Miller, Fortman, and Kress have recently added Connors to their team, one fact is evident:  It makes no sense for Objector Easton to hire four lawyers working in three different states to prepare an objection filled with boilerplate allegations and arguments.  As this arrangement indicates, the purpose of such objections is not to benefit class members or even Ms. Easton herself, but to line the pockets of professional objectors.  *See* Exhibit Y (summarizing 18 federal cases in which Miller, Fortman, Kress, and/or Connors have objected since 2008).

Miller also appears to be in the business of serving as a class action objector so fellow professional objectors can ply their trade.  For example, in *In re IPO Secs. Litig.*, 728 F. Supp. 2d 289 (S.D.N.Y. 2010), Miller and a corporate entity that he appears to have created for the purpose of objecting to class action settlements were objectors represented by two attorneys whom the court characterized as "serial objectors."  *Id*. at 291 n.5, 294–95.  After rejecting Miller's objections, the court found "evidence of bad faith and vexatious conduct" by the horde of professional objectors who had descended on this settlement.  *Id*. at 294.  The court sanctioned several of these professional objectors – including Miller's counsel – for refusing to answer questions the court propounded "to determine if any of the Objectors' counsel have a pattern or practice of objecting to class action settlements for the purpose of securing a settlement from

class counsel." *Id.* at 294–95. This untoward behavior led the court to "concur with the numerous courts that have recognized that professional objectors undermine the administration of justice by disrupting settlement in the hopes of extorting a greater share of the settlement for themselves and their clients." *Id.* at 295. As this disreputable episode illustrates, Miller's track record casts doubt on the authenticity of the positions advanced in the Easton objection.

## C. Theodore Frank and the Center for Class Action Fairness Are Serial Objectors Who Repeatedly Seek Thousands of Dollars in Attorneys' Fees for Filing Objections.

Theodore Frank and his Center for Class Action Fairness are both frequent objectors who monitor class action settlements solely for the purpose of objecting. Though there is merit in Frank's attempt to distance himself from professional objectors (Frank Obj. at 2 (defining professional objectors as "for-profit attorneys who attempt or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of the attorneys' fees")), a review of the cases in which Frank has either objected or represented an objector through CCAF shows that one of his missions is to reduce class counsel's award of attorney fees by any means necessary – while he gets paid in the process.[24] *See, e.g.*, *Dewey v. Volkswagen of Am.*, 909 F. Supp. 2d 373, 396–97 (D.N.J. 2012) (granting CCAF's $82,134.10 fee request); *In re Apple Inc. Sec. Litig.*, No. 5:06-CV-05208, 2011 WL 1877988, at *5 (N.D. Cal. May 17, 2011) (awarding Frank and CCAF $87,000 in fees). Moreover, Frank's objections have not always led to changes in the settlement

---

[24] In this regard, CCAF is the litigation arm of Frank's broader tort reform mission. *See, e.g.*, Theodore H. Frank, Resident Fellow, American Enterprise Institute and Director, AEI Legal Center for the Public Interest, *Protecting Main Street from Lawsuit Abuse: Statement Presented to the Senate Republican Conference* (March 16, 2009) at 1 (testifying that the tort system is "still a tremendous drag on the economy relative to other industrialized nations" and identifying "class-action litigation" as one feature of the American system (among many) responsible for "rais[ing] costs tremendously"), *available at* http://www.aei.org/files/2009/03/16/Frank%20 testimony.pdf (Ex. Q).

agreement. *See, e.g., Dewey*, 909 F. Supp. 2d at 396–97 (rejecting CCAF's argument that "no value should be assigned to non-monetary terms of the settlement and that benefit to the class should be measured by the amount of cash class members receive"); *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 205-06 (D.D.C. 2011) (rejecting Frank's attempt to reduce attorneys' fees award to 10 percent of the common fund).

Further, even though Frank tries to gain credibility by distancing himself from professional objectors and by offering "to stipulate to an injunction prohibiting [Frank] and his attorneys from accepting compensation in exchange for the settlement of this objection" (Frank Obj. at 3), Frank and CCAF themselves have previously sought fee awards deemed excessive. *See In re Apple*, 2011 WL 1877988, at *4–6 (noting that CCAF's request for an award of $297,916 "would result in an excessive hourly rate of more than $2,800"); *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 813–14 (N.D. Ohio 2010) (denying CCAF's request for $88,000 in attorneys' fees based on a lodestar multiplier of 2.2 and instead awarding him an unenhanced lodestar of $39,936); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 842 F. Supp. 2d 346, 351 (D. Me. 2012) (awarding Frank $10,000 fee despite request for $19,973.80). The fact that objector blackmail is not Frank's or CCAF's *modus operandi* should not impart any validity to Frank's arguments. As explained further already, Frank's objections are either groundless or easily resolved, and thus provide no reason to disturb this settlement.

## VII. THE REMAINING "OBJECTIONS" HAVE BEEN ADDRESSED OR ARE NOT PROPERLY CONSIDERED OBJECTIONS.

### A. Ms. Radlinski's Objection Has Been Fully Addressed By The Parties.

Objector Radlinski [D.E. 90] raised a concern involving the Osteo Bi-Flex Ambassador's Club loyalty rewards program. The parties took immediate action to moot Ms. Radlinski's objection by revising the proof of purchase criteria specific to Ms. Radlinski, agreeing to review

current Ambassador's Club data to address this issue for other Class members (in effect, waiving the proof of purchase requirement if they had previously submitted proof of purchase as part of the Ambassadors Club), and updating the Claim Form accordingly. *See* K. McCall Ltr. [D.E. 92]; Hamer Aff. (Ex. B) ¶ 15.a.

