# EXHIBIT S

**UNITED STATES DISTRICT COURT**
**NORTERHN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NICK PEARSON, FRANCISCO PADILLA, CECILIA LINARES, AUGUSTINA BLANCO, ABL GONZALEZ, and RICHARD JENNINGS, On Behalf of Themselves and All Others Similarly Situated, | |
| Plaintiffs, | Case No.: 11CV 07972 |
| v. | |
| NBTY, INC., a Delaware corporation; and REXALL SUNDOWN, INC., a Florida corporation; and TARGET CORPORATION, a Minnesota Corporation, | |
| Defendants. | |

**Report of Keith A. Reutter, Ph.D.,**
**Regarding Settlement**

## I. Introduction

1. I am a Ph.D. economist and Principal in the Washington, D.C. office of the Berkeley Research Group ("BRG"). BRG is an economic and financial consulting firm with offices in major U.S. and foreign cities. I have been associated with BRG since shortly after its founding in early 2010, and have been professionally employed as an economist for over 15 years. I hold a Bachelor of Science and Master of Arts in economics from the University of Texas-Arlington, as well as a Doctor of Philosophy in economics from Auburn University.

2. My professional experience includes the analysis of financial and economic data as it pertains to damages in complex litigation, as well as regulatory matters. I have filed testimony in state and federal courts, as well as with the U.S. Federal Energy Regulatory Commission. In addition to consulting work, I have taught economics and finance as an adjunct professor. My curriculum vitae containing a description of my education, professional experience as an economist, publications, and affiliations is attached as Appendix A. BRG is being compensated for my work in this matter at my standard hourly rate of $375. My compensation is in no way dependent on the outcome of this litigation. I have testified at trial or by deposition in the following matters in the last four years: *Liliana Cardenas, et al. Plaintiffs, v. NBTY, Inc., and Rexall Sundown, Inc., Defendants*, United States District Court Eastern District of California, Case No.: 2:11-CV-01615-LKK-CKD (2013); *Tara Holdings v. Stewart Lawn and Landscape*, In the Circuit Court for Anne Arundel County, Maryland, Case No. 02-C-11-156176 (2012 – 2013); *Backyard Power, Inc. v. Lawn Equipment Parts Co.*, In the United States District Court for the District of Maryland (2009).

## II. Assignment and Summary of Conclusions

3.      In January of 2013, I submitted an expert report on behalf of plaintiffs regarding the estimation of class-wide damages in the current matter.  It is my understanding that the parties have agreed to settle the litigation, and I have reviewed the Settlement Agreement.  The settlement provides two benefits to members of the proposed Class, a direct monetary benefit and a benefit derived from the proposed injunctive relief.  I have been retained by plaintiffs' counsel and have been asked by the plaintiffs to provide an estimate of the minimum value of the monetary relief made available to members of the proposed Class, and to value the proposed injunctive relief created by the settlement.  I estimate the value of the direct monetary relief being made available and the proposed injunctive relief with the understanding that branded (including but not limited to Osteo Bi-Flex) and private label glucosamine chondroitin products manufactured or sold by the Settling Defendants, many of which prominently display the "rebuilds cartilage" or a similar message, are subject to the proposed injunctive relief.  In completing this assignment I, or those under my direct supervision, have reviewed Rexall Sundown, Inc. ("Rexall") documents produced in discovery, declarations from Rexall employees, as well as court filings and data available through public sources.  A list of documents relied upon in forming the opinions contained herein is attached as Appendix B.

4.      Based on my review of Rexall's documents, and other material, it is my opinion that, to a reasonable degree of economic certainty, the monetary relief made available to members of the proposed Class is, at a minimum, $14.2 million.  Further, the injunctive relief agreed to in this settlement will likely result in savings to consumers of at least $18.5 million annually and savings to members of the proposed Class, who are repeat purchasers of the covered products, of $8.7 million per year.

## III.     Background

3

5.



6.



