UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NICK PEARSON, FRANCISCO PADILLA, CECILIA LINARES, AUGUSTINA BLANCO, ABEL GONZALEZ, and RICHARD JENNINGS, On Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>NBTY, INC., a Delaware corporation; and REXALL SUNDOWN, INC., a Florida Corporation; and TARGET CORPORATION, a Minnesota Corporation,<br><br>Defendants. | Case No.: 11 CV 07972<br><br><u>CLASS ACTION</u><br><br>**Judge James B. Zagel** |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, ATTORNEYS' FEES
<u>AND EXPENSES AND INCENTIVE AWARDS</u>**

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................1

Procedural History and Settlement Negotiations ...........................................................4

Class Certification and Definition ................................................................................6

II. THE SETTLEMENT ............................................................................................6

    A. Class Relief ....................................................................................................6

        1. Compensatory Relief .............................................................................6
        2. Injunctive Relief....................................................................................8

    B. Incentive Awards to Class Representatives .....................................................9

    C. Attorneys' Fees and Expenses ......................................................................9

    D. The Expense of Class Notice and Administration ..........................................9

Class Notice and Response by the Class......................................................................10

III. THE COURT SHOULD APPROVE THE SETTLEMENT BECAUSE IT IS FAIR,
     REASONABLE AND ADEQUATE....................................................................12

    A. Public Policy Strongly Favors Class Action Settlements ...............................12

    B. The Settlement Is Procedurally Fair ............................................................13

    C. The Settlement Is Substantively Fair ...........................................................15

        1. The Strength of Plaintiffs' Case on the Merits Measured Against the
           Terms of the Settlement Supports Approval.............................................16

           a. The Value of the Fund Created for the Class Members.....................17
           b. The Injunctive Relief Imparts Substantial Benefits ...........................17

        2. Rexall's Ability to Pay........................................................................21

        3. Eliminating the Complexity and Expense of Further Litigation
           Supports Approval ...............................................................................22

# TABLE OF CONTENTS
### (Cont'd)

**Page**

    4.  The Class Members have Reacted Positively to the Settlement and There is Little Opposition to the Settlement ........................................................................24

    5.  There was No Collusion in Achieving a Settlement ................................................25

    6.  Competent Counsel Believe that the Settlement is in the Best Interest of the Class...............................................................................................................26

    7.  Sufficient Discovery Was Taken ...........................................................................28

    8.  The Public Interest Is Served by the Settlement ....................................................29

IV.   CLASS CERTIFICATION .......................................................................................29

    A.  Numerosity – Federal Rule of Civil Procedure 23(a) .....................................30

    B.  Commonality – Federal Rule of Civil Procedure 23(a)(2) ............................31

    C.  Typicality – Federal Rule of Civil Procedure 23(a)(3)..................................32

    D.  Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).....................33

    E.  The Proposed Class Meets the Requirements of Federal Rule of Civil Procedure 23(b)(3) ........................................................................................34

    F.  The Notice To The Class Satisfied Due Process ..........................................36

V.   THE COURT SHOULD APPROVE THE REQUESTED AWARD OF ATTORNEYS' FEES TO BE PAID BY REXALL TO CLASS COUNSEL...............................................37

    A.  Class Counsel Are Entitled To Compensation .............................................39

    B.  The Requested Fees Are Well Within The Accepted Range Of Percentages................43

       1.  The Value of The Fund ...........................................................................44
       2.  The Value of the Injunctive Relief...........................................................46
       3.  The Percentage of the Class Benefit is Reasonable ..................................48

**TABLE OF CONTENTS**
(Cont'd)

Page

C.  A Lodestar Analysis also Shows that the Requested Fee is Reasonable .......................49

D.  Class Counsel is Entitled to an Award of Expenses .......................................................51

E.  Incentive Awards ...........................................................................................................51

CONCLUSION.......................................................................................................................52

**TABLE OF AUTHORITIES**

**Cases**                                                                  **Page**

*Allen v. City of Chicago,*
    828 F. Supp. 543 (N.D. Ill. 1993).  ......................................................... 31

*Alliance to End Repression v. Chicago,*
    561 F. Supp. 537 (N.D. Ill. 1982).  ......................................................... 26

*Am. Civil Liberties Union v. U.S. Gen. Servs. Admin.,*
    235 F. Supp. 2d 816 (N.D. Ill. 2002)  ..................................................... 15

*Am. Int'l. Grp., Inc. v. ACE INA Holdings, Inc.,*
    07 CV 2898, 2012 WL 651727, (N.D. Ill. Feb. 28, 2012)
    *appeal dismissed,* 710 F.3d 754 (7th Cir. 2013)  ................................... 52

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997)................................................................................ 35

*Arenson v. Bd. of Trade,*
    372 F. Supp. 1349 (N.D. Ill. 1974)  ........................................................ 50

*Armstrong v. Brd. of Sch. Directors of the City of Milwaukee,*
    616 F. 2d 305 (7th Cir. 1980) overuled on other grounds,
    *Fetzer v. Adreas,* 134 F.3d 873 (7th Cir. 1998)  .................................... 12

*Banyai v. Mazur,*
    N o. 00 Civ. 9806, 2008 WL 5110912, at *4 (S.D.N.Y. Dec. 2, 2008)  ............................... 39

*Bellifemine v. Sanofi-Aventis U.S. LLC,*
    No. 07 Civ. 2207(JGK), 2010 WL 3119374, at *4 (S.D.N.Y. Aug. 6, 2010)  ........................ 48

*Boeing Co. v. Van Gemert,*
    444 U.S. 472 (1980)................................................................... *passim*

*Bower v. MetLife, Inc.,*
    No. 1:09-cv-351, 2012 U.S.Dist. LEXIS 149117, (S.D. Ohio Oct. 17, 2012)......................... 38

*Butler v. Sears, Roebuck & Co.,*
    702 F.3d 357 (7th Cir. 2012) vacated and remanded, 133 S.Ct. 2768 (2013),
    reinstated Nos. 11-8029, 12-8030,
    2013 U.S. App. LEXIS 17748 (7th Cir. August 22, 2013)..................................... 35

# TABLE OF AUTHORITIES
(Cont'd)

**Cases**                                                                 **Page**

*Carson v. Amer. Brands, Inc.*,
  450 U.S. 79 (1981)............................................................................... 16

*Chemi v. Champion Mortgage*,
  No. 2:05-cv-1238 (WHW) 2009 WL 1470429 (D.N.J. May 26, 2009)............................... 51

*Cohen v. Chilcott*,
  522 F. Supp. 2d 105 (D.D.C. 2005) ....................................................... 37

*Cohn v. Nelson*,
  375 F.Supp. 2d 844 (E.D. Mo. 2005)........................................................ 43

*Cook v. Niedert*,
  142 F.3d 1004 (7th Cir. 1998)............................................................. 52

*Cotton v. Hinton*,
  559 F. 2d 1326 (5th Cir. 1977) ........................................................... 12

*D'Amato v. Deutsche Bank*,
  235 F.R.D. 78 (2d Cir. 2001)............................................................21-22

*De La Fuente v. Stokely-Van Camp., Inc.*,
  713 F.2d 225 (7th Cir. 1983) ........................................................... 32, 33

*DiGiacomo v. Plains All Am. Pipeline*,
  No. H-99-4137, 2001 WL 34633373 (S.D. Tex. Dec. 19, 2001) ............................. 50

*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
  768 F. 2d 884 (7th Cir. 1985), *cert. denied*, 48 U.S. 1004 (1986)....................... *passim*

*Felzen v. Adreas*,
  134 F.3d 873 (7th Cir. 1998) ............................................................. 12

*Florin v. Nationsbank of Georgia, N.A.*,
  34 F.3d 560 (7th Cir. 1994) ............................................................. 40, 50

*Fournigault v. Independence One Mortg. Corp.*,
  234 F.R.D. 641 (N.D. Ill. 2006)............................................................ 34

# TABLE OF AUTHORITIES
(Cont'd)

**Cases**                                                                                                 **Page**

*Gaskill v. Gordon*,
    942 F.Supp. 382 (N. D. Ill. 1996) ............................................................................... 48

*Gaspar v. Linvatec Corp.*,
    167 F.R.D. 51 (N.D. Ill. 1996) .................................................................................. 33

*Gastineau v. Wright*,
    592 F.3d 747 (7th Cir. 2010) ..................................................................................... 40

*Goldberger v. Integrated Resources, Inc.*,
    209 F.3d 43 (2d Cir. 2000) ........................................................................................ 39

*Goodman v. Epstein*,
    582 F.2d 388 (7th Cir. 1978) .................................................................................... 12

*Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*,
    212 F.R.D. 400 (E.D. Wis. 2002) ......................................................................... 13-14

*Harman v. Lyphomed*,
    945 F.2d 969 (7th Cir. 1991) ..................................................................................... 40

*Heekin v. Anthem, Inc.*,
    1:05-CV-01908-TWP, 2012 WL 5878032 (S.D. Ind. Nov. 20, 2012) ...................................... 52

*Hinman v. M & M Rental Ctr., Inc.*,
    545 F. Supp. 2d 802 (N.D. Ill. 2008). ........................................................................ 33

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983), ................................................................................................. 43

*Hispanics United of DuPage Cnty. v. Vill. of Addison, Ill.*,
    988 F. Supp. 1130 (N.D. Ill. 1997) ...................................................................... 13, 26

*In re Apple Computer, Inc. Deriv. Litig.*,
    No. C 06-4128 JF (HRL), 2008 WL 4820784 (N.D. Cal. Nov. 5, 2008) ............................ 43

*In re AT&T Mobility*,
    270 F.R.D. 330 (N.D. Ill. 2010) ......................................................................... 34, 35

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*,
    789 F. Supp. 2d 935 (N.D. Ill. 2011) ....................................................................... 15

vi

# TABLE OF AUTHORITIES
(Cont'd)

**Cases**                                                                                                    **Page**

*In re Cenco, Inc. Secs. Litig.*,
  519 F.Supp. 322 (N.D. Ill. 1981) ........................................................................... 50

*In re Charter Comm's., Inc. Sec. Litig.*,
  No. MDL 1506, 2005 WL 4045741 (ED.Mo. 2005)............................................ 50

*In re Folding Carton Antitrust Litigation*,
  84 F.R.D. 245 (N.D. Ill. 1979) ............................................................................ 50

*In re Gen. Motors Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995), *cert. denied*, 516 U.S. 824.......................................... 25

*In re Jiffy Lube Int'l., Inc. Text Spam Litig.*,
  No. 3:11-MD-226-JM (JMA), 2012 WL 4849617 (S.D. Cal. Oct. 10, 2012) ......................... 47

*In re Kentucky Grilled Chicken Coupon Mktg. & Sales Practices Litig.*,
  280 F.R.D. 364 (N.D. Ill. 2011) ..................................................................... passim

*In re Lawnmower Engine Horsepower Mktg. & Sales Pracs. Litig.*,
  733 F. Supp. 2d 997 (E.D. Wis. 2010) ................................................................ 23

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*,
  MDL 08-1999, 2010 WL 4386552 (E.D. Wis. Oct. 28, 2010) ................................ 38

*In re Mexico Money Transfer Litig.*,
  164 F. Supp. 2d 1002 (N.D. Ill. 2000) .................................................. 13, 24, 35, 42

*In re Mexico Money Transfer Litig.*,
  267 F.3d 743 (7th Cir. 2001) ............................................................... 21, 46, 47

*In re NASDAQ Market-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998). ....................................................................... 49

*In re Neopharm, Inc. Sec. Litig.*,
  225 F.R.D. 563 (N.D. Ill. 2004)........................................................................... 33

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y.1997) ........................................................................ 21

*In re Prudential Sec. P'ships Litig.*,
  163 F.R.D. 200 (S.D.N.Y. 1995) ....................................................................... 12

## TABLE OF AUTHORITIES
(Cont'd)

**Cases**                                                                                                              **Page**

*In re Sony SXRD Rear Projection Television Class Action Litig.*,
  No. 06 Civ. 5173 (RPP), 2008 WL 1956267 (S.D.N.Y. May 1, 2008) ............................... 21, 42

*In re Synthroid Mktg. Litig.*,
  264 F.3d 712 (7th Cir. 2001) ........................................................................................ 40, 51

*In re Union Carbide Corp. Consumer Prods. Bus.* Sec. *Litig.,*
  724 F. Supp. 160 (S.D.N.Y. 1989) ........................................................................................ 49

*Ingram v. Coca-Cola Co.,*
  200 F.R.D. 685 (N.D.Ga. 2001) ............................................................................................ 43

*Isby v. Bayh*,
  75 F. 3d 1191 (7th Cir. 1996) ........................................................................... 12, 13, 16, 24

*Jeffboat LLC v. Director, Office of Workers' Compensation Programs*,
  553 F.3d 487 (7th Cir. 2009) ................................................................................................ 49

*Kaufman v. Am. Exp. Travel Related Svcs. Co.*,
  264 F.R.D. 438 (N.D. Ill. 2009) ..................................................................................... 36, 37

*Keele v. Wexler*,
  149 F.3d 589 (7th Cir. 1998)) .............................................................................................. 31

*Kitson v. Bank of Edwardsville*,
  No. 08-507-GPM, 2010 WL 331730 (S.D. Ill. Jan. 25, 2010) ............................................ 48

*League of Martin v. Milwaukee*,
  588 F. Supp. 1004 (E.D. Wis. 1984) ................................................................................... 21

*Levitan v. McCoy*,
  No. 00-C5096, 2003 WL 1720047 (N.D. Ill. Mar. 31, 2003) ............................................. 30

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.,*
  671 F. Supp. 819 (D. Mass. 1987) ....................................................................................... 43

*Mangone v. First USA Bank*,
  206 F.R.D. 222 (S.D. Ill. 2001) ............................................................................... 13, 17, 24

## <u>TABLE OF AUTHORITIES</u>
(Cont'd)

<u>**Cases**</u> <u>**Page**</u>

*Mars Steel Corp. v. Continental Nat'l Bank & Trust*,
    834 F. 2d 677 (7th Cir. 1987) ................................................................ 7, 16, 25, 45

