UNITED STATES DISTRICT COURT
NORTHERN DISTRICTOF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NICK PEARSON, FRANCISCO PADILLA, CECILIA LINARES, AUGUSTINA BLANCO, ABEL GONZALEZ, and RICHARD JENNINGS, On Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>NBTY, INC., a Delaware corporation; and REXALL SUNDOWN, INC., a Florida Corporation; and TARGET CORPORATION, a Minnesota Corporation,<br><br>Defendants. | Case No.:  11 CV 07972<br><br>CLASS ACTION<br><br>**Judge James B. Zagel**<br><br>**DECLARATION OF JEFFREY I. CARTON, ESQ., IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT, ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARDS** |

JEFFREY I. CARTON, an attorney duly admitted to practice law before the Courts of the States of New York and Connecticut, hereby affirms the following to be true under penalties of perjury.

1.      I am an attorney duly licensed to practice law in the Courts of the States of New York and Connecticut, and I am a member of the law firm of Denlea & Carton LLP ("D&C"), attorneys for plaintiff Richard Jennings ("Jennings"), and one of the attorneys for the Class for whom we have previously been appointed as Class Counsel.

2.      I have personal knowledge of the matters set forth in this Declaration based upon my active involvement in the prosecution of this action over the past two and one-half years and a review of the files in my firm's possession.

3.     I respectfully submit this Declaration pursuant to 28 U.S.C. §1746 in support of Plaintiffs' Motion for Final Approval of Class Action Settlement, Attorneys' Fees and Expenses, and Incentive Awards.  As set forth more fully below and in the accompanying Memorandum of Law, as well as in Plaintiffs' Response to Objections and the Parties' Joint Response to Objections, this action is ripe for final approval.

**The Challenged Claims and Procedural History**

4.     On August 22, 2011, Jennings, a resident of Oak Bluffs, Massachusetts, filed an action in the United States District Court for the District of Massachusetts, on behalf of himself and all other similarly situated consumers, alleging that Rexall violated the Massachusetts Unfair Trade Practice Act, Mass. Gen. Laws ch. 93A, §§2, *et seq.*, and breached an express warranty, in connection with its manufacturing, marketing and sale of Defendants' Osteo Bi-Flex line of products.  Jennings alleged that the claim that the products "renew" or "help renew" cartilage is false and deceptive. His Complaint was based upon the scientific and medical principles that adult articular cartilage is not vascularized (i.e., it has no blood flow) and lacks the capacity to regenerate itself after sustaining damage from injury or disease, including osteoarthritis; and that osteoarthritis, a disease which is characterized by the degradation and degeneration of articular cartilage that leads to pain and inflammation caused by bones grinding together, is not reversible. Jennings alleges that the claim that Osteo Bi-Flex can renew or rebuild cartilage is deceptive because neither glucosamine nor chondroitin sulfate, alone or in combination with each other, will cause cartilage to rebuild or renew.

5.     The action that Jennings filed in the District of Massachusetts is one of several currently pending actions involving various glucosamine and chondroitin products

manufactured by NBTY, Inc., its subsidiary Rexall Sundown, Inc., or one of their affiliates. *Cardenas, et al. v. NBTY, Inc. et al.*, No. 2:11-cv-01615-TLN-CKD (E.D. Cal), was filed on June 14, 2011 against NBTY, Inc. and Rexall Sundown, Inc. arising out of the manufacture and sale of their Osteo Bi-Flex line of glucosamine and chondroitin joint health dietary supplement products. It originally sought a California-only class but was amended to seek a multi-state class. *Linares, et al. v. Costco Wholesale, Inc.*, No. 3:11-cv-0547-MMA-BGS (S.D. Cal.), was filed on November 2, 2011, arising out of Costco's sale of the Kirkland Signature Brand line of glucosamine and chondroitin joint health dietary supplement products and seeking a California-only class. This action, *Pearson v. Target Corporation*, No. 1:11-cv-07972 (N.D. Ill.), was filed on October 28, 2011, arising out of Target's sale of its Up & Up line of glucosamine and chondroitin joint health dietary supplement products and seeking a multi-state class. *Blanco v. CVS Pharmacy, Inc., No.* 5:13-cv-00406-JGB-SP (C.D. Cal.), was filed on March 4, 2013, arising out of CVS Pharmacy's sale of certain CVS-brand glucosamine chondroitin dietary supplement products and seeking a California and multi-state class.

6. In addition to Osteo Bi-Flex, Rexall and its affiliates manufacture other glucosamine joint health dietary supplements sold under the brand names of Rexall Sundown, Inc., NBTY, Inc., or their affiliates, as well as private label brands of glucosamine and chondroitin joint health dietary supplement products, including the Costco products purchased by the named plaintiffs in the *Linares* action and the Target glucosamine and chondroitin dietary supplement product for which the Court sustained the

Amended Complaint in the *Pearson* action.[1]  The core issues in all cases are similar, in

that they contest the veracity of similar joint health benefit representations made about the

NBTY/Rexall-branded products and the private label products that Rexall manufactures for

other retailers, all of which are covered by the Settlement Agreement.  By agreement of all

of the parties, and as set forth in the Settlement Agreement, the nationwide class action

settlement is being implemented through this matter, *Pearson v. Target Corporation.*

**Jennings' Prosecution of His Action**

7.      Prior to all of these cases being "consolidated" in *Pearson v. Target*

*Corporation* for purposes of a global settlement, Jennings and his counsel expended

significant time and resources prosecuting his claims in the District of Massachusetts, the

net result of which was to serve as a catalyst for the global resolution of all of the actions

pending against Defendants.  In fact, it was the very last night before the Parties were to

begin a jury trial in Massachusetts that Rexall agreed to a settlement with Jennings, which

eventually led to the global, nationwide settlement now before the Court.

