UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NICK PEARSON, FRANCISCO PADILLA, CECILIA LINARES, AUGUSTINA BLANCO, ABEL GONZALEZ, and RICHARD JENNINGS, On Behalf of Themselves and All Others Similarly Situated,<br><br>                            Plaintiffs,<br><br>    v.<br><br>NBTY, INC., a Delaware corporation; and REXALL SUNDOWN, INC., a Florida Corporation; and TARGET CORPORATION, a Minnesota Corporation,<br><br>                            Defendants. | Case No.: 11 CV 07972<br><br>CLASS ACTION<br><br>**Judge James B. Zagel** |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT,
ATTORNEYS' FEES AND EXPENSES, AND INCENTIVE AWARDS**

**TABLE OF CONTENTS**

**Page**

I.    The Cost And Time Required To Measure The Economic Impact Of The Injunctive Relief After The Labeling Changes Take Effect Outweigh The Utility Of Any Such Effort .................................................................................. 1

II.   The Court Can Approve The Settlement And Award Attorneys' Fees Based Upon The Record Before It................................................................................2

      A.    The Labeling Changes Are Significant And Socially Valuable ................................................................................................2

      B.    The Value Of The Labeling Changes Is Properly Determined At The Time Of Final Settlement Approval ............................................. 5

III.  The Court Does Not Have To Place A Value On The Injunctive Relief In Order To Award Attorneys' Fees ....................................................................7

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Blum v. Stenson,*
    465 U.S. 886, 104 S. Ct. 1541, 79 L.Ed.2d 891 (1984)..........................................................8

*Colgan v. Leatherman Tool Grp., Inc.*,
    135 Cal. App. 4th 663 (2006) ...................................................................................................5

*DeHoyos v. Allstate Corp.,*
    240 F. R. D. 269 (W. D. Tex. 2007) .......................................................................................8

*Delacruz v. Cytosport, Inc.*,
    No. C 1103532 CW, 2012 WL 1215243 (N. D. Cal. April 11, 2012).....................................3

*Dennis v. Kellogg Co.*,
    697 F.3d 858 (9th Cir. 2012) ....................................................................................................5

*Fox v. Vice*,
    131 S.Ct. 2205 (2011)................................................................................................................7

*Hanlon v. Chrysler Corp.,*
    150 F. 3d 1011 (9th Cir. 1998) .................................................................................................8

*Harsch v. Eisenberg*,
    956 F.2d 651 (7th Cir. 1991) ....................................................................................................8

*Heller v. Silverbranch Const. Corp.*,
    376 Mass. 621, 382 N.E.2d 1065 (1978) ................................................................................6

*Hensley v. Eckerhart*
    461 U.S. 424 (1983)..................................................................................................................7

*Hill v. Roll Int'l. Corp.*,
    195 Cal. App. 4th 1295, 128 Cal. Rptr. 3d 109 (2011) ...........................................................4

*Hughes v. Ester C. Co.,*
    930 F. Supp. 2d 439 (E. D. N. Y. 2013) ..................................................................................3

*In re Bluetooth Headset Products Liab. Litig.*,
    654 F. 3d 935 (9th Cir. 2011) ..................................................................................................8

# **TABLE OF AUTHORITIES**
## **(Cont'd)**

**Cases**                                                                                                            **Page**

*In re Mexico Money Transfer Litigation*,
    267 F.3d 743 (7th Cir. 2001) ...................................................................................................5

*In re Mexico Money Transfer Litig.*,
    164 F. Supp. 2d 1002 (N. D. Ill. 2000) ....................................................................................9

*In re Tobacco II Cases,*
    46 Cal. 4th 298 (2009) .............................................................................................................5

*Kirchoff v. Flynn*,
    786 F.2d 320 (7th Cir. 1986) ...................................................................................................8

*Kwikset Corp. v. Superior Court*,
    51 Cal. 4th 310, 246 P.3d 877 (2011) ..................................................................................3, 4

*Lavie v. Procter & Gamble Co.*,
    105 Cal. App. 4th 496 (2003) ..................................................................................................6

*Negrete v. Allianz Life Ins. Co.,*
    No. CV-06-6838 CAS (MANx), 2012 WL 6737390 (C. D. Cal. Dec. 27, 2012) ..................4

*Reynolds v. Beneficial Nat. Bank*,
    288 F.3d 277 (7th Cir. 2002) ...................................................................................................6

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N. D. Ill. 2011) ..................................................................................3, 6

