## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NICK PEARSON, FRANCISCO PADILLA,
CECILIA LINARES, AUGUSTINA
BLANCO, ABEL GONZALEZ, and
RICHARD JENNINGS, on Behalf of
Themselves and All Others Similarly Situated,

        Plaintiffs,

        v.

NBTY, INC., a Delaware corporation; and
REXALL SUNDOWN, INC., a Florida
Corporation; and TARGET CORPORATION,
a Minnesota Corporation,

        Defendants.

No. 11 CV 7972
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

The resolution of a class action by settlement agreement with NBTY, Inc. ("NBTY"),

Rexall Sundown, Inc. ("Rexall"), and Target Corporation ("Target") is now before us.  Class

Objectors challenge the settlement, contending that excessive attorneys' fees awarded to class

counsel will result in a settlement that is not "fair, adequate and reasonable," in violation of Fed.

R. Civ. P. 23(h).

## FACTS AND PROCEEDINGS

A. Background

Defendants NBTY, Rexall, and Target are in the business of marketing, selling, and

distributing, amongst many hundreds of products, a line of joint-health dietary supplements

called "Up & Up Glucosamine."  Within this line are two separate products.  The first is Triple

Strength Glucosamine Chondroitin plus MSM ("Up & Up Triple Strength").  The second is Advanced Glucosamine Chondroitin Complex ("Up & Up Advanced").  The labeling on both products make similar representations as to the beneficial effect the product has on joint health. For example, both products' labeling states that the supplement helps to "maintain the structural integrity of joints."  The Up & Up Advanced label also states that it will "help rebuild cartilage" and "lubricate joints."  The Up & Up Triple Strength label states that the supplement "supports mobility and flexibility."

In or around June 2011, Plaintiff Nick Pearson ("Pearson") decided to purchase a bottle of Up & Up Triple Strength based on the representations made on the product's labeling. Plaintiff used the product as directed but did not experience any of the beneficial effects represented on its packaging. Subsequently, Pearson became aware of several clinical studies that suggested the active ingredients in the supplement, Glucosamine and Chondroitin, are ineffective in relieving symptoms of or actually curing joint-related ailments. Pearson alleges that, had he known that Defendant's representations about Glucosamine and Chondroitin were false, he would not have purchased Up & Up Triple Strength. Therefore, he claims he has suffered injury through loss of the money he spent on the product.

Similarly, starting as early as 1997 and continuing through the Class Period, Plaintiffs Francisco Padilla, Cecilia Linares, Augustina Blanco, Abel Gonzalez, and Richard Jennings were exposed to and saw Defendants' representations on the labels of Defendants' various products. After reading the representations on the label, Plaintiffs purchased and consumed Defendants' products as directed.  Plaintiffs did not have the joint health benefits as represented.

B. Procedural Background

This case commenced as six separate federal court actions across the country involving various joint health dietary supplements manufactured or sold by Defendants. These actions were entitled: *Cardenas and Padilla v. NBTY, Inc and Rexall Sundown, Inc.*, No. 2:11-cv-01615-LKK-CKD (E.D. Cal.) (filed June 14, 2011); *Jennings v. Rexall Sundown, Inc.*, No. 1:11-cv-11488-WGY (D. Mass.) (filed August 22, 2011); *Padilla v. Costco Wholesale Corp.*, No. 1:11-cv-07686 (N.D. Ill.) (filed October 28, 2011); *Linares and Gonzales v. Costco Wholesale, Inc.*, No. 3:11-cv-02547-MMA-RBB (S.D. Cal.) (filed November 2, 2011); *Pearson v. Target Corp.*, No. 1:11-cv-07972 (N.D.Ill.) (filed November 9, 2011); and *Blanco v. CVS Pharmacy, Inc.*, No. 5:13-cv-00406-JGB-SP (C.D. Cal.) (filed March 4, 2013).

On April 15, 2013, Plaintiffs executed a global, nationwide settlement agreement settling and releasing for consideration, *inter alia*, all of the claims made in each case that was to be submitted to this Court for final approval. On April 22, 2013, Plaintiffs, together, filed a second amended complaint against Defendants in this Court. On May 16, 2013, we provisionally certified the Class, consisting of all consumers who purchased for personal use certain joint health dietary supplements sold or manufactured by Defendants.

