1

1                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3    NICK PEARSON and RICHARD JENNINGS,          )
                                                 )
4                                                ) No. 11 CV 7972
                                                 )
5              Plaintiffs,                        )
                                                 )
6    vs.                                          ) Chicago, Illinois
                                                 )
7    TARGET CORPORATION; NBTY, INC., a Delaware  )
     Corporation; REXALL SUNDOWN, INC., a Florida) October 4, 2013
8    Corporation                                 )
                                                 )
9              Defendants.                        )10:47 o'clock a.m.

10                     TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE JAMES B. ZAGEL
11

12

     For the Plaintiffs:
13
                    STEWART M. WELTMAN, LLC
14                  BY:  Stewart M. Weltman
                    53 West Jackson
15                  Suite 364
                    Chicago, Illinois 60604
16                  (312) 588-5033

17                  DENLEA & CARTON LLP
                    BY:  Peter Newton Freiberg
18                       Jeffrey Ian Carton
                    One North Broadway
19                  Suite 509
                    White Plains, New York 10601
20                  (914) 920-7400

21
     Court reporter:
22
                    Blanca I. Lara, CSR, CPR, RPR
23                  219 South Dearborn Street
                    Room 2504
24                  Chicago, Illinois 60604
                    (312) 435-5895
25

1   Appearances (continued:)

2

3   For the plaintiffs:

4           BONNETT FAIRBOURN FRIEDMAN & BALINT, PC
            BY:  Elaine Ryan
5           2325 East Camelback Road
            Suite 300
6           Phoenix, Arizona 85016
            (602) 274-1100
7

8   For the defendants:

9

10          SIDLEY, AUSTIN LLP
            BY:   Kara L McCall
                  Michael W. Davis
11                Christopher Matthew Gaul.
            One South Dearborn Street
12          Chicago, Illinois 60603
            (312) 853-7000

13

14  For Objector Ted Frank:

15          CENTER FOR CLASS ACTION FAIRNESS
            BY:  Melissa A. Holyoak
16          1718 M Street NW, No. 236
            Washington, DC 20036
17          (573) 823-5377

18

19

20

21

22

23

24

25

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:47:16 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:47:24 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 10:47:34 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 10:47:56 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 10:48:24 | 25 |

1       (Proceedings taken in open court:)

2            THE CLERK:  Case number 11 CV 7972, Pearson versus

3    Target Corporation.

4            MR. WELTMAN:  Good morning, Your Honor.

5            Stewart Weltman on behalf of the plaintiffs.

6            MR. FREIBERG:  Good morning, Your Honor.

7            Peter Freiberg also on behalf of the plaintiffs.

8            MR. CARTON:  Good morning, Your Honor.

9            Jeffrey Carton also on behalf of the plaintiffs.

10           MS. RYAN:  And Elaine Ryan on behalf of the

11   Plaintiffs.

12           MS. MC CALL:  Kara McCall from Sidley & Austin on

13   behalf of the defendants.

14           MR. DAVIS:  Hello.  Michael Davis, Your Honor, on

15   behalf of defendants.

16           MR. GAUL:  And Christopher Gaul on behalf of the

17   defendants.

18           MS. HOLYOAK:  Melissa Holyoak on behalf of the

19   objector Ted Frank.

20           THE COURT:  I have some questions.

21           MR. WELTMAN:  Sure.

22           THE COURT:  I've looked through the remedies.  There

23   is, I think, an obvious difficulty.  Not the fault of the

24   lawyers, in fact probably not the fault of the parties either,

25   and I've dealt with this in one prior case, although it

1    resolved itself.  When you're dealing on an individual basis

2    relatively small damages and damages that may be difficult for

3    an individual to prove, I don't think -- I actually searched

4    the drawer that I have where I throw things.  I don't think I

10:49:08    5    have a receipt in any of those for any item worth less than

6    $80.

7          And I looked in a drawer where I routinely and

8    foolishly just toss receipts because I find the effort of

9    walking an additional four or five steps to the trash basket

10:49:34    10    too much for me, so I open a drawer and I stick this stuff in.

11    And then after a year or two and the drawer is becoming

12    difficult to close, I take them, throw them out, and then I

13    start the process over.

14          So the actual value, the number of refunds, is likely

10:50:04    15    to be small.  And, in many cases, even if somebody has this

16    stuff, they may not think it's worth the candle to send it in.

17    So what I regard as the single most defensible value of

18    settlement in this case to plaintiffs has to do with the change

19    in information.

10:50:37    20          MR. WELTMAN:  The labeling changes.

21          THE COURT:  The one question I had was, are there any

22    studies about how many people read these things?

23          MR. WELTMAN:  How many people read the labels?

24          THE COURT:  Yeah, read the labels.

10:50:54    25          MR. WELTMAN:  Well, Your Honor, actually, yes.  I'm

1    going to cite them to you, but yes, people do read the labels.

2           THE COURT:  Right.  How many people read the labels?

3           MR. WELTMAN:  I would say most of the people, I

4    can't -- that wasn't what I was prepared to respond to today,

10:51:10   5    Your Honor, but there are consumer studies, we're familiar with

6    them, I'm familiar with them, that discuss this very point,

7    that, in fact, the point of purchase, the front of the label,

8    is the critical transaction point.  It's when the consumer

9    makes the decision --

10:51:27  10           THE COURT:  Well, the question is, reading fine print.

11   I'll give you an example of in another field entirely.  And

12   part of it is because I knew people who practiced in the field,

13   but part of it is the evaluation that I saw from the time I

14   took the bench in 1987 to, maybe, 1992, 1993, and it had to do

10:51:52  15   with Blue Sky Laws which said, well, you do this prospectus for

16   stock you're going to issue and you have to tell certain

17   things.