### B. Ms. Paulson's Objection Should Be Overruled.

Objector Paulson (Ex. R) (who apparently did not file or otherwise submit her objection to the Court) does not present any specific concerns regarding this Settlement. While Objector Paulson expressed strong feelings about lawyers and class actions generally, this is not a proper objection and should be overruled. *In re TD Ameritrade Acct. Holder Litig.*, Nos. C 07–2852 & C 09-4903, 2011 WL 4079226, at *12 (N.D. Cal. Sept. 13, 2011) ("Ms. Lamy's apparent concern for Ameritrade is inapposite, since the purpose of Rule 23(e)'s final approval process is the protection of absent class members, and not the defendant.").

### C. The Remaining "Objections" Are Actually Claim Submissions.

The last two "objections" received are more properly considered claims submissions. Mr. Leardi [D.E. 91] specifically stated "I wish to stay in the class settlement," explained that he believes "these products did not help," described the multiple purchases he made during the class period, and even submitted proof of such purchases. Mr. Koneval [D.E. 101] simply stated "I [] am a member of the settlement class" and identified the products he purchased during the class period. Accordingly, the Leardi and Koneval filings are being treated as claims by the settlement administrator.

### CONCLUSION

In conclusion, and based on the foregoing reasons, Plaintiffs and Settling Defendants hereby request that all objections be overruled.

38

Dated: September 4, 2013      By:   */s/ Kara L. McCall*

                      Kara L. McCall
                      Michael W. Davis
                      Theodore R. Scarborough, Jr.
                      SIDLEY AUSTIN LLP
                      One South Dearborn Street
                      Chicago, IL 60603
                      Telephone: (312) 853-7000
                      *Counsel for Defendants NBTY, Inc.; Rexall Sundown, Inc.; and Target Corp.*

                      Stewart M. Weltman
                      STEWART M. WELTMAN, LLC
                      53 W. Jackson, Suite 364
                      Chicago, Illinois 60604
                      Telephone: (312) 588-5033
                      (Of Counsel: Levin Fishbein Sedran & Berman)

                      Of Counsel:
                      Elaine A. Ryan
                      Patricia N. Syverson
                      Lindsey M. Gomez-Gray
                      BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.
                      2325 E. Camelback Rd., Suite 300
                      Phoenix, Arizona 85016
                      Telephone: (602) 274-1100
                      *Attorneys for Plaintiffs Nick Pearson, Francisco Padilla, Cecilia Linares, Augustina Blanco, and Abel Gonzalez*

                      Peter N. Freiberg (admitted *pro hac vice*)
                      Jeffrey I. Carton  (admitted *pro hac vice*)
                      DENLEA & CARTON LLP
                      One North Broadway, Suite 509
                      White Plains, New York 10601
                      Telephone:   (914) 920-7400
                      *Attorneys for Plaintiff Richard Jennings*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 4, 2013, a true and correct copy of the following document was electronically filed and served on all counsel of record in this action who are deemed to have consented to electronic service via the Court's CM/ECF system: **Parties' Joint Response to Objections**.

I also certify that the foregoing document is being served by U.S. Mail this day on all counsel of record or *pro se* parties identified below who are not authorized to receive electronically Notices of Electronic Filing.

| | |
|---|---|
| C. Jane Radlinski<br>309 E. Church Street<br>Jacksonville, FL 32202-2725<br>(904) 633-2699<br>*Pro se* Objector | John Michael Buckley<br>370 Canyon Spring Dr.<br>Rio Vista, CA 94571<br>(707) 374-3853<br>*Pro se* Objector |
| Peggy Thomas<br>2109 N.W. 12th Avenue<br>Ft. Lauderdale, FL 33311<br>(954) 761-1589<br>*Pro se* Objector | Simone Thomas<br>2109 N.W. 12th Avenue<br>Ft. Lauderdale, FL 33311<br>(305) 903-6935<br>*Pro se* Objector |
| Rhonda L. Paulson<br>13383 E. Marie Creek Road<br>Couer d'Alene, ID 83814<br>*Pro se* Objector | Donald Charles Koneval<br>8314 Manorford Drive<br>Parma, OH 44129-5309<br>(440) 842-6232<br>*Pro se* Objector |
| Anthony Leardi<br>1813 Renwick Street<br>Bethlehem, PA 18017<br>(610) 865-7821<br>*Pro se* Objector | Joseph Darrell Palmer<br>Law Office of Darrell Palmer PC<br>603 N. Highway 101, Suite A<br>Solana Beach, CA 92075<br>(858) 792-5600<br>Attorney for Objectors Kathleen McNeal<br>and Alison Paul |

40

| | |
|---|---|
| Melissa A. Holyoak<br>Center for Class Action Fairness<br>1718 M Street NW, No. 236<br>Washington, DC 20036<br>(573) 823-5377<br>Attorney for Objector Ted Frank | Jonathan E. Fortman #40319<br>250 Saint Catherine Street<br>Florissant, Missouri 63031<br>(314) 522-2312<br>Attorney for Objector Pamela Easton |
| Steve A. Miller<br>Steve A. Miller, PC<br>1625 Larimer Street, No. 2905<br>Denver, CO  80202<br>(303) 892-9933<br>Attorney for Objector Pamela Easton | Maureen Connors<br>6625 Pearl Road<br>Parma Heights, OH 44130<br>(216) 640-9860<br>Attorney for Objector Pamela Easton |
| John C. Kress (53396MO)<br>The Kress Law Firm, LLC<br>4247 S. Grand Blvd.<br>St. Louis, MO 63111<br>(314) 631-3883<br>Attorney for Objector Pamela Easton | |