---

[1] Cramer-Krasselt Study (REX0004055 – 4179) (attached here as Exhibit 1); ACNielsen Study (REX0002483 – 2590) (attached here as Exhibit 2). Cramer-Krasselt is a Chicago-based advertising and public relations firm that reported over $1 billion in revenue in 2012. See http://www.c-k.com/#/offices/. Cramer-Krasselt's clients include luxury car maker Porsche, Corona beer, and Benjamin Moore Paints. Founded in 1923, and headquartered in New York City, ACNielsen is a global market research firm. ACNielsen's products and services include the collection and sale of retail pricing data derived from store scanners, as well as the analysis of consumer trends. See http://www.nielsen.com/us/en.html.
[2] ACNielsen Study (Exhibit 2), at REX0002494.
[3] Cramer-Krasselt Study (Exhibit 1), at REX0004083-85.
[4] Cramer-Krasselt Study (Exhibit 1), at REX0004121-22.



7.

---

[5] Cramer-Krasselt Study (Exhibit 1), at REX0004083 and 4164.
[6] MillwardBrown Study (attached here as Exhibit 3), at REX0002324.
[7] ACNielsen Study (Exhibit 2).
[8] ACNielsen Study (Exhibit 2), at REX0002486, 2492 and 2494.
[9] ACNielsen Study (Exhibit 2), at REX0002486.
[10] ACNielsen Study (Exhibit 2), REX0002547.

8.    Exhibit 6 represents the demand for and supply of Osteo Bi-Flex prior to and following the proposed restaging.  Initially the market for Osteo Bi-Flex is in equilibrium at $E_0$, where the demand ($D_0$) for Osteo Bi-Flex intersects the supply ($S_0$) of the product.  Based on the ACNielsen survey, the repositioning of the Osteo Bi-Flex product line, to emphasize the purported ability to rebuild cartilage, was expected to increase demand from $D_0$ to $D_1$ on Exhibit 6, thus, increasing both the price of Osteo Bi-Flex and the quantity sold, establishing a new equilibrium at $E_1$.  If the injunctive relief is successful at de-emphasizing the rebuilds cartilage message, I would expect the demand for Osteo Bi-Flex to shift back toward and approach $D_0$, establishing a new lower price and reduced sales volume, both of which would benefit members of the proposed Class, as well as other future consumers.

## IV.    Valuation of Injunctive Relief

9.    The above studies, conducted on behalf of Rexall, suggest that restaging Osteo Bi-Flex, in compliance with the injunctive relief described in the settlement, will have a negative impact on product sales because consumers will no longer be influenced by this key message.  In other words, a subset of consumers, who were previously enticed by the rebuilds cartilage message, will no longer be misled by those representations and hence will refrain from buying the covered products, resulting in a reduction in sales volume.  Thus, it is expected that as a result of the injunctive relief, i.e., a prohibition against the rebuilding of cartilage claims, fewer consumers

will be misled, which will result in savings to consumers.

 

    *a.*      ***Branded Osteo Bi-Flex***

    10.     It is my understanding that calendar year 2012 retail sales of Rexall's branded

[12] Thus, future purchasers of these

products will likely include current members of the proposed Class. Based on the conclusions

contained in the foregoing surveys, it is my opinion that the injunctive relief will likely result in

annual savings to consumers who purchase branded Osteo Bi-Flex, of $14.8 million annually, or

$1.23 million per month. [13]

and carries over into the injunctive relief period, it is my opinion that the injunctive relief will

likely result in annual savings to current members of proposed Class, those who continue to

purchase branded Osteo Bi-Flex, of approximately $7.0 million, or $ 583,333 per month.[14] If

defendants only comply with the injunctive relief regarding the rebuilding cartilage message on

branded Osteo Bi-Flex products for a 30-month period, the benefit to consumers provided for in

the settlement will be an estimated $37 million ($1.23 million per month $\times$ 30 months), and the

---

[11] Declaration of Michael Collins ("Collins Declaration"), at ¶ 7.
[12] Declaration of Jorge Granja ("Granja Declaration"), at ¶ 3.
[13]

[14]

benefit to current members of the proposed Class is an estimated $17.5 million ($583,333 per month × 30 months).