*Masters v. Wilhelmina Model Agency*,
    473 F. 3d 423 (2d Cir. 2007) ................................................................. 7

*Maxwell v. Arrow Fin. Servs., LLC*,
    No. 03 C 1995, 2004 WL 719278, at *2 (N.D. Ill. Mar. 31, 2004) ......................................... 30

*McBean v. City of New York,*
    233 F.RD. 377 (S.D.N.Y. 2006) ................................................................. 42

*McKinnie v. JP Morgan Chase Bank N.A.*,
    678 F. Supp. 2d 806 (E.D. Wis. 2009) ................................................................. 7

*Mercury Interactive Corp. Sec. Litig.,*
    618 F.3d 988 (9th Cir. 2010) ................................................................. 37, 38

*Meyenberg v. Exxon Mobil Corp.*,
    No. 3:05-cv-15-DGW, 2006 WL 5062697 (S.D. Ill. June 5, 2006) .................................... 21, 47

*Mills v. Electric Auto Lite Co.*,
    396 U.S. 375 (1970) ................................................................. 39

*Missouri v. Jenkins,*
    491 U.S. 274 (1989) ................................................................. 49

*Padilla v. Costco Wholesale Corp.*,
    No. 1:11-cv-07686 (N.D. Ill.) ................................................................. 4

*Pappas v. Naked Juice Co. of Glendora, Inc.*,
    No. CV11-08276 JAK (PLAx) (C.D. Cal.) (August 7, 2013) ................................... 47

*Parker v. Time Warner Entm't Co., L.P.*,
    631 F. Supp. 2d 242 (E.D.N.Y. 2009) ................................................................. 21

*Perez v. Asurian Corp.*,
    501 F.Supp.2d 1360 (S.D. Fla. 2007) ................................................................. 48

## <u>TABLE OF AUTHORITIES</u>
(Cont'd)

<u>Cases</u>                                                                                <u>Page</u>

*Pope v. Harvard Banchares, Inc.*,
   240 F.R.D. 383 (N.D. Ill. 2006)........................................................................ 30

*Radmanovich v. Combined Ins. Co. of Am.*,
   216 F.R.D. 424 (N.D. Ill. 2003)........................................................................ 32

*Rosario v. Livaditis*,
   963 F.3d 1013 (7th Cir. 1992).......................................................................... 31

*Saltzman v. Pella Corp.*,
   257 F.R.D. 471 (N.D. Ill. 2009)................................................................. 31, 36

*Schulte v. Fifth Third Bank*,
   805 F. Supp. 2d 560 (N.D. Ill. 2011)....................................................... 16, 23, 46

*Skelton v. General Motors Corp.*,
   860 F.2d 250 (7th Cir. 1988) ........................................................................... 40

*Smith v. Nike Retail Servs., Inc.*,
   234 F.R.D. 648 (N.D. Ill. 2006)........................................................................ 30

*Smith v. Qwest Communications*,
   No. C11-02599, 2013 WL 3200592 (N.D. Cal. June 24, 2013) ...............................7

*Smith v. Sprint Communications Co., L.P.*,
   37 F. 3d 612 (7th Cir. 2004) ............................................................................ 35

*Spicer v. Chi. Bd. Options Exch., Inc.*,
   844 F. Supp. 1226 (N.D. Ill. 1993). .................................................................. 51

*Staton v. Boeing Corp.*,
   327 F.3d 938 (9th Cir. 2003) ........................................................................... 46

*Stern v. Gambello*,
   480 Fed. Appx. 867 (9th Cir. 2012)....................................................................7

*Sutton v. Bernard*,
   504 F.3d 688 (7th Cir. 2007)........................................................................... 40

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
   463 F.3d 646 (7th Cir. 2006) ........................................................................... 15

x

# TABLE OF AUTHORITIES
(Cont'd)

**Cases**                                                                            **Page**

*Taubenfield v. AON Corp.*,
415 F.3d 597 (7th Cir. 2005) ............................................................................... 48

*Trustees v. Greenough*,
105 U.S. 527 (1881) ............................................................................................... 39

*Tylka v. Gerber Prods. Co.*,
178 F.R.D. 493 (N.D. Ill. 1998) ........................................................................... 31

*Uhl v. Thoroughbred Tech. & Telecomm's.*,
309 F.3d 978 (7th Cir. 2002) ............................................................................... 12

*US Airways, Inc. v. McCutchen*,
133 S. Ct. 1537 (2013) .......................................................................................... 39

*Vought v. Bank of Am., N.A.*,
901 F. Supp. 2d 1071 (C.D. Ill. 2012) ............................................................ 26, 48

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) .......................................................................................... 31

*Waters v. Intern. Precious Metals Corp.*,
190 F.3d 1291 (11th Cir. 1999) .............................................................................. 7

*Wear v. Sprint Communications Co. L.P.*,
No. 2:11-cv-809, 2013 WL 3108312 (D. Nev. June 18, 2013) ................................ 7

*Whitten v. ARS Nat. Servs., Inc.*,
No. 00C6080, 2001 WL 1143238 (N.D. Ill. Sept. 27, 2001) ................................ 31

*Will v. Gen. Dynamics Corp.*,
No. 06-698-GPM, 2010 WL 4818174 (S.D. Ill. Nov. 22, 2010) ........................... 52

*Williams v. MGM-Pathe Communications Co.*,
129 F.3d 1026 (9th Cir. 1997) ................................................................................ 7

*Williams v. Rohm & Haas Pension Plan*,
658 F. 3d 629 (7th Cir 2011) ................................................................................. 13

## <u>TABLE OF AUTHORITIES</u>
(Cont'd)

**<u>Page</u>**

**<u>Other Authorities</u>**

1 Alba Conte, *Attorney Fee Awards § 2.06 (2d ed.1993)* ............................................................ 50

2 Alba Conte and Herbert Newberg NEWBERG ON CLASS ACTIONS ¶1.18 ........................ 45

3 Alba Conte and Herbert Newberg NEWBERG ON CLASS ACTIONS § 7.20. ............................... 30

3 Alba Conte and Herbert Newberg NEWBERG ON CLASS ACTIONS § 3:5. ................................. 30

4 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.4 §§1 ……………………25

*Manual for Complex Litigation* (Third) (1995) ........................................................... 25

C.A. Wright, A. Miller & N. Kane,
 FEDERAL PRACTICE AND PROCEDURE § 1762 (2d ed. 1986)). ................................................... 30

*Consumer Class Actions* (6th ed. 2006) ......................................................................... 39

Richard Posner, *Economic Analysis of Law* (2d ed. 1984) ........................................................ 39

Plaintiffs Nick Pearson, Francisco Padilla, Cecilia Linares, Augustina Blanco, and Abel Gonzalez, by their counsel Bonnett, Fairbourn, Friedman & Balint, P.C. and Stewart M. Weltman, LLC (Of Counsel Levin Fishbein Sedran & Berman), and Richard Jennings, by his counsel Denlea & Carton LLP (collectively, "Plaintiffs"), respectfully submit this Memorandum of Law in Support of their Motion for Final Approval of the class action settlement reached in this matter, and the entry of a Final Judgment: (1) providing final approval of the Settlement Agreement as fair, reasonable, adequate, and in the best interests of the Class; (2) certifying, for all purposes, under Rule 23(b)(3), a Class as defined in the Settlement Agreement, and appointing Plaintiffs' counsel as Class Counsel for the Class; (3) awarding attorneys' fees and expenses to Class Counsel as provided for in the Settlement Agreement; (4) awarding Plaintiffs incentive awards as provided for in the Settlement Agreement; and (5) granting such other and further relief as is stated in the proposed Final Judgment and Order submitted to the Court.

## I.  INTRODUCTION

NBTY, Inc. ("NBTY"), its subsidiary Rexall Sundown, Inc. ("Rexall"), and their affiliates (collectively, the "Settling Defendants") manufacture, market, distribute, and sell joint health dietary supplements that contain glucosamine and/or chondroitin, as well as various other ingredients.  Rexall sells these joint health dietary supplements under its own brand names, and also manufactures joint health dietary supplements sold under "private label" brand names and for other merchants such as Target and Costco (hereafter the "Covered Products").[1]

Plaintiffs are consumers of the Covered Products. They purchased the Covered Products at various times in various locations throughout the United States. They allege consumer fraud

---

[1] The full listing of the products and the applicable time periods for which Class Members may make claims and for which releases will be provided pursuant to the Settlement Agreement is set forth in Exhibit A to the Settlement Agreement.

claims under various state consumer protection statutes in the numerous lawsuits that are being resolved by the settlement before the Court. The claims arise from certain misrepresentations that have appeared over many years on the packaging and in the advertising of the Covered Products.

Rexall's largest selling joint health glucosamine dietary supplement is a line of products known as Osteo Bi-Flex. Rexall's Osteo Bi-Flex, the other Covered Products, and the majority of glucosamine/chondroitin products sold to consumers by the Settling Defendants make essentially three types of joint health benefit claims: (1) that the products rebuild or renew joints or cartilage; (2) that the products maintain joints and cartilage; and (3) that the products provide some form of palliation relief either through more joint flexibility, mobility, cushioning, or comfort. Plaintiffs have alleged that all three types of joint health benefit representations are false and misleading.

This settlement, a by-product of arm's-length negotiations that have resulted in a compromise of the Plaintiffs' claims, is substantial and significant. The settlement provides for a claims made procedure, **with no ceiling**, such that the total potential compensatory benefits made available by this settlement are conservatively valued at approximately $27.3 million classwide, or a minimum of approximately $14.2 million based only on compensatory benefits to direct notice recipients.

The Settlement also provides for a major labeling change by an industry leader and one of the largest sellers of glucosamine/chondroitin products in the United States. Rexall will remove *all* representations regarding rebuilding or renewing cartilage from the labeling and advertising for the Covered Products, including both its branded products and for the private label products it manufactures for others. For at least 30 months following the approval of this

settlement, and very likely in perpetuity,[2] purchasers of the Covered Products, including purchasers of Osteo Bi-Flex, will no longer be misled by these rebuilding or renewing cartilage misrepresentations. Dr. Keith Reutter, an expert economist, valued the benefit of these labeling changes to the current Class Members at approximately $7.0 million per year for the Osteo Bi-Flex products and at approximately $1.7 million per year for the private label products, for a combined value of approximately $21.7 million just for the 30-month period. See Report of Keith Reutter, Ph.D., at ¶¶9-12.[3]

This is a substantial and robust result that not only benefits future purchasers of these products but also benefits the significant number of Class Members who are repeat users. Consumers will no longer be misled by one of the primary representations made about the benefits of the Covered Products. And, as Dr. Reutter opines, prices for these products are likely to decrease as much as 10% once these representations are removed from the labeling. *Id*., at ¶9. Apart from the monetary value of this injunctive relief, the elimination of fraud in the marketplace through these label changes is one of the primary purposes behind consumer fraud laws – protection of consumers. Thus, when such a substantial labeling change is wrought from

---

[2] The current body of clinical evidence, including the National Institutes of Health sponsored Glucosamine Arthritis Intervention Trial ("GAIT") studies, the largest conducted to date, concluded that neither glucosamine or chondroitin, alone or in combination, rebuilt or renewed cartilage. See e.g., Sawitzke AD, Shi H. Finco MF, et al., "The Effect of Glucosamine and/or Chondroitin Sulfate on the Progression of Knee Osteoarthritis: a Report from the Glucosamine/Chondroitin Arthritis Intervention Trial." Arthritis Rheum 2008; 58:3183-91. As demonstrated in the reports of Plaintiffs′ experts, it is very likely that no new scientific evidence will come to light that rebuts the current science (see, e.g., January 4, 2013 Report of Thomas J. Schnitzer, M.D., Ph.D., at ¶¶10-13 (attached as Exhibit U to the "Master Exhibit List," which is attached to the Joint Response to Objections being filed herewith), and Report of Jeremiah E. Silbert, M.D., at ¶A.4-5, B.4-5, and C (attached as Exhibit V to the "Master Exhibit List")), and the Settlement Agreement therefore provides a strong incentive for Rexall to keep the labeling changes in place, since adding them back will expose Rexall to suit. See, Settlement Agreement, ¶13.

[3] All exhibits referenced herein are submitted as part of the "Master Exhibit List," which is attached to the Joint Response to Objections being filed herewith.

a defendant by way of private plaintiff actions, this constitutes a major consumer fraud victory and one that this Court and the law should encourage by giving it final approval.

<u>**Procedural History and Settlement Negotiations**</u>

This action is one of several pending federal court actions involving various joint health dietary supplements manufactured or sold by the Settling Defendants. The first of these actions, *Cardenas, et al. v. NBTY, Inc. et al.*, No. 2:11-cv-01615-TLN-CKD (E.D. Cal), was filed on June 14, 2011 against NBTY and Rexall arising out of the manufacture and sale of their Osteo Bi-Flex line of glucosamine and chondroitin joint health dietary supplement products. It originally sought a California-only class but was amended to seek a multi-state class. *Jennings v. Rexall Sundown, Inc.*, No. 1:11-cv-11488-WGY (D. Mass.), was filed on August 22, 2011, also arising out of the manufacture and sale of the Osteo Bi-Flex line of glucosamine and chondroitin joint health dietary supplement products, and sought a Massachusetts-only class. *Linares, et al. v. Costco Wholesale, Inc.*, No. 3:11-cv-0547-MMA-BGS (S.D. Cal.), was filed on November 2, 2011, arising out of Costco's sale of the Kirkland Signature Brand line of glucosamine and chondroitin joint health dietary supplement products and sought a California-only class.[4] This case, *Pearson v. Target Corp.*, No. 1:11-cv-07972 (N.D. Ill.), was filed on October 28, 2011, arising out of Target's sale of its Up & Up line of glucosamine and chondroitin joint health dietary supplement products and sought a multi-state class. *Blanco v. CVS Pharmacy, Inc.,* No. 5:13-cv-00406-JGB-SP (C.D. Cal.), was filed on March 4, 2013, arising out of CVS Pharmacy's sale of certain CVS-brand glucosamine chondroitin dietary supplement products and sought a California and multi-state class. The core issues in all of the cases arise out of a common

---

[4] *Padilla v. Costco Wholesale Corp.*, No. 1:11-cv-07686 (N.D. Ill.), a companion case to *Linares*, was filed on October 28, 2011 and recently dismissed. After the Court dismissed the Complaint but granted leave to amend, Plaintiff elected not to amend his Complaint because settlement negotiations were nearing a final agreement.

nucleus of operative facts, in that they contest the veracity of joint health benefit representations made about the Covered Products that are covered by the Settlement Agreement.