8.      Jennings filed his complaint on August 22, 2011. Rexall responded with two

motions to dismiss, both of which were denied by the court upon Jennings amending his

Complaint. The two motions to dismiss involved extensive briefing by the parties and

appearances before the court. When the court denied Rexall's second motion to dismiss

on April 10, 2012, it also scheduled an "exemplar" trial of Jennings' claims for its trial term

beginning October 1, 2012. The setting of that "exemplar" trial led to extensive and

expedited discovery over the next several months.

---

[1] The full listing of products and the applicable time periods for which class members may make claims and for which releases will be provided pursuant to the Settlement Agreement are set forth in Exhibit A to the Settlement Agreement.

9.     The discovery conducted in the *Jennings* case consisted of the exchange of numerous documents, the depositions of the parties, and the depositions of three expert witnesses.  Rexall produced over 7,000 pages of documentation, consisting mostly of its "claim substantiation" file and documents related to its marketing of Osteo Bi-Flex. Jennings made an extensive production of his medical records spanning many years. There were three party depositions. Jennings was deposed for the better part of a day, and two Rexall employees (Florence Okaro and Angelica Vrablic, Ph.D.) were deposed over the course of two days.

10.     Both Jennings and Rexall made extensive expert disclosures, Jennings proffering the expert disclosure of Jeremiah E. Silbert, M.D., and Rexall proffering the expert disclosures of C. Thomas Vangsness, M.D and Daniel Grande, Ph.D.  Dr. Silbert was deposed in Boston, Massachusetts, Dr. Grande was deposed in Manhasset, New York, and Dr. Vangsness was deposed in Los Angeles, California. All three expert depositions were extensive, complex and challenging because of the scientific aspects of the experts' opinions and the abundant medical literature that exists regarding the efficacy of glucosamine and/or chondroitin.

11.     The efforts of Jennings and his counsel resulted in Rexall withdrawing one of its expert witnesses, a critical development in the prosecution of the case.  Dr. Vangsness was designated by Rexall to testify as an expert witness, but after his deposition was concluded, Rexall withdrew his designation as a testifying expert witness, because the rigorous examination conducted at his deposition by Jennings' counsel caused him to make significant admissions and concessions that significantly undermined Rexall's defenses.  Causing a party to withdraw an expert witness is a rare occurrence, but it

happened as a result of our extensive preparation for Dr. Vangsness' deposition and the methodical cross-examination conducted of him during his deposition.

12.     Following the expedited discovery in connection with the "exemplar" trial, Rexall moved for summary judgment, which the court denied after extensive briefing by all parties. In addition, several motions *in limine* were filed by Rexall, which required Jennings to submit opposition briefs. Jennings and Rexall then prepared a lengthy pretrial memorandum pursuant to the court's order, and were ready to proceed to the "exemplar" trial beginning October 1, 2012. Rexall and Jennings agreed to settle Jennings' claims, subject to a final resolution encompassing all pending lawsuits, late the night before the parties were scheduled to begin a jury trial when they entered into a Memorandum of Understanding.  That Memorandum of Understanding served as the catalyst for the global resolution of all cases now before the Court.

**Settlement Negotiations**

13.     The settlement of Jennings' (and his fellow class members') claims was reached following several months of negotiations between attorneys at my law firm and counsel for Rexall.  These conversations began in May 2012 when counsel for Rexall broached the subject of settlement, following which the attorneys exchanged numerous different settlement constructs and proposals.  At the same time as the parties were preparing for the "exemplar" trial, they were also negotiating the terms of a settlement, and as a result of these extensive, arm's-length negotiations, the Memorandum of Understanding was executed on September 31, 2012, on the eve of the "exemplar" trial the District Court in Massachusetts had set for its trial term beginning October 1, 2012. The Memorandum of Understanding contemplated the settlement of all pending

glucosamine supplement cases. As a result, counsel for all parties in all of the pending cases thereafter participated in several in-person conferences and conference calls, which ultimately resulted in the execution of the written Settlement Agreement for which the Court provided its preliminary approval on May 30, 2013. Notably, much of the framework for the current settlement was the result of our negotiations with Defendants' counsel which resulted in the Memorandum of Understanding.

14. During the entire negotiation process, it was only after the relief in favor of Rexall and NBTY and the Settlement Class was agreed upon that the Parties negotiated the issue of attorneys' fees and incentive awards for the named plaintiffs. The amount of attorneys' fees and incentive awards was agreed upon only after extensive negotiations between the Parties' counsel, and with the understanding that payment of such amounts will be made from Defendants' corporate coffers without diminishing or eroding the redress available for the Settlement Class in any way.

15. The settlement was agreed to without any collusion whatsoever on behalf of the Parties or their counsel. At all times, the Parties were represented by competent and experienced counsel. During the negotiations, Rexall was represented by Kara L. McCall, Michael W. Davis and Robert T. Scarborough, attorneys with the national law firm of Sidley Austin, LLP who vigorously advocated Rexall's position; Jennings was represented by James R. Denlea, Jeffrey I. Carton and Peter N. Freiberg, of D&C; and the plaintiffs in the other pending cases were represented by Stewart M. Weltman and Elaine A. Ryan.