*Tandy v. Marti*,
    213 F. Supp. 2d 935 (S. D. Ill. 2002) ......................................................................................5

# TABLE OF AUTHORITIES
## (Cont'd)

**Page**

**Statutes**

15 U.S.C. 45(a)(1) ..................................................................................................................4

Cal. Civ. Code § 1760 ............................................................................................................5

Cal. Code of Civil Procedure §1021.5 ...................................................................................8

815 Ill. Comp. Stat. 505/2 ......................................................................................................4

815 Ill. Comp. Stat. 505/10(a)(c) ...........................................................................................8

Mass. Gen. Laws ch. 93A, §2(b) ...........................................................................................4

Mass. Gen. Laws, ch. 93A, §9(4) ..........................................................................................8

Plaintiffs Nick Pearson, Francisco Padilla, Cecilia Linares, Augustine Blanco, Abel Gonzalez, and Richard Jennings ("Plaintiffs"), respectfully submit this supplemental memorandum of law in further support of their motion for the final approval of the pending class action settlement, an award of attorneys' fees and expenses, and incentive awards.

I.  **The Cost And Time Required To Measure The Economic Impact Of The Injunctive Relief After The Labeling Changes Take Effect Outweigh The Utility Of Any Such Effort.**

At the Fairness Hearing conducted on October 4, 2013, the Court invited Plaintiffs' counsel to submit additional briefing as to whether the Court could gain more confidence about the value of the injunctive relief by waiting a reasonable amount of time and analyzing the impact of the labeling changes after they had been implemented. (Transcript of Proceedings October 4, 2013, p. 36). While the possibility is theoretically attractive, after consulting with Plaintiffs' expert economist, Plaintiffs' counsel have determined that the type of information that the Court inquired about is not available within a reasonable time period (if it is available at all) and, even if it were available, the cost of the required analysis is prohibitive.

As set forth in the accompanying Supplemental Report of Plaintiffs' economist Dr. Keith Reutter (Exhibit A) ("Supp. Reutter Report"), awaiting the implementation of the labeling changes in an attempt to better measure the actual economic impact of the injunctive relief would not be feasible. Any meaningful analysis would require the consideration of competitors' and retailers' proprietary sales and marketing information (not easily obtained), take several years to perform, and would likely cost in excess of $500,000.00. As more fully set forth in his Supplemental Report, Dr. Reutter notes the following:

- Analyzing defendants' sales and pricing data alone before and after the labeling changes, "would not measure the actual economic impact of the labeling changes…" Supp. Reutter Report, ¶ 3.

1

- There "are other confounding economic factors that continuously influence the price and sales of the covered products" and "these additional factors would have to be taken into consideration in order to measure the actual economic impact of the labeling changes in terms of prices and volume of sales." *Id.*, ¶ 3.

- "In such a situation, an observed increase (or decrease) in the price or volume sold of the covered products would mean little viewed in isolation…" *Id.*, ¶ 3.

- As a result of these confounding factors, "[a] regression analysis would have to be performed" in order to "isolate the actual monetary value of the labeling changes." *Id.*, ¶ 3.

- A regression analysis could not be performed using defendants' data alone and would require data from various third-party sources such as defendants' competitors and retailers (including their sales, advertising, and marketing spending). *Id.*, ¶¶ 4-7, 9-10.

- It is unlikely that "competing manufacturers or retail outlets would willingly and unilaterally produce the sensitive, confidential and proprietary business information needed." *Id.*, ¶ 16.

- Moreover, good economic practices would require this data be compiled from the two years prior to and the two years after the labeling changes. *Id.*, ¶ 13.

- Such a study could not be completed for two to three years following the implementation of the labeling changes and would "cost in excess of $500,000…" *Id.*, ¶ 15.

Accordingly, while the regression analysis described above may provide some additional information regarding the value of the injunctive relief, the additional costs incurred in gathering and analyzing such information (involving many third party subpoenas and, very likely, motion practice to quash and/or enforce those subpoenas), and the resulting delay in a final ruling on this matter outweigh its utility.

**II.     The Court Can Approve The Settlement And Award Attorneys' Fees Based Upon The Record Before It.**

   A.     The Labeling Changes Are Significant And Socially Valuable.

Plaintiffs respectfully submit there is an ample record before the Court to both approve the settlement and award attorneys' fees. Even putting aside for a moment the parties' arguments as to the value of the *monetary* components of this settlement (see Plaintiffs'

2

Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement, Attorneys' Fees and Expenses and Incentive Awards, D.E. 121, pp. 2, 6-7, 17; and Parties' Response to Objections, D.E. 113, pp. 6-9), Dr. Reutter's initial report provides a sufficient monetization of the value of the injunctive relief. *See, e.g.*, *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 583 (N. D. Ill. 2011) (court accepted expert valuation of injunctive relief without requiring a post approval analysis of injunctive relief).