A Preliminary Approval Order of the proposed class action settlement between Plaintiffs and Defendants was entered on May 30, 2013. [Doc. 89]. Objections to the class action settlement were filed subsequently.

Currently before us is Plaintiffs' Motion for Final Approval of the Class Action Settlement and Award of Attorneys' Fees, Expenses, and Incentive Awards.

C. Settlement Agreement

The Settlement Agreement, reached after protracted, arm's length negotiations over several months, secures for the Class a constructive common fund, injunctive relief, costs for notice and attorneys' fees, and a provision for incentive awards for Plaintiffs. The Settlement explains the claims process and guarantees $2 million towards a guaranteed fund, with unclaimed funds remitting to a *cy pres* fund. The injunctive relief is in the form of labeling changes on Defendants' products for a period of thirty months. Rexall identified and provided notice to approximately five million individual class members belonging to three categories: (1) members of NBTYs Ambassador Club; (2) members of Vitamin World's loyalty program or online purchasers of Vitamin Glucosamine products; and (c) Costco Wholesale club members who have purchased Costco's Kirkland-brand glucosamine products. In exchange, Class Members release Defendants from known and unknown claims.

## DISCUSSION

Objectors contest both the fee award and approval order. Objectors argue that this Court should not approve as fair and reasonable a settlement agreement that, on its face, so disproportionately advances the interests of Class Counsel over those of the class itself through excessive attorneys' fees. Plaintiffs' attorneys contend that, due to the substantial benefit procured for Class Members, an award of the requested attorneys' fees would be reasonable and result in a fair settlement. We consider the reasonableness of the settlement to determine if it should be approved.

## PART I: REASONABLENESS OF THE SETTLEMENT

A. General Principles of Law Under Rule 23

In class action settlements, a district court cannot rely solely on the adversarial process to protect the interests of the persons most affected by litigation—namely the class— and must rely on the fiduciary obligations of the class representatives and especially class counsel to protect those interests. The fiduciary obligation owed to clients is particularly significant when the class members are consumers, who ordinarily lack both the monetary stake and sophistication in legal and commercial matters that would motivate and enable them to monitor the efforts of class counsel on their behalf. *See Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011). This is why settlements of class actions must be approved by the district court as fundamentally "fair, adequate and reasonable." Fed.R.Civ.P. 23(e)(1)(c).

The Seventh Circuit has held that, in evaluating the fairness of a settlement, the district court must consider the strength of the plaintiffs' case compared to the defendants' settlement offer; the risk, expense, complexity, and likely duration of further litigation; the extent of discovery completed; and the experience and views of counsel. *Synfuel Technologies v. DHL Express (USA)*, 463 F.3d 646, 653 (7th Cir. 2006) (quoting *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996)). The Seventh Circuit further held that "the fairness of the settlement must be evaluated primarily on how it compensates class members for past injuries," not on whether it provides relief to future customers. *Id.*, at 654. A district court's decision regarding the approval of a settlement will not be reversed unless there is a clear showing of abuse of discretion. *Id.*

*Strength of Plaintiffs' Case on the Merits Compared to Defendants' Settlement Offer*

While it is difficult to calculate the precise probability of success Plaintiffs may experience through continued litigation, the Court finds non-trivial potential obstacles to Plaintiffs' prevailing on the merits. As a threshold, Plaintiffs may be refused class certification.

On the other hand, after lengthy settlement negotiations, the Defendants' offered to create an unlimited constructive fund for the approximately 12 million Class Members. Of these Class Members, about 9.1 million received notice by publication and a smaller number of 4.7 million Class Members received direct, individual notice. Each Class Member is eligible to make a claim for at least $3 for one undocumented purchase, and up to $50 for documented purchases. Even if the value of the Settlement is limited to direct notice recipients, the Settlement has made available to the Class a monetary benefit of at least $14.2 million. Of this fund, only $2 million is guaranteed to be paid out by Defendants, either directly or to a *cy pres* fund. The Settlement secures an additional $6.5 million for the cost of notice and attorneys' fees and expenses, for a total of a $20.2 million made available to the Class.