18           And, ordinarily, when there was an objection when

19   somebody filed a class action for all of the people who bought

10:52:15  20   this stuff, bought these stocks, would say, well, you know,

21   they didn't tell us about this risk, they didn't tell us about

22   that risk, and then the case settled or the company went to

23   bankruptcy, one of those two things happened.  And there was,

24   by the time I got on the bench, the prospectuses were pretty

10:52:36  25   large.  And they became larger and larger as time went on, and

1   they got to the point where the cases started to disappear,

2   they started to find fewer and fewer Blue Sky cases.  The cases

3   really depended not on the prospectus but on some public

4   statement that the CEO had made.

10:53:03    5           MR. WELTMAN:  Right.

6           THE COURT:  And one of the reasons that it was shifted

7   to them is, these prospectuses became so long that I once

8   hypothesized that you could have an issuance of the new share,

9   new set of shares, and that you'd have 20 or 30 pages of fine

10:53:25   10   print about all of the things that could go wrong.  And I

11   reached the conclusion that you could probably, I wouldn't say

12   certainly, probably get away with putting something in a

13   prospectus which said we do not vouch for the honesty of the

14   directors and founders of this company, it is possible that

10:53:49   15   they will pocket money for their own purposes and not

16   diligently pursue the business.

17           My view is is that with the possible exception of the

18   people at the brokerage firms who have to read this stuff

19   seriously, the average citizen would buy the stock anyway, and

10:54:11   20   the reason they buy the stock anyway is to not read through 30

21   pages.

22           And my concern is whether I had a phenomenon here in

23   which case the label might be perfectly good but if the print

24   is small enough and it tells you all you need to know about the

10:54:34   25   medication or the vitamin or the non-FDA substance that's being

|       |                                                                        |
|-------|------------------------------------------------------------------------|
| 1     | sold, does this actually influence, is the apparent injunctive         |
| 2     | relief actually worth very much to the public.  And,                   |
| 3     | particularly, what is the correction here, "individual results         |
| 4     | may vary"?                                                             |

10:55:00  5     MR. WELTMAN:  No.  No, Your Honor.

6     THE COURT:  But what actually good do the "individual

7     results may vary" do?

8     MR. WELTMAN:  That one is not an important labeling

9     change.

10:55:08  10     THE COURT:  Yeah, but what did that one do?  Because

11     there were fights about that one, too.

12     MR. WELTMAN:  We just had that one because there is a

13     high placebo effect -- in fact, we make it very clear in our

14     papers, that one was just for people to know, who might not

10:55:25  15     otherwise presume that, that that would be, you know, a

16     possibility that individual results would vary.  But that was

17     not -- I mean, that is not the keystone labeling change here,

18     of course.

19     The keystone labeling change is, as we've set forth in

10:55:44  20     our papers and put graphically, you can see it, we've attached

21     it as exhibits, each of the labels that's subject to this

22     change basically had a series of prominent representations

23     about the product, generally one, and generally two, sometimes

24     three.  This is one of those.  And right underneath the product

10:56:09  25     name, there were these three representations or two

1    representations, and if you saw the exhibits you will see that
2    that is no longer going to be there.

3        And we submitted, again under seal, Your Honor,
4    evidence from the company's own documents that shows that a
10:56:32    5    very, very high percentage of the people who purchased these
6    products deemed that to be a key message.

7        So it is an important result, as far as we're
8    concerned.  People buy these products based upon basically two
9    reasons, one is what I will call the palliation reason, which
10:56:53    10    is the feel better joint inflammation or whatever, and then the
11    rebuilds, renews.  People think and buy this for a long-term
12    basis believing that somehow they are going to rebuild or renew
13    their cartilage, and that's a key message that's no longer
14    going to be made on the labeling of these products.

10:57:18    15        Our view is --

16        THE COURT:  The other thing that disturbed me about
17    this is, your position from the very beginning is, and I was
18    unclear on exactly where this stood, but let's take the lesser
19    form --

10:57:37    20        MR. WELTMAN:  Sorry?

21        THE COURT:  There are two things you can say about
22    something that has only a placebo effect, and we're assuming,
23    this is hypothetical, you got something that says only placebo
24    effect.  You can tell people it doesn't work for anybody, alter
10:58:11    25    the structure in some way, but you're actually not saying to

1  them the only valuable purpose served by this is that it has a

2  placebo effect, in which case you could take a label and put a

3  glucosamine on it and instead of actually putting glucosamine

4  in the pills you could put sugar pills on there, a classic

10:58:42  5  placebo effect structure.

6  My difficulty is, if, basically, somebody can prove to

7  me, or to anybody, that glucosamine chondroitin doesn't do any

8  of the things by itself other than a placebo effect, the issue

9  then becomes is what the appropriate remedy is.  And the

10:59:10  10  appropriate remedy in your case seems to be, we're going to

11  tell people, basically, there's no guarantee here, you could

12  even put more on it and say that studies have shown that it has

13  no effect at all, a lot of stuff like that, but why are we

14  going to the issue of injunctive relief in putting notices on

10:59:43  15  bottles for something which, if all that you said in the

16  complaint is true, shouldn't be on the market at all.

17  MR. WELTMAN:  Well, Your Honor, this was the subject

18  of negotiation.

19  THE COURT:  Right.

10:59:56  20  MR. WELTMAN:  And, again, I want to point -- I want to

21  make it very clear that in our complaints there are two

22  separate issues, separate categories of what we contend to be

23  misrepresentations about the products, one is what I will call

24  the palliation, joint flexibility, pain relief, lubrication of

11:00:27  25  the joints, whatever you want to call that.  There's a second

1  approach, that's the rebuilds, renews representation.  These
2  are two separate types of representations.

3          If you take a look at the expert report of Dr. Thomas
4  Schnitzer you will see he was our expert who testified in the
5  Osteo Bi-Flex case we had in California, those are two separate
6  issues.  We negotiated a deal where we tried to get as much as
7  we could, but for us to negotiate an entire complete label
8  change would've required us to go to trial.