### b. *Private Label Glucosamine Chondroitin*

11.     In addition to branded Osteo Bi-Flex, the Settling defendants manufacture and sell private label glucosamine chondroitin products (sold under retailers' private label), the wholesale sales of which ███████████████████████[15] Data to precisely estimate the extent to which private label sales will be impacted by the labeling change is not available.  However, because the private label products compete in the same market as Osteo-Bi-Flex, it is reasonable to assume that they will likely be impacted in a way similar to that described for branded Osteo Bi-Flex.  Thus, using the analysis outlined above, it is my opinion that the injunctive relief will likely result in annual savings to consumers who purchase the covered private label glucosamine chondroitin products of $3.7 million, or $308,333 per month.[16]  Further, it is my opinion that the injunctive relief will likely result in annual savings to current members of the proposed Class, who continue to purchase the covered products, of $1.7 million, or $141,667 per month.[17]  If, as above, the injunctive relief regarding the rebuilding cartilage message on private label glucosamine chondroitin products is adhered to for only a 30-month period, the benefit to consumers, resulting from the injunctive relief provided for in the settlement, will be an estimated $9.25 million ($308,333 per month × 30 months), and the benefit to members of the proposed Class an estimated $4.25 million ($141,667 per month × 30 months).

---

[15] Collins Declaration, at ¶ 8.
[16] ████████████████████████████████████████████████
[17] ████████████████████████████████████████████████

c.    *Combined Benefit, Branded Osteo Bi-Flex and Private Label Glucosamine Chondroitin*

12.    Given the foregoing analysis, it is my opinion that the injunctive relief associated with the removal of rebuilding cartilage representations will likely result in annual savings to consumers who purchase the covered products of $18.5 million ($14.8 million + $3.7 million), or $1.54 million per month, and to repeat purchaser members of the proposed Class of $8.7 million ($7.0 million + $1.7 million), or $725,000 per month.   If defendants only comply with the injunctive relief regarding the rebuilding cartilage message for a 30-month period, the benefit to consumers resulting from the injunctive relief provided for in the settlement is estimated to be $46.2 million, and the estimated benefit to current members of the proposed Class is approximately $21.7 million.[18]

## V.    Valuation of Direct Monetary Relief Made Available to Members of the Proposed Class

13.    In addition to injunctive relief, the settlement provides that Rexall will pay, on an uncapped basis, claims made by members of the proposed Class.  It is my understanding that the settlement provides that, at a minimum, Rexall will remit to claimants $3.00 per bottle for each undocumented purchase of covered products, up to a maximum of 4 bottles, or $12.[19]  Further, it is my understanding that the Settling Defendants, or those acting on behalf of the Settling Defendants, have conducted a notice program that is estimated to have reached over 76 percent

---

[18] ███████████████████████████████████████████████████████

[19] ███████████████████████████████████████████████████████

of the estimated 12 million members of the proposed Class, or 9.1 million people.[20] It also is my understanding that at least 4,718,651 members of the proposed Class received direct notice (via email or postcard) of the settlement.[21] Per the terms of the settlement, each member of the proposed Class has the right to file a claim for no less than $3. Thus, assuming that each of the 9.1 million, or 76 percent of 12 million members of the proposed Class, who were estimated to have been exposed to the Class notice made only one undocumented claim of purchase, under the terms of the settlement, an upper range of the minimum value of the funds that the settling defendants have agreed to pay is $27.3 million (9.1 million times $3). If the analysis is limited to those members of the proposed Class who received direct notice by email or postcard the resulting minimum value of the proposed settlement, on a value made available basis, is $14.2 million (4,718,651 × $3 = $14.2 million).

Keith A. Reutter
August 30, 2013

---

[20] Affidavit of Mark D. Schey, ¶ 10.
[21] Affidavit of Michael E. Hamer, ¶¶ 10 – 13; Affidavit of Dan Ross, ¶¶ 5 and 6.