At the time of execution of the Settlement Agreement, *Linares,* after surviving two rounds of motions to dismiss, was in the midst of class and merits discovery. *Pearson*, after also surviving two rounds of motions to dismiss, was also in the midst of class and merits discovery. *Cardenas* was in the midst of the class certification process with Plaintiffs having filed their opening class certification brief and expert reports, and the Defendants having completed the depositions of Plaintiffs' experts. *Jennings* was on the eve of a pre-class certification "exemplar" trial of the merits of the individual plaintiff's claims, with expert reports, expert depositions, and all discovery completed for both sides. Discovery in both the *Cardenas* and *Jennings* cases, along with the filing of expert reports and expert depositions in those cases, provided the Plaintiffs and their counsel a fulsome record upon which to base their settlement negotiations.

As a trial date was set for the *Jennings* "exemplar" trial and class certification papers were filed in *Cardenas,* settlement negotiations commenced on two fronts – one between Rexall's and Jennings's counsel, and the other between Rexall's counsel and counsel for Cardenas/Padilla, Linares, Gonzalez, Blanco, and Pearson. After several months of arm's-length negotiations between the Parties, a definitive written settlement was executed by all Parties in mid-April 2013. To achieve a global resolution of all of these similar cases pending across the United States, the Parties agreed to centralize settlement in this Court. On April 22, 2013, Plaintiffs filed their Second Amended Complaint by which all Plaintiffs' claims under the various states' consumer protection statutes were brought in this Court. [D.E. 64].

By Order dated May 24, 2013, as corrected on May 30, 2013, the Court provided its preliminary approval of the class-action settlement, and directed that notice be provided to the Class pursuant to the notice plan approved by the Court. [D.E. 87].

### Class Certification and Definition

Pursuant to the Settlement Agreement, Plaintiffs request that the Court certify a Class defined as:

> All persons in the United States who, during particular times and in certain U.S. locations as identified in Exhibit A to the Settlement Agreement purchased one or more of the Covered Products.

> Excluded from the Class are (i) Defendants; (ii) retailers of the Covered Products; (iii) the parents, subsidiaries, affiliates, officers, and directors of (i) and (ii); (iv) those who purchased the Covered Products for the purpose of resale or distribution; and (v) those persons who submit valid requests for exclusion from the Settlement Class.

## II.     THE SETTLEMENT

### A.     Class Relief

#### 1.     Compensatory Relief

Each Class member is entitled to seek monetary compensation.[5]  Class members who have adequate proof of purchase (*e.g*., receipts, intact boxes, or bottles that display a readable UPC code and readable lot number, or similar documentation that identifies the Covered Product and date and location of purchase) shall be entitled to reimbursement of $5 for each purchased bottle of the Covered Products up to ten (10) bottles.  Class members who do not have adequate proof of purchase will be entitled to reimbursement of $3 per bottle of the Covered Products purchased up to a maximum of four (4) bottles upon submitting their claim form, identifying the Covered Product(s) purchased, the approximate date of purchase, and the location of the

---

[5] As discussed below, the Class is estimated to be in excess of 12 million households.

purchase.[6]  Rexall has agreed to pay all valid claims, with no cap on the amount of monies paid to the Class Members.  Under *Boeing Co. v. Van Gemert,* 444 U.S. 472 (1980), and its progeny,[7] the total potential compensatory benefit of this settlement fund (i.e., money available to the Class) is either approximately $27.3 million (assuming that all 9.1 million Class Members who received notice of the Settlement file the minimum claim for $3) or $14.2 million (assuming that the approximately 4.7 million Class Members who received direct, individual notice of the Settlement file the minimum claim for $3).

While there is no cap, the Settlement Agreement provides for a $2 million minimum payment or "floor" to be paid out by Rexall.  If the total dollar value of valid claims is less that $2 million, the payment to each Settlement Class member who submits a valid claim with adequate proof of purchase shall be increased *pro rata* up to a maximum of triple what he or she was entitled until the payments reach $2 million.  If these increases do not exhaust the minimum $2 million payout, then the payment to each Settlement Class member who submits a valid claim without proof of purchase shall be increased *pro rata* up to a maximum of double what he or she was entitled until the total payments reach $2 million.  If, after these payments, the total payments do not reach $2 million, the residual amount will be paid to the Orthopedic Research and Education Foundation ("OREF"), subject to Court approval.  OREF does not and has not had

---

[6] The claim form does not require notarization, and can be submitted by U.S. Mail or on-line at the settlement website www.GlucosamineSettlement.com.

[7] *See, e.g. In re Kentucky Grilled Chicken Coupon Marketing & Sales Practices Litigation*, 280 F.R.D. 364 (N.D. Ill. 2011); *Williams v. MGM-Pathe Communications Co.*, 129 F.3d 1026, 1029 (9th Cir. 1997); *Stern v. Gambello*, 480 Fed. Appx. 867 (9th Cir. 2012); *Waters v. Intern. Precious Metals Corp.*, 190 F.3d 1291, 1297 (11th Cir. 1999); *McKinnie v. JP Morgan Chase Bank N.A.*, 678 F. Supp. 2d 806, 812 (E.D. Wis. 2009); *Masters v. Wilhelmina Model Agency*, 473 F. 3d 423 (2d Cir. 2007); *Wear v. Sprint Communications Co. L.P.*, No. 2:11-cv-809, 2013 WL 3108312 (D. Nev. June 18, 2013); and *Smith v. Qwest Communications*, No. C11-02599, 2013 WL 3200592 (N.D. Cal. June 24, 2013).  See also, *Mars Steel Corp. v. Continental Nat'l Bank and Trust Co.*, 834 F.2d 677, 679 (7th Cir. 1987).

any prior relationship with Rexall and does not receive any donations or benefit from Rexall. (August 30, 2013 Declaration of Michael Collins, at ¶¶3-5).

### 2. __Injunctive Relief__

The settlement agreement also provides for the removal of key labeling claims from all of the Covered Products currently manufactured or sold by Rexall. Numerous covered products, including Rexall's largest branded selling product (Osteo Bi-Flex) and many other products sold by major retailers such as CVS, Costco and Target, will be impacted by these label changes.[8] The Settlement Agreement provides that for a period of 30 months from the date of the Final Approval, Rexall will not make any representations that the Covered Products will rebuild, build, or renew cartilage ("rebuilding cartilage representations") on the labeling or packaging of any Covered Products. Settlement Agreement [D.E.73-1], ¶8. For the same 30-month period, and as part of the negotiations related to the other types of claims made by Rexall (*e.g.*, claims related to joint comfort or pain, flare-ups, soothing, cushioning, nourishing, mobility, lubrication, or support) ("palliation representations"), Rexall will be required to place on the packaging and labeling of the same products a statement that "individual results may vary." *Id.*, ¶8. Rexall will have a period of six months from the date of Final Approval to begin shipping Covered Products with the label changes. *Id.* Rexall has an incentive to keep these labeling changes in place after the 30-month period expires, in that the Settlement Agreement provides that as long as it keeps these labeling changes in place, no Class Member who purchases a Covered Product after the 30-month period can sue Rexall on any claim that was or could have been asserted in the litigation.

---

[8] Rexall has the authority to implement (for its branded products) or require the implementation of (for the private label products manufactured or supplied by Rexall), the label changes required by the Settlement Agreement. May 28, 2013 Declaration of Michael Collins [D.E. 73-5].

*Id.*, ¶13. If, however, Rexall re-introduces the "rebuild" cartilage representations after the 30-month period, it will be subject to suit. *Id.*

### B. Incentive Awards to Class Representatives

The Settlement agreement provides that, subject to Court approval, Rexall will pay and will not object to the Court awarding each of the six (6) Class representatives an incentive award of $5,000. Settlement Agreement [D.E. 73-1], ¶10. The payment of these incentive awards will be separate and apart from, and will not diminish or erode, the payment of claims to Class Members as set forth above. *Id.*

### C. Attorneys' Fees and Expenses

The Settlement Agreement provides that Rexall agrees to pay and will not object to the Court awarding the firm of Denlea & Carton LLP (counsel for Plaintiff Richard Jennings) an aggregate fees and expenses award of $2.5 million, and that Rexall agrees to pay and will not object to the Court awarding the firms of Bonnett, Fairbourn, Friedman & Balint, P.C.; Stewart M. Weltman LLC (Of Counsel Levin Fishbein Sedran & Berman); and Levin Fishbein Sedran & Berman, (counsel for Plaintiffs Nick Pearson, Francisco Padilla, Cecelia Linares, Augustina Blanco and Abel Gonzalez) an aggregate fees and expenses award of $2 million. *Id.*, ¶9. All attorneys' fees and expenses are to be paid separate and apart from, and will not diminish or erode, the payment of claims to Class Members. *Id.*

### D. The Expense of Class Notice and Administration

Finally, the Settlement Agreement provides that Rexall shall pay a minimum of $1.5 million, and a maximum of $2.5 million, for the costs associated with the dissemination of notice to the Class and the administration of the claims process. *Id.*, ¶15. As with attorneys' fees and expenses, Rexall is paying the cost of notice and administration separate and apart from the payments that will be made to Class Members who file valid claims.

### Class Notice and Response By the Class

Pursuant to the Preliminary Approval Order entered by the Court on May 30, 2013, a robust notification was provided to the Class Members. Heffler Claims Group ("Heffler") was appointed by the Court to serve as the claims administrator, and oversaw the process of notifying the Class of the proposed settlement. As demonstrated more fully in the Affidavit of Mark Schey, the CEO of Digital Settlement LLC ("DS") (Exhibit A), a firm specializing in developing and executing targeted class action notice plans used by Heffler in creating the publication notice program, and the Affidavit of Michael Hamer, a Project Manager at Heffler (Exhibit B), Heffler designed a targeted media campaign to reach the highest number of Class Members.

The media campaign was designed to reach all consumers who may have purchased the Covered Products, but was further focused on supplement users age 35 years and older, and, where possible, even further focused on glucosamine supplement users.

The targeted campaign consisted of four means of communicating with the Class: (1) publication of the Court-approved notice in five magazines that Heffler and DS determined would best reach the Class (*Guidepost, People, Prevention, First for Women, and Woman's World*) (Schey Affidavit, Exhibit A, ¶8; Exhibit B); (2) direct mailing to known consumers (approximately 4.7 million unique consumers who purchased Rexall products were identified through retail and loyalty program information and were provided direct mail notice (by postcard or email) of the Settlement) (Declaration of Dan Ross, Exhibit C, ¶¶5-6); Hamer Affidavit, Exhibit B, ¶¶10-13); (3) an Internet campaign in which over 49 million impressions were generated through Yahoo, Google, and AOL, alerting consumers to the settlement and directing them to the settlement website (www.GlucosamineSettlement.com) (Schey Affidavit, Exhibit A, ¶9); and (4) a social media campaign involving Facebook that provided approximately 132 million targeted alerts to consumers about the settlement. *Id*. The combination of these four means of communicating with the Class was implemented by Heffler to reach approximately 76% of the Class Members, or approximately 9.1 million Class Members. *Id*., ¶10.

The Class response has been overwhelmingly positive. As further demonstrated in the Affidavit of Michael Hamer, as of August 29, 2013 a total of 1,620 persons, of the approximately 12 million Class Members, attempted to exclude themselves in some form or another from the Class. *Id.*, ¶16. This is .0001% of the entire Class, and .0003% of the 4,718,651 Class Members who received direct notice. As reflected on the Court's docket, only eight (8) people filed objections to the Settlement (which are addressed below and in the Parties' separately filed Joint Response to Objections). As of August 29, 2013, approximately 19,593 people have filed claims with the settlement administrator. *Id.*, ¶17. The claims process will continue through December 3, 2013.

The claims process was designed to make filing claims as simple as possible. The Notice (including the Internet impressions) directed the Class Members to the settlement website, where Class Members can file claims on-line via an electronic form. The settlement website has all of the important documents posted, and Heffler has maintained an automated voice information system for Class Members to call for further information. Heffler is taking all actions needed to assess all claims. For example, during the claims administration process, one Class Member brought to Heffler's attention that Rexall has a loyalty program (its "Ambassador's Club" program), pursuant to which persons who purchase Osteo Bi-Flex and submit UPC codes to Rexall can earn reward points and receive coupons. Although Rexall does not maintain records showing exactly how many bottles an Ambassador's Club member has purchased, Rexall agreed to check the claims made by the Class Members against Rexall's data to determine whether any claimant had previously submitted proof of purchase to Rexall as part of the Ambassador's Club, in order to qualify them for receiving compensation under the "proof of purchase" aspect of the settlement, even though claimants may not have actual proof of purchase to submit. Hamer Declaration, ¶15.a.

III.   **THE COURT SHOULD APPROVE THE SETTLEMENT BECAUSE IT IS FAIR, REASONABLE, AND ADEQUATE**

A.   **Public Policy Strongly Favors Class Action Settlements**

The Seventh Circuit has repeatedly recognized that "[f]ederal courts favor settlement." *See, e.g.*, *Uhl v. Thoroughbred Tech. & Telecomm's.*, 309 F.3d 978, 986 (7th Cir. 2002); *Goodman v. Epstein,* 582 F.2d 388, 404 (7th Cir. 1978) ("[S]ettlement of claims . . . is recognized as essential to the continued functioning of our judicial system."). This is particularly true in class action litigation. *Isby v. Bayh*, 75 F. 3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F. 2d 884, 888-89 (7th Cir. 1985), *cert. denied*, 48 U.S. 1004 (1986) (noting that there is a general policy favoring voluntary settlements of class action disputes); *Armstrong v. Brd. of Sch. Directors of the City of Milwaukee*, 616 F. 2d 305, 312 (7th Cir. 1980), *overruled on other grounds*, *Felzen v. Adreas*, 134 F. 3d 873 (7th Cir. 1998) ("It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement."). Class action settlements minimize the litigation expenses of the parties and reduce the strain such litigation imposes upon already scarce judicial resources. *Armstrong*, 616 F. 2d at 313 (citing *Cotton v. Hinton*, 559 F. 2d 1326, 1331 (5th Cir. 1977)). In sum, "[i]t is well established that there is an ***overriding public interest*** in settling and quieting litigation, and this is particularly true in class actions." *In re Prudential Sec. P'ships Litig.,* 163 F.RD. 200, 209 (S.D.N.Y. 1995) (emphasis added)).