**Settlement Class Certification and Definition**

16. The proposed settlement provides the following:

7

**A.**     **Certification of the Proposed Settlement Class**

Plaintiffs request that the Court certify a Class defined as:

> All persons in the United States who, during particular times and in certain U.S. locations as identified in Exhibit A to the Settlement Agreement purchased one or more of the Covered Products.[2]

> Excluded from the Class are (i) Defendants; (ii) retailers of the Covered Products; (iii) the parents, subsidiaries, affiliates, officers, and directors of (i) and (ii); (iv) those who purchased the Covered Products for the purpose of resale or distribution; and (v) those persons who submit valid requests for exclusion from the Settlement Class.

**B.**     **Class Relief**

**1.**     **Monetary Relief - Claims Paid To Class Members**

Each Class member shall be entitled to seek monetary compensation.[3]  Class members who have adequate proof of purchase (*e.g.*, receipts, intact boxes or bottles that display a readable UPC code and readable lot number, or similar documentation that identifies the Covered Product and date and location of purchase) shall be entitled to reimbursement of $5 for each purchased bottle of the Covered Products up to ten (10) bottles.  Class members who do not have any adequate proof of purchase will be entitled to reimbursement of $3 per bottle of the Covered Products purchased up to a maximum of four (4) bottles upon submitting their claim form, which will require a sworn declaration that identifies the Covered Product(s) purchased, the approximate date of purchase, and the

---

[2] The full listing of Covered Products, including their dates of distribution and locations of sale, is set forth in Exhibit A to the Settlement Agreement.

[3] The Class is estimated to be in excess of 12 million households.

location of the purchase.[4]  There is no ceiling on the amount of monies that Defendants may have to pay for valid claims.  Defendants have agreed to pay all valid claims.

## 2.  Injunctive Relief

During settlement negotiations, the Parties agreed to the removal of certain labeling claims from all of the Covered Products currently being manufactured or sold by Defendants.  There are dozens of different products that will be impacted by these label changes.  The Settlement Agreement provides that for a period of 30 months from the date of the Final Approval, Defendants will not use any representations that the products will rebuild, build, or renew cartilage ("rebuilding cartilage representations") on the labeling and packaging for any Covered Products that they manufacture, sell, or supply to other retailers.  Removal of the rebuilding cartilage claims was a significant goal of Jennings and his counsel, which we achieved when the Memorandum of Understanding was executed.  For the same 30-month period, and as part of the negotiations related to the other types of claims made by Defendants (e.g., claims related to joint comfort or pain, flare-ups, soothing, cushioning, nourishing, mobility, lubrication, or support) ("palliation representations"), Defendants will be required to place on the packaging and labeling of the same products a statement that "individual results may vary."  Defendants will have a period of six months from the date of Final Approval to begin shipping Covered Products with the label changes.  Defendants also have an incentive to keep these labeling changes in place after the 30-month period expires, in that the Settlement Agreement provides that, to the extent that and for as long as the label changes are kept in place after the 30-month period, no Settlement Class member who purchases such product after the 30-month

---

[4]  The claim form will not require notarization, and can be submitted by U.S Mail or electronically uploaded at the settlement website, www.GlucosamineSettlement.com.

period can sue Defendants on any claim that was or could have been asserted in the litigation.

### C. Incentive Awards to Class Representatives

The Settlement Agreement provides that, subject to Court approval, Defendants agree to pay and will not object to the Court awarding each of the six (6) Class representatives an incentive award of up to $5,000. The payment of these incentive awards will be separate and apart from, and will not diminish or erode, the payment of claims to the Class Members as set forth above.

### D. Attorneys' Fees and Expenses

The Settlement Agreement provides that the Defendants agree to pay and will not object to the Court awarding the firm of Denlea & Carton LLP (counsel for Plaintiff Richard Jennings) an aggregate fees and expenses award of $2.5 million; and that Defendants agree to pay and will not object to the Court awarding the firms of Bonnett, Fairbourn, Friedman & Balint, P.C., Stewart M. Weltman LLC (Of Counsel Levin Fishbein Sedran & Berman), and Levin Fishbein Sedran & Berman (counsel for Plaintiffs Nick Pearson, Francisco Padilla, Cecelia Linares, Augustine Blanco and Abel Gonzalez) an aggregate fees and expenses award of $2 million. All attorneys' fees and expenses are to be paid separate and apart from, and will not diminish or erode, the payment of claims to the Class Members as set forth above.

### Counsel Conducted Intense Arm's-Length Negotiations

17.     As noted above, at the same time as Jennings and Rexall were preparing for the "exemplar" trial, they were also engaged in settlement negotiations. Rexall's counsel initially proposed a general construct for the settlement of all claims, which ultimately

culminated in the Memorandum of Understanding executed by Jennings and Rexall, which was the catalyst for and eventually led to the global settlement that resolves at least five cases pending in federal district courts throughout the United States. Following the execution of the Memorandum of Understanding which provided the framework for the global resolution, all parties, including the plaintiffs in the other pending cases, engaged in a series of telephone conferences and in-person meetings during which resolution of all claims was agreed to in order to achieve a global settlement and disposition of all pending cases. Following a lengthy meeting in Chicago, the parties finalized the Settlement Agreement, which was signed by all parties and their counsel on or around April 15, 2012.