As previously discussed in Plaintiffs' Memorandum in Support of Final Approval (D.E. 121, pp. 17-21) and in Plaintiffs' Response to Objections (D.E. 120, pp. 2-9), the agreed-to labeling changes are significant. They remove a major marketing message relating to the products' purported ability to rebuild and renew cartilage, which has been made by the settling defendants on the front of their labeling for over ten years. The settling defendants' own contemporaneous documents reflect that these representations are important to a majority of their consumers. Indeed, courts have noted the important role labels and marketing play in driving consumer behavior:

> Simply stated: labels matter. The marketing industry is based on the premise that labels matter, that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities they may come to associate with a particular source. An entire body of law, trademark law, exists to protect commercial and consumer interests in accurate label representations . . . because consumers rely on the accuracy of those representations in making their buying decisions.

*Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328, 246 P.3d 877, 889 (2011) (internal quotes and citations omitted). *See also Delacruz v. Cytosport, Inc.,* No. C 1103532 CW, 2012 WL 1215243 (N.D. Cal. Apr. 11, 2012) (same proposition – labels matter); *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 475 (E.D. N.Y. 2013) ("The marketing industry is based on the premise that labels matter, that consumers will choose one product over another similar product based on

3

its label and various tangible and intangible qualities they may come to associate with a particular source." (citing *Kwikset*)); and *Hill v. Roll Int'l Corp.,* 195 Cal. App. 4th 1295, 130, 128 Cal. Rptr. 3d 109, 118 (2011) ("We agree wholeheartedly that 'labels matter,' all labels…").

Likewise, in *Negrete v. Allianz Life Ins. Co.*, No. CV 06-6838 CAS (MANx), 2012 WL 6737390, at *20 (C.D. Cal. Dec. 27, 2012), the court noted that, "'[c]onsumers are nearly certain to rely on prominent (and prominently marketed) features of a product which they purchase,' particularly where there are not otherwise compelling reasons for purchasing a product that is allegedly worth less than the purchase price" (internal citations omitted). There can be no doubt that the labeling changes here, removing one of the key representations made by defendants about their products for more than the last ten years, provides consumers with more truthful information on the labeling. And it is, of itself, the accomplishment of an important social goal that should be assigned great value in determining the fairness and adequacy of the settlement as well as awarding attorneys' fees. More truthful information in the marketplace allows consumers to make better informed choices, which can be valued now.[1]

---

[1] The state consumer protection statutes under which this case is brought expressly state that in interpreting their provisions, courts should look to the FTC's interpretations. *See*, 815 Ill. Comp. Stat. 505/2 ("In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act."); Mass. Gen. Laws ch. 93A, §2(b) ("…the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended."). FTC Guidance further establishes that the removal of the "rebuilds and renews" cartilage representations constitutes the removal of highly material information and thus is important and substantial relief. For example, the "FTC Policy Statement on Deception," issued in 1986 (http://www.ftc.gov/bcp/policystmt/ad-decpt.htm) states: "The Commission presumes that express claims are material," noting that promotional messages by the company reflect a belief that consumers are interested in those messages. Similarly, the policy states that "[t]he Commission also considers claims or omissions material if they significantly involve health, safety, or other areas with which the reasonable consumer would be concerned. Depending on the facts, information pertaining to the central characteristics of the product or service will be presumed material." The policy notes that information has been found material where it concerns the purpose, safety, efficacy, or cost of the product or service. According to the Commission, "a 'material' misrepresentation or practice is one which is likely to affect a consumer's choice of or conduct regarding a product. In other words, it is information that is important to consumers."