In addition to the fund, the Settlement Agreement provides for injunctive relief in the form of labeling changes that eliminate key false marketing claims alleged in the lawsuit. However, the value of the injunctive relief, while potentially significant to both Class Members who may still be looking to improve joint health and those who are not Class Members, is difficult to ascertain and does not flow directly to the Class Members.

*Risk, expense, complexity, and likely duration of further litigation*

Even before this dispute was "consolidated" into the present case, the Plaintiffs expended significant time and resources in prosecuting individual Plaintiffs' cases in courts across the country. During this time, Plaintiffs survived multiple motions to dismiss and Defendant's motion for summary judgment. Leading up to this Settlement Agreement, parties engaged in the lengthy period of settlement negotiations.

This class action litigation continues to involve a number of complex legal, factual, and scientific questions. The disputed issues include scientific literature and medical studies

regarding the benefits of glucosamine and chondroitin, whether Class Members obtained some benefit (excluding a known placebo effect) from the use of the products, and whether the Class Members are entitled to damages. Parties also dispute the impact of and potentially liability arising from the disputed misrepresentations. There are also contested issues relating to class certification.

In the absence of a settlement, Plaintiffs would be required to undergo extensive litigation to secure a finding of liability, and then, if successful, continued litigation on causation, damages, limitations and other defenses. Even if able to prevail at all of these stages, Plaintiffs may face an appeal. Should Plaintiffs continue to litigate, any recovery or benefit would not likely be realized for years.

*Extent of discovery completed*

At the time the Settlement was agreed upon, each of the individual cases were at various stages of litigation, but had undergone sufficient discovery to enable the parties and counsel to evaluate their respective cases. Thousands of pages of documents had been produced, depositions had been taken of experts and employees, and expert reports had been submitted. Discovery completed in *Cardenas* and *Jennings*, including the depositions of experts and preparation of expert reports, provided Plaintiffs and counsel a thorough record upon which to evaluate the case and determine whether settlement was in the best interests of the Class.

*Experience and views of counsel*

Counsel for Plaintiffs and Defendants have both investigated the claims and underlying events and transactions alleged in the complaints; conducted legal research; engaged in motion practice; reviewed evidence obtained in discovery and class certification discovery,

consultations, reports, and depositions of experts; and considered arguments made by all Parties as to the merits of the case.

Counsel has also assessed the considerable expense, length of the time necessary to continue prosecution of the claims through trial, post-trial motions, and likely appeals, as well as the significant uncertainty in predicting the outcome of the litigation.

Based on the unavoidable expense, length, and risks inherent in litigation, counsel concluded that the Settlement Agreement is fair, reasonable, and adequate and in the best interests of the Class.

*Presence of Collusion in Gaining a Settlement*

Objectors oppose the Settlement due to three provisions they contend are signs of self-dealing and collusion: (1) the structure of the Settlement; (2) a "clear sailing" provision; and (3) a segregated fund provision.

Objectors' central opposition to the Settlement is that it allocates $4.5 million, or 70% of what it calculates is a $6.5 million constructive common fund (comprised of $4.5 million fees and $2 million guaranteed funds), to Class Counsel.  Objectors contend that this disproportionate percentage award, almost two-thirds of the total fund, to counsel suggests self-dealing.

Second, Objectors, point to counsel's inclusion of a "clear sailing" provision that provides that Defendants will not oppose class counsel awards of $4.5 million as evidence of self-dealing.  Objectors contend that the clear sailing provision "decouples class counsel's financial incentives from those of the class" and creates an incentive for counsel to settle lawsuits in a manner that is favorable to counsel, even at the detriment to the Class.

Objectors finally argue that the Settlement's segregated fund provision that ensures that fees, costs, and incentive awards are paid "separate and apart from" class relief is another

indication of self-dealing. Any reduction in fees would revert back to Defendants and a change in the fee structure would create no additional benefit to Class Members, reducing the incentive for Class Members to scrutinize and challenge potentially improper fees.

Class Counsel (and, for that matter, Defendants' counsel) denies any collusion and asserts that the Settlement was achieved through arm's-length discussions by conference calls, in-person meetings and written exchanges, during which offers and demands were exchanged. Counsel maintains that only after the relief to the Class was agreed upon did the Parties discuss the issue of attorneys' fees and incentive awards.