9          So we looked at this, we knew the science was solid,
10  and we convinced defendant that it was solid on the renews,
11  rebuilds, sufficient enough they were willing to take out that
12  key representation.  They were not willing to concede every
13  contention that we made in our complaint.  They were not
14  willing, though we tried to bargain, to change some of the
15  palliation representations.

16          So we're confronted with, as class counsel, an offer
17  which achieves some of what we sought to obtain in this case.
18  In fact, a significant change, an entire category of
19  representations is being removed by agreement.  And we, like
20  any other plaintiff's counsel in negotiation, has to make an
21  evaluation.  Is this a good result, is it a perfect result?
22  No, it's not a perfect result.  Of course, not.  A perfect
23  result, if you accept our allegations, is to completely remove
24  all representations, but that's the byproduct of negotiation.
25          And I submit to you, Your Honor, that what we've

11:00:53

11:01:20

11:01:43

11:02:16

11:02:39

1    achieved in terms of the rebuilds and renews, and getting a

2    main representation taken off of the front of the labels, is

3    fairly unprecedented if not completely unprecedented in private

4    consumer fraud class actions.  You can take a look at the

5    cases, I don't think there are any.  It's a major achievement

6    to get a defendant to take one of -- the real estate on that

7    package is not large.  They choose the key messages they want

8    to put on that package and we got one of those messages removed

9    by agreement.  Do we get all of them?  No.  You know, would I

10   have preferred to get all of them?  Of course.  But that's the

11   byproduct of compromise and we perceive this to be a major

12   accomplishment by way of the litigation.  It was the reasons,

13   to me, a driving factor to submit this because it is a major

14   change.

15          THE COURT:  Okay.

16          Do you want to be heard on this at all?

17          MS. RYAN:  Unless the Judge has any questions that are

18   particular to the defendants ....

19          THE COURT:  I cannot imagine that you would want to

20   say anything now.

21          MS. RYAN:  No.

22          THE COURT:  Okay.

23          The objector?

24          MS. HOLYOAK:  I do have something on this, Your Honor.

25   You were talking about the injunctive relief and about the

1   evaluation of it.  And I think one of the problems with the
2   parties' briefs is that they ignore the Seventh Circuit law,
3   which is Synfuel, which says we need to look at the fairness of
4   the settlement based on how we're compensating these past
5   injuries.

6          Now, the parties have tried to distinguish Synfuel by
7   saying, well, they're not -- Synfuel doesn't apply because in
8   Synfuel they said they wouldn't be future victims.  But here,
9   the real question in Synfuel was how are you compensating these
10  past injuries.  And under the complaint they're basically
11  saying, hey, these class members, they wouldn't purchase the
12  product at all if they had known or they would have paid a lot
13  less if they had known that this really doesn't rebuild
14  cartilage, or whatnot.

15         And so the question here is, how do these future
16  changes, which apply to future customers and future purchases,
17  how does that compensate for this past injury for paying too
18  much.  And it doesn't.  And that's why in Synfuel it says the
19  fairness of the settlement should not be viewed differently.

20         THE COURT:  But my question to you is, no matter how
21  large the pool you put aside for people who bought the product
22  and shouldn't have bought the product, or bought the product on
23  the basis of representations that shouldn't have been made,
24  how, in fact, do you set the system that is going to compensate
25  them for losses which, in many cases, may be 10, 15 dollars?

11:04:28
11:04:43
11:04:59
11:05:18
11:05:45

11:06:17

11:06:39

1   We've dealt with this before, but usually when we deal
2   with it before -- well, the cases I've dealt with this before
3   are cases in which, for example, utility provides something,
4   some service that really is absolutely worthless or very close
5   to worthless, and the defendant has in its records the name of
6   every individual who purchased.  And you could reconstruct this
7   and say, okay, we're going to send you a little notice, every
8   one of these people, that there are erroneous charges and we're
9   going to give you credit on your next bill, which is a way a
10  utility company can do that.

11              We now have a fairly substantial number of people
12  whose identities are not known, who have to trouble themselves
13  to put some kind of request via stamp, if people still use
14  that, although the e-mail is a lot cheaper, and say, you know,

11:07:00

15  I bought three bottles of this stuff and I want my $15 back.

16              There's some people who are going to do that, there's
17  absolutely no question, but, generally speaking, you are in a
18  situation where if you take what the Seventh Circuit said
19  literally, you've got settlements that cannot, in fact, be

11:07:24

20  achieved because you don't know to whom to send the money and
21  you don't know how much.

22              MS. HOLYOAK:  Well, here we do.  I mean, they did have
23  information for 4 million members.  So they could've been --
24  they could've sent a check for 5, 10, 12 dollars, like the

11:07:42

25  maximum amount of the purchase, to those 4 million and still

1　remained a claims process for the others, for the remaining

2　class members, to be able to send in claims.

3　　　　I think the other problem here is --

4　　　　THE COURT:　Now, do I weigh against that the cost of

11:07:58　5　doing that?

6　　　　MS. HOLYOAK:　I'm sorry?

7　　　　THE COURT:　Do I weigh against that the cost of doing

8　that?

9　　　　MS. HOLYOAK:　The cost of sending the direct checks?

11:08:06　10　　　　THE COURT:　The cost of hunting down the people.　You

11　wind up with a fairly expensive process.　And, basically, you

12　may dispense a fairly small amount of money, but what does

13　happen is -- if, for example, the defendants are managing that

14　process, you have some argument that there's a level of

11:08:36　15　deterrence here because they're going to have to spend money

16　finding people who bought from their store, sending checks out,

17　and maybe they won't do it the next time, but that's not the

18　same thing as considering fairness in terms of compensation of

19　the people who bought it.

11:08:51　20　　　　There's a social purpose if Target winds up spending a

21　fair amount of money and using people to look at a lot of

22　papers and trying to make a decision as to whether a claim is

23　legitimate or illegitimate, that's a penalty they're paying,

24　it's a cost, but it's not necessarily a benefit to any

11:09:18　25　significant part of the class.