# Appendix A



# Keith A. Reutter, Ph.D.

Berkeley Research Group, LLC
1919 M Street NW, Suite 800
Washington, DC 20036
Direct: 202.480.2645
Cell: 571.327.4103
kreutter@brg-expert.com

**BIO/SUMMARY**

Keith Reutter, Ph.D. is a Principal in the Berkeley Research Group's ("BRG") Washington, DC office. Dr. Reutter specializes in providing economic and statistical analysis and expertise in regulatory and complex litigation matters, including: antitrust (*e.g.* price fixing, market definition, attempted monopolization, allegations involving the Sherman Act and Hatch-Waxman Act), intellectual property (*e.g.* patent and trademark infringement, 337 investigations before the U.S. International Trade Commission) labor and employment (*e.g.* wrongful termination, discrimination), class certification proceedings, and commercial litigation (*e.g.* breach of contract, false advertising).

Dr. Reutter has provided testimony before state and federal courts, the American Arbitration Association, and the Federal Energy Regulatory Commission.

Dr. Reutter's engagements have covered a wide range of industries, including natural gas, oil and diluent pipelines, basic chemicals, consumer products, pharmaceuticals, dairy products, basic food stuffs, high-tech industries and products (e.g. computer software and hardware) and real estate.

**EDUCATION**

Ph.D., Economics, Auburn University, Lowder School of Business, 1997
    Fields of Concentration: Industrial Organization/Regulation, Econometrics, History of Economic Thought
    Dissertation: From Franchise to State Commission: Regulation of the Electric Utility Industry, 1907 to 1932

M.A., Economics, the University of Texas-Arlington, 1992

B.S., Economics, the University of Texas-Arlington, 1988



## EXPERT RETENTIONS

*Lorean Barrera, et al., Plaintiffs v. Pharmavite, LLC, Defendants*, United States District Court for the Central District of California, Case No.: CV-11-4153 (AGrx). Expert report regarding the estimation of damages.

*Rebecca Bohn, et al., Plaintiffs v. Pharmavite, LLC, Defendants*, United States District Court for the Central District of California, Case No.: 2:11-cv-10430-GHK-AGR (2013). Expert report regarding the estimation of damages and deposition testimony.

*Luis Lerma, et al., Plaintiffs, v. Schiff Nutrition International and Schiff Nutrition Group, Defendants*, United States District Court Southern District of California, Case No.: 11-CV-1056-JAH(MDD) (2013). Expert report regarding the estimation of damages.

*Liliana Cardenas, et al. Plaintiffs, v. NBTY, Inc., and Rexall Sundown, Inc., Defendants*, United States District Court Eastern District of California, Case No.: 2:11-CV-01615-LKK-CKD (2013). Expert report and deposition testimony regarding the estimation of damages.

*Tara Holdings v. Stewart Lawn and Landscape*, In the Circuit Court for Anne Arundel County, Maryland, Case No. 02-C-11-156176 (2012 - 2013). Expert report regarding damages. Deposition and trial testimony.

*Waypoint Aviation Services, Inc. et al. v. Lycoming Engines, et al.* In the Circuit Court of Cook County, Illinois, No. 06 CH 22950 (2012). Expert report regarding the estimation of damages.

*Backyard Power, Inc. v. Lawn Equipment Parts Co.*, In the United States District Court for the District of Maryland (2007 - 2009). Expert report regarding commercial damages. Deposition.

*Settlement Hearing Regarding Crompton's EPDM Damages*, before independent arbitrator (2005). Testimony before independent arbitrator regarding antitrust damages.

*The Townsend Group, Inc. v. the National Lumberman's Publishing Corp et al.*, before the American Arbitration Association (2002). Expert report regarding damages.

*inData Corporation v. Verdict Systems et al.*, In the Superior Court of the State of Arizona (2001) Case No. CV 1999-93390. Expert report regarding damages.