"Thus, the Seventh Circuit has found that a District Court's inquiry as to whether to grant approval 'is limited to [the consideration of] whether the proposed settlement is lawful, fair, reasonable and adequate.'" *In re Kentucky Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 280 F.R.D. 364, 375 (N.D. Ill. 2011) ("*In re KFC*") (citing *Uhl*, 309 F.3d at 986); *see also*

*Williams v. Rohm & Haas Pension Plan*, 658 F. 3d 629, 634 (7th Cir 2011); *Mangone v. First USA Bank*, 206 F.R.D. 222, 227 (S.D. Ill. 2001) ("It is true that something could always be added to every class action settlement to make it more favorable to class members, but that is not the standard by which class action settlements should be measured."). The Seventh Circuit also urges district courts to be mindful that "[t]he essence of a settlement is compromise," so "the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution after trial." *Hiram Walker*, 768 F.2d at 889. A district court should not reject a settlement "solely because [the settlement] does not provide a complete victory to the plaintiffs." *Isby*, 75 F.3d at 1200. The court is not called upon to determine whether the settlement reached by the parties is the best possible deal, or whether class members will receive as much from a settlement as they might have recovered from victory at trial. *In re Mexico Money Transfer Litig*., 164 F. Supp.2d 1002, 1014 (N.D. Ill. 2000).

Here, the proposed Settlement is fair and supported by the vast majority of Class members. Accordingly, the Court should grant final approval to the Settlement.

### B.     The Settlement Is Procedurally Fair

Rule 23 of the Federal Rules of Civil Procedure authorizes the court to approve a class action settlement that is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In evaluating a settlement, the court must consider both the settlement's substantive terms and the negotiating process leading up to the settlement. *Hispanics United of DuPage Cnty. v. Vill. of Addison, Ill.*, 988 F. Supp. 1130, 1150 n. 6 (N.D. Ill. 1997). "A strong initial presumption of fairness attaches to the proposed settlement when it is shown to be the result of" arm's-length negotiations conducted after adequate discovery. *Id*.; *see also Great Neck Capital Appreciation*

*Inv. P'ship., L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 410 (E.D. Wis. 2002) ("A strong presumption of fairness attaches to a settlement agreement" when it is "the result of arm's-length negotiations by competent counsel.").

There can be no serious debate about whether the Settlement Agreement was the result of intensive and hard-fought negotiations. As a trial date was set for the *Jennings* exemplar trial and class certification papers were filed in *Cardenas,* negotiations commenced on two fronts – one between Defendants' counsel and Jennings's counsel, and the other between Defendants' counsel and counsel for Cardenas/Padilla, Linares, Gonzalez, Blanco, and Pearson. On literally the eve of trial in *Jennings*, a Memorandum of Understanding was executed in the *Jennings* case on September 30, 2012, which required the agreement of parties in the *Cardenas/Padilla, Linares, Gonzalez, Blanco, and Pearson* cases and contemplated the settlement of all pending glucosamine supplement cases involving Rexall's products. Counsel for all parties in all of the pending cases thereafter participated in several in-person conferences and conference calls, which ultimately resulted in the execution of the written Settlement Agreement for which the Court provided its preliminary approval on May 30, 2013.

It was only after the relief in favor of Rexall and the Settlement Class was agreed upon that the Parties negotiated the issue of attorneys' fees and incentive awards for the named plaintiffs. This was true both in connection with the negotiation of the initial Memorandum of Understanding in September 2012, and in connection with the negotiation of the global Settlement Agreement in April 2013. Moreover, it was agreed that the payment of such amounts would not diminish or erode the monetary amounts made available to the Settlement Class in any way.

The settlement was agreed to without any collusion whatsoever on behalf of the Parties or

14

their counsel. At all times, the Parties were represented by competent and experienced counsel. Rexall was represented by the national law firm of Sidley Austin, LLP who vigorously advocated Rexall's position; and Plaintiffs were represented by four separate law firms with nationwide class action experience and a track record of proven results on behalf of consumers throughout the country. The settlement is the product of thoroughly litigated cases by competent and experienced counsel on both sides. The robustness of the relief obtained by Plaintiffs and Class Counsel on behalf of the Class reflects not only the fairness and reasonableness of the Settlement, but also demonstrates that it is free from any collusion on the part of either side to the negotiations.

### C. The Settlement Is Substantively Fair

The Settlement easily surpasses the test of substantive fairness established by the Seventh Circuit. There are several factors that the Seventh Circuit has identified for analyzing whether a class action settlement should be given final approval: (1) the strength of plaintiffs' case on the merits measured against the terms of the settlement; (2) the defendants' ability to pay; (3) the complexity, length, and expense of continued litigation; (4) the amount of opposition to the settlement; (5) the presence of collusion in gaining a settlement; (6) the reaction of the members of the class to the settlement; (7) the opinion of competent counsel; (8) the stage of the proceedings and the amount of discovery completed; and (9) the public interest. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir. 2006); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.,* 789 F. Supp. 2d 935, 958 (N.D. Ill. 2011); *Am. Civil Liberties Union v. U.S. Gen. Servs. Admin.,* 235 F. Supp. 2d 816, 818 (N.D. Ill. 2002). In weighing these factors, the district court should recognize that the first factor -- the relative strength of the plaintiffs' case on the merits as compared to what the defendants offer by way of

settlement -- is the most important consideration. See, e.g., *Schulte v. Fifth Third Bank*, 805 F.

Supp. 2d 560, 579 (N.D. Ill. 2011).

In reviewing a proposed class settlement, a court should not decide the merits of the case

or resolve unsettled legal questions. *Carson v. Amer. Brands, Inc.*, 450 U.S. 79, 88, n. 14 (1981);

*Hiram Walker*, 768 F.2d at 889; *Isby*, 75 F.3d at 1196-97. Instead, the court's inquiry should be

limited to the consideration of whether the proposed settlement is lawful, fair, reasonable, and

adequate. *Id.*, at 1196. Analysis of each factor overwhelmingly shows that the settlement is fair,

reasonable, and in the best interests of the Class, and should be approved.

        1.      **The Strength of Plaintiffs' Case on the Merits Measured Against the Terms of the Settlement Supports Approval**.

The settlement provides substantial benefit to the Class, both in terms of the monetary

compensation and the prospective labeling changes Rexall is required to make, which will

impact one of the top selling glucosamine/chondroitin products currently in the market (Osteo

Bi-Flex) and numerous private label products, including products sold by some of the largest

retailers such as CVS, Costco and Target. Collectively, the total potential benefit (both monetary

relief and injunctive relief) to the Class is conservatively estimated to be at least approximately

$35.9 million (if the total potential benefit of the monetary relief is limited just to those

4,718,651 million class members who received direct notice ($14.2 million) and if the total value

of the injunctive relief is limited solely to Class Members ($21.7 million)). Given that there are

risks involved in any such litigation, including achieving class certification and then prevailing

on the merits, the significant benefits created by this settlement certainly militates in favor of

final approval. *See, e.g., Isby*, 75 F.3d at 1200 ("essence of settlement is compromise" and a

settlement "will not be rejected solely because it does not provide a complete victory to

plaintiffs"); *Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust*, 834 F. 2d 677, 682-83 (7th

Cir. 1987) (approving settlement "possibly worth" $11.5 million over objections that case if tried would result in $750 million to $1.5 billion verdict); *Hiram Walker,* 768 F.2d at 889 ("Thus, the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution *after* trial."); *see also Mangone v. First USA Bank*, 206 F.R.D. 222, 228 (S.D. Ill. 2001) (citing above cases).

### a.    The Value of the Fund Created for the Class Members.

There is no limit on the number of claims that Rexall will pay. Indeed, the total potential compensatory benefit available to the Class is not less than $14.2 million. The Settlement Administrator estimates that there are approximately 12 million class members and that the publication notice reached more than 76% of the class, such that more than 9.1 million class members were exposed to the notice. More than 4.7 million class members received direct, individual notice. Under the terms of the Settlement, each class member has a claim for at least $3 – the minimum amount for one undocumented purchase. This yields a total potential monetary benefit of approximately $27.3 million (12 million class members x 76% reach x $3.00 minimum claim) or approximately $14.2 million if limited to the direct notice recipients (4.7 million direct notice recipients x $3.00). These amounts are conservative because class members are entitled to make multiple claims, up to $12 each for undocumented purchases and up to $50 for documented purchases. Thus, the Settlement has created a minimum total potential monetary benefit to the Class of at least $14.2 million, if limited to the direct notice recipients.

### b.    The Injunctive Relief Imparts Substantial Benefits.

In addition to the monetary relief, the settlement provides robust injunctive relief in the form of labeling changes that eliminate key false marketing claims alleged in these lawsuits. Rexall has agreed to stop making misrepresentations that its products will renew or

rebuild cartilage.

The joint/cartilage renewal/rejuvenation representation has been one of the key marketing messages made by Rexall and the vast majority of glucosamine/chondroitin manufacturers about these products for over a decade.  (these documents (marked confidential under a protective order) are attached to the Declaration of Keith Reutter, Ph.D., which is being filed with the Court's Electronic Case Filing System in redacted form).

The remaining representations made about the Covered Products primarily regard palliation – *e.g.*, joint comfort – and with regard to these claims, the Settlement Agreement requires that the labels state that "individual results may vary." No longer will the labeling make unqualified representations that the Covered Products will provide relief for all persons who take these products. Instead, consistent with the scientific evidence that reflects that in excess of 35%

of users of these products experience a "placebo effect,"[9] consumers will now be told – up front – that these products may or may not work for them. In short, the injunctive/labeling relief is a very significant component of this settlement in that it will require the industry leader in the manufacture and sale of glucosamine/chondroitin products to remove a representation that is a proven driver of sales. As set forth at length in the accompanying Declaration of Keith Reutter, Ph.D., the monetary value of the label changes to the Class Members amounts to approximately $21.7 million just for the 30 month period. If, as is expected, the label changes remain in place permanently, the estimated annual monetary benefit to the Class Members is approximately $8.5 million annually.[10]

As more fully set forth in his report, Dr. Reutter analyzed the effect that Rexall's emphasis on rebuilding cartilage has likely had on pricing and units sold. ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[9] Schnitzer Report, ¶¶20-21, Exhibit U to the "Master Exhibit List.".
[10] The benefit to all consumers is even greater. The annual savings to all consumers who purchase Osteo Bi-Flex as a result of the removal of these representations will be $14.8 million, and the annual savings to all consumers who purchase the private label products will be $3.7 million. Reutter Report, ¶¶10-11.

██████████████████████████████

███████████████████████████████████████

████, Dr. Reutter concluded that consumers who were previously enticed by the rebuilds cartilage message will no longer be misled by those representations and therefore will refrain from buying the Covered Products, resulting in a reduction in the sales volume for the products. Relying upon these contemporaneous documents, it is Dr. Reutter's opinion that the removal of these key marketing messages will result in a drop in demand and also result in consumer savings, both to current Class Members who are repeat purchasers and future consumers, as a result of a 10% reduction in the pricing of Osteo Bi-Flex and the other Covered Products. See generally Reutter Report, ¶¶9-12.

Dr. Reutter quantified the consumer savings that will be realized as a result of the removal of the rebuilding cartilage claims. Based upon sales data provided by Rexall, he concludes that the injunctive relief will result in annual savings to those Class Members who purchase Osteo Bi-Flex in the amount of $7.0 million, and will result in annual savings of approximately $1.7 million to those Class Members who purchase the private label products covered by the Settlement, for a total monetary benefit to the Class from the injunctive relief of approximately $8.7 million annually.[11] For the 30-month period set forth in the Settlement Agreement, the estimated benefit to the Class from the injunctive relief set forth in the Settlement is approximately $21.7 million, and is approximately $46.2 million for all consumers.

In order to determine whether a proposed settlement is fair, reasonable and adequate, a court should evaluate the entire settlement, including "any prospective injunctive relief in

---

[11] ████████████████████████████████████████████
███████████████████████████████████████████████

addition to any tangible benefits [ ] conveyed to the class." *Meyenberg v. Exxon Mobil Corp.*, No. 3:05-cv-15-DGW, 2006 WL 5062697 (S.D. Ill. June 5, 2006); *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 748 (7th Cir. 2001) (prospective relief provided in a settlement "is not an outcome to be sneered at."). The total benefits of the settlement - both monetary and consumer protection - must then be measured against the risks and uncertainty of litigation. The immediate benefits that will devolve to the Class from the Settlement far outweigh the risk that the Class could recover nothing, and far outweigh the delay and expense that will be inherent in continued litigation. "The essence of a settlement is compromise," and "the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution after trial." *Hiram Walker*, 768 F.2d at 889. Settlement here is a substantial victory for Plaintiffs and the Class.

### 2. **Rexall's Ability to Pay.**

Rexall has agreed to pay the amounts proposed in the Settlement and has made no suggestion of hardship; this factor is not at issue. *See League of Martin v. Milwaukee*, 588 F. Supp. 1004, 1021-22 (E.D. Wis. 1984). Even if it were at issue, "'the fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate the settlement is unreasonable or inadequate.'" *Parker v. Time Warner Entm't. Co., L.P.*, 631 F. Supp. 2d 242, 261 (E.D.N.Y. 2009) (citing *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y.1997)) (alteration in original). It is well-established that "a defendant is not required to 'empty its coffers' before a settlement can be found adequate." *In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173 (RPP), 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008). Where the other factors weigh in favor of approval, the defendant's ability to withstand a greater judgment does not alone suggest that a settlement is unfair. *D'Amato v. Deutsche Bank*,

235 F.R.D. 78 ( 2d Cir. 2001).

Here, Rexall may be able to withstand a judgment in favor of the Class, but this factor is outweighed by all of the other factors which support the Settlement.  This is not a significant factor for the Court to consider.