18.     Jennings and D&C, as well as the other named plaintiffs and their counsel, have determined that the proposed settlement is fair, reasonable, and adequate, and is in the best interests of the Class. That conclusion is based on an investigation into the claims and underlying events and transactions alleged in the Complaint, legal research, evidence obtained in discovery which was virtually complete before settlement negotiations began, consultations with experts, and arguments made by all Parties relating to the merits of the action.

19.     There can be no serious debate about whether the Settlement Agreement was the result of intensive and hard-fought negotiations, as the settlement dialogue began only after more than two years of vigorous litigation and took place between experienced, capable counsel, each resolute in zealously advocating and defending their respective clients' positions. Thus, the Settlement is entitled to the presumption of fairness.

20.     All Parties, and their counsel, have a thorough understanding of the case. While Plaintiffs strongly believe that the claims asserted in the Complaint have merit, they

also recognize the uncertainties in any litigation.  There is no certainty that the Class would prevail at trial, despite counsels' belief in the strength of their positions.  It is the well-informed opinion of counsel for Jennings that the benefits afforded to the class by the Settlement are real and substantial, both in terms of the monetary consideration that is being paid to the class, as well as the injunctive relief that will require Rexall to make significant label changes to many different products that directly address the allegations which gave rise to this action.

21.     Throughout the litigation, Rexall has consistently denied any wrongdoing, and has maintained that its claims were lawful and supported by scientific evidence.  Moreover, Rexall raised a number of defenses that, if accepted by the Court or a jury at trial, could limit the extent of a recovery by the Class or prevent any recovery altogether.  Although Jennings and D&C believe that Rexall's arguments lack merit, their decision to settle the action takes account of the risks that the fact-finders may conclude otherwise. Additionally, even if Jennings and the Settlement Class were to prevail, litigating the case through trial and possible appeal would take a considerable amount of time, perhaps years, thus delaying benefit to the Class.

22.     By contrast, the proposed Settlement has none of these drawbacks, and confers substantial and immediate benefits on the Class.  If the Court approves the Settlement, compensation to Class Members and changes in Rexall's disclosure language about its products are assured rather than uncertain.  In particular, as noted above, the Settlement provides unlimited compensation to the members of the Class because it has no ceiling on the amount of claims that Rexall will pay.  Rexall has agreed to pay the costs of notice  and administration of the Settlement (with a minimum payment of $1.5 million and a maximum payment of $2.5 million) separate and apart from the benefit that the

Class Members will receive by filing claims, and has also agreed to pay attorneys' fees and costs in addition to the recovery on behalf of the Class, such that attorneys' fees will not diminish or erode the benefit to the Class. The Settlement also provides for significant public policy considerations:  Rexall will not hereafter make the scientifically unsupported and deceptive claim that its products can "rebuild" or "renew" cartilage.

23.      In sum, in agreeing to settle the action, Jennings and his counsel, and the parties in the other pending actions and their counsel, have taken into account the benefits available to the Class through settlement, the considerable expense and length of time that would likely be necessary to continue to prosecute the claims through trial, post-trial motions and likely appeals, and the significant uncertainties in predicting the outcome of the lawsuit.  Considering all of these factors, and balancing them against the certain and substantial benefits of the Settlement, they have concluded that the Settlement is fair, reasonable, adequate, and superior to the risks and delays associated with further litigation.

**Class Notice**

24.      As shown in the accompanying Affidavits of Mark Schey, of Digital Settlement, LLC, and Michael Hamer of Heffler Claims Group ("Heffler"), the notice to the Class Members was as robust and as extensive as possible. Pursuant to the notice plan that the Court approved when it provided its preliminary approval of the Settlement, Heffler was appointed as the claims administrator to oversee the publication and dissemination of notice to the Class, and to process the claims that are filed by the Class Members.  The class notice plan – using a combination of magazine print, direct notice to over 4.7 million Class Members by mail and email, Internet messaging, and social media networking – was designed to reach, and did reach, over 76% of the Class.

**Responses By the Class**

25.  The reaction of the Class to the settlement has been overwhelmingly positive.  Out of a Class consisting of approximately 12 million members, just eight (8) Class Members filed a purported objection to the Settlement, and only 1,620 persons have validly opted out of the Settlement.  The small number of objections and opt-outs speaks volumes about the value of the Settlement.  Furthermore, approximately 19,593 people have already filed claims, and the deadline for doing so will not expire until December 3, 2013.  The merits of the objections are addressed in the Parties' separately filed Joint Response to Objections.

**Experience of Class Counsel**

26.  The attorneys of Denlea & Carton LLP ("D&C") are highly qualified attorneys with extensive experience in complex litigation and consumer class actions. Many of the firm's attorneys graduated with honors from elite law schools and previously practiced at prominent New York firms. I am an honors graduate of Dartmouth College and Columbia Law School, and previously practiced at Cravath, Swaine, and Moore. My partner, Peter N. Freiberg, who served as the lead lawyer from our firm prosecuting Jennings' claims, graduated from the University of Pennsylvania and Tulane University School of Law, cum laude, and served as an Assistant District Attorney with the Manhattan District Attorney's Office for many years.  We have both practiced law for over 22 years, and our experiences are fully described in the Firm Biography which is attached hereto as Exhibit A.  As demonstrated below, the experience and expertise of Class Counsel, as well as the results achieved for the Class, establish the reasonableness of the fee requested as part of the Settlement.