B.  The Value of The Labeling Changes Is Properly Determined At The Time of Final Settlement Approval.

Courts are frequently required to determine the value of prospective injunctive relief based upon the best available information at the time. For instance, the Seventh Circuit, in *In re Mexico Money Transfer Litigation*, 267 F.3d 743 (7th Cir. 2001), prospectively ascribed the potential value of the injunctive relief provided for in the settlement before it. The court stated, "[p]rospective relief to which the defendants have agreed will alert class members to the FX spread and promote competition that **may drive the retail price** of pesos closer to the interbank price …" *Id*. at 748 (emphasis added). Thus it was sufficient for the Seventh Circuit, in evaluating the potential benefits of the injunctive relief, to project out, *without the need for a post hoc analysis*, that the injunctive relief might drive prices downward. Importantly, it said that this potential relief was not to be "sneered at." *Id.*

Plaintiffs respectfully submit that the Court can and should do the same here. The record reflects that the "rebuilds and renews" cartilage representation was one of the most important messages to a large portion of defendants' consumers, and a key ingredient in defendants' "repositioning" and "restaging" of its brands in the marketplace ten years ago. Removing these representations furthers an important purpose underlying all consumer protection laws – that the marketplace be free of false information.[2]

---

[2] *See, e.g.*, *Tandy v. Marti*, 213 F. Supp. 2d 935, 937 (S.D. Ill. 2002) ("The [Illinois Consumer Fraud] Act gives a 'clear mandate to the Illinois courts to utilize the Act to the greatest extent possible to eliminate all forms of deceptive or unfair business practices and provide appropriate relief for consumers.'") (citation omitted); Cal. Civ. Code § 1760 (the CLRA is designed "to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection"); *Dennis v. Kellogg Co.*, 697 F.3d 858, 867 (9th Cir. 2012) ("'The UCL is designed to preserve fair competition among business competitors and protect the public from nefarious and unscrupulous business practices.'"); *In re Tobacco II Cases ("Tobacco II")*, 46 Cal. 4th 298, 320 (2009) ("The purpose of [injunctive] relief, in the context of a UCL action, is to protect California's consumers against unfair business practices by stopping such practices in their tracks."); *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 703 (2006) (As the court noted, the settlement here has "resulted in a significant benefit for a substantial number of people by causing [Defendant] to change its labeling and advertising practices

5

All that the Seventh Circuit requires when it comes to valuing injunctive relief is for the parties to attempt to provide some monetization of its value **at the time of the final settlement approval**. *See Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 283 (7th Cir. 2002) (criticizing parties for making no attempt to provide a monetization of the injunctive relief at the time of the final approval). Plaintiffs are aware of no law in this Circuit that would require this Court to wait to value injunctive relief. Indeed, courts in this district have approved settlements involving injunctive relief without requiring the injunctive relief to be valued retrospectively. In *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N. D. Ill. 2011), for example, the court was presented with a settlement that, *inter alia* provided for non-monetary relief requiring the bank to change its overdraft charge practices. In moving for approval of a class action settlement, the plaintiffs proffered the report of an expert in banking and financial institutions to estimate the present value of the change in the bank's business practices. The court accepted this expert report that estimated the value of the prospective injunctive relief, without requiring a *post hoc* valuation. *Id.* at 583.

Here, Plaintiffs offered the expert report of Dr. Reutter to provide the Court with a reasonable good faith estimate of the value of the injunctive relief based upon the settling defendants' own consumer research and other contemporaneous documents. Dr. Reutter's initial report shows that there is value in these label changes, that they are significant, and that they will benefit Class Members who are repeat purchasers of these products as well as the consuming public at large. This real public benefit was brought about by this litigation and resultant

---

and by enjoining it from making future misleading representations."); *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 503 (2003) ("[W]hether an advertisement is deceptive under the UCL . . . certainly has important public policy implications for California consumers and businesses."); and *Heller v. Silverbranch Const. Corp.*, 376 Mass. 621, 382 N.E.2d 1065 (1978) (the Massachusetts Unfair Trade Practices Act is designed to "ensure an equitable relationship between consumers and persons engaged in business").

settlement and covers numerous iterations of Defendants' products which are sold under many different brand names at many different retail stores. Delaying the complete resolution of this matter for two years, or perhaps more, for the purposes of conducting a *post hoc* valuation, at considerable additional expense to the parties, is not needed. The Court has sufficient information before it from which it can conclude that the Settlement's rigorous injunctive relief, which goes to the heart of plaintiffs' allegations that these products will not renew or rebuild cartilage, supports final approval and an award of attorneys' fees.

### III. The Court Does Not Have To Place A Value On The Injunctive Relief In Order To Award Attorneys' Fees.

As courts have noted, the determination of the proper amount of attorneys' fees to be awarded should not become a second litigation unto itself. *Hensley v. Eckerhart,* 461 U.S. 424, 437 (1983); *Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011). As discussed below, the Court has a sufficient record upon which to grant final approval and award attorneys' fees.