*Actual Benefit to Class*

Defendants' evaluation of the benefit made available to the Class dramatically exceeds the actual benefit realized by the Class. At the close of the claims deadline on December 3, 2013, only 30,245 claims had been filed, amounting to a distribution of $865,284.00 to Class members. The actual benefit to the Class, then, was a mere 4.2% of the $20.2 million Defendants claim it made available to the Class.

Defendants claim that the remaining $1,134,716.00 of the guaranteed fund of $2 million, to be provided as a *cy pres* award to the Orthopedic Research and Education Foundation upon the Court's approval, is a benefit to the Class. Defendants further maintain that the Class also realizes an actual benefit from valuable labeling changes as a result of the Settlement's securement of injunctive relief. Neither the *cy pres* fund nor the injunctive relief provides a direct benefit to the Class, but instead creates a benefit to the general public and future glucosamine consumers.

B. Conclusion

The settlement agreement, withholding approval of the requested attorneys' fees, is fair, adequate, and reasonable and the result of arms-length negotiations. Even though the actual benefit to the Class is only a fraction of the available fund, the settlement provides for adequate economic recovery by claimants in light of the costs, likelihood of only marginal additional relief to individual consumers, and uncertainty of continued litigation. While the *cy pres* fund and injunctive relief are substantial benefits secured under the settlement agreement, they benefit the public and future consumers of glucosamine—not Class members for past injuries—and cannot be a key consideration in determining the fairness of the settlement.

I will approve reasonable incentive awards in the amount of $5,000 for each of the six named Plaintiffs, for a total of $30,000.

Because Objectors' challenge to the fairness of the settlement agreement is based on a determination that the requested fee awards are substantively unreasonable, I will now turn to the reasonableness of the fee award.

## PART II: ATTORNEYS' FEES AND COSTS

### A. Attorneys' Fee Award Based on Constructive Fund

1. Standard of Review

Attorneys' fees are generally awarded based on the value of the settlement (i.e. the fund as a whole), not just the portion of the fund actually claimed by class members. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 480 (1980), 100 S. Ct. 745, 62 L.Ed.2d 676 (attorney is entitled to a reasonable fee from the fund as a whole); *Mirfasihi v. Fleet Mortgage Co.*, 551 F.3d 682, 687 (7th Cir. 2008) ("a proper attorneys' fee award is based on success obtained *and* expense (including opportunity cost of time) incurred"); *In Re HP Inket Printer Litigation*, 716 F.3d 1173 (9th Cir. 2013) (attorneys' fees are attributable to the relief obtained for the class).

Courts have an independent obligation to ensure that the fee award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount. *Bluetooth*, 654 F.3d at 941; see also Committee Notes to Rule 23(h), 2003. A recent study, commissioned by the Institute for Legal Reform and conducted by Mayer Brown LLP, found that in the vast majority of class action lawsuits, the fees awarded to class counsel far exceeds the payout received by the class. "Do Class Actions Benefit Class Members? An Empirical Analysis of Class Actions," Mayer Brown, available at www.instituteforlegalreform.com. While the study suffers from non-trivial limitations, it raises an important issue regarding the frequently misaligned goals of class counsel and the class. Due to this issue, as well as others, it is particularly important that the Court rely on an adequate factual basis to determine whether a settlement and fee award is fair to the entire class. *In Re Baby Products Antitrust Litigation*, 708 F.3d 163, 175 (district court did not have necessary factual basis, including the amount of compensation distributed directly to the class, to determine whether settlement was fair); *Bluetooth*, at 943 (district court made: 1) no explicit fee calculation; 2) no comparison between fees award and benefit to class or degree of success in litigation; and 3) no comparison between fee calculation methods). To that end, courts may only include the value of injunctive relief to the total common fund in the unusual instance where the value to individual class members of the injunctive relief can be accurately ascertained. *Staton v. Boeing*, 327 F.3d 938, 974 (9th Cir. 2003).