1       MS. HOLYOAK:  Absolutely.  But that's not even a

2   question here.  They do have the 4 million names that they

3   could send directly that money to those 4 million people.  And

4   it's not very clear why they just left it for a clearance

11:09:33    5   process for all 12 million, but here -- but you hit the nail on

6   the head on why that ends up being unfair, because here, as

7   we've seen, 20,000 claims have been submitted, which, as you

8   have explained, who keeps receipts, you know, from Target

9   5 years ago for their dietary supplements, the majority of

11:09:53   10   these are going to be for the no-proof.  So it's very likely

11   that the maximum amount that's going to actually get to the

12   class is $500,000, and then you have a side credit of

13   1.5 million and you have 4.5 million to the attorneys.  They

14   are looking at more than six times what the actual class is

11:10:11   15   going to receive, and, of course, that is untenable under Baby

16   Products and under other cases.  But so they very well could

17   have used a direct -- sent a check directly.

18       Can I talk about other points, Your Honor?  Or do you

19   want to address something else?

11:10:29   20       THE COURT:  No; go ahead.

21       MS. HOLYOAK:  I want to talk a little bit about the

22   motion schedule, Your Honor.  I think I -- I believe I

23   mentioned -- we argued this in our objection that under

24   In Re Mercury Interactive, it's a Ninth Circuit case, it said

11:10:52   25   when you're setting the objection schedule, you need to set --

1     THE COURT:  Are you telling me you want more time?

2     MS. HOLYOAK:  Yes, I would like more time.

3     THE COURT:  I'll give you more time.

4     MS. HOLYOAK:  Thank you.

11:11:01    5     THE COURT:  What else have you got?

6     MS. HOLYOAK:  Well, no, that is just -- not for my

7     objections, I'm saying for all class members, what happened

8     here was the fee motion came after the objection deadline.  And

9     so all class members were deprived of vital information about

11:11:16   10     the fee, fee motion, including here the fact that they're

11     seeking a multiplier of 2.7, and absent class members are

12     interested in the fact that they be paying their attorneys

13     $1,800 an hour for this result.

14     THE COURT:  Have you actually talked to a lot of class

11:11:34   15     members?

16     MS. HOLYOAK:  Have I?

17     THE COURT:  Yes.

18     MS. HOLYOAK:  Personally?  No, I have not.

19     THE COURT:  Well, that's another issue that concerns

11:11:42   20     me about this case.  When we're dealing with very small stakes,

21     when it's $15, $20, you don't really expect that there's going

22     to be a lot of input from actual class members.  You can

23     anticipate that there will be input from various entities

24     deeply concerned about their class action process in the United

11:12:08   25     States, but most of those people, and you are one of them, are

1    speaking for people and speaking for the interest of people who

2    have, with the exception probably of a few very crabby people,

3    not spent a lot of time talking to you or to their lawyers.  So

4    when you start talking like this, it's a little like hearing

5    some elected official telling us what the American people want

6    when that individual has talked, if any, to a very small number

7    of people.

8                    MS. HOLYOAK:  Well, part of --

9                    THE COURT:  But the question is, leaving aside the

10   people who were somehow damaged to the tune of 20 bucks or 30

11   bucks, leaving them aside and leaving whatever emotional tug

12   there is, which is very small when the amounts are very small,

13   there must be some other purpose that your objection seeks to

14   serve other than the class members in this particular case.

15                   And it seemed to me that much of your briefing dealt

16   with the basic premise that forget what the class members may

17   or may not want and may not even want to consider, the process,

18   as exemplified by this settlement, isn't achieving its overall

19   goals, not necessarily the goals of the individual class

20   members but the goals of class actions in the first place.

21                   I think that a strong undercurrent in what you're

22   briefing is that this is a classic example of something that

23   really should not be occurring the way it's occurring.  And

24   there are all kinds of other alternatives, but they don't

25   necessarily exist because we have various federal regulatory

1   agencies who regulate a variety of things, what we're dealing

2   with today is not one of them.

3           Although that's not the way it has to be.  I know

4   people who actually have traveled to Berlin to buy vitamins

11:14:44   5   because the Germans certify and treat vitamins the way the FDA

6   treats penicillin or some new antibiotic, we don't do that

7   here.  So, I mean, it's possible that there is some other

8   remedy but this is beyond the authority of anybody standing or

9   sitting in this courtroom now.

11:15:12   10          But tell me something about where you think the system

11  goes wrong without shedding a tear about the individual class

12  member and its 15 bucks.

13          MS. HOLYOAK:  Well, I think you can do both at the

14  same time, because under, you know, 23(h) and the circuit

11:15:29   15  authority that we have, you need to have this fee motion prior

16  to the objection deadline which would solve some of the

17  problems.

18          I think some of the class members, more class members,

19  probably, would be objecting if they understood exactly that

11:15:43   20  they were paying $1,800 an hour, effectively, based on the

21  multiplier, to their attorneys for this result, but also based

22  on the, you know -- on the alleged value of this injunctive

23  relief and wanting to know where is this coming from.

24          I think there is some information not available to the

11:16:00   25  class members and more could have objected if so.  In fact,

1    that's one argument I would reject based on the settling

2    parties, they said that, well, it doesn't matter that our fee

3    motion came after the objection, and it doesn't matter that

4    this motion to seal came after the deadline because the

11:16:19    5    objectors will be able to respond.  But there's other people,

6    the absent class members, may have objected as well if they had

7    more of this information.

8        But I agree with you, Your Honor, that there are lots

9    of problems just based on the class action law that the

11:16:33    10    settlement is untenable, again, based on the Third Circuit.

11    These ratios paying the class members 500,000, 1.5 and the

12    attorneys 4.5 is untenable under Baby Products and other

13    courts.

14        Did you have any other questions, Your Honor, about

11:17:05    15    how the Court should look at the settlement and these ratios?