## SELECTED CONSULTING

*In the Matter of Certain Audiovisual Components and Products Containing Same,* Before the U.S. International Trade Commission, Investigation No. 337-TA-837 (2012 – 2013).

*In the Matter of Certain Video Displays and Products and Containing Same,* Before the U.S. International Trade Commission, Investigation No. 337-TA-828 (2012).

DTE/MichCon analysis regarding ANR Pipeline and Storage facilities (2012 – 2013).

*In the Matter of Certain Semiconductor Chips with Minimized Chip Package Size and products Containing Same,* Before the U.S. International Trade Commission, Investigation No. 337-TA-605 (Bond Forfeiture Proceeding) (2012).

*In the Matter of Certain Dynamic Random Access Memory and NAND Flash Memory Devices and Products Containing the Same,* Before the U.S. International Trade Commission, Investigation No. 337-TA-803 (2012).

*In the Matter of Enbridge Southern Lights Tolls, before the National Energy Board, RH-1-2011,* Canada (2011).

*In re Southeastern Milk Antitrust Litigation*, In the United States District Court for the Eastern District of Tennessee, at Greeneville (2007 – 2009).

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation,* In the United States District Court for the District of Connecticut (2004 – 2009).

*In re Wellbutrin Antitrust Litigation,* In the United States District Court for the Eastern District of Pennsylvania (2006 – 2008).

*Faye Vassilates et al., v. Del Monte et al.,* Superior Court State of California County of Alameda (2007 – 2008).

*Columbus Drywall et al., v Masco Corporation et al.,* In the United States District Court for the Northern District of Georgia, Atlanta Division (2006 – 2007).

*In re Carbon Black Antitrust Litigation,* In the United States District Court for the District of Massachusetts (2004 – 2006).



**SELECTED TESTIMONY BEFORE THE FEDERAL ENERGY REGULATORY COMMISSION**

Comments of C. Danner, H. Kahwaty, K. Reutter and C. Tyler re the NOI, "Analysis of Horizontal Market Power in Transactions Under the Federal Power Act," Docket No. RM11-14-000. May 2011.

Comments of K. Reutter re the NOI, "Analysis of Horizontal Market Power in Transactions Under the Federal Power Act," Docket No. RM11-14-000. May 2011.

Market Power Analysis re Pine Prairie Energy Center, LLC (update), FERC Docket No. CP04-379-002, February 2009.

Market Power Analysis re Michigan Consolidated Gas Company, FERC Docket No. PR09-10-000, December 2008.

Market Power Analysis re Southern Pines Energy Center (update), FERC Docket No. CP02-229-004, May 2008.

Market Power Analysis re Washington 10 Storage Corporation, FERC Docket No. PR08-26-000, May 2008.

Market Power Analysis (update) re Caledonia Natural Gas Storage Facility, FERC Docket No. CP08-52-000, January 2008.

Market Power Analysis re Leaf River Energy Center LLC, FERC Docket No. CP08-8-000, October 2007.

Market Power Analysis re Tres Palacios Storage LLC, FERC Docket No. CP07-90-000, February 2007.


**PUBLICATIONS/PRESENTATIONS**

"Recent Changes in Statute and Case Law: Effects on the Value of Intellectual Property Assets," with W.O. Kerr, prepared for and presented at the 2012 Annual Meeting of the Society for Mining, Metallurgy and Exploration.

"The First Step in Restructuring the US Electric Industry," with A. Barnett and H. Thompson, *Energy Economics*, Vol. 27, Issue 2, pp. 225-235 (Spring 2005).

"Electricity Substitution: Some local industrial evidence," with A. Barnett and H. Thompson, *Energy Economics*, Vol. 20, Issue 4, pp. 411-419 (Fall 1998).



"Power Pools vs. Bilateral Markets: A Survey," Auburn Policy Research Center monograph, summer 1996.