### 3. Eliminating the Complexity and Expense of Further Litigation Supports Approval.

This class action litigation involves a number of complex legal, factual, and scientific questions.  Some are inherent in the Class's claims, while others would be injected by Rexall in opposing class certification and defending the efficacy of its products.  These disputed issues include:

- The tremendous amount of scientific literature and medical studies relating to glucosamine and chondroitin, some of which suggest that consumers may gain some benefit (at a minimum a perceived/placebo effect) from the products;

- The extent to which Class Members may have relied upon the disputed misrepresentations about the efficacy of the products, and whether or not those misrepresentations may have caused Class Members to purchase the products;

- The fact that individualized issues might preclude class certification given the many different reasons why consumers may have purchased the products;

- Whether Class Members obtained some benefit from the use of the products, and whether the products are entirely ineffective;

- The fact that individualized issues might preclude class certification given the varied benefit levels received by users of the products;

- Whether Rexall's claims are in fact deceptive or misleading pursuant to the standards of the various state consumer protection statutes that Plaintiffs' claims are filed under;

- Whether Plaintiffs are entitled to a nationwide class; and

- Whether Class Members are entitled to damages.

Plaintiffs and Class Counsel believe that they have a very strong case on the merits of the above issues, but they also realistically recognize the uncertainties that are inherent in any lawsuit. Plaintiffs and Class Counsel also recognize that it is possible that a Court would refuse to certify a class. *See Schulte*, 805 F. Supp. 2d at 582. They also realistically recognize that a finding of no liability is possible, and that if they were successful at trial establishing Rexall's liability, there might be extensive litigation following that finding in order to litigate causation, damages, limitations and other defenses. Even if the Class were to prevail on both class certification and the merits, Rexall would likely appeal, and it could be years before Class Members saw any recovery or other benefit, if at all.

Compared to these risks, the benefits that Class Members will enjoy and the consumer protections that will take effect if the Settlement is approved are real and substantial. Class members are entitled to compensation, and Rexall will no longer make certain claims regarding the efficacy of its products, including being prohibited from claiming that its products will rebuild or renew cartilage. Here, "[s]ettlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation." *Schulte*, 805 F. Supp. 2d at 586. Accordingly, this factor also weighs in favor of settlement. *See, e.g., In re Lawnmower Engine Horsepower Mktg. & Sales Pracs. Litig.*, 733 F. Supp. 2d 997, 1008 (E.D. Wis. 2010) ("The 'complexity, length and expense of further litigation' factor strongly favors this settlement, in that further litigation would be enormously complex, lengthy and expensive.").

4. **The Class Members have Reacted Positively to the Settlement and there is Little Opposition to the Settlement.**[12]

In addition to the factors set forth above, the Court should also look at the reaction of Class Members when considering the approval of a settlement. The lack of any meaningful opposition strongly supports approval. *See Mangone,* 206 F.R.D. at 227 (concluding that 19,637 opt outs (representing "a mere 0.10614%" of the class") and 97 objections ("a mere 0.0052%" of the class), was "minuscule when compared to the Class as a whole" and such "overwhelming support by class members is strong circumstantial evidence supporting the fairness of the Settlement"); *In re Mexico Money Transfer Litig.*, 164 F.Supp.2d at 1020-21 (acceptance rate of 99.9% of class members "is strong circumstantial evidence in favor of the settlements"); *Isby*, 75 F.3d at 1200 (affirming approval of settlement where "[o]nly thirteen per cent of the class submitted written objections in response to the notice of settlement.").

Here, the Settlement Class is estimated to comprise approximately 12 million consumers. As of August 20, 2013, a total of 1,620 persons have sought to exclude themselves from the Class. Declaration of Michael Hamer, ¶16. Only 8 people filed objections (4 of which are (or are represented by) professional objectors (*see* the Parties' Joint Response to Objections, Section VI)). In percentage terms, .0001% of the Class sought to exclude themselves, and .000001% of the Class objected. These infinitesimally small numbers alone demonstrate that the Class has reacted overwhelmingly positively to the Settlement, and is "strong circumstantial evidence supporting the fairness of the Settlement." *Mangone,* 206 F.R.D. at 227. This is particularly so given that that more than 4.7 million class members received direct/individual notice.

The very few objections that were filed lack merit, and should be overruled, as set forth in the Parties' separately filed Joint Responses to Objections.

---

[12] For the sake of brevity, the discussion of factors 4 and 6 have been combined.

### 5.   **There Was No Collusion in Achieving a Settlement**.

As a matter of law, a court should presume that settlement negotiations were conducted in good faith and that the resulting agreement was reached without collusion in the absence of evidence to the contrary.  *Mars Steel*, 834 F.2d at 681-82.  "Courts are entitled to rely on the opinion of competent Class Counsel that the settlement is fair, reasonable and adequate, where Class Counsel are qualified, and where discovery and settlement negotiations are extensive and thorough."  *In re KFC*, 280 F.R.D. at 378; *see also In re Gen. Motors Pick-Up Truck Fuel Tank Prod. Liab. Litig*., 55 F.3d 768, 785 (3d Cir. 1995), *cert. denied*, 516 U.S. 824 ("This preliminary determination establishes an initial presumption of fairness when the court finds that:  (1) the negotiations occurred at arm's length… [and] (3) the proponents of the settlement are experienced in similar litigation. . . ."); *see also* 4 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.4 §§1 at 90 (4th ed. 2002); *Manual for Complex Litigation* (Third) § 30.42 (1995).  The instant settlement – the product of extensive negotiations between skilled counsel – is entitled to this presumption of fairness.

Settlement here was achieved through arm's-length discussions.  As reflected more fully in the accompanying Declarations of Class Counsel, after the Memorandum of Understanding was entered into in the *Jennings* matter on September 30, 2012 just before the "exemplar" trial was to start, the Parties began global settlement discussions that concluded in April 2013 when the definitive Settlement Agreement was signed. Numerous conference calls, in-person meetings and written exchanges occurred between counsel for the Parties, during which offers and demands were exchanged.   At both stages, first with regard to the negotiation of the Memorandum of Understanding and then with regard to the global Settlement Agreement, only after the relief to the Class was agreed upon did the Parties discuss the issue of attorneys' fees

and incentive awards. At no time did counsel for the Parties collude, and at all times counsel for the Parties strenuously advocated their respective positions. In fact, the settlement discussions were conducted in tandem with trial preparation in *Jennings* and class certification and merits discovery in *Cardenas*, so that the Parties were all in a sufficient position to evaluate the overall strengths and weaknesses of one another's case.

### 6 . Competent Counsel Believe that the Settlement is in the Best Interest of the Class.

"The opinion of competent counsel is another relevant consideration in determining whether a proposed settlement is fair, reasonable and adequate." *Vought v. Bank of Am., N.A.*, 901 F. Supp. 2d 1071, 1096 (C.D. Ill. 2012). "Courts are entitled to rely on the opinion of competent Class Counsel that the settlement is fair, reasonable and adequate, where Class Counsel are qualified, and where discovery and settlement negotiations are extensive and thorough." *In re KFC*, 280 F.R.D. at 378; *Hispanics United*, 988 F. Supp. at 1170 ("In determining the fairness of a class settlement, the Court is entitled to rely heavily on the opinion of competent counsel.") (internal quotations and citation omitted). "Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." *Alliance to End Repression v. Chicago*, 561 F. Supp. 537, 548 (N.D. Ill. 1982).

Here, Class Counsel determined that the proposed settlement is fair, reasonable, and adequate, and is in the best interests of the Class. That conclusion is based on an investigation into the claims and underlying events and transactions alleged in the complaints; legal research; motion practice, including numerous motions to dismiss based upon numerous legal grounds, a motion for summary judgment in the *Jennings* case, and class certification briefing in *Cardenas*; evidence obtained in discovery and in preparation of the "exemplar" trial in *Jennings*, which was complete before the settlement was agreed upon; class certification discovery in *Cardenas*;

consultations with experts; expert disclosures and depositions; and arguments made by all Parties as to the merits of the action. Class Counsel have a thorough understanding of the case. While they strongly believe that the claims asserted in the Complaint have merit, they also recognize the uncertainties in any litigation. There is no certainty that the Class would prevail at trial, despite Class Counsels' belief in the strength of their position.

Throughout the litigation, Rexall has consistently denied any wrongdoing, and has maintained that its actions were lawful in all respects. It proffered a vigorous defense, largely focused on attempting to establish that the products do in fact provide the benefits claimed. Moreover, Rexall was vigorously opposing class certification, and raised a number of defenses that, if accepted by the Court or a jury at trial, could limit the extent of a recovery by the Class or prevent any recovery altogether. Plaintiffs' (and their counsels') decision to settle the actions takes account of these risks. Additionally, even if the Class was to prevail, litigating the case through trial and likely appeal would take a considerable amount of time, perhaps years, in cases that have already been pending for over two years. The Class settled here is a nationwide class, which is permissible in a settlement class context where manageability is not at issue, but which is not a certain result if the parties were to litigate class certification to decision. Thus, this settlement benefits a larger class than otherwise might have been certified if the parties were to litigate.

The proposed Settlement has none of these drawbacks, and confers substantial and immediate benefits on the Settlement Class. If the Court approves the Settlement, compensation to Class Members and changes in Rexall's labeling are assured rather than uncertain. The agreed-upon benefits in favor of the Class will be implemented promptly after Final Approval of the Settlement - much more rapidly than if the parties were to proceed to class certification,

further expert discovery, summary judgment motions, a trial and likely appeal, and the post-judgment processing of claims that would be necessary for any award of damages in a contested class action.

In sum, in agreeing to settle the action, Class Counsel have taken into account the substantial benefits available to the Settlement Class through settlement; the considerable expense and length of time that would likely be necessary to continue to prosecute the claims through trial, post-trial motions, and likely appeals; and the significant uncertainties in predicting the outcome of this litigation. Considering all of these factors, and balancing them against the certain, substantial, and immediate benefits of the Settlement to the Class, they have concluded that the Settlement is fair, reasonable, adequate, and superior to the risks and delays associated with further litigation.

### 7. <u>Sufficient Discovery Was Taken.</u>

When the Settlement was agreed upon, there had been sufficient discovery to enable the Parties and their counsel to evaluate their respective cases. At the time of execution of the Settlement Agreement, *Linares,* after having survived two rounds of motions to dismiss, was in the midst of class and merits discovery. *Pearson*, after having survived two rounds of motions to dismiss, was also in the midst of class and merits discovery. *Cardenas* was in the midst of the class certification process including a document production received from Rexall, the Plaintiffs having filed their opening class certification brief and expert reports, and the Defendants having completed the depositions of Plaintiffs' experts. *Jennings* was on the eve of a pre-class certification "exemplar" trial of the merits of the individual plaintiff's claims, with expert reports, expert depositions, and all discovery completed for both sides. Two employees of Rexall, who are responsible for substantiating the claims that Rexall makes for its products, were deposed, after a large production of documents was made. Rexall produced its "substantiation

28

file" consisting of over 7,000 pages of documentation which it claimed supported the representations made on its labels. And, in *Jennings*, three expert witnesses were disclosed (with accompanying Rule 26 expert disclosures) and deposed, thus enabling both Parties to understand the legal, scientific and medical aspects of this case.

Discovery in both the *Cardenas* and *Jennings* cases, along with the filing of expert reports and expert depositions in those cases, provided Plaintiffs and their counsel a thorough record upon which to base their opinion that settlement is in the best interest of the Class

### 8. <u>The Public Interest Is Served by the Settlement</u>.

Finally, the interest of the public will be served by the Settlement, not only in terms of Class Members receiving compensation, but also because of the labeling changes that Rexall will be required to implement as part of the Settlement. A key goal of these cases was to obtain a judgment that would compel Rexall to remove the claim that its branded products "rebuild" or "renew" cartilage because those claims are false and deceptive to consumers. The settlement, which requires Rexall to remove this language from the labels of its branded and private label products as part of the injunctive relief, will ensure that Class Members will no longer purchase glucosamine/chondroitin products manufactured and/or sold by Rexall based on these false representations. Thus, the Settlement is both substantively and procedurally fair, adequate, and in the best interest of the Class, and the Court is respectfully requested to grant final approval of the Settlement.

## IV. CLASS CERTIFICATION

A Settlement Class was certified for preliminary approval by Order of the Court dated May 30, 2013, and there is no basis to depart from the Court's earlier finding that the Class readily meets the requirements for class certification under Rule 23(b)(3) of the Federal Rules of

Civil Procedure. The Class meets each of the requirements of Rules 23(a) and (b)(3), and therefore, certification is appropriate.

### A.   Numerosity — Federal Rule of Civil Procedure 23(a).

Rule 23(a)'s first requirement, numerosity, is satisfied where "the class is so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). There is no specific number required, nor is a plaintiff required to state the exact number of potential class members. *Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648, 659 (N.D. Ill. 2006); s*ee also* 3 NEWBERG ON CLASS ACTIONS § 7.20, at 66. Instead, courts are permitted "to make common-sense assumptions that support a finding of numerosity." *Maxwell v. Arrow Fin. Servs., LLC*, No. 03 C 1995, 2004 WL 719278, at *2 (N.D. Ill. Mar. 31, 2004). Generally, where the membership of the proposed class is at least 40, joinder is impracticable and the numerosity requirement is met. *Pope v. Harvard Banchares, Inc*., 240 F.R.D. 383, 387 (N.D. Ill. 2006). The requirement that joinder be impracticable does not mean that joinder is impossible. Rather, it need only be "extremely difficult or inconvenient to join all members of the class." *Levitan v. McCoy*, No. 00-C5096, 2003 WL 1720047, at *3 (N.D. Ill. Mar. 31, 2003) (quoting C.A. Wright, A. Miller & N. Kane, FEDERAL PRACTICE AND PROCEDURE § 1762, at 159 (2d ed. 1986)).