27.    D&C's attorneys have been certified as class counsel and have prosecuted numerous class actions including:

- *Llanos v. Shell Oil Company And Shell Oil Products US,* No. SU-2006-009404 (N.Y. Sup. Ct.).  State-wide class action alleging that Shell improperly imposed monthly inactivity or dormancy fees on Shell Gift Cards in violation of New York Gen. Bus. L. § 349 and Shell's contracts with its customers.  The court certified the class and approved a settlement on March 31, 2010.

- *Argento v. Wal-Mart Stores, No. 22850/06 (N.Y. Sup. Ct.). On October 2,* 2009, the New York Appellate Division granted plaintiff's motion for certification of a state-wide class of consumers alleging that Sam's Club violated state consumer protection laws and its membership contracts by backdating membership renewals.  The court subsequently approved a settlement in May, 2012.

- *Dupler v. Costco Wholesale Corporation, Civ. No. 06-3141 (E.D.N.Y.).  Class* action alleging that Costco backdated membership renewals purchased after the prior membership period's expiration date, in violation of state consumer protection laws and Costco's membership contracts.  Class certification was granted on January 31, 2008, and a nationwide class settlement was approved on April 20, 2010.

- *In re Ticketmaster Sales Practices Litigation,* No. 09-0912 (C.D.Cal.).  Court appointed Jeffrey I. Carton interim co-lead counsel pursuant to Federal Rule of Civil Procedure 23(g) on July 17, 2009.  On February 13, 2012, the court granted final approval of a settlement.

- *In re Bayer Corp. Combination Aspirin Products Marketing and Sales Practices Litigation,* No. 09-2023 (E.D.N.Y.).  On June 8, 2009, the court appointed Jeffrey I. Carton to Plaintiff's Executive Committee in this Multidistrict Litigation in which plaintiffs allege that Bayer Healthcare LLC violated state consumer protection and warranty laws in connection with the deceptive marketing and sales of Bayer combination aspirin products.

- *Luks v. Empire Blue Cross/Blue Shield,* Index No. 03/64337 (N.Y. Sup.Ct.N.Y. Cty.).  State-wide class action brought on behalf of more than 1,000 surgeons that compelled insurer to revoke its policy, commonly referred to as the "single incision" policy, of refusing to cover certain medically appropriate surgical procedures.  The action was resolved on a class-wide basis, providing millions of dollars in reimbursement to New York physicians.

- *Breedlove v. Window Rock Ent., Inc.,* 04-00610 (Cal. Super. Ct. Orange Cty.). Consumer class action challenging false and deceptive advertising for the

popular diet supplement CortiSlim. The case was resolved on a nationwide class basis.

- *Fox v. Cheminova, Inc.,* 00-5145 (E.D.N.Y.). Class action brought against pesticide manufacturers on behalf of commercial lobstermen in Long Island Sound, alleging destruction of lobster stock. The court certified the class and approved a settlement.

- *Dupler v. Old Navy LLC and The Gap, Inc.,* No. 06/008356 (N.Y. Sup. Ct., Nassau Cty.). Class action alleging consumers were short-changed when returning merchandise bought with store-issued coupons. On August 6, 2007, the court approved a settlement.

- *Aggarwal v. MagicJack LP,* No. 50 2011 CA 009521 (Fla. Cir. Ct. Palm Beach Cty.). Class action alleging consumers' renewal dates for internet telephone subscriptions were set unlawfully. A nationwide class action settlement was approved in February, 2012.

- *Held v. AAA Southern New England,* 3:11-cv-105-SRU (D. CT.). *Class* action alleging that the AAA did not adequately disclose its policy of using a member's prior expiration date as the commencement date for renewal memberships. On August 6, 2013, the court granted final approval of a settlement.

28. As the foregoing experiences reveal, the attorneys principally involved in this matter are experienced litigators, having litigated complex civil actions, including many class action and consumer fraud lawsuits throughout the country.

**The Time and Labor Expended by Counsel**

29. The time and labor expended by Class Counsel in this action are set forth in the summary below. This summary is based upon contemporaneous time records that our attorneys keep on a regular and accurate basis, a true and correct copy of which is attached hereto as Exhibit B. Through August 30, 2013, the attorneys at D&C devoted approximately 1478 hours over a period of more than two years to prosecuting this action. We conducted an extensive investigation of the issues involved in this case, including the medical aspects of the claims that glucosamine and/or chondroitin can renew cartilage,

and consulted with numerous experts regarding these scientific issues. We analyzed the many legal issues concerning the claims of deceptive trade practices, engaged in extensive discovery, and prepared the *Jennings* case for trial on an expedited basis. We also engaged in sometimes contentious arm's-length negotiations with Rexall's counsel, and reached agreement on the material terms of the settlement before negotiating the proposed fee award.