If the Court is inclined to view the benefits of this settlement as being primarily injunctive, the Court should award plaintiffs' counsel a fee based upon the "lodestar" approach. Indeed, if the value of the settlement is based solely upon injunctive relief (which it should not, as there is minimally $2 million being distributed to class members and a cy pres recipient), the case is no longer a common fund case and the percentage of the fund approach to determining fees is no longer an option. Instead, the Court must apply a lodestar plus multiplier approach — at the time of final approval. Under the lodestar approach, the Court takes counsels' lodestar and applies a multiplier, if it chooses, based upon its contemporaneous judgment of the importance of the injunctive relief obtained. Here, counsel respectfully submit that the removal of a key representation that falsely claims that the products can renew or rebuild cartilage, prominently made on many products' labeling for over ten years, deserves a positive multiplier.

As the court in *Hanlon v. Chrysler Corp.,* 150 F. 3d 1011, 1029 (9th Cir. 1998) (emphasis added) noted,

> In employment, civil rights and *other injunctive relief class actions*, courts often use a lodestar calculation because *there is no way to gauge the net value of the settlement or any percentage thereof*. The lodestar calculation begins with the multiplication of the number of hours reasonably expended by a reasonable hourly rate. *Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). . . The resulting figure may be adjusted upward or downward to account for several factors including the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment.

To a similar effect, the Seventh Circuit has held that "the lodestar approach is best in cases with substantial injunctive or precedent-creating components." *Harsch v. Eisenberg*, 956 F.2d 651, 663 (7th Cir. 1991) (quoting *Kirchoff v. Flynn*, 786 F.2d 320, 328 (7th Cir. 1986)). Likewise, in *In re Bluetooth Headset Products Liab. Litig.*, 654 F. 3d 935, 941 (9th Cir. 2011), the court stated, "[t]he 'lodestar method' is appropriate in class actions… where the relief sought – and obtained – is often primarily injunctive in nature and thus not easily monetized, but where the legislature has authorized the award of fees to ensure compensation for counsel undertaking socially beneficial litigation." This is precisely the case here – the legislatures have authorized statutory fee awards to encourage private counsel to pursue socially beneficial litigation. See, 815 Ill. Comp. Stat. 505/10(a)(c); Calif. Code of Civil Procedure §1021.5; Mass. Gen. Laws, ch. 93A, §9(4). See also *DeHoyos v. Allstate Corp.,* 240 F. R. D. 269, 324 (W. D. Tex. 2007) (applying a 1.68 multiplier where relief was primarily injunctive, and stating that in civil rights and other injunctive relief cases, courts often use a lodestar calculation because there is no way to gauge the net value of the settlement or any percentage thereof).

In short, if, as the Court has indicated, it believes that the primary benefit of this settlement is the injunctive relief, the Court can and should award fees to class counsel based

upon a lodestar calculation. Because such a calculation is, by definition, not a percentage of the fund approach, awaiting for a *post hoc* analysis of the actual monetary impact of the labeling changes would not be necessary.

In moving for attorneys' fees, Class Counsel provided the Court complete information as to the hours they invested in this litigation and their reasonable and customary rates. (D.E. 124 and D.E. 125). The documented lodestar is subject to adjustment for the results achieved by Class Counsel. Plaintiffs respectfully submit that given the strength of the injunctive relief and the monetary component of this settlement,[3] an upward adjustment is appropriate here. Further, due consideration should be given to the fee having been separately negotiated so as to not reduce any benefits to the class. "Because the attorneys' fee award was separately negotiated separately funded, it does not reflect any diminished recovery class members." *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1033 (N. D. Ill. 2000). In fact, the only beneficiaries of a reduced fee award here are the defendants, to whom a diminished fee award will revert.

In conclusion, this settlement has provided a robust notice program, an uncapped claims process (including for undocumented claims), and substantial and significant injunctive relief through the removal of false marketing claims that are key to consumers' choices. If there is a basis upon which to finally approve this settlement, which Plaintiffs submit there is, then there is a basis upon which to award Plaintiffs' counsel their fees and Plaintiffs their incentive awards. Counsel have performed in the best interests of the class and their clients. They have obtained significant results. Because Plaintiffs' counsel work on a contingent basis, attorneys' fee awards

---

[3] The fact is that there is a monetary component to this settlement, a robust notice program minimally valued at $1.5 million, Class Members were given the opportunity to make undocumented claims up to four purchases, a minimum floor of $2 million to be paid to class members, and the unclaimed amount to be distributed to an a highly regarded orthopedic research organization.