2. "Percentage-of-Recovery" vs. Lodestar Method

Depending on the type of relief obtained for the class—either constructive common fund and/or injunctive relief—attorneys' fees may be calculated under either the "lodestar" method or as a "percentage-of-the-recovery." The "lodestar method" is appropriate in class actions where the relief obtained is primarily injunctive in nature and thus not easily monetized. Class actions

brought under fee-shifting statutes (such as federal civil rights, securities, antitrust, copyright, and patent acts) frequently use the lodestar method. In these fee-shifting cases, the relief sought and obtained is largely only injunctive in nature and thus not easily monetized, but the legislature has authorized the award of fees to ensure compensation for counsel undertaking socially beneficial litigation. *Bluetooth*, 654 F.3d 935, 941 (9th Cir. 2011).

A lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer. *Id.*; *Staton v. Boeing*, 327 F.3d 938, 965 (9th Cir. 2003). Though the lodestar figure calculated in determining an attorney fee award is presumptively reasonable, the court may adjust it upward or downward by an appropriate positive or negative multiplier reflecting a host of reasonableness factors, including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment. *Bluetooth*, 654 F.3d at 941-42.

On the other hand, where a settlement produces a constructive common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-the-recovery method. *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 975 (7th Cir. 1991); *Bluetooth*, at 942. Under the latter method, attorneys' fees are derived from a percentage of the common fund. A constructive common fund is valued based on the direct monetary relief made available to members of the proposed class, not just the portion actually claimed by class members. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 480 (1980), 100 S. Ct. 745, 62 L.Ed.2d 676; *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423,437 (2d Cir. 2007) ("the entire settlement fund, and not some portion thereof, was created through the efforts of counsel"). While the value of *cy pres* and injunctive relief will not be added to the amount of total funds

made available, they are relevant factors in determining what percentage of the fund is reasonable as fees. *Id.*; *Baby Products*, 708 F.3d at 179.

Courts typically calculate 25% of the fund as the "benchmark" for a reasonable fee award in cases involving recoveries of between $5 million and $15 million, and must provide adequate explanation in the record of any "special circumstances" justifying a departure. *Abrams v. Van Kampen Funds, Inc.*, 2006 WL 163023, at *19 (N.D. Ill. Jan. 18, 2006). Courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time, and may cross-check a percentage-of-recovery fee award with the lodestar method. *In re Synthroid Marketing Litigation*, 264 F.3d 712, 718 (7th Cir. 2001); *Baby Products*, 708 F.3d, at 176-77.

3. Calculating the Value of Constructive Common Fund

Counsel has primarily secured a constructive common fund to benefit the Class. An initial calculation of attorneys' fees based on a percentage-of-recovery method is appropriate. The value of the fund is based on the total funds made available to the Class—not only the funds actually claimed by the Class. Plaintiffs' counsel estimates that approximately 9.1 million members, comprising 76% of the estimated 12 million proposed Class members, were provided some type of notice. Of this, 4,718,651 Class members were provided direct notice of the class action proceeding via email or postcard.

At a recovery rate of $3 per bottle with no required documentation by the 4,718,651 members given direct notice, the value of the constructive fund is $14.2 million. Of the available common fund, the Class is guaranteed only two million dollars. Counsel also secured for the Class an additional $1.5 million for notice costs and requests $4.5 million in attorneys' fees and expenses, which Defendants have agreed to not contest. Not including the value of any

injunctive relief, the total direct monetary relief made available by the settlement through a constructive fund, notice costs, and attorneys' fees and expenses is $20.2 million. As such, attorneys' fees totaling $4.5 million constitutes approximately 22.3% of the total potential benefit and may be reasonable.

However, as Objectors foresaw, the data, compiled after the December 3 claims deadline, revealed that, like other consumer class actions with individual relief of a small value, the settlement resulted in a very low claims rate by the Class. *Spillman v. RPM Pizza, LLC*, No. 10-349-BAJ-SCR, 2013 U.S. Dist. LEXIS 72947, at *8 (M.D. La. May 23, 2013) (0.27% claims rate for $15 max claim); *Livingsocial*, 2013 U.S. Dist. LEXIS 40059, at *52 (D.D.C. Mar. 22, 2013) (.25% claims rate). A mere 30,245 claims were filed, representing 0.25% of the 12 million proposed Class Members, and 0.7% of even the 4,718,651 Class Members who received direct notice. Only a total of $865,284.00 of the available constructive common fund went to benefit the Class. This comprised a 4.2% of the available fund of $20.2 million. The remaining $1,134,716.00 of the guaranteed fund of $2 million is to be remitted in *cy pres* to the Orthopedic Research and Education Foundation.