16        THE COURT:  I think I understand your position.

17        MS. HOLYOAK:  Okay.  Thank you, Your Honor.

18        MR. WELTMAN:  Your Honor, there is value imparted in

19    the settlement.  We submitted an expert report that shows that

11:17:37    20    these representations that are being removed were very

21    important and, in fact, he has estimated a value just for the

22    30-month period.

23        Now, whether or not this benefits current class

24    members, which we pointed out in the evaluation that they do,

11:17:57    25    because there are a substantial --

1   THE COURT:  The most significant aspect of the remedy

2   sought in this case is the future worth of the change.  I don't

3   think you can get around, and I don't think you particularly

4   want to get around, the proposition that these individual

11:18:26   5   claims are very small.  The collected claim by the class has

6   some substance, because if you put a lot of people with their

7   $15 together eventually it winds up into 6 and possibly 7

8   figures.  So, I mean, there's something that's really there,

9   but the truth is, I have to consider the factual difficulties

11:19:00   10   and procedural difficulties in getting the funds to the people

11   who spent them.

12   And the truth of the matter is is the fact that you

13   have better data on some than you do on all does not alter the

14   fact that probably the number of known customers is less than

11:19:27   15   50 percent of the whole.  And I'm reluctant to accept the

16   objector's proposition that when you were dealing with class

17   action, which all class members pretty much stand on exactly

18   the same footing, that one group of people whose damages are

19   easier to ascertain wind up getting paid and those who aren't

11:19:57   20   don't get paid, that, I think, is a general problem with class

21   actions, except usually in cases where the damages are

22   substantial you pretty much pay out to pretty much everybody

23   who was affected by it knowing that you're going to miss a few.

24   What we have here is a possibility that they could

11:20:24   25   adopt a procedure where you would have a better idea of the few

1    and not much of an idea, which we're never going to have, not

2    much of an idea of the whole.  So from my point of view, this

3    falls--and small-stakes cases almost always do--falls in this

4    category of cases where you're not going to have effective

11:21:04    5    class-wide monetary relief, which is why I think the basis

6    you're offering for the fee petition and for disbursement of

7    funds, and in terms of your expert, so much more focused on

8    future benefit than it is on concerns for remedying small

9    amounts of money that were lost by people who might not have

11:21:45    10    bought the product if the label were different.

11    Another thing that occurs to me, and this was actually

12    my last question, so if you have anything else you want to say

13    to me first, you can do so.

14    MR. WELTMAN:  Okay.  Well, Your Honor, the injunctive

11:22:07    15    relief is a very important factor in the settlement.  We've

16    said that all along.  We have provided a mechanism by which

17    people who were so inclined could seek payment in claims.  They

18    didn't even have to have receipts, there was a tier that they

19    could just say they had non-document purchase.

11:22:33    20    THE COURT:  Right.

21    MR. WELTMAN:  But when we're dealing with societal

22    issues, the furtherance of and importance of societal issue,

23    the elimination in futuro, in the future, of a representation

24    that, by the documents we've shown you and the expert report

11:22:53    25    we've shown you, is an important representation to consumers.

11:23:16

1      By eliminating what we contend to be a highly
2  misleading misrepresentation, we have furthered a very
3  important goal, a very important societal goal.  And if the
4  Court does not take that into account -- the courts, not this
5  court but the courts in general, don't take into account
6  substantial future injunctive relief like this and compensate
7  counsel who fight for that--because we fought for it, we spent
8  time, a lot of time litigating this, hiring experts--if you
9  don't reward counsel for that and also approve it, then you

11:23:42

10  disincentivize future counsel from ever seeking these types of
11  very important social goals which are the social goals behind
12  the consumer fraud laws to begin with.  That's what they're
13  about.

14      I mean, it's one thing to say, okay, we'll pay people

11:23:57

15  for their past damages as best we can, but to stop the conduct
16  which causes the harm in the future is the ultimate goal of
17  consumer fraud laws.  So I submit to you, that's a reason to
18  approve the settlement, that is a reason to award counsel fees,
19  and the incentive awards that we've requested.

11:24:20

20      Now I'll answer your question.
21      THE COURT:  I'll give you an example of why I'm
22  thinking the way I'm thinking.  Many, many years ago there were
23  probably in the hundreds of cases filed against various banks
24  for their practices with respect to the administration of

11:24:39

25  mortgages, payment of taxes, property taxes, a variety of other

1    things.  All started in Minnesota, most of the cases were

2    brought by one law firm.  A judge who later went to the Eighth

3    Circuit who was a district judge in Minnesota resolved a ton of

4    them and I may have had 80 or 90 that I resolved.  What

11:25:05    5    eventually came to pass were two things, one of which educated

6    plaintiffs' counsel and the other educated all of us.  The

7    cases originally started out because there were a group of

8    plaintiffs' lawyers who thought, with some justification, that

9    these banks had adopted policies, escrow policies, that were

11:25:40   10    designed by the leadership of the bank to extract extra money

11    from their customers.  It became clear long before the cases

12    got to me that that was not true.

13                MR. WELTMAN:  That was not true?

14                THE COURT:  Not true.

11:25:57   15                MR. WELTMAN:  Okay.

16                THE COURT:  The upper level of banking couldn't have

17    cared less.  The practices were started by mid-level managers

18    who didn't want to go to the bank and say we paid more in

19    escrow than we took out and the banks lost money.  So they

11:26:13   20    over-escrowed.

21                Well, it takes a lot of the moral force out of the

22    case.  The Jamie Diamonds of the world probably were not aware

23    of escrow practices because they probably never had a mortgage

24    on their own and they weren't interested in that grungy part of

11:26:36   25    banking.  And the cases eventually settled, but one of the ways

1    they settled was because as these agreements kept maturing, the

2    lawyers for both sides understood that some of these solutions

3    were not helpful to class members, and the things that the

4    lawyers thought were really good for the class met with a lot

5    of condemnation, usually by some lawyer from the neighborhood

6    who would yell, say, "you know, why are you forcing the bank to

7    do this, it's not something that my client wants, it's actually

8    damaging to my client."