## PROFESSIONAL AFFILIATIONS

Energy Bar Association
American Economic Association


## ACADEMIC AND OTHER POSITIONS

Reutter Economics, LLC
       Principal: 2009 – 2012

Nathan Associates Inc.
       Principal Economist: 2007 – 2009
       Managing/Senior Economist: 2001 – 2007

InteCap/Micronomics, Inc.
       Senior Economist/Director: 1999 – 2001

The University of Southern Indiana
       Assistant Professor of Economics and Finance (Adjunct): 1998

American General Finance
       Senior Analyst – Risk Analysis: 1998 – 1999

Capital Economics
       Economist: 1997

Auburn Policy Research Center
       Research associate: 1993 – 1997

# Appendix B

**Appendix B**
**Material Relied Upon by Keith A. Reutter, Ph.D.**

**Bates Numbered Documents**

Exhibit 1        Cramer-Krasselt Survey (REX0004055-4179)

Exhibit 2        ACNielsen Study (REX0002483-2590)

Exhibit 3        MillwardBrown Study (REX0002314-2356)

Exhibit 4        Food and Drug Pricing, Osteo Bi-Flex (Pricing Suggested by ACNielsen Study)

Exhibit 5        Mass Merchandiser Pricing, Osteo Bi-Flex (Pricing Suggested by ACNielsen Study)

Exhibit 6        Expected Changes in Demand for Osteo Bi-Flex, Given ACNielsen Study


**Court Documents**[1]

*Nick Pearson, et al., Plaintiffs, v. NBTY, Inc., et al., Defendants, Second Amended Class Action Complaint*, United States District Court, Northern District of Illinois, Eastern Division, Case No. 11 CV 07972 [D.E. 64] (Apr. 22, 2013)

Master Exhibit A        Affidavit of Mark D. Schey, dated August 30, 2013

Master Exhibit B        Affidavit of Michael E. Hamer, dated August 30, 2013

Master Exhibit C        Affidavit of Dan Ross, dated August 14, 2013

Master Exhibit J        Declaration of Michael Collins, dated August 30, 2013

Master Exhibit Z        Declaration of Jorge Granja, dated August 29, 2013


**Websites**

http://www.c-k.com/#/offices/

http://www.glucosaminesettlement.com/claim/

http://www.nielsen.com/us/en.html

---

[1] To reduce the size of this filing, attachments to Dr. Reutter's Report that are also on the *Pearson* docket or on the Parties' Master Exhibit list are not attached as exhibits hereto.

# Exhibit 1

Exhibit 1 redacted in its entirety.

# Exhibit 2

Exhibit 2 redacted in its entirety.

# Exhibit 3

Exhibit 3 redacted in its entirety.

# Exhibit 4

## Exhibit 4: Food and Drug Pricing, Osteo Bi-Flex
## (Pricing Suggested by ACNielsen Study)

| Product | Bottle Size (count) | Price Current [a] ($) | Restaged [b] ($) | Increase (%) |
|---|---|---|---|---|
| Double Strength | | | | |
| Triple Strength | | | | |
| Plus MSM Bone & Joint Care | | | | |

Source: ACNielsen Study, REX0002490 and 2494.

Notes:
[a] "Current" price refers to the price in 2002 prior to the restaging.
[b] "Restaged" refers to the suggested price following the restaging.

# Exhibit 5

**Exhibit 5: Mass Merchandiser Pricing, Osteo Bi-Flex**
**(Pricing Suggested by ACNielsen Study)**

| Product | Bottle Size (count) | Price Current [a] ($) | Restaged [b] ($) | Increase (%) |
|---|---|---|---|---|
| Double Strength | | | | |
| Triple Strength | | | | |
| Plus MSM Bone & Joint Care | | | | |



Source: ACNielsen Study, REX0002492 and 2496.

Notes:
[a] "Current" price refers to the price in 2002 prior to the restaging.
[b] "Restaged" refers to the suggested price following the restaging.

# Exhibit 6

**Exhibit 6: Expected Changes in Demand for Osteo Bi-Flex, Given ACNielsen Study**