Here, Rexall's products are sold throughout the United States. The Class of purchasers of the Covered Products is reasonably estimated to be in excess of 12 million households. See Settlement Agreement Notice Plan, D.E. 73-1. Accordingly, the Class satisfies the numerosity requirement – particularly since class members are geographically dispersed. *See* 3 NEWBERG ON CLASS ACTIONS § 3:5, at 243-46 ("Class actions under the amended Rule 23 have frequently involved classes numbering in the hundreds, or thousands. . . . In such cases, the impracticability of bringing all class members before the court has been obvious, and the Rule 23(a)(1)

requirement has been easily met."). For the foregoing reasons, the Class satisfies the numerosity requirement of Fed. R. Civ. P. 23(a)(1).

### B. Commonality — Federal Rule of Civil Procedure 23(a)(2).

Rule 23(a)(2)'s commonality element requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). In this case, the questions that drive this litigation – Rexall's conduct and questions of Rexall's liability – are the same for *each* class member. Rexall's liability to each class member can thus be determined in one stroke and the commonality requirement presents no barrier to certification.

Commonality exists if a common nucleus of operative fact exists. *Rosario v. Livaditis*, 963 F.3d 1013, 1017 (7th Cir. 1992); *Saltzman v. Pella Corp.,* 257 F.R.D. 471, 478 (N.D. Ill. 2009). "If 'at least one question of law or fact [is] common to the class,' then commonality is typically found." *Tylka v. Gerber Prods. Co.,* 178 F.R.D. 493, 496 (N.D. Ill. 1998) (quoting *Allen v. City of Chicago*, 828 F. Supp. 543, 551 (N.D. Ill. 1993)). Where, as here, the "defendants have engaged in standardized conduct toward the members of the proposed class[,]" the commonality requirement is easily met. *Whitten v. ARS Nat. Servs., Inc.*, No. 00C6080, 2001 WL 1143238, at *3 (N.D. Ill. Sept. 27, 2001) (quoting *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998)); *Tylka,* 178 F.R.D. at 496-97*; see also Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551 (2011) (stating that "commonality requires that the claims of the class simply depend upon a common contention . . . of such a nature that it is capable of class-wide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke").

As alleged in Plaintiffs' Second Amended Class Action Complaint, all Class members share common questions of fact and law that predominate over issues affecting only individual Class members. The common factual and legal issues include:

- Whether the representations or omissions that Rexall made about the Covered Products were or are misleading, or likely to deceive;

- Whether Plaintiffs and the Class members were deceived in some manner by Rexall's representations;

- Whether the alleged conduct constitutes violations of the laws asserted herein;

- Whether Plaintiffs and Class members have been injured and the proper measure of their losses as a result of those injuries;

- Whether Plaintiffs and Class members are entitled to an award of compensatory/actual damages; and

- Whether Plaintiffs and the Class are entitled to injunctive, declaratory or other equitable relief.

For the foregoing reasons, the proposed Settlement Class satisfies the commonality requirement of Fed. R. Civ. P. 23(a)(2).

### C.     Typicality — Federal Rule of Civil Procedure 23(a)(3).

Rule 23 also requires that the named plaintiff's claims are "typical" of other class members' claims. Fed. R. Civ. P. 23(a)(3). "The issue of typicality is closely related to the commonality and should be liberally construed." *Pella, supra* at 257 F.R.D. at 479 (citing *De La Fuente v. Stokely-Van Camp., Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)). Typicality is satisfied if the plaintiff's claims arise from "the same course of conduct that gives rise to the claims of other class members and all of the claims are based on the same legal theory." *Id.*; s*ee also Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 432 (N.D. Ill. 2003) (internal quotations omitted). The existence of factual differences will not preclude a finding of

typicality. *Id.*; s*ee also De La Fuente,* 713 F.2d at 232; *In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. 563, 566 (N.D. Ill. 2004) ("Typicality does not mean identical") (citing *Gaspar v. Linvatec Corp.,* 167 F.R.D. 51, 57 (N.D. Ill. 1996)).

Here, Plaintiffs and the other Class members all purchased and consumed at least one of the Covered Products. Accordingly, Plaintiffs and the other Class Members were all exposed to Rexall's common misrepresentations, which caused them consumer injury and damage under state consumer protection laws. Moreover, none of the named Plaintiffs is subject to a unique defense or claim that would differentiate them from the rest of the proposed Class. Accordingly, Plaintiffs' claims are typical of the other Settlement Class members' claims.

### D.  Adequacy of Representation — Federal Rule of Civil Procedure 23(a)(4).

The final Rule 23(a) prerequisite requires that a proposed class representative "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement is satisfied where the class representative(s) "(1) has retained competent counsel, (2) has a sufficient interest in the outcome of the case to ensure vigorous advocacy, and (3) does not have interests antagonistic to those of the class." *Pella,* 257 F.R.D. at 480; *see also Hinman v. M & M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 807 (N.D. Ill. 2008).

Here, Plaintiffs' interests are completely aligned with the interests of the other Settlement Class members - all have been injured by Rexall's conduct. Furthermore, Plaintiffs have no interests antagonistic to the interests of the other Settlement Class members. Plaintiffs' counsel and their firms have decades of experience acting as lead class counsel in numerous consumer fraud class actions and other class actions. See, Declarations of Jeffrey I. Carton, Stewart M. Weltman, and Elaine A. Ryan (which are being filed contemporaneously herewith). Moreover, Courts find counsel adequate where "they have invested substantial time and resources in [a]

33

case by investigating the underlying facts, researching the applicable law, and negotiating a detailed settlement." *In re AT&T Mobility*, 270 F.R.D. at 344. Here, proposed class counsel engaged in substantial and detailed pre-filing investigation, including research and review of the scientific research regarding glucosamine and chondroitin as well as the other ingredients contained in the Covered Products. Moreover, at their own expense, counsel for Plaintiffs Pearson, Padilla, Linares, Gonzalez, and Blanco have engaged a nationally and internationally regarded expert in the field of osteoarthritis, musculoskeletal pain, and glucosamine and chondroitin, Dr. Thomas J. Schnitzer M.D., Ph.D., of the Northwestern University Feinberg School of Medicine. Likewise, at their own expense, counsel for Plaintiff Jennings have retained Jeremiah E. Silbert, M.D., a renowned physician retired from Harvard Medical School who has been studying glucosamine for several decades. Accordingly, both Plaintiffs and their counsel satisfy the adequacy requirement of Rule 23(a)(4).

### E. The Proposed Class Meets the Requirements of Federal Rule of Civil Procedure 23(b)(3).

In addition to the four requirements of Fed. R. Civ. P. 23(a), Plaintiffs must also satisfy one of the three requirements of Rule 23(b). Here, Plaintiffs seek certification under Fed. R. Civ. P. 23(b)(3), and thus must show "that the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* "'Considerable overlap exists between the court's determination of commonality and a finding of predominance. A finding of commonality will likely satisfy a finding of predominance because, like commonality, predominance is found where there exists a common nucleus of operative facts.'" *Pella*, 257 F.R.D. at 484 (quoting *Fournigault v. Independence One Mortg. Corp.*, 234 F.R.D. 641, 644 (N.D. Ill. 2006)). The predominance requirement "trains on the legal or factual

questions that qualify each class member's case as a genuine controversy" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

Here, "Plaintiffs claim that Defendants engaged in standardized conduct that violated laws that are common [to the class], and the class and subclasses will therefore be cohesive." *In re AT&T Mobility*, 270 F.R.D. at 345 (citing *Amchem Prods.*, 521 U.S. at 623). Further, because a settlement class is sought here, the Court need not inquire whether the case, if tried, would present manageability problems. *Smith v. Sprint Communications Co., L.P.*, 37 F. 3d 612, 614 (7th Cir. 2004) (quoting *Amchem Prods.*, 521 U.S. at 591). At its essence, "[p]redominance is a question of efficiency." *Butler v. Sears, Roebuck & Co.*, 702 F.3d 357, 362 (7th Cir. 2012), *vacated and remanded*, 133 S.Ct. 2768 (2013), *reinstated*, Nos. 11-8029, 12-8030, 2013 U.S. App. LEXIS 17748 (7th Cir. Aug. 22, 2013). Without a doubt, "[a] class action is the more efficient procedure for determining liability and damages in a case such as this, involving a [common misrepresentation] that may have [harmed] tens of thousands of consumers yet not [harmed] any one of them [] enough to justify the expense of an individual suit." *Id.*

In this case, common questions predominate because Defendants' alleged unlawful conduct is *identical* with regard to all members of the proposed Settlement Class. Thus, the predominance and the superiority requirements are satisfied because liability and damages would have been decided predominantly, if not entirely, based on common evidence and Plaintiffs and the Class share a common grievance against Defendants. *In Re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1013.

### F.    The Notice To The Class Satisfied Due Process.

The notice provided to the Class fully complied with due process: it informed Class Members of their right to opt-out or exclude themselves from the settlement, their right to appear through their own counsel, their right to object to the terms of the settlement along with the form that the objection must take, and detailed the deadlines for opt-out/exclusion or objection, the date of the final approval hearing, the scope of the claims released if a Class member does not opt-out and remains in the Class, the relief available and how to participate in same, and the amounts requested for the named plaintiffs' incentive awards and fees and expense awards. *See, e.g.*, *Kaufman v. Am. Exp. Travel Related Svcs. Co.*, 264 F.R.D. 438, 445-46 (N.D. Ill. 2009).

The proposed Settlement Class is comprised of approximately 12 million consumer households. In false advertising cases, where the identity of individual class members typically cannot readily be ascertained from the transaction records, publication notice is the only means of informing settlement class members of the existence of the settlement and its terms. *Saltzman*, 257 F.R.D. at 476 ("Notice by publication has been used in cases where potential class member names were confidential or impracticable to ascertain."). The media part of the notice plan was based upon an analysis of print publications and the potential Internet usage by consumers who may have purchased a glucosamine product. Based upon the Settlement Administrator's analysis of publications likely to reach the target audience, five national magazines were chosen for publication notice: *Guidepost*, *People, Prevention*, *First for Women*, and *Woman's World*. In addition to the print notice, notice was placed in three of the largest groups of Internet sites: Yahoo, Google, and AOL. The Notice Plan also used social media through Facebook.

Here, the notice plan went far beyond these threshold requirements. Over 4.7 million persons capable of being readily identified (approximately 40% of the Class) received direct mail notice of the settlement. As noted by the Claims Administrator, "[d]irect notice of this type (approximately 40% of the class) is rare in a case like this one where the product involved is an over-the-counter consumer product." Schey Affidavit, ¶10. For those Class Members who were not capable of being identified, the notice plan provided for multiple publications in several national magazines, placement on several of the largest Internet sites, and use of the largest social media tool, Facebook. The notice to the class clearly satisfied due process. See, e.g., *In re KFC*, 280 F.R.D. at 374-75 (approving a notice plan consisting of publication in *Parade*, Internet advertising, the maintenance of a website containing the notice, and targeted on-line advertising and sponsored key-word search advertisements); *Kaufman*, 264 F.R.D. at 446 (publication of notice in "a national newspaper of wide circulation, plus an online publication, constitutes sufficient notice by publication."); *Cohen v. Chilcott*, 522 F. Supp. 2d 105 (D.D.C. 2005) (approving notice plan consisting of publication in *USA Today* and an Internet campaign targeted to the demographics of the class members).

Finally, the amount of money set aside (and to be paid by Rexall) for notice and settlement administration is significant, with a floor of $1.5 million and a ceiling of $2.5 million, and will not erode or diminish the benefits available to the Class.

## V. THE COURT SHOULD APPROVE THE REQUESTED AWARD OF ATTORNEYS' FEES TO BE PAID BY REXALL TO CLASS COUNSEL.

Procedural objections to Class Counsels' fee applications were filed based upon *Mercury Interactive Corp. Sec. Litig.,* 618 F.3d 988 (9th Cir. 2010). In *Mercury*, the Ninth Circuit held that Rule 23(h) requires that class members be allowed the opportunity to object to Class Counsel's fee motion itself, not merely to the preliminary notice that such a motion will be filed.

*Mercury* is not binding upon this Court, and "it appears that no court outside the Ninth Circuit has ever followed its conclusion that Rule 23(h) requires a fee petition to be filed before the objection deadline." *Bower v. MetLife, Inc.,* No. 1:09-cv-351, 2012 U.S. Dist. LEXIS 149117, at *15-16 (S.D. Ohio Oct. 17, 2012). As noted in *Bower*, Rule 23(h) does not by its plain language require that a fee petition be submitted at any specific time. Furthermore, here the Court's preliminary approval order authorized the notice to the Class, which informed Class Members that Class Counsel would seek remuneration of $4.5 million, such that the Class was clearly informed of the maximum amount of fees and expenses, which comports with Rule 23(h). *See, e.g.*, *In re AT & T Mobility*, 789 F. Supp. 2d at 972 ("class notice [that] enabled Class Members to learn that Class Counsel would seek 'a fee no greater than the lesser of ten percent (10%) of the aggregate value of the Settlement or twenty-five percent (25%) of the amounts refunded by taxing jurisdictions to the Settlement Class' [was] adequate notice [of fee request]."); *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, MDL 08-1999, 2010 WL 4386552, at *1-2 (E.D. Wis. Oct. 28, 2010) (Notice informing class members that (1) "class counsel had not yet submitted a request for attorneys' fees and expenses," and (2) "class counsel would make a fee request of no more than one-third of the cash benefits, plus $14 million as compensation for obtaining the warranty benefits, plus an unspecified amount of litigation expenses," was sufficient, even in light of *Mercury* decision). See also, Response to Objections, Section III.A.

Notwithstanding that *Mercury* is not binding upon this Court, Class Counsel will submit their fee application on September 4, 2013 – one month before the Final Approval Hearing. This will allow the Objectors more than sufficient time to review the papers being submitted in support of the fee petitions.