30. The aggregate hours worked by the attorneys and staff that contributed to the prosecution of the case are:

| Personnel | Hours | Rate | Lodestar |
|---|---|---|---|
| James R. Denlea | 41.00 | $675.00 | $27,675.00 |
| D. Gregory Blankinship | 105.40 | $625.00 | $65,875.00 |
| Jeffrey I. Carton | 190.50 | $675.00 | $128,587.50 |
| Peter N. Freiberg | 1076.50 | $650.00 | $699,725.00 |
| Todd S. Garber | 15.00 | $625.00 | $9,375.00 |
| Christa Ronci | 50.35 | $150.00 | $7,552.50 |
| **TOTAL:** | **1478.75** | | **$938,790.00** |

31. Significantly, D&C is a small firm comprised of six (6) attorneys. The firm with which Mr. Freiberg and I were previously affiliated was also a small firm with fewer than twenty (20) attorneys. As a result, the time spent on this action in the hope of eventually obtaining a substantial verdict or settlement for the Class, and a fee for Class Counsel, was a significant commitment of the firm's (and our prior firm's) resources. While D&C carefully screens its class action contingency matters to enhance its likelihood of success, there was absolutely no assurance that the extraordinary commitment of time and effort devoted to this action would result in the payment of any fee at all. Moreover, the action was leanly staffed and efficiently managed, with two attorneys, Mr. Freiberg and

myself, accounting for the significant majority of the time devoted to the case. Class Counsel should be fairly compensated for the substantial time and labor invested to obtain this outstanding Settlement on behalf of the Class.

**The Magnitude and Complexity of this Action**

32.     The magnitude and complexity of this action support the fee award sought by Class Counsel.  The Class itself is large, comprising approximately more than 12 million households.  In dollar terms, moreover, the magnitude of the litigation is equally substantial. The consumers who purchased Osteo Bi-Flex and the other joint health supplements  have spent hundreds of millions of dollars as a result of deceptive claims made by Rexall; the Settlement substantially addresses this issue by providing compensation to the Class members, as well as a substantial overhaul of the claims made by Rexall for these products, that will now prohibit it from making, among other things, the false claim that glucosamine and/or chondroitin can renew or rebuild cartilage, on many different branded and private label products.  This alone is a significant accomplishment of Jennings and his counsel, because Rexall has agreed to remove the claim that Jennings challenged and which was alleged to be false and deceptive through the efforts of his counsel.  By any measure, the magnitude of the case is substantial, fully justifies Class Counsel's investment of time and labor, and fully merits the requested fee award.  In addition, the litigation involved a number of complex legal and factual issues - many of them raised by Rexall as substantive defenses. Rexall vigorously defended the *Jennings* case, having filed two motions to dismiss, a motion for summary judgment, motions *in limine*, and preparing the case for the "exemplar" trial, and agreeing to the Memorandum of Understanding only the night before the Parties were scheduled to begin a jury trial.

## The Risk of the Litigation

33.     The risks involved in prosecuting this action support the requested award of attorneys' fees. From the outset, there was no assurance that the Class would prevail, or that Class Counsel would receive any fee for its efforts. D&C (and our prior firm) accepted this case on a purely contingent basis, investing substantial time, money, energy, and lost opportunity costs to prosecute the action without any guarantee of compensation (or even reimbursement of its out of pocket costs). Unlike defense counsel, who are paid hourly rates and reimbursed on a regular basis for their expenses, Class Counsel has received no compensation since this case began. Moreover, there was no way to know whether D&C would ever be compensated for its substantial commitment to this action. In fact, the case law is littered with unsuccessful class actions that provided no relief to the putative class and no fee for class counsel.

34.     Viewed from the outset of the litigation, Class Counsel faced substantial risks, including the risk of not prevailing on a possible motion to dismiss, and later, class certification, summary judgment, trial, or appeal. The specific risks include the risks of not prevailing on Jennings' allegations concerning the deceptive nature of Rexall's claims about the efficacies of its products and establishing damages. Of course, Class Counsel received no compensation while incurring the risks of the litigation. To the contrary, Class Counsel incurred 100% of the risk, devoting their time and labor to identifying Rexall's wrongdoing, evaluating Rexall's potential liability, analyzing potential legal theories, drafting the Complaint, engaging in extensive document discovery, interrogatories, and depositions, opposing Rexall's two motions to dismiss, its summary judgment motion, and its tendering of two expert witnesses. Throughout, there was no assurance of success or

compensation. The requested fee award is entirely reasonable in light of the risks incurred by D&C.

**The Quality of Representation**

35.     In addition, the quality of Class Counsel's representation is reflected in the reputation of D&C; the experience of the attorneys principally involved in this case; and above all, the manner in which they prosecuted this case from the pleadings, through discovery, to the settlement negotiations and the instant motion for final approval. The Settlement negotiated with Rexall is a highly favorable outcome for the Class, and is the direct result of the creativity, diligence, hard work, and skill brought to bear by Class Counsel at every stage of the proceedings. Moreover, this result was achieved without the assistance of any governmental enforcement action. Throughout the litigation, moreover, Class Counsel put the best interests of the Class ahead of their own, negotiating the most favorable settlement terms possible before turning to the question of attorneys' fees, and then negotiating a fee to be paid by Rexall, rather than by the Class, and which in no way diminishes or erodes the benefits received by Class Members. Class Counsel's exemplary prosecution of this class action weighs strongly in favor of the proposed fee award.