9

should be made to incentivize plaintiffs' counsel to pursue cases involving small claims but large frauds. "A contingent fee must be higher than a fee for the same legal service paid as they are performed. The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services." Richard Posner, *Economic Analysis of Law*, §21.9 (2d ed. 1984). As such, Plaintiffs' counsel should be awarded fees contemporaneous with the final approval and not have to wait years for their just compensation.[4]

For all the foregoing reasons, Plaintiffs, the Class, and Class Counsel respectfully request that the Court grant final approval of the Settlement and approve the requested attorneys' fees and incentive awards to be paid by the Settling Defendants.

Dated: November 6, 2013

By: /s/Stewart M. Weltman
STEWART M. WELTMAN, LLC
53 W. Jackson, Suite 364
Chicago, Illinois 60604
Telephone: 312-588-5033
(Of Counsel: Levin Fishbein Sedran & Berman)

Of Counsel:

Elaine A. Ryan (012870)
Patricia N. Syverson (admitted *pro hac vice*)
BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.
2325 E. Camelback Rd., Suite 300
Phoenix, Arizona 85016
Telephone: 602-274-1100

*Attorneys for Plaintiffs Nick Pearson, Francisco Padilla, Cecilia Linares, Augustina Blanco, and Abel Gonzalez*

By: /s/ Peter N. Freiberg

---

[4] Payment of which could be further delayed if an appeal is taken by an objector, such that the implementation of the labeling changes might even be further delayed.

        Peter N. Freiberg (admitted *pro hac vice*)
        Jeffrey I. Carton (admitted *pro hac vice*)
        DENLEA & CARTON LLP
        One North Broadway, Suite 509
        White Plains, New York 10601
        Telephone:  (914) 920-7400

        *Attorneys for Plaintiff Richard Jennings*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 6, 2013, a true and correct copy of the following document was electronically filed and served on all counsel of record in this action who are deemed to have consented to electronic service via the Court's CM/ECF system: **Plaintiffs' Supplemental Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement, Attorneys' Fee and Expenses and Incentive Awards.**

I also certify that the foregoing document is being served by U.S. Mail this day on all counsel of record or *pro se* parties identified below who are not authorized to receive electronically Notices of Electronic Filing.

| | |
|---|---|
| C. Jane Radlinski<br>309 E. Church Street<br>Jacksonville, FL 32202-2725<br>(904) 633-2699<br>*Pro se* Objector | John Michael Buckley<br>370 Canyon Spring Dr.<br>Rio Vista, CA 94571<br>(707) 374-3853<br>*Pro se* Objector |
| Peggy Thomas<br>2109 N.W. 12th Avenue<br>Ft. Lauderdale, FL 33311<br>(954) 761-1589<br>*Pro se* Objector | Simone Thomas<br>2109 N.W. 12th Avenue<br>Ft. Lauderdale, FL 33311<br>(305) 903-6935<br>*Pro se* Objector |
| Rhonda L. Paulson<br>13383 E. Marie Creek Road<br>Couer d'Alene, ID 83814<br>*Pro se* Objector | Donald Charles Koneval<br>8314 Manorford Drive<br>Parma, OH 44129-5309<br>(440) 842-6232<br>*Pro se* Objector |
| Anthony Leardi<br>1813 Renwick Street<br>Bethlehem, PA 18017<br>(610) 865-7821<br>*Pro se* Objector | Joseph Darrell Palmer<br>Law Office of Darrell Palmer PC<br>603 N. Highway 101, Suite A<br>Solana Beach, CA 92075<br>(858) 792-5600<br>*Attorney for Objectors Kathleen McNeal and Alison Paul* |

Melissa A. Holyoak
Center for Class Action Fairness
1718 M Street NW, No. 236
Washington, DC 20036
(573) 823-5377
*Attorney for Objector Ted Frank*

Steve A. Miller
Steve A. Miller, PC
1625 Larimer Street, No. 2905
Denver, CO 80202
(303) 892-9933
*Attorney for Objector Pamela Easton*

John C. Kress (53396MO)
The Kress Law Firm, LLC
4247 S. Grand Blvd.
St. Louis, MO 63111
(314) 631-3883
*Attorney for Objector Pamela Easton*

Jonathan E. Fortman #40319
250 Saint Catherine Street
Florissant, Missouri 63031
(314) 522-2312
*Attorney for Objector Pamela Easton*

Maureen Connors (0074094OH)
6625 Pearl Road
Parma Heights, OH 44130
(216) 640-9860
*Attorney for Objector Pamela Easton*

/s/ Stewart M. Weltman
One of Plaintiffs' Attorneys

13