The low claims rate in combination with funds being remitted to *cy pres* in an amount greater than the actual benefit to the Class suggests that there is substantial reason to decrease the percentage of the attorneys' fee award from the "standard" 25% percentage of the settlement. *Baby Products*, 708 F.3d at 179.

Plaintiffs' attorneys claim, however, that they have secured very valuable injunctive relief—the removal of representations on the labeling of Defendant's products for thirty months. Although injunctive relief may be a factor supporting an increase in the percentage of recovery, the benefit secured here, like in *Synfuel*, would primarily benefit future customers and not Class

Members. *Synfuel*, at 653.  Consequently, any injunctive relief secured here does not support an increase in the percentage recovery rate awarded to counsel.

4. Crosscheck with Lodestar Method

While the Seventh Circuit does not require calculation of attorneys' fees by the lodestar method, it does require courts to "do their best to award counsel the market price for legal services." *Synthroid Marketing*, 264 F. at 717–21.  To this end, we crosscheck the amount of attorneys' fees awarded under the percentage-of-the-recovery against a lodestar calculation. Given that Plaintiffs' attorneys have submitted declarations in support of their requests for attorneys' fees and expenses for purposes of conducting a lodestar, assessing the lodestar will not be a difficult task.

The attorneys for Plaintiff are comprised of two legal teams.  The first legal team is comprised of three firms: (1) Bonnett, Fairbourn, Friedman & Balint, P.C. ("BFFB"), (2) Stewart M. Weltman LLC ("WELTMAN LLC"), and (3) Levin Fishbein Sedran & Berman ("LFSB"). The second legal team is the law firm Denlea & Carton LLP ("D&C").  Both teams have submitted data that reflects reasonable hourly rates for attorneys of the same experience and skill.

*Team One: BFFB, Weltman LLC, and LFSB*

BFFB, consisting of six attorneys, one litigation support specialist, and four paralegals, submitted to the court the following breakdown of its time and proposed hourly rates:

Elaine A. Ryan: 390.1 hours at $575.00

Patricia N. Syverson: 399.3 hours at $525.00

Todd D. Carpenter: 40.2 hours at 525.00

T. Brent Jordan: 42.4 hours at $500.00

Lindsey M. Gomez-Gray: 365.2 hours at $250.00

Kevin R. Hanger: 35.2 hours at $250.00

Brian R. Elser: 3.0 hours at $225.00

Rose K. Creech: 16.7 hours at $175.00

Lydia L. Rueda: 199.3 hours at $165.00

David J. Streyle: 20.6 hours at $165.00

Meredith K. Kight: 5.7 hours at $165.00

These figures total 1,517.7 hours and amount to a base lodestar figure for BFFB of $617,166.50. BFFB also submitted a breakdown of expenses, primarily composed of expert fees, totaling $57,398.04.

Weltman LLC submitted that Stewart M. Weltman spent a total of 474.75 hours on this litigation at an hourly rate of $685, for a total lodestar of $325,203.75. Weltman LLC did not report any additional expenses.

LFSB's legal team, comprised of one partner, one associate, and paralegal, submitted the following breakdown of their fees:

Howard J. Sedran: 12.3 hours at $775.00

Charles Sweedler: 59.0 hours at $525.00

James Rapone: 45.0 hours at $265.00

These figures total 116.3 hours and amount to a base lodestar figure for LFSB of $52,432.50. LFSB submitted expenses of $29,091.06.

Based on these figures, the total base lodestar figure for BFFB, Weltman LLC, and LFSB, calculated as proposed by plaintiffs' counsel, is $994,802.75, with expenses totaling $86,489.10. BFFB, Weltman LLC, and LFSB requested a fee award of $2 million. Applying a

lodestar method crosscheck at counsel's regular billing rates, a total lodestar of $994,802.75,

represents a request to use a lodestar multiplier of 2 (i.e. Class Counsel's fee request equaled

twice what they would have received at their regular billing rates).