9         And over a period of time, they worked out a series of

10   solutions.  They worked out the solutions because they found

11   from actual practice that some things were good for the class

12   and other things were not good for the class and that in some

13   cases what was good was the kind of thing where the bank was

14   willing to give options, choose one, two, or three, and you

15   choose and do what's best for you.

16        So the final settlements of these cases were much less

17   controversial than the original ones.  Granted, that in some

18   cases the banks were concerned because the transaction costs of

19   achieving this were a little high.  You know, they had to have

20   somebody sending out papers saying you have choice 1, 2, or 3

21   and somebody had to record it, but it wasn't much, and it

22   worked out very well.

23        What I looked at when I saw what I thought was the

24   principal aspect of this case was the proposition that based on

25   what expert witnesses have told us, is that people pay

1    attention to labels.  And if you make these changes to the

2    label, the sales will be, I guess in your case, given

3    compromise, far less contaminated by whatever salesmanship the

4    defendants want to have.  But the lesson I learned from the

11:29:16    5    mortgage cases was, why do I have to look into the future, why

6    don't they make the changes and see what happens to their

7    sales, see what the actual damage was, see what the actual

8    benefits are.

9                What I am asked to do here is to pay a certain sum of

11:29:37    10    money for the value that is delivered to the plaintiff class

11    and to the public in general, why do I have to make that

12    decision as to how much should be paid for this before I know

13    what happens?

14                The truth is, if this has no effect at all on their

11:30:05    15    sales, none, zero, I wind up paying you and extracting costs

16    from the defendants that does not achieve the goal that your

17    expert thinks it will achieve.  It may very well be that you

18    can come in here and say to me, the proof is now, the medical

19    proof is uncontrovertible that the only effect this has is

11:30:41    20    placebo.  And, as a result, I don't know, let's say 20 percent

21    placebo for everybody that takes the pill, you have a whole

22    bunch of people who don't buy it, their sales plummet, and you

23    come in here and say this shows the public value of what we

24    have done in this case, we have forced them to do something

11:31:05    25    that the FDA doesn't do because they don't exercise the

1   jurisdiction, we have forced them to give honest information to

2   consumers, and as a result of this the consumers aren't buying

3   it, and they shouldn't buy, and this is a great benefit and

4   now, Your Honor, after the last 6 months or year has passed we

11:31:26   5   can tell you, this is the benefit we have brought, and you can

6   come in here and say we underestimated what this was worth to

7   the public and we want more as a reward for our public service.

8   And I understand that usually the last thing you want

9   to say to a lawyer is, wait for your money.  We have many

11:31:46   10   practitioners of law in the United States -- what was that

11   great line?  It was a criminal defense lawyer.  It turned out

12   to be true, I can't remember his name, it was a guy in the

13   1940's, 1930's, famous New York defense lawyer, when somebody

14   would call him and tell him what their trouble was and seek to

11:32:19   15   come and discuss this with him, he would stop them within a

16   minute or two of their description and his answer was "I don't

17   listen, I don't think, I do not wish to hear until I receive"

18   and then he mentioned whatever amount it was.

19   So, basically, I understand why this may not be the

11:32:46   20   most attractive possible result for you.  It also seems to me

21   to be significant in light of the argument that even the

22   objector is making, because the objector is making certain

23   assumptions about what people would or would not do under these

24   circumstances and she doesn't know either.  This is her best

11:33:15   25   guess.  And this proposal is your best guess.  Why should I

1    guess when I don't have to guess?  And why don't I adopt a

2    structure that says wait and see on the money?  And in a

3    situation where your only incentive is the money possibly can

4    get bigger, but probably you think it won't, and if I were in

11:33:41    5    your shoes I wouldn't think it's going to get any bigger

6    either.

7            Go ahead.

8            MR. WELTMAN:  May I answer the question?

9            THE COURT:  Because I wanted you to understand exactly

11:33:48    10    what I'm thinking.

11           MR. WELTMAN:  I understand.

12           Your Honor, if that were a possibility "maybe" would

13    be my response, but it's not a possibility.  You can't

14    prospectively try to figure out what the -- you know, you

11:34:07    15    can't, like, start to say today we've got a benchmark, this is

16    the yearly sales of Osteo Bi-Flex, and then they're going to

17    implement the labeling change, and now let's see what the

18    yearly sales are.  There's no -- you can't -- there may be

19    other people who buy the product for different reasons, but you

11:34:28    20    are not going to be able to measure the amount of people who

21    don't buy the product because of the removal of a key

22    misrepresentation.

23           THE COURT:  Oh, that part I don't have a problem with.

24           MR. WELTMAN:  So I don't know how we prove up the fact

11:34:40    25    that --

1    THE COURT:  You just take a look at what their sales

2  are, what percentage of the market they had, if they had any

3  percentage, and what percentage of the market the drugs

4  themselves had.  From that, you have a chance of making a

11:34:53   5  reasonable inference that this change was instrumental.  Was it

6  entirely instrumental?  Maybe not.

7    Examine, for example, if you want to take an extreme

8  example, you set out this thing saying "it absolutely doesn't

9  help" and then somebody in Sweden discovers that if you don't

11:35:14  10  take glucosamine with water from pure springs you increase your

11  cancer risk by 15 percent.  Well, I think that would put a dent

12  in glucosamine sales and it would have absolutely nothing to do

13  with what's on the label.  So there are lots of things that

14  could, theoretically, happen, but I'm still better off in terms

11:35:43  15  of knowledge if I take a look at what happens to sales

16  post-correction of the label.  Maybe its not the most accurate

17  thing, but it's better than what I got now.