### A.    Class Counsel Are Entitled To Compensation

According to the common fund rule, "'a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.'" *US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1545 (2013) (citing *Boeing* Co. *v. Van Gemert,* 444 U.S. 472 (1980)); s*ee also Mills v. Electric Auto Lite Co.*, 396 U.S. 375, 392 (1970) (recognizing counsel's right to compensation for obtaining *a* common benefit on behalf of the class). This rule has existed in federal courts for more than a century now. *See Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) (citing to *Trustees v. Greenough*, 105 U.S. 527 (1881)).

In economic terms, "[t]he attorney fee award is the compensation for the *effort* expended to benefit the class. Counsel will not undertake actions of this nature unless they can receive adequate compensation for (i) their time, (ii) the risk of not prevailing, (iii) the delay in receipt of fees, [and] (iv) the investment (money as well as time) that must be made in a case." Stuart T. Rossman & Charles Delbaum, *Consumer Class Actions §* 15.2.1 (6th ed. 2006). Indeed, the contingency fee awarded to class counsel must be greater than the fees that the same attorneys would charge their clients in non-contingency cases. As Judge Posner has explained:

> A contingent fee must be higher than a fee for the same legal services paid as they are performed. The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services. The interest rate on such a loan is high because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is so much higher than that of conventional loans.

Richard Posner, *Economic Analysis of Law §* 21.9 (2d ed. 1984). Federal courts have adopted similar reasoning in approving fee awards for class counsel. *See Banyai v. Mazur,* N o . 00 Civ. 9806, 2008 WL 5110912, at *4 (S.D.N.Y. Dec. 2, 2008) ("A lawyer whose compensation

is contingent on services can be expected to receive more than she would receive if she were charging an hourly rate.") (citations omitted).

In the Seventh Circuit, a district court awarding attorneys' fees may use the lodestar method, the percentage of recovery method, or some combination of the two. *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560 (7th Cir. 1994); *Harman v. Lyphomed*, 945 F.2d 969 (7th Cir. 1991). The base lodestar may be adjusted upward via a multiplier to reflect the benefit of the settlement to the Class as well as the contingent nature of the attorneys' undertaking based on a likelihood of success in obtaining a judgment or settlement measured at the time the attorney began work on the case. *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010) (citations and quotations omitted); *Skelton v. General Motors Corp.,* 860 F.2d 250, 255 (7th Cir. 1988) (citations and quotations omitted). The court's task is to do its "best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market" at the outset of the litigation when the risk of loss still existed. *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007), citing *In re Synthroid Mktg. Litig*., 264 F.3d 712, 718 (7th Cir. 2001).

In *In re Synthroid*, the Seventh Circuit held that the market rate for legal fees depends in part on the following: (1) the risk of nonpayment a firm agrees to bear, in part, (2) the quality of its performance, in part on (3) the amount of work necessary to resolve the litigation, and in part on (4) the stakes of the case. *Id*., at 721. Consideration of these factors confirms that an aggregate award of $4.5 million to Class Counsel is reasonable and appropriate.

First, Class Counsel incurred a significant risk of nonpayment by prosecuting these cases. For example, as a result of the high placebo effect for these products, there is a general perception that these products work. Thus, while Plaintiffs' counsel believe that there is

substantial scientific evidence supporting their claims, this public perception of efficacy - both amongst jurists and fact finders - made these cases a very risky undertaking. At the inception of the lawsuits there was no certainty that Plaintiffs would succeed, or that the cases would settle and there are, as discussed above, numerous procedural and merits hurdles that pose risks to the success of these cases.

Second, Class Counsel have performed excellently. They have collectively navigated numerous motions to dismiss and a motion for summary judgment, have embarked upon class certification motion practice, have retained expert witnesses, and, in the *Jennings* case, prepared for a trial upon five months' notice, completing extensive fact and expert discovery and announcing themselves "ready for trial" in a relatively short period of time. The settlement that Class Counsel have achieved is significant, not only in terms of the funds made available to the Class, but also in terms of the prospective injunctive relief that will prohibit Rexall from making key misrepresentations regarding the numerous Covered Products.

Third, Class Counsel expended a tremendous amount of work to prepare the cases and achieve a resolution. As shown in the respective Declarations of Class Counsel, Plaintiffs and their attorneys invested considerable time and expense investigating the claims, initiating the lawsuits, responding to motions, conducting discovery, preparing for trial in *Jennings*, prosecuting class certification in *Cardenas*, proffering very qualified experts to support the claims, and otherwise vigorously prosecuting the cases on behalf of a Class of 12 million consumers.

Given the great risk taken and the substantial result obtained, under either the percentage of recovery method or the lodestar method, Class Counsels' fee applications are eminently reasonable and should be granted in their entirety. Again, it must be stressed that attorneys' fees

are not being paid out of the fund that has been made available for Class Members to claim against, and Rexall has agreed to pay all attorneys' fees separate and apart from the recovery in favor of the Class. Attorneys' fees will not diminish or erode the funds made available to the Class. As a result, the fee award will have no impact whatsoever on the benefit made available to the Class.

The Federal Rules of Civil Procedure expressly authorize the court to "award reasonable attorney's fees and nontaxable costs that are authorized by law *or* **by the parties' agreement.**" Fed. R Civ. P. 23(h) (emphasis added). When the settling defendant agrees to pay class counsel's fees from its corporate treasury, independent of the benefit obtained for the class, "the Court's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members." *McBean v. City of New York,* 233 F.RD. 377, 392 (S.D.N.Y. 2006).

Here, Rexall has agreed to pay Class Counsels' fees and expenses, as a result of which the fee award will not diminish or erode the total potential benefit (both monetary and injunctive) that will be available to the Class. "Thus regardless of the size of the fee award, class members ... will receive the same benefit; the fee award does not reduce the recovery to the class. Under these circumstances, the danger of conflicts of interest between attorneys and class members is diminished." *In re Sony SXRD,* 2008 WL 1956267 at \*15. Thus, courts routinely have approved the payment of class counsel fee awards by the defendant, rather than the class members. *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1033 ("Because the attorneys fees award was separately negotiated and separately funded, it does not reflect any diminished recovery to class members.").

Moreover, courts give considerable deference to fee agreements negotiated at arm's-

length by the parties, especially when the fee is to be paid by the defendant rather than the class members. This is particularly true where, as here, the Parties agreed upon the material terms of the settlement in favor of the Class Members before negotiating the attorneys' fee award. Moreover, the agreed amount of attorneys' fees was negotiated by sophisticated counsel familiar with complex class action litigation. *See Ingram v. Coca-Cola Co.,* 200 F.R.D. 685, 695 (N.D. Ga. 2001) (giving "substantial weight to a negotiated fee amount"); *In re Apple Computer, Inc. Deriv. Litig., No.* C 06-4128 JF (HRL), 2008 WL 4820784, at *3 (N.D. Cal. Nov. 5, 2008) ("A court should refrain from substituting its own value for a properly bargained-for agreement"); *Cohn v. Nelson,* 375 F. Supp. 2d 844, 861 (E.D. Mo. 2005) ("[W]here, as here, the parties have agreed on the amount of attorneys' fees and expenses, courts give the parties' agreement substantial deference.") (citation omitted).

The Supreme Court has endorsed this type of consensual resolution of attorneys' fee issues as the ideal toward which litigants should strive. In *Hensley v. Eckerhart,* 461 U.S. 424, 437 (1983), the Supreme Court stated: "A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee." *See also M. Berenson* Co. *v. Faneuil Hall Marketplace, Inc.,* 671 F. Supp. 819, 829 (D. Mass. 1987) (noting that in class actions, "ideally the parties will settle the amount of the fee between themselves").

**B. The Requested Fees Are Well Within The Accepted Range Of Percentages.**

Under the percentage of recovery theory, if one looks only at the minimum total potential value of the direct compensation prong of the Settlement (the $14.2 million made available for claims by the direct mail recipients, plus $1.5 million notice and administration costs and $4.5 million in attorneys' fees and expenses), without regard to the injunctive relief, the agreed-to

aggregate fee of $4.5 million in attorneys' fees and expenses amounts to approximately 22% of the total potential benefit to the Class. If one adds to this $20.2 million total potential value the $21.7 million minimum value of the injunctive relief, the agreed-to aggregate fee of $4.5 million amounts to approximately 11% of the total potential benefit to the Class.

### 1.     The Value of The Fund.

The fund available for Class Members is uncapped, and has a minimum value of approximately $14.2 million (if limited to the direct mail recipients). There are over 12 million Class Members, and publication notice reached over 76% of the Class, such that more than 9.1 million Class Members were exposed to the notice. More than 4.7 million Class Members received direct, individual notice. Under the terms of the Settlement, each class member has a claim for at least $3 – the minimum amount for one undocumented purchase. This yields a minimum total potential benefit to the Class of approximately $27.3 million (12 million class members x 76% reach x $3.00 minimum claim) or $14.2 million (4.7 million direct notice recipients x $3.00). These amounts are conservative because class members are entitled to make multiple claims, up to $12 each for undocumented purchases and up to $50 for documented purchases. *See* generally, Declaration of Keith Reutter, Ph.D., ¶13.

Class Counsels' fees may be determined on the basis of the amount of the total potential benefit made available to the Class. This rule of law stems from the Supreme Court's decision in *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980). In *Boeing*, the Supreme Court was faced with the issue of whether a proportionate share of the fees awarded to lawyers who represented the successful class may be assessed against the unclaimed portion of the fund created by the judgment. The Court held as follows:

> Once the class representatives have established the defendant's liability and the total amount of damages, the members of the class can obtain their share of the recovery by

proving their individual claims against the judgment fund. This benefit devolves with certainty upon the identifiable persons whom the court has certified as members of the class. Although the full value of the benefit to each class member cannot be determined until he presents his claim, a fee award against the entire judgment fund will shift the costs of litigation to each absentee in the exact proportion that the value of his claim bears to the total recovery.

*Boeing*, 444 U.S. at 479.

Courts in this Circuit adhere to this rule. In *Mars Steel, supra,* the Seventh Circuit concluded that the defendant bank's agreement to provide 23,000 corporate borrowers the opportunity for new loans up to $100,000 for a one-year period if found creditworthy, was worth approximately $500 per class member. Based upon class members being given this opportunity – as opposed to their actually taking it - the court concluded that the "maximum" value of the settlement was $11.5 million (23,000 class members times the potential $500 benefit). Thus, the settlement was valued at $11.5 million even though, unlike here, there was no certainty that any class member might gain this benefit (1) because they may not have needed a loan during the following year and (2) they might not have met the bank's creditworthiness standards upon application. Nevertheless, the court found that this settlement "possibly worth as much as $11.5 million to the plaintiffs" was "generous and certainly adequate . . ." *Id.* at 682.

In a very recent consumer class action claims-made settlement in this District, the court in *In re KFC* citing *Boeing*, noted:

> Absent extenuating circumstances, ***fees are based on the benefit made available to the class, as opposed to the amounts actually claimed.*** This approach promotes the deterrence goals of class actions. *See, e.g., Boeing,* 444 U.S. at 480, 100 S.Ct. 745; 2 NEWBERG ON CLASS ACTIONS § 1.18 (3d Ed.1992) ("[I]t is now settled that class counsel may seek a fee award based on the total potential benefit to the class, rather than being limited by the total amount of claims actually exercised by class members.")

280 F.R.D. at 386 n.7 (emphasis added)

45

In addition, the amounts paid by Rexall for notice and administration, attorneys' fees and costs should be added to the total class benefit for purposes of calculating attorneys' fees. *Schulte*, 805 F. Supp. 2d at 600-601; *Staton v. Boeing Corp.*, 327 F.3d 938, 975 (9th Cir. 2003) ("We conclude that where the defendant pays the justifiable cost of notice to the class - but not, as here, an excessive cost - it is reasonable (although certainly not required) to include that cost in a putative common fund benefiting the plaintiffs for all purposes, including the calculation of attorneys' fees.").

In considering the fee petition, the Court should therefore allocate the percentage on the basis of the total potential benefit made available for Class Members to claim against, whether those funds are claimed or not. Class Counsel have succeeded in creating an uncapped fund for Class Members to access, with a conservative minimum potential benefit of approximately $14.2 million (if limited to the direct notice recipients and not including the value of the injunctive relief), and the award of attorneys' fees should be calculated based upon the full potential benefit made available to the Class.

### 2. The Value of the Injunctive Relief.

As noted above, it is estimated that the Settlement will provide the prospective injunctive relief which is valued at approximately $21.7 million for members of the Class for the 30-month period. This benefit provides real value to the Class and valuable consumer protection which the Court can consider when awarding fees.

In *In re Mexico Transfer Litigation*, 267 F.3d 743, 748 (7th Cir. 2001), in evaluating the overall fairness and reasonableness of the settlement, the Seventh Circuit noted that the prospective relief provided in that settlement "is not an outcome to be sneered at." There, like here, the defendants were required to change their representations about their products so that

future consumers, consisting of some whom were current class members, were going to possibly purchase defendants' products in the future. *Id*.

Moreover, in order to determine whether a proposed settlement is fair, reasonable and adequate, the Court should evaluate the **entire** settlement, including "any prospective injunctive relief in addition to any tangible benefits [ ] conveyed to the class." *See Meyenburg* 2006 WL 5062697, at *8 (citing *In re Mexico Money Transfer Litigation*, 267 F.3d at 748-49). *Meyenburg* considered all aspects of the settlement and found there was "substantial benefit to the class" where, *inter alia*, defendant "agreed to modify its business practices for three years," which, like here, involved injunctive relief that "specifically encompasses and addresses the challenged conduct," "insures a benefit to all class members, whether or not they file a claim," and "was initiated solely as a result of the Settlement." Id., at *4, *8. The *Meyenburg* court further noted the injunctive relief was an important factor to weigh in evaluating whether the settlement was fair and reasonable, "regardless of the dollar value of this [injunctive relief] component to the Settlement." *Id*. at *8. Yet, as set forth in the expert report of Dr. Reutter, here the injunctive relief has a quantifiable dollar value, making it even more significant.