**The Requested Fee in Relation to the Settlement**

36.     The combined requested fee award of all Class Counsel amounts to approximately 11% of the minimum total potential benefit to the Class.  This minimum total potential benefit to the Class consists of the minimum amount of the total compensatory benefit available to the Class of $20.2 million (consisting of $14.2 million available for claims by Class Members who received direct notice, plus $1.5 million for costs of notice and administration and $4.5 million for attorneys' fees and expenses) and $21.7 million

(the minimum value to the Class of the injunctive relief which requires Rexall to change is labels), for a total of $41.9 million. The aggregate requested fee of $4.5 million amounts to approximately 11% of the minimum total benefit available to the Class from the Settlement.

37.     With respect to the claims paid to the Class, there is no limit on the number of claims that Rexall will pay. As shown in the Declaration of Keith Reutter, Ph.D., the minimum value of the fund created for the benefit of the Class is $14.2 million. Under the Settlement Agreement, each member of the Class has the right to file a claim for no less than $3. There are approximately 12 million members of the Class, and the notice program reached over 76% of the Class Members, or approximately 9.1 million people. Furthermore, at least 4,718,651 received direct notice of the settlement, either by email or by postcard. Thus, assuming that each of the 9.1 million (76% of the 12 million Class Members) files a claim for only one undocumented purchase ($3), the upper range of the minimum value of the funds Rexall has agreed to pay is approximately $27.3 million. If the analysis is limited to the members of the Class who received direct notice (4,718,651), the resulting value of the fund made available is approximately $14.2 million.[5] The costs of notice and administration of at least $1.5 million and the aggregate attorneys' fees and expenses award of $4.5 million are added to the $14.2 million, for a total minimum

_____

[5] The Settlement Agreement also provides for a minimum payment/floor of at least $2 million to be paid out by Defendants to consumers who make valid claims. If the total dollar value of valid claims is less that $2 million, the payment to each Settlement Class member who submits a valid claim with adequate proof of purchase shall be increased *pro rata* up to a maximum of triple what he or she was entitled until the payments reach $2 million. If these increases do not exhaust the minimum $2 million payout, then the payment to each Settlement Class member who submits a valid claim without proof of purchase shall be increased *pro rata* up to a maximum of double what he or she was entitled until the total payments reach $2 million. If, after these payments, the total payments do not reach $2 million, the residual amount will be paid to the Orthopaedic Research and Education Foundation (OREF), subject to Court approval.

compensatory benefit to the Class of $20.2 million.

38.     The label changes required by the Settlement Agreement also provide a significant financial benefit to the Class.  The Settlement Agreement completely eliminates one of the key false marketing claims alleged in these lawsuits, which Jennings and his counsel forced through their tireless efforts.  Rexall has agreed to stop making misrepresentations that its products will renew or rebuild cartilage.  This labeling change is nothing short of industry changing – joint/cartilage renewal/rejuvenation has been one of the key marketing messages made by Rexall and the vast majority of glucosamine/chondroitin manufacturers about these products for over a decade. Eliminating this marketing message will result in significant financial savings to the Class Members.

39.     These labeling changes are also significant because no longer will Rexall be able to make unqualified representations that the Covered Products will provide relief for all persons who take these products.  Instead, consistent with the scientific evidence which reflects that in excess of 35% of users of these products experience a "placebo effect," consumers will now be told – up front – that these products may or may not work for them.   In short, the injunctive/labeling relief is a significant component of this settlement in that it will require the industry leader in the manufacture and sale of glucosamine/chondroitin products to refrain from making key misrepresentations about its products and also provide important consumer disclosures about the variability of its products' purported benefits.

40.     Plaintiffs have quantified the value of the injunctive relief.  As set forth at length in the accompanying Declaration of Keith Reutter, Ph.D., the monetary value of the

injunctive relief/label changes amounts to not less than $21.7 million in favor of the Class.

41.    Thus, all told, the minimum total potential benefit to the Class is $41.9 million. The fee requested by D&C is approximately 6% of that minimum total potential benefit, which is a very reasonable amount as fully explained in Plaintiffs' accompanying Memorandum of Law in support of this motion.

**Public Policy Considerations**

42.    The settlement obtained by Class Counsel provides substantial benefits to the public. First and foremost, the Settlement serves public policy - as embodied in the various state consumer fraud statutes that the claims are brought under – by compensating consumers, and requiring Rexall to amend its labels so that there are no more false or deceptive claims made about the efficacies of Rexall's products. This will prevent future consumers from being deceived when purchasing products, and allow them to make better informed judgments when purchasing the products. Class Counsel deserve substantial credit for bringing about these substantial prospective benefits to the public, as well as obtaining direct financial benefits to Rexall members aggrieved by the false and deceptive manner in which Rexall's products were marketed.

43.    Again, the label changes are particularly significant in light of the fact that Rexall's own marketing documents demonstrate how important the "renew" or "rebuild" cartilage claim is to consumers' decisions to purchase these products. The fact that Rexall – an industry leader – has agreed to remove this deceptive claim, and to address other of the challenged representations about the efficacies of its products amounts to a significant change in the dietary supplement industry. There are many other lawsuits pending throughout the United States concerning joint health supplements, and Plaintiffs expect

that other manufacturers will follow the outcome of this case and also change their labels.

**The Lodestar/Multiplier Method**

44.     The fee requested in this case is also justified under the lodestar method. D&C  reasonably devoted approximately 1478 hours to this action, including time spent researching the facts and the law, drafting the Complaint, conducting document discovery, taking and defending depositions, briefing several motions including motions to dismiss and a motion for summary judgment, preparing for the "exemplar" trial, negotiating the Settlement, and responding to Class Members' inquiries.  Applying D&C's typical hourly rates ($625.00 to $675.00), which are reasonable and well within the range typically charged by similarly well qualified counsel in the New York metropolitan area, yields a lodestar of $938,790.00.