*Team Two: D&C*

D&C, consisting of six attorneys and staff, submitted in a declaration the following

breakdown of its time and proposed hourly rates:

James R. Denlea: 41 hours at $675.00

D. Gregory Blankinship: 105.40 hours at $625.00

Jeffrey I. Carton: 190.50 hours at $675.00

Peter N. Freiberg: 1076.50 hours at $650.00

Todd S. Garber: 50.35 hours at $150.00

Based on these figures, calculated as proposed by Plaintiffs' attorneys, the value of the

total 1,478.75 hours D&C devoted to this action amounts to a base lodestar figure for D&C of

$938,790.00.  D&C's requested fee is $2,500,000, including $93,187.13 in expenses.  Applying a

lodestar method crosscheck at counsel's regular billing rates, a total lodestar of $938,790.00,

represents a request to use a lodestar multiplier of 2.56.


5. Conclusion

Based on a comparison of the percentage-of-the-recovery method and lodestar method, I

am awarding attorneys' fees exclusively for securing a common fund, while taking into account

factors, such as the actual benefit to the Class.  Due to the low actual relief secured for the Class

and lack of other meaningful benefit to compensate the Class for past injuries, a substantial

decrease in the percentage of the recovery is warranted.  Based on a crosscheck with the

Lodestar methodology, fees in the amount of $994,802.75 and expenses in the amount of

$86,489.10 will be awarded to BFFB, Weltman LLC, and LFSB, and fees in the amount of $938,790.00 and expenses in the amount of $93,187.13 will be awarded to D&C, for a total of $1,933,592.75.

These fees reflect a lodestar with no multiplier. This award comprises 9.6% of the total fund of $20.2 million, including notice costs and fees, and 13.6% of the $14.2 of the available common fund. This award adequately (and, arguably, more than adequately) compensates counsel for the market price of their legal services.[1]

**B. Potential Attorneys' Fee Award Based on Injunctive Relief**

Parties ordinarily may not include an estimated value of undifferentiated injunctive relief in the amount of an actual or putative common fund for purposes of determining an award of attorneys' fees. *Staton v. Boeing*, 327 F.3d 938, 974 (9th Cir. 2003). However, in limited cases, the legislature has authorized the award of fees to counsel undertaking socially beneficial litigation. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S. Ct. 1612, 44 L.Ed.2d 141 (1975) (only Congress can authorize an exception to the standard American rule that attorneys' fees are not recoverable by the winning party in federal litigation).

---

[1] Calculating a lodestar, as we have done here, has its own difficulty. We accept both the hourly rates and the hours spent. Opposing counsel in a settled case rarely, if ever, challenge rates or hours spent in class action litigation. Hours and rate challenges are generally confined to non-class cases filed under fee-shifting statutes, where defendants allege that the plaintiffs' lawyer took 150 hours to complete a 95 hour job and charged rates higher than that lawyer's time was worth in his or her practice. On our own initiative, we considered the question of hours and fees. Based on the experience of our own dockets, the hourly rates were within the realm of reason and, in most, but not all cases the highest paid lawyers expended fewer hours than those with lower rates which is economically sound. The total number of hours is large in comparison to the class benefits. I approve the hours because the claims presented some difficulty. Several cases that were filed separately were constructed into an economically worthwhile case based on millions of consumers all of whom would receive very small damages, i.e., a maximum of $50.00 per class member, many in the range of $3.00 to $12.00. This case is not unique; I have cited similar cases. What is clear is that preparing this case required close analysis of the economic feasibility of proceeding and the method for doing so. In particular, the case was "soft" because there was no contention that the product physically harmed a large class of people. The harm done by purchasing a bottle of pills or capsules was inflicted on the small change in the buyer's pocket. It takes extra effort to try to prevail fully in such a case. For this reason, we conclude that hours spent were within the realm of reason.

These cases, addressing topics such as civil rights, employment, and antitrust, are identified by statutory fee-shifting provisions. *Bluetooth*, 654 F.3d at 941 (citing cases); *Gagne v. Maher*, 594 F.2d 336, 339-41 (2d Cir. 1979) (fees to recipient's attorneys was authorized under Civil Rights Attorney's Fees Awards Act of 1976 where class recovered almost all requested relief); *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 822 (3d Cir. 1995) (calculation of attorneys' fee by the lodestar method was not legislatively justified because fee in hybrid relief consumer case was not made pursuant to statute). Courts typically use a lodestar calculation to arrive at an award of fees to counsel because there is often no way to gauge the net value of the settlement or any percentage thereof. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) (rejecting straight percentage recovery fee calculation because of uncertainty of settlement valuation).