18    MR. WELTMAN:  Well, actually, I submit to you, Your

19  Honor, that it's not better, and here's why, all right:  We

11:36:03  20  don't know what -- Osteo Bi-Flex is not prohibited from going

21  on a big marketing campaign and pushing their product based

22  upon the representations they have now.  We will never be able

23  to know how many people don't buy the product in the future as

24  a result of removal of these representations, but what we do

11:36:25  25  know, we do know right now is that if this injunctive relief is

1    put in place, then that particular misrepresentation will never

2    be made again, and that's an important goal.

3              THE COURT:  But why do we know that it is important?

4    We don't know it's important, and, on top of it, we don't know

11:36:45   5    how important it is.

6              MR. WELTMAN:  We do.  We submitted to Your Honor

7    documents or evidence in consumer surveys as late as 2011 that

8    show that a very high -- I can't disclose it because it's under

9    seal, but if you can take a look at the report of Dr. Reutter,

11:37:02   10   in 2011 there was a consumer survey that showed a very high

11   percentage of people think of this representation is a key

12   representation.  So you are now eliminating what we contend to

13   be a false representation in the future, that's the important

14   point.

11:37:21   15            THE COURT:  Swell.  But the fact is is what effect

16   does this have on the market.  Are people stopping from buying

17   this stuff.  And if they're stopping buying this stuff, are

18   they stopping it because of what you have gotten done or are

19   they stopping it for some other reason.  If they're stopping it

11:37:40   20   because something else raises its head, what you did is you

21   made a terrific effort to eliminate something and it turned out

22   not to matter.

23            MR. WELTMAN:  Well, let's assume nobody stops buying

24   it, okay.

11:37:55   25            THE COURT:  Yeah.

1       MR. WELTMAN:  Let's put that hypothetical in front of

2  us.  We've just eliminated the representation that we believe

3  is false and people still continue to buy it.  Even then, even

4  then, the consumer fraud policies and purposes behind the

11:38:13     5  consumer fraud laws have been furthered because now they're

6  making purchases based upon the absence of this representation

7  which we contend is fraudulent.

8       So it's a free world, people can make purchased

9  decisions based upon other things, but we have eliminated, if

11:38:33    10  this settlement is approved, what we contend to be a false

11  representation.  And if people continue to purchase the same

12  levels, that's what they do.

13       The estimate that Dr. Reutter prepared --

14       THE COURT:  But what's the value?

11:38:46    15       MR. WELTMAN:  What's the value?

16       THE COURT:  Yes.

17       MR. WELTMAN:  The value is is in the marketplace there

18  should be truthful information.

19       THE COURT:  And what are you attaching to the dollars?

11:38:55    20  I'm trying attach dollars to this.

21       MR. WELTMAN:  Well, we've attempted to do that based

22  upon --

23       THE COURT:  Well, and that's my problem, it's an

24  attempt.

11:39:02    25       MR. WELTMAN:  Okay.

1       THE COURT:  That's my problem, it's an attempt.  That

2  there is a value to it --

3       You are leaping to his aid?

4       MR. CARTON:  Well, if I may offer a word or two, Your

11:39:14  5  Honor?

6       MR. WELTMAN:  Sure.  Be my guest.

7       MR. CARTON:  Thank you.

8       Your Honor, Jeffrey Carton of Denlea & Carton.

9       As interesting as the colloquy is, my concern is that

11:39:22  10  the Court's question sort of ignores altogether the value that

11  is otherwise being achieved in terms of the pool compensation

12  and address that's being made available to class members.

13       Your Honor doesn't have --

14       THE COURT:  Wait.  Wait.  Wait.  Stop.  I started with

11:39:37  15  this premise not that that didn't count, what you're talking

16  about.  I started with the premise that likely the greatest

17  value, if there is value in this, comes from what happens in

18  the future, not the past.  If you want to tell me that paying a

19  fair number of people relatively small amounts of money to

11:40:01  20  compensate them?  Yeah, that is a value.  It's exactly the kind

21  of value that I'm trying to find with respect to future sales,

22  and it's dollars and it counts.  What we're in the business

23  here of discussing is, what's the worth of that, how does that

24  contribute to the worth of these individual people, and how do

11:40:27  25  we measure the compensation to class counsel.

1     MR. CARTON:  Yes, and I appreciate that.  And I think

2  we framed that discussion with the information that's available

3  to the parties at this moment in time.

4     THE COURT:  Yes, absolutely no question you're doing

11:40:43    5  it with respect to what's happening now.

6     MR. CARTON:  Correct.  And what we do in that respect,

7  and it may be an imperfect science, but we do our very best to

8  value two aspects of the resolution:  We value the aspect of

9  the recompense that we've provided to class members, which is

11:40:59  10  an unlimited pool which is available to all consumers, all

11  households, and then what we try and do at the same time, Your

12  Honor, is obviously do our best to provide a basis by which to

13  value that future relief.  And that future relief is value

14  based upon what we --

11:41:13  15     THE COURT:  I got that.

16     MR. CARTON:  Okay.

17     THE COURT:  What you have misunderstood that the only

18  thing I was talking about is the value and the change of the

19  label, that's the only thing I was talking about.  I am not

11:41:27  20  talking about the compensation.  Although to tell you the

21  truth, the fees requested in this case for compensation of

22  those who sold is likely to be significantly smaller than the

23  compensation that would be awarded if the future actions were

24  significant.  But I've said my piece and I understand your

11:41:58  25  piece.

1    MR. CARTON:  Thank you.

2    MR. WELTMAN:  Your Honor, if I could just make a

3  couple more comments?

4    THE COURT:  Sure.

11:42:04   5    MR. WELTMAN:  What Your Honor is asking is that at

6  some point in the future, I don't know, 2 years after, whenever

7  the labeling changes are made, is that we commission what would

8  be an extremely expensive study to try to figure out what the

9  causes are for whether or not -- whether --

11:42:26  10    THE COURT:  I have a short answer for you for that.

11    MR. WELTMAN:  Yeah.

12    THE COURT:  You can get somebody to tell me how they

13  value and tell me how much it would cost.