Courts – in this Circuit and elsewhere – have similarly recognized that injunctive relief – especially the type of significant relief provided for here – may properly be considered when determining the reasonableness of the settlement, and in turn an award of attorneys' fees. *See, e.g., Pappas v. Naked Juice Co. of Glendora, Inc*., No. CV11-08276 JAK (PLAx) (C.D. Cal.), Order at 5 (August 7, 2013) (court took into account "injunctive relief valued at $1.4 million" as part of the settlement fund for purposes of determining whether the settlement was reasonable) (attached as Exhibit W to the "Master Exhibit List,"); *In re Jiffy Lube Int'l., Inc. Text Spam Litig*., No. 3:11-MD-226-JM (JMA), 2012 WL 4849617, at *2 (S.D. Cal. Oct. 10, 2012)

(preliminarily approved settlement as fair and reasonable when considering all aspects of the recovery to the class, including the injunctive relief); *Bellifemine v. Sanofi-Aventis U.S. LLC*, No. 07 Civ. 2207(JGK), 2010 WL 3119374, at *4 (S.D.N.Y. Aug. 6, 2010) (court considered the "substantial" injunctive relief in finding the settlement was fair and reasonable); *Perez v. Asurian Corp.*, 501 F.Supp.2d 1360, 1381 (S.D. Fla. 2007) (finding the prospective injunctive relief at issue "weigh[s] heavily in favor of approving this Settlement"); *Vought v. Bank of America, N.A.*, 901 F.Supp.2d at 1089-1092 (value of injunctive relief was considered in determining whether to approve the settlement).

### 3. The Percentage of the Class Benefit is Reasonable.

"In this Circuit, the range of percentage of fund awards is between 30% and 40%. *See* e.g., *Taubenfield v. AON Corp.*, 415 F.3d 597, 600 (7th Cir. 2005) (approving attorneys' fees in the amount of 30% of a $7.5 million settlement); *Gaskill v. Gordon*, 942 F.Supp. 382, 386 (N. D. Ill. 1996) (awarding a 38% fee); *Kitson v. Bank of Edwardsville*, No. 08-507-GPM, 2010 WL 331730 (S.D. Ill. Jan. 25, 2010) (33% fee award). Because no cap is placed on the amount of money Rexall will pay to the Class Members, and because each Class Member is entitled to make at least one undocumented claim for $3, the total potential compensatory benefit created by the Settlement is at least $14.2 million (if the calculation is limited to the approximately 4.7 million Class Members who received direct, individual notice) or $27.3 million (if the 9.1 million Class Members who were reached by the combination of direct and publication notice are considered). As noted above, under several different approaches, either limiting the percentage analysis to the minimum total potential benefit of the compensatory relief being made available to Class Members or including the value of the injunctive relief, the aggregate agreed-to amount of $4.5 million in fees and expenses is well within the acceptable percentage range.

For example, the minimum total potential benefit of the overall settlement is approximately $41.9 million (consisting of the minimum total potential benefit made available to Class Members who received direct notice of $14.2 million, $1.5 million in notice and administration costs, agreed-to fees of $4.5 million, and the $21.7 million value of the injunctive relief), and the aggregate agreed-to fees and expenses of $4.5 million amounts to approximately 11% - well within the range of percentages awarded in this Circuit.

### C. A Lodestar Analysis also Shows that the Requested Fee is Reasonable

As more fully set forth in Class Counsels' respective Declarations, the fee request is also reasonable under the lodestar method. Class Counsel invested substantial effort in bringing about the settlement on behalf of approximately 12 million consumers. As set forth more fully in Class Counsels' respective Declarations, to arrive at a base lodestar, Class Counsel multiplied the total hours by the current hourly rates of the attorneys who worked on this class-action case. A reasonable hourly rate should be in line with the prevailing community rate charged for similar services by lawyers of reasonably comparable skill, experience and reputation. *Jeffboat LLC v. Director, Office of Workers' Compensation Programs*, 553 F.3d 487, 489 (7th Cir. 2009). Each petitioning firm's Declaration details the calculation of hours for each attorney that worked on the case (which were compiled from contemporaneous time records maintained by each attorney) and the prevailing hourly rate charged by those attorneys. As set forth in their respective Declarations, Class Counsel respectfully submit that the number of hours expended on the litigation were reasonable and necessary, and that the hourly rates prevailing for the attorneys involved are also reasonable.[13]

---

[13] The Supreme Court has approved the use of current hourly rates to compensate for inflation and loss of use of funds. *Missouri v. Jenkins,* 491 U.S. 274, 284 (1989). *See also In re Union Carbide Corp. Consumer Prods. Bus.* Sec. *Litig.,* 724 F. Supp. 160, 163 64 (S.D.N.Y. 1989) (citing cases); *In re NASDAQ Market-Makers Antitrust Litig,* 187 F.R.D. 465, 489, n.25 (S.D.N.Y. 1998).

As their respective Declarations demonstrate, the fees requested are reasonable and justified under either a straight lodestar approach, a percentage of recovery approach, or a cross-checked approach. [14] Class Counsel's contingency risk, the quality of representation, the outstanding result achieved, and other relevant factors support the application of the very reasonable multipliers requested by Class Counsel.

As explained in their Declarations, Class Counsel each believe that the multiplier requested by them is unquestionably within the range of multipliers found reasonable by courts, and is fully justified in light of the effort undertaken by Class Counsel, the recovery achieved, and risks involved. "Typical multipliers awarded in comparable class action litigation average around 4, but are often much higher." *In re KFC*, 280 F.R.D. at 381. Indeed, courts have approved multipliers of up to and beyond four (4). *In re Cenco, Inc. Secs. Litig.*, 519 F.Supp. 322 (N.D. Ill. 1981) (multiplier of 4); *In re Folding Carton Antitrust Litigation*, 84 F.R.D. 245 (N.D. Ill. 1979) (multipliers ranging from 1.3 to 3); *Arenson v. Bd. of Trade*, 372 F. Supp. 1349 (N.D. Ill. 1974) (multipliers of 3 and 4); *DiGiacomo v. Plains All Am. Pipeline,* No. H-99-4137, 2001 WL 34633373, at *10-11 (S.D. Tex. Dec. 19, 2001) (awarding percentage fee that resulted in multiplier of 5.3); *In re Charter Comm's., Inc. Sec. Litig.,* No. MDL 1506, 2005 WL 4045741, at *18 (ED. Mo. 2005) (approving 20% fee yielding 5.61 lodestar multiplier as "within the range of multipliers found reasonable for cross-check purposes") (citations omitted); 1 Alba Conte, *Attorney Fee Awards § * 2.06, at 39 (2d ed.1993) ("When a large common fund has been recovered and the hours are relatively small, some courts reach a

---

[14] Class Counsel further notes that their work in this case is not complete. They are filing this application for attorneys' fees prior to final approval of the settlement, and therefore the lodestar calculation description of the work set forth herein does not account for all of the time that Class Counsel will spend on this case.

50

reasonable fee determination based on large multiples of 5 or 10 times the lodestar.").

A district court may use the lodestar method, the percentage of recovery method, or some combination of the two. *Florin*, 60 F.3d at 1247, n. 2. Here, where the percentage of recovery is well within the range permitted in this Circuit, the lodestar may be used as a "cross-check" to confirm the reasonableness of the award. *Accord Chemi v. Champion Mortgage,* No. 2:05-cv-1238 (WHW), 2009 WL 1470429, at *12 (D.N.J. May 26, 2009). That is particularly true here, as Rexall will pay Class Counsels' fees and the multiplier is well within the range of those approved by the courts in the past.

### D.     Class Counsel Is Entitled to an Award of Expenses

Additionally, Class Counsel are entitled to an award of costs pursuant to Fed. R. Civ. P. 23(h), which provides that the court may award "reasonable attorney's fees and non-taxable costs that are authorized by law or by the parties' agreement." Courts regularly award reimbursement for expenses that are reasonable and necessarily incurred. *Spicer v. Chi. Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1256 (N.D. Ill. 1993). As shown in Class Counsels' respective Declarations, Class Counsel advanced significant costs litigating these cases, including costs associated with discovery, travel, court fees, and, perhaps most significantly, to retain expert witnesses that were instrumental in providing critical evidence addressing Rexall's claims regarding the efficacy of the products. As with the attorneys' fees, the Court's award of the costs incurred by Class Counsel will not diminish or erode the benefit to the Class Members, because all costs and fees are being paid by Rexall independent of compensation to the Class.

### E.     Incentive Awards

The parties have agreed that each of the named Plaintiffs will be awarded an incentive payment of up to $5,000, to be paid by Rexall in addition to the funds made available to the

Class. Incentive awards are justified when necessary to induce individuals to become named representatives. *In re Synthroid*, 264 F.3d at 722. In deciding whether an incentive award is proper, and, if so, in what amount, relevant factors include the action the plaintiff has taken to protect the interests of the class, the degree to which the class has benefited from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation. *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (approving incentive award of $25,000). As shown in Class Counsels' Declarations, the named Plaintiffs were active participants in the prosecution of these cases, willingly undertook the responsibilities and burden associated with serving as a class representative, and helped to achieve a substantial settlement for the Class Members. They are certainly deserving of the reasonable remuneration for their efforts in the amount of $5,000 each.

A $5,000 incentive award for each Plaintiff, to be paid by Rexall, is entirely reasonable. *See In re KFC*, 280 F.R.D. at 383 (approving as reasonable aggregate incentive award of $25,000.00, which amounted to $5,000 award to each named plaintiff); *see also Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (affirming district court's incentive award of $25,000 to named plaintiff); *Heekin v. Anthem, Inc.*, 1:05-CV-01908-TWP, 2012 WL 5878032, at *1 (S.D. Ind. Nov. 20, 2012) (authorizing payment of $25,000 incentive award to named plaintiffs); *Am. Int'l. Grp., Inc. v. ACE INA Holdings, Inc.*, 07 CV 2898, 2012 WL 651727, at *17 (N.D. Ill. Feb. 28, 2012) *appeal dismissed,* 710 F.3d 754 (7th Cir. 2013) (awarding named plaintiffs incentive awards of $25,000 each); *Will v. Gen. Dynamics Corp.*, No. 06-698-GPM, 2010 WL 4818174, at *4 (S.D. Ill. Nov. 22, 2010) (same).

**CONCLUSION**

For all the foregoing reasons, Plaintiffs, the Class, and Class Counsel respectfully request that the Court should grant final approval of the Settlement and approve the requested attorneys' fees and incentive awards to be paid by Rexall.

Dated:  September 4, 2013

By:   /s/Stewart M. Weltman
STEWART M. WELTMAN, LLC
53 W. Jackson, Suite 364
Chicago, Illinois 60604
Telephone: 312-588-5033
(Of Counsel: Levin Fishbein Sedran & Berman)

Of Counsel:

Elaine A. Ryan (admitted *pro hac vice*)
Patricia N. Syverson (admitted *pro hac vice*)
BONNETT,    FAIRBOURN,    FRIEDMAN    &
BALINT, P.C.
2325 E. Camelback Rd., Suite 300
Phoenix, Arizona 85016
Telephone: 602-274-1100

*Attorneys for Plaintiffs Nick Pearson, Francisco Padilla, Cecilia Linares, Augustina Blanco, and Abel Gonzalez*

By: /s/ Peter N. Freiberg
Peter N. Freiberg (admitted *pro hac vice*)
Jeffrey I. Carton (admitted *pro hac vice*)
DENLEA & CARTON LLP
One North Broadway, Suite 509
White Plains, New York 10601
Telephone:   (914) 920-7400

*Attorneys for Plaintiff Richard Jennings*

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2013, a true and correct copy of the following document was electronically filed and served on all counsel of record in this action who are deemed to have consented to electronic service via the Court's CM/ECF system: **Plaintiffs' Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement, Attorneys' Fee and Expenses and Incentive Awards.**

I also certify that the foregoing document is being served by U.S. Mail this day on all counsel of record or *pro se* parties identified below who are not authorized to receive electronically Notices of Electronic Filing.

C. Jane Radlinski
309 E. Church Street
Jacksonville, FL 32202-2725
(904) 633-2699
*Pro se* Objector

Peggy Thomas
2109 N.W. 12th Avenue
Ft. Lauderdale, FL 33311
(954) 761-1589
*Pro se* Objector

Rhonda L. Paulson
13383 E. Marie Creek Road
Couer d'Alene, ID 83814
*Pro se* Objector

Anthony Leardi
1813 Renwick Street
Bethlehem, PA 18017
(610) 865-7821
*Pro se* Objector

John Michael Buckley
370 Canyon Spring Dr.
Rio Vista, CA 94571
(707) 374-3853
*Pro se* Objector

Simone Thomas
2109 N.W. 12th Avenue
Ft. Lauderdale, FL 33311
(305) 903-6935
*Pro se* Objector

Donald Charles Koneval
8314 Manorford Drive
Parma, OH 44129-5309
(440) 842-6232
*Pro se* Objector

Joseph Darrell Palmer
Law Office of Darrell Palmer PC
603 N. Highway 101, Suite A
Solana Beach, CA 92075
(858) 792-5600
Attorney for Objectors Kathleen McNeal
and Alison Paul

Melissa A. Holyoak
Center for Class Action Fairness
1718 M Street NW, No. 236
Washington, DC 20036
(573) 823-5377
Attorney for Objector Ted Frank

Steve A. Miller
Steve A. Miller, PC
1625 Larimer Street, No. 2905
Denver, CO  80202
(303) 892-9933
Attorney for Objector Pamela Easton

John C. Kress (53396MO)
The Kress Law Firm, LLC
4247 S. Grand Blvd.
St. Louis, MO 63111
(314) 631-3883
Attorney for Objector Pamela Easton

Jonathan E. Fortman #40319
250 Saint Catherine Street
Florissant, Missouri 63031
(314) 522-2312
Attorney for Objector Pamela Easton

Maureen Connors (0074094OH)
6625 Pearl Road
Parma Heights, OH 44130
(216) 640-9860
Attorney for Objector Pamela Easton

/s/ Peter N. Freiberg
One of Plaintiffs' Attorneys