45.     D&C's contingency risk, the quality of representation, the outstanding result achieved, and other relevant factors support the application of a modest 2.7 multiplier to confirm that the requested $2,500,000 award to D&C (inclusive of $93,187.13 in disbursements) is reasonable and should be approved.  Indeed, Jennings selected D&C as Class Counsel because he was aware of the firm's outstanding work, its experience in class litigation, and its comparatively modest rates.

46.     Comparing the lodestar with the requested fee of $2,500,000 minus $93,187.13 in expenses yields a multiplier for D&C of 2.56.  That multiplier is unquestionably within the range of multipliers found reasonable by courts in this Circuit, and is fully justified in light of the effort undertaken by Class Counsel, the recovery achieved, and risks involved.

**Incentive Award to Plaintiff Jennings**

47.　　Class Counsel respectfully requests that the Court should approve the payment of an incentive award of $5,000 to Jennings in recognition of his efforts on behalf of the Class.　Pursuant to the Settlement Agreement, Rexall has agreed to pay this award using its own resources, which means this payment will not reduce or erode the benefits provided to the Class members.　The requested payment is well deserved and falls well within the range of incentive awards approved in prior cases.

48.　　Jennings shouldered considerable burdens in representing the class.　He reviewed and discussed with us the pleadings, discovery demands, discovery responses and other documents. He responded to discovery (interrogatories and request for production of documents), and opened up his medical history to Rexall, producing medical records that in some cases dated back more than 10 years. He sat for a deposition that lasted the better part of a day.　He met with us on several occasions, including prior to the filing of the Complaint, to prepare for his deposition and during his deposition, and corrected his deposition transcript.　He conferred with us regarding the settlement negotiations, at all times encouraging D&C to obtain the best possible result for the absent class members.

49.　　Finally, Jennings' efforts were essential in obtaining an extraordinary victory for the Class, including an unlimited amount of compensation in favor of the class, and a change to Rexall's labels which removes the deceptive claim that deceived Jennings in the first place, that the products will rebuild or renew cartilage. Under the circumstances, a $5,000 incentive award, to be paid by Rexall, is entirely reasonable.

50.     In light of the above and as set forth more fully in the accompanying Memorandum of Law, I respectfully submit that the Court should  (i) grant final approval to the settlement, (ii) award Jennings the incentive award to which he is deserving and (iii) award D&C attorneys' fees, costs and expenses in the amount of $2,500,000, which Rexall has agreed to pay.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 4, 2013 in White Plains, New York.

_____

JEFFREY I. CARTON

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2013, a true and correct copy of the following document was electronically filed and served on all counsel of record in this action who are deemed to have consented to electronic service via the Court's CM/ECF system: **Declaration of Jeffrey I. Carton, Esq. in Support of Final Approval of Settlement, Attorneys' Fees and Expenses and Incentive Awards.**

I also certify that the foregoing document is being served by U.S. Mail this day on all counsel of record or *pro se* parties identified below who are not authorized to receive electronically Notices of Electronic Filing.

C. Jane Radlinski
309 E. Church Street
Jacksonville, FL 32202-2725
(904) 633-2699
*Pro se Objector*

John Michael Buckley
370 Canyon Spring Dr.
Rio Vista, CA 94571
(707) 374-3853
*Pro se Objector*

Peggy Thomas
2109 N.W. 12th Avenue
Ft. Lauderdale, FL 33311
(954) 761-1589
*Pro se Objector*

Simone Thomas
2109 N.W. 12th Avenue
Ft. Lauderdale, FL 33311
(305) 903-6935
*Pro se Objector*

Rhonda L. Paulson
13383 E. Marie Creek Road
Couer d'Alene, ID 83814
*Pro se Objector*

Donald Charles Koneval
8314 Manorford Drive
Parma, OH 44129-5309
(440) 842-6232
*Pro se Objector*

Anthony Leardi
1813 Renwick Street
Bethlehem, PA  18017
(610) 865-7821
*Pro se Objector*

Joseph Darrell Palmer
Law Office of Darrell Palmer PC
603 N. Highway 101, Suite A
Solana Beach, CA  92075
(858) 792-5600
*Attorney for Objectors*
*Kathleen McNeal and*
*Alison Paul*

Melissa A. Holyoak
Center for Class Action Fairness
1718 M Street NW, No. 236
Washington, DC 20036
(573) 823-5377
*Attorney for Objector Ted Frank*

Jonathan E. Fortman #40319
250 Saint Catherine Street
Florissant, Missouri 63031
(314) 522-2312
*Attorney for Objector Pamela Easton*

Steve A. Miller
Steve A. Miller, PC
1625 Larimer Street, No. 2905
Denver, CO  80202
(303) 892-9933
*Attorney for Objector Pamela Easton*

Maureen Connors (0074094OH)
6625 Pearl Road
Parma Heights, OH 44130
(216) 640-9860
*Attorney for Objector Pamela Easton*

John C. Kress (53396MO)
The Kress Law Firm, LLC
4247 S. Grand Blvd.
St. Louis, MO 63111
(314) 631-3883
*Attorney for Objector Pamela Easton*

/s/ Peter N. Freiberg
One of Plaintiffs' Attorneys