Class Counsel argues that the labeling changes included in the settlement are of significant value and that the attorneys' fees should account for the benefit of this injunctive relief. Class Counsel asserts that the removal of representations on the packaging of glucosamine products will provide consumers with valuable information and is likely to lead to decreased prices for Class Members and future consumers. Objectors, however, argue that counsel should be rewarded only for the benefit secured directly for the Class. The benefit of the injunctive relief is not to the Class, but to future consumers of glucosamine.

Even assuming *arguendo* that the Plaintiffs' attorneys were entitled to fees for securing injunctive relief, there is a major problem regarding valuation of the removal of representations from the labels of Defendants' products.

Class Counsel submitted an initial report ("Reutter Rep.") by Plaintiffs' economist Dr. Keith Reutter estimating that the value of the injunctive relief was approximately $21.7 million

to current class members and $46.2 million to all consumers.  See Reutter Rep. Ex. S.  In order to assess the potential benefit to the class of injunctive relief, this Court requested Plaintiffs' counsel to submit additional briefing regarding calculating the value of the injunctive relief by analyzing the impact of the labeling changes after they are implemented.  On November 6, 2013, Class Counsel submitted the Supplemental Report of Plaintiffs' economist Dr. Keith Reutter ("Supp. Reutter Report") which concluded that it is infeasible to better measure the actual economic impact of the injunctive relief by waiting for the implementation of the labeling changes.  Dr. Reutter concluded that any meaningful analysis would require the consideration of competitors' and retailers' proprietary sales and marketing information, which would be difficult to obtain, take several years to perform, and be quite expensive.

Plaintiffs' counsels' argument that the economic benefit cannot be measured after the labeling changes are actually implemented undermines any possibility that such changes could be accurately estimated prior to such implementation.  Dr. Reutter opines that actual economic impact cannot be gleaned from an analysis of defendant Rexall's data alone.  Dr. Reutter concludes that accurately estimating the economic impact of the proposed labeling changes will "require the purchase of retail sales data from a vendor such as ACNielsen, and will require knowledge of the advertising budgets of competing manufacturers and retail outlets."

Plaintiffs' counsel's own conflicting reports by Dr. Reutter strongly suggests that there is no accurate estimate to assess the value to the Class of the injunctive relief.  The Seventh Circuit has conceded that a "high degree of precision cannot be expected in valuing a litigation, especially regarding the estimation of the probability of particular outcomes," but found that a judge that does not attempt to provide a monetization of the injunctive relief abuses his discretion.  *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 285 (7th Cir. 2002).

Plaintiffs' counsel argues that it should be awarded fees without a reasonably accurate and defensible determination of the value of injunctive relief by calculating fees based on a lodestar method with a multiplier because it has engaged in socially beneficial litigation. However, we will not award attorneys' fees for injunctive relief secured without clear indication from Congress that consumer class actions fall into fee-shifting "socially beneficial litigation."

At this time, we are neither able nor willing to award the plaintiffs' attorneys fees based on inconsistent conjecture as to what may happen in the future regarding labeling changes—especially, when the court may wait and, possibly, base such an award on accurate data. *Bluetooth*, 654 F.3d at 945 (remanded to the district court for lack of an adequate explanation for fee award). Accordingly, whether Plaintiffs' counsel can prove the value of the labeling changes that it secured on behalf of the Class is an issue that it may be able to raise after the passage of time. As of now, the value is not proven even as to the members of the Class.

## CONCLUSION

We approve judgment on the final settlement and award of attorneys' fees, accepting attorneys' fees for the benefits of injunction, and expenses as follows: $617,166.50 in fees and $57,398.04 in expenses to BFFB; $325,203.75 in fees to Weltman LLC; $52,432.50 in fees and $29,091.06 in expenses to LFSB; $938,790 in fees and $93,187.13 in expenses to D&C. I further approve reasonable incentive awards in the amount of $5,000 for each of the six named Plaintiffs, for a total of $30,000.

ENTER:

James B. Zagel
United States District Judge

DATE: January 3, 2014

21