14    MR. WELTMAN:  Well, Your Honor, another way, again,

11:42:40  15  and the law looks at it this way, forget about the value of the

16  injunctive relief, just look at it as injunctive relief.  It is

17  injunctive relief, it's a significant label change.  And in the

18  context --

19    THE COURT:  Okay, except you're starting on a

11:42:55  20  significant label change and I have no way of measuring whether

21  that is true or not.  Maybe it's not significant, maybe it

22  turns out not to be significant.

23    MR. WELTMAN:  We've submitted to you contemporaneous

24  documents in the defendants' own records that show that it's a

11:43:09  25  key representation to a lot of consumers.

1          THE COURT:  I understand that that stuff is there, but

2    the truth of the matter is, I don't know how valid their things

3    are.  So it's much better to take a look at this stuff on what

4    has actually happened as opposed to something in the future.

11:43:29    5    And as a matter of general policy, one of the most difficult

6    things with courts is trying to evaluate the effective future

7    injunctive relief.

8          Now, evaluating the future injunctive relief really is

9    not much of a problem if, for example -- what was that, and

11:43:54   10    this is the FDA that did this, that pain-killing drug that

11    drove people nuts because it was about the only thing that

12    worked, killed the pain of surgeries that involved screwing

13    something into a bone to separate two bones.  It was a month of

14    television of people getting up and saying, you know, I can't

11:44:17   15    walk anymore because they've taken this drug off the market.

16    And they took it off the market because it did have adverse

17    effects.  I can't remember the name.  But that one, that's

18    pretty clear, you can get a pretty good idea.

19          But you're talking now about a mass market product,

11:44:37   20    you're talking about a widely advertised product, and maybe

21    putting that change in that letter on those words on the box

22    isn't going to have much of an impact.  Now, do you want me to

23    tell you it's not going to have much of an effect?  I don't

24    know.  It might be massively effective, but I don't want to

11:44:58   25    make a judgment based on a guess where I don't have to guess,

1   where I can get much closer to a rational assessment of the

2   value of this, and it might be very substantial.  That's where

3   I am.

4          Let me hear from the objector.

5          MS. HOLYOAK:  I just wanted to respond, Your Honor, to

6   the fact that they are arguing that their fee should be based

7   on the advancement of a social goal.  A class action is not a

8   private AG type of action.  They're not supposed to be rewarded

9   for trying to further social goals and social norms.

10         I understand that Your Honor wants empirical evidence,

11  okay, is it a tiny effect, a large effect.  It really doesn't

12  matter.  If it has enormous effect for the public, maybe that's

13  great, but they should not be compensated for that fact.  And

14  the Seventh Circuit recognizes that.  Because who are their

15  clients?  The class members.  And how are their class members

16  being compensated?  And Synfuel shows that injunctive relief

17  that we're talking about does not compensate them for those

18  past injuries.

19         THE COURT:  I'm glad you said that because I was

20  pretty sure that's exactly what you were going to say, but as I

21  have approached this case, I'd like to actually hear it as

22  opposed to guessing what you were going to say.  Thanks.

23         MS. HOLYOAK:  Understand, Your Honor.  Thank you.

24         THE COURT:  I will probably ask for some additional

25  papers.  I think from the point of view of the defendants in

1  this case, there's probably not a lot they want to say.  They

2  just want it, I think, to be over.  But the issue basically,

3  and you can give me a paper on it, on behalf of class counsel,

4  as to your views, duly considered probably after consulting

11:47:18  5  with experts, as to whether and to what degree it is possible I

6  might be in a much better position to decide the value of the

7  services after a period of some length.  I'm not even

8  specifying the length because you may find experts who are

9  going to tell you about -- and there have been cases which I've

11:47:43  10  dealt with where you judge stuff on the initial effect, maybe

11  two or three, four months in, and there are some you can't tell

12  for a while.

13       So you may want to address on the hypothetical that I

14  choose to wait, you might want to address the issue as to how

11:48:04  15  long do I wait.  And, obviously, you have some interest in

16  having that period be as short as possible, and maybe you can

17  defend the position that in three or four months we'll know

18  whether this had any effect.

19       At any rate, I am not going to rule today.  Let me set

11:48:33  20  this for mid November.

21       MS. MC CALL:  Your Honor, could I be heard on one

22  thing?

23       THE COURT:  Absolutely.

24       MS. MC CALL:  Thank you.

11:48:45  25       THE COURT:  You've been so silent.

1    MS. MC CALL:  I just wanted to make clear.  It sounded

2  like all of the discussions today is about the reasonableness

3  of the attorney's fee award and I didn't really hear the

4  objector, or, quite frankly, Your Honor, expressing any

5  concerns about the reasonableness of the compensation that's

6  being provided to the class, i.e., the reasonableness of the

7  settlement itself putting aside what the order of attorney's

8  fees might be.

9    And, you know, we have looked into this and the

10  Seventh Circuit does allow a final judgment without deciding

11  attorney's fees.  It allows attorney's fees to be decided --

12    THE COURT:  I am very well aware of that.

13    MS. MC CANN:  Okay.  Because our position would be,

14  we think that the settlement can be approved as final without

15  having to decide the attorney's fees.

16    THE COURT:  That's absolutely true.

17    MS. MC CANN:  Okay.

18    THE COURT:  Although, there's one thing you should

19  understand, and that is, I am unlikely to excuse you from the

20  case, because if I decide on some method of evaluation, there

21  will be data that I will need from you, from your clients.

22    MS. MC CANN:  Understood.  Understood.

23    THE COURT:  All right.  That's fine.

24    Thanks.

25    Give them a date.

1          THE CLERK:  Wednesday, November 20th at 9:30.

2

3

4      (Which concluded the proceedings had on this date in

5       the above entitled cause.)

6

7

8

9                 *     *     *     *     *     *     *     *

10

11

12   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

13        RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

14

15

16

17              /s/Blanca I. Lara                    date

18

19

20

21

22

